Brook Brisson (AK Bar No. 0905013)
Suzanne Bostrom (AK Bar No. 1011068)
Bridget Psarianos (AK Bar No. 1705025)
Brian Litmans (AK Bar No. 0111068)
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
Fax: (907) 276-7110
bbrisson@trustees.org
sbostrom@trustees.org
bpsarianos@trustees.org
blitmans@trustees.org

*Attorneys for Plaintiffs Gwich'in Steering
Committee, Alaska Wilderness League, Alaska Wildlife Alliance
Canadian Parks & Wilderness Society-Yukon,
Defenders of Wildlife, Environment America,
Friends of Alaska National Wildlife Refuges,
National Wildlife Federation, National
Wildlife Refuge Association, Northern
Alaska Environmental Center, Sierra Club,
The Wilderness Society, and Wilderness
Watch*

Karimah Schoenhut (*pro hac vice*)
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
50 F St., NW 8th Floor
Washington, DC 20001
Phone: (202) 548-4584
Fax: (202) 547-6009
karimah.schoenhut@sierraclub.org

*Attorney for Plaintiff Sierra Club*

# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| GWICH'IN STEERING COMMITTEE, ALASKA WILDERNESS LEAGUE, ALASKA WILDLIFE ALLIANCE, CANADIAN PARKS & WILDERNESS SOCIETY-YUKON, DEFENDERS OF WILDLIFE, ENVIRONMENT AMERICA, INC., FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES, NATIONAL WILDLIFE FEDERATION, NATIONAL WILDLIFE REFUGE ASSOCIATION, NORTHERN ALASKA ENVIRONMENTAL CENTER, SIERRA CLUB, THE WILDERNESS SOCIETY, and WILDERNESS WATCH, | Case No. 3:20-cv-00204-SLG |

Plaintiffs,

v.

DAVID BERNHARDT, in his official capacity as Secretary of the Interior, UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, and U.S. FISH & WILDLIFE SERVICE,

Defendants.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
(Alaska National Interest Lands Conservation Act, §§ 303(2)(B), 304(a), Pub. L. No. 96-487, 94 Stat. 2371 (1980) & 16 U.S.C. §§ 3101–3233; National Wildlife Refuge System Administration Act, 16 U.S.C. §§ 668dd–668ee; National Environmental Policy Act, 42 U.S.C. §§ 4321–4370j; Tax Cuts and Jobs Act, Pub. L. 115-97, tit. 2, § 20001; Wilderness Act, 16 U.S.C. §§ 1131–1136; Endangered Species Act, 16 U.S.C. §§ 1531–1544; Administrative Procedure Act, 5 U.S.C. §§ 702–706)

Plaintiffs Gwich'in Steering Committee, Alaska Wilderness League, Alaska

Wildlife Alliance, Canadian Parks & Wilderness Society-Yukon, Defenders of Wildlife,

Case 3:20-cv-00204-SLG   Document 19   Filed 11/02/20   Page 2 of 76

Environment America, Inc., Friends of Alaska National Wildlife Refuges, National Wildlife Federation, National Wildlife Refuge Association, Northern Alaska Environmental Center, Sierra Club, The Wilderness Society, and Wilderness Watch (collectively, Plaintiffs) file this Complaint for Declaratory and Injunctive Relief, alleging:

## I.     NATURE OF THE CASE

1.     The Coastal Plain of the Arctic National Wildlife Refuge (Arctic Refuge) is iconic and sacred. It provides habitat for numerous fish and wildlife species, including caribou, polar bears, birds, and wolves. It offers exceptional recreational experiences, in large part because of its incredible wilderness and wildlife values. Most critically, it is sacred land to the Gwich'in Nation, Indigenous people of Alaska and Canada, because of the importance of the Coastal Plain to the Porcupine Caribou Herd and the deep cultural and spiritual connection between the Gwich'in and the caribou.

2.     Because of its exceptional subsistence, wildlife, habitat, and cultural values, the Coastal Plain has been protected under federal law for decades. Those protections prohibited oil and gas leasing and development in the area.

3.     This protected status changed in 2017. A rider to tax reform legislation allowed for an oil and gas leasing program on the Coastal Plain. The U.S. Department of the Interior (DOI) and the Bureau of Land Management (BLM) have since rushed to

_____
FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 3 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

complete their environmental review and adopt an extensive and harmful leasing program.

4. In issuing the final environmental impact statement (EIS) and signing the record of decision (ROD), BLM failed to comply with numerous federal statutes and regulations that impose important protections for the lands and resources on the Coastal Plain. These laws require thorough, transparent, and careful analysis of the impacts of BLM's decision. The agency's failure threatens the exceptional resources of the Coastal Plain and the subsistence, cultural, and spiritual connection between the Gwich'in People and the Coastal Plain.

5. The U.S. Fish and Wildlife Service (FWS) issued a Biological Opinion (BiOp) in support of the final EIS and ROD. FWS determined the leasing program would not jeopardize polar bears on the Coastal Plain nor adversely modify their critical habitat. In making this determination, FWS relied on mitigation measures that are not reasonably certain to occur, and failed to consider the best available science, the impacts of the entire leasing program on designated critical habitat, and the contribution of the leasing program to climate change. BLM relied on the BiOp to adopt the leasing program. FWS violated the Endangered Species Act (ESA) and the Administrative Procedure Act (APA) because its consultation with BLM was deficient and its determinations in the BiOp are arbitrary and capricious. BLM violated the ESA by unreasonably relying on the BiOp to conclude that the leasing program would not jeopardize the survival and recovery of

polar bears or destroy or adversely modify the species' designated critical habitat, and by failing to reinitiate consultation with FWS.

6.     This action arises under, and alleges violations of: the Alaska National Interest Lands Conservation Act (ANILCA), §§ 303(2)(B), 304(a), Pub. L. No. 96-487, 94 Stat. 2371 (1980) and 16 U.S.C. §§ 3101–3233; Title II of the Tax Cuts and Jobs Act, Public Law 115-97, Section 20001 (Tax Act); the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370j, and implementing regulations; the National Wildlife Refuge System Administration Act (Refuge Act), 16 U.S.C. §§ 668dd–668ee, and implementing regulations; the Wilderness Act, 16 U.S.C. §§ 1131–1136; the ESA, 16 U.S.C. §§ 1531–1544, and implementing regulations; and the APA, 5 U.S.C. §§ 701– 706.

7.     Plaintiffs bring this action to invalidate BLM's unlawful final EIS, ROD, and ANILCA Section 810 Final Evaluation, FWS's deficient BiOp, BLM's reliance on the BiOp, and any related or subsequent decisions based on those documents.

8.     Plaintiffs seek vacatur and declaratory and injunctive relief against the Secretary of the Interior, DOI, BLM, and FWS. The agencies' actions and decisions fail to comply with applicable law, are arbitrary, capricious, an abuse of discretion, and not in accordance with the law, in excess of statutory authority, and without observance of the procedure required by law. 5 U.S.C. § 706(2).

## II.   JURISDICTION AND VENUE

9.       This Court has jurisdiction over the parties and subject matter of this action under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (action to compel mandatory duty), 28 U.S.C. § 2201 (declaratory relief), 28 U.S.C. § 2202 (injunctive relief), and 16 U.S.C. § 1540(g) (ESA citizen suit provision).

10.      Pursuant to 16 U.S.C. § 1540(g)(2)(A), on August 24, 2020, Plaintiffs provided 60 days' notice of intent to sue to DOI, BLM, and FWS regarding BLM's unreasonable and unlawful reliance on the BiOp, in violation of the ESA to ensure against jeopardy and destruction or adverse modification of critical habitat for the polar bear. Plaintiffs urged DOI and BLM to reinitiate consultation. A copy of the notice letter is attached as Exhibit A. Defendants have not remedied the violations to date.

11.      The BLM's final EIS, ROD, and ANILCA Section 810 Final Evaluation, and FWS's BiOp are final agency actions for which Plaintiffs have a right to judicial review under the APA. 5 U.S.C. §§ 701–706.

12.      Defendants' sovereign immunity is waived pursuant to the APA. 5 U.S.C. § 702.

13.      Venue is proper in the District of Alaska under 28 U.S.C. § 1391(a)–(c) and (e), as well as 16 U.S.C. § 1540(g)(3)(A), because a substantial part of the events giving rise to the claims occurred within the BLM Alaska State and Arctic District Offices, and the FWS Alaska Regional Office, because many groups are primarily located in or

maintain offices in Alaska, and because the lands at issue in the case — the Coastal Plain of the Arctic National Wildlife Refuge — are located in Alaska.

## III.    PARTIES

<u>Plaintiffs</u>

14.    Plaintiff Gwich'in Steering Committee is a 501(c)(3) nonprofit organization based in Fairbanks, Alaska. The Gwich'in Steering Committee is a voice for the 8,000 members of the Gwich'in Nation speaking out to protect the sacred calving and nursery grounds of the Porcupine Caribou Herd — the Coastal Plain. The Gwich'in Steering Committee was formed in 1988 in response to proposals to drill for oil in the Coastal Plain. The Gwich'in Steering Committee represents the communities of Arctic Village, Venetie, Fort Yukon, Beaver, Chalkyitsik, Birch Creek, Canyon Village, Circle, and Eagle Village in Alaska, and Old Crow, Fort McPherson, Tsiigehtchic, Aklavik, and Inuvik in Canada. The mission of the Gwich'in Steering Committee is to ensure the long-term health and viability of the Porcupine Caribou Herd, which sustains the Gwich'in way of life. Protecting the Coastal Plain and the Porcupine Caribou Herd is a human rights issue for the Gwich'in People. The Gwich'in Steering Committee is dedicated to protecting the entire ecosystem that the caribou rely on so that the Gwich'in People will have a future in their homeland. As depicted in the map below, the traditional homelands

of the Gwich'in generally follow the migratory path of the Porcupine Caribou Herd, but because of how sacred the Coastal Plain is to the Gwich'in, the area is not visited:



The Gwich'in Steering Committee's goal is to permanently protect the Coastal Plain of the Arctic Refuge. Gwich'in leaders have advocated for permanent protection of the Coastal Plain of the Refuge for decades, since before the passage of the Alaska National Interest Lands Conservation Act. The Gwich'in Steering Committee engages in numerous activities to advocate for permanent protection of the Refuge, including public

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 8 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

outreach and education, media work, public speaking, and attending conferences and events. The Gwich'in Steering Committee has submitted comments on numerous Refuge decisions and has presented testimony to Congress, the United Nations Special Rapporteur on Indigenous Peoples, and at public hearings on the EIS. The Gwich'in Steering Committee submitted extensive comments on the draft EIS, including raising issues under ANILCA section 810 and subsistence use of the Coastal Plain's resources.

15.     Plaintiff Alaska Wilderness League (AWL) is a nonprofit organization founded in 1993 with approximately 100,000 members and supporters, including many members in Alaska. AWL's mission is to galvanize support to secure vital policies that protect and defend America's last great wild public lands and waters. AWL advocates for the protection of Alaska's wild lands and waters and works to prevent environmental degradation on Alaska's public lands and waters, including the Arctic Refuge. AWL actively works on issues related to oil and gas development and the protection of the Arctic Refuge. AWL is committed to honoring the human rights and traditional values of the people of the Arctic.

16.     Plaintiff Alaska Wildlife Alliance (AWA) was founded by Alaskans in 1982 to protect intact ecosystems so that our state's wildlife can be managed for biodiversity and the benefit of present and future generations. AWA as over 300 members and supporters. AWA and its members speak out against energy development that unduly threatens vulnerable Alaskan ecosystems and species, including BLM's

Case 3:20-cv-00204-SLG   Document 19   Filed 11/02/20   Page 9 of 76

leasing program for the Coastal Plain. AWA is particularly concerned about impacts on Coastal Plain ecosystems and wildlife, including but not limited to the endangered Steller's eider and Beaufort Sea Polar bears, as well as millions of migrating and nesting shorebirds, the Porcupine and Central Arctic caribou herds, and muskoxen. In addition to threatening wildlife, the leasing program violates the rights of Alaska Natives to subsist on this vibrant landscape. AWA views the Coastal Plain as one of the last unspoiled wild areas in the world, and seeks to ensure that protections guaranteed in its designation are honored for future generations of Alaskans and wildlife.

17. Plaintiff Canadian Parks and Wilderness Society – Yukon Chapter (CPAWS Yukon) is one of thirteen chapters of the Canadian Parks and Wilderness Society, which has over 40,000 supporters across Canada. CPAWS Yukon has approximately 220 members and over 2,000 supporters. It was founded in 1992 by Yukoners who wanted to bring attention to conservation issues in the Yukon Territory. CPAWS Yukon aims to preserve vast tracts of the Yukon's most beautiful and ecologically important lands and waters. CPAWS Yukon supports fair and democratic land-use planning that respects the rights of Yukon First Nations, engages all Yukoners, and recognizes the importance of protected areas as a means to promote ecological integrity and a sustainable future for the Yukon. CPAWS Yukon works on issues related to oil and gas activities on the Coastal Plain of the Arctic Refuge, which have the potential to harm the Porcupine Caribou Herd, which is critical to the culture and

subsistence ways of life for Indigenous peoples across northern Yukon and into the Northwest Territories.

18.     Plaintiff Defenders of Wildlife (Defenders) is a nonprofit conservation organization and one of the nation's leading advocates for endangered species and wildlife. Founded in 1947, Defenders is headquartered in Washington, D.C. and maintains six regional offices throughout the country, including in Anchorage, Alaska. Defenders represents approximately 1.8 million members and supporters nationwide and around the world, including more than 6,000 in Alaska. Defenders uses education, public outreach, science, policy, and litigation, along with legislative and administrative advocacy, to defend the species, ecosystems, and habitats that are central to the organization's mission, including on the Arctic National Wildlife Refuge. Defenders has worked for decades to safeguard the Arctic Refuge from destructive oil and gas development. Protecting this vital unit of the National Wildlife Refuge System is key to implementing Defenders' vision to ensure that diverse wildlife populations are secure and thriving, sustained by a healthy and intact network of lands and waters. Defenders also works to support implementation of the FWS's Polar Bear Conservation and Recovery Plan, and to reduce any conflicts or impacts to polar bears and other wildlife that may arise from current or proposed development activities in the Arctic Refuge and elsewhere in the Arctic.

19.     Plaintiff Environment America, Inc. (Environment America) is an advocacy group comprised of twenty-nine affiliate organizations and members and supporters in every state, including Alaska. Environment America works to protect air, water, and open spaces. Environment America engages in independent environmental research and advocates for policies by lobbying and mobilizing the public. Environment America has worked to raise awareness about the harmful impacts of oil and gas on public lands, including the Arctic Refuge, and the need to protect our natural heritage over fossil fuel extraction.

20.     Plaintiff Friends of Alaska National Wildlife Refuges (Friends) is a nonprofit organization founded in 2005 and based in Homer, Alaska. It is a volunteer group that works to assist FWS to accomplish its congressionally-mandated mission for the sixteen national wildlife refuges in Alaska. Friends promotes the conservation of all Alaska National Wildlife Refuges by helping to protect and enhance their habitats and wildlife, including the Arctic Refuge, and by assisting the FWS through outreach to decision-makers and testimony before Congress.

21.     Plaintiff National Wildlife Federation (NWF), one of America's largest conservation organizations, has worked across the country to unite Americans from all walks of life in giving wildlife a voice for over eighty years. NWF has 51 state and territorial affiliates, including an Alaska affiliate, and more than 6 million members and supporters, including hunters, anglers, gardeners, birders, hikers, campers, paddlers, and

other outdoor enthusiasts. NWF programs work to protect the 600 million acres of public lands owned by all Americans and has a longstanding interest in ensuring these lands are managed properly for fish, wildlife, and communities.

22.     Plaintiff National Wildlife Refuge Association is a non-profit organization focused exclusively on protecting and promoting the 850 million-acre National Wildlife Refuge System, the world's largest network of lands and waters set aside for wildlife conservation. Founded in 1975, its mission is to conserve America's wildlife heritage for future generations through strategic programs that enhance the National Wildlife Refuge System and the landscapes beyond its boundaries. With approximately 80% of the land mass of the National Wildlife Refuge System in Alaska, the National Wildlife Refuge Association has throughout its history focused significant resources on protecting and enhancing Refuge System resources in Alaska, including the Arctic Refuge.

23.     Plaintiff Northern Alaska Environmental Center (Northern Center) is an Alaska nonprofit environmental organization founded in 1971 with over 900 members, sixty percent of whom are located throughout Alaska. The Northern Center's mission is to promote the conservation of the environment and sustainable resource stewardship in Interior and Arctic Alaska through education and advocacy. One of the Northern Center's major focus areas is its Arctic program. The Northern Center actively works to protect the Arctic, its communities, and vital wildlife habitats and wildlands, including the Arctic Refuge, from the harms associated with oil and gas development. The Northern Center

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 13 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

also works to amplify the voices of local populations impacted by development. The Northern Center participates in agency decision-making processes related to oil and gas development in the Arctic, including the challenged action. The Northern Center provides its members and the public with information about the impacts of oil and gas on the Arctic, enabling members to participate as well.

24.     Plaintiff Sierra Club is the nation's oldest and largest grassroots environmental organization. The Sierra Club is a national nonprofit organization of approximately 800,000 members dedicated to exploring, enjoying, and protecting the wild places of Earth; to practicing and promoting the responsible use of the Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment, and to using all lawful means to carry out these objectives. The Alaska Chapter of the Sierra Club has approximately 1,800 members. The Sierra Club's concerns encompass a variety of environmental issues in Alaska, and the organization has long been active on issues related to the protection of the Coastal Plain of the Arctic Refuge.

25.     Plaintiff The Wilderness Society is a nonprofit organization headquartered in Washington, D.C., with offices throughout the country, including a six-person staff in Alaska. Its overall mission is to protect wilderness and inspire Americans to care for wild places. The Wilderness Society has close to a million members and supporters, many of whom are in Alaska. The goal of its Alaska program is to permanently protect special

places in America's Arctic and sub-Arctic, including in the Arctic Refuge. The Wilderness Society has been engaged in Arctic Refuge conservation efforts for decades, and has consistently participated in public processes associated with Arctic Refuge decisions. Among other areas of focus, staff from The Wilderness Society work to advance scientific understanding and conservation policy for highly migratory caribou and fish resources that utilize much of the landscape to complete their life cycles.

26.     Plaintiff Wilderness Watch is a nonprofit organization founded in 1989. Its mission is to defend the nation's 111-million-acre National Wilderness Preservation System. Wilderness Watch advocates for appropriate stewardship according to the requirements of the Wilderness Act of 1964. Wilderness Watch monitors agency stewardship of designated Wilderness in Alaska and organizes its members to participate in public processes in Alaska, including the Arctic Refuge, that impact designated Wilderness.

27.     Plaintiffs participated actively in the administrative process related to the oil and gas leasing program by submitting public comments, engaging with experts to review the analysis, giving oral testimony, and engaging their millions of members and supporters to participate in support of Coastal Plain protection to achieve organizational missions and goals. Plaintiffs also have an interest in ensuring that DOI, BLM, and FWS comply with applicable laws.

_____

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 15 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

28. Plaintiffs' members and supporters work, visit, and recreate in and around the Arctic Refuge and on the Coastal Plain, including those lands and waters on the Coastal Plain that are open to oil and gas leasing and activities under BLM's decision, and plan to return to the Coastal Plain. Plaintiffs' members and supporters also live in and around the Arctic Refuge. Plaintiffs' members and supporters use the Coastal Plain and depend on the health of the subsistence resources in the Coastal Plain and its vicinity to support their subsistence way of life, including to maintain cultural and spiritual practices and their identity. Plaintiffs' members and supporters have health, subsistence, cultural, economic, recreational, scientific, environmental, aesthetic, educational, conservation, and other interests in the Coastal Plain of the Arctic Refuge. Plaintiffs' members and supporters enjoy or use wildlife that inhabit these areas, in particular caribou, polar bears, and birds. Plaintiffs' members and supporters recreate on the Coastal Plain in multiple seasons because of its exceptional wilderness values and the exceptional visitor experience.

29. These interests, their members' and supporters' use and enjoyment of the Coastal Plain and adjacent areas, and the resources present in the area and that rely on the area, have been, are being, and will continue to be adversely affected by oil and gas program and activities in the Coastal Plain, including leasing the Coastal Plain. The leasing program, leasing, and oil and gas activities allowed by the lease program — including seismic exploration — will degrade and harm the natural environment and

wildlife and habitat used and enjoyed by the Plaintiffs' members and supporters, thereby harming the interests of Plaintiffs' members and supporters. The oil and gas lease program, and activities enabled by the lease program and lease sale, will also impede Plaintiffs' members' ability to access subsistence resources in the region or to use subsistence resources that rely on the Coastal Plain, and impact cultural and spiritual connections and traditions.

30.     BLM's adoption of a leasing program in violation of NEPA, ANILCA, the Refuge Act, the Tax Act, the Wilderness Act, and the ESA threatens imminent irreparable harm to the interests of the Plaintiffs and their members. The agency's failure to adhere to mandated procedures and its reliance on a flawed analysis also harms Plaintiffs' and their members' and supporters' ability to engage in the public process and ensure informed decision making and compliance with statutory protections otherwise mandated for the Coastal Plain.

31.     These actual, concrete injuries suffered by Plaintiffs and their members and supporters are fairly traceable to BLM's adoption of the leasing program in violation of the substantive and procedural protections of these laws, and would be redressed by the relief sought in this case.

32.     FWS's deficient BiOP in violation of the ESA and APA threatens imminent, irreparable harm to the interests of Plaintiffs and their members and supporters to the Southern Beaufort Sea (SBS) population of polar bears. These actual, concrete

injuries suffered by Plaintiffs and their members and supporters are fairly traceable to the deficient BiOp for the leasing program and would be redressed by the relief sought in this case.

Defendants

33.     Defendant David Bernhardt is the Secretary of the Interior and is being sued in his official capacity. Secretary Bernhardt is the official ultimately responsible under federal law for ensuring that the actions and decisions of BLM and FWS comply with all applicable laws and regulations. Secretary Bernhardt is the official who signed the ROD.

34.     Defendant DOI is an agency of the United States responsible for oversight of BLM and FWS.

35.     Defendant BLM is an agency within DOI. Under the Tax Act, it is responsible for management of a competitive oil and gas program including the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain.

36.     Defendant FWS is an agency within DOI and is charged with administering units of the national wildlife refuge system, including the Arctic Refuge, and with administering the ESA for polar bears (in addition to other terrestrial species).

## IV.     STATEMENT OF FACTS

The Exceptional Values of the Coastal Plain of the Arctic Refuge

_____

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 18 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

37.     The Arctic Refuge is iconic among America's wildlife refuges. Many consider it to be the crown jewel of the National Wildlife Refuge System, the largest system of public lands and waters managed for wildlife conservation in the world. At over 19 million acres, the Arctic Refuge is America's largest and wildest national wildlife refuge. It encompasses boreal forests in the south, glaciers in the Brooks Range, the highest peak in Arctic Alaska, numerous braided rivers and natural springs, and the Coastal Plain that borders the Beaufort Sea to the north.

38.     Its over 1.5-million-acre Coastal Plain is a vibrant and ecologically rich area that has been referred to as the "Serengeti of the Arctic" and is recognized as the biological heart of the Arctic Refuge. It is rare and important habitat for many animals, including caribou, polar and grizzly bears, birds, ice seals, musk oxen, and wolves.

39.     The Porcupine Caribou Herd migrates annually through Alaska and Canada, traveling upwards of 2,700 miles per year — the longest overland migration of any terrestrial mammal. The Porcupine Caribou Herd relies on the Coastal Plain for calving, post-calving, and insect relief habitat, and as a source of high-protein nutrition away from predators.

40.     The herd's migratory path brings it to the Coastal Plain in the early summer, as early as May, where, in a frenzy of activity, the tens of thousands of calves are born within a few days of each other. The caribou cows find plentiful and high-protein food on the Coastal Plain to nourish and replenish them after their long journey

and the stress of birth. The insect relief attributes of the Coastal Plain are also critical to the herd. The relentless insects of the Arctic are a major problem for the caribou and can even lead to death. The winds, coastline, and aufeis (areas of ice buildup along rivers) provide critical and potentially life-saving insect relief.

41. The Arctic Refuge lies at the heart of the traditional homelands of the Gwich'in people. As they have since time immemorial, the Gwich'in Nation of Alaska and Canada relies heavily on the Porcupine Caribou Herd for subsistence and as the foundation of their culture. Indeed, Porcupine caribou are so central to the lives of the Gwich'in that they call themselves the "caribou people," and the Gwich'in name for the Coastal Plain is "Iizhik Gwats'an Gwandaii Goodlit" — which translates to "the Sacred Place Where Life Begins."

42. The relationship between the caribou and the Gwich'in is guided by the belief that the caribou have a piece of the Gwich'in in their heart and the Gwich'in have a piece of the caribou in their heart. As a result, the Gwich'in made a pact with the caribou to protect them so the caribou can continue to provide for the Gwich'in. The Gwich'in have maintained their cultural identity and connection to the Arctic Refuge and the Coastal Plain for millennia.

43. Gwich'in traditional knowledge instructs that the caribou will be harmed by the development of the Coastal Plain, the sacred calving and nursery grounds of the Porcupine Caribou Herd.

Case 3:20-cv-00204-SLG   Document 19   Filed 11/02/20   Page 20 of 76

44. The Coastal Plain also provides denning habitat for polar bears, which are protected as a threatened species under the ESA. Polar bear populations have been reduced to a precarious state due to impacts from climate change, which will only worsen as warming in the Arctic region continues.

45. The Coastal Plain has the highest density of onshore polar bear denning habitat in America's Arctic. This is because the topography of the Coastal Plain, where the rivers and hills of the Coastal Plain create areas of deep snow drifts, is uniquely different from the rest of Alaska's Arctic. These areas where snow accumulates are ideal denning sites for pregnant polar bears. Maternal denning habitat includes corridors between the dens and the coast, as polar bears move along riverine corridors, traveling between their dens and food sources.

46. The abundant plants and insects available in the summer also allow many bird species to nest and forage on the Coastal Plain, which they do as part of their annual migrations through all of North America's flyways and, remarkably, to six continents. Birds begin returning to the Coastal Plain in the spring and remain through late summer and into early fall.

47. The Arctic Refuge is our nation's premiere wilderness Refuge and the wilderness values of the Coastal Plain are incomparable. The untrammeled nature provides unique opportunities to study and understand ecosystems and functions on a landscape scale. The integrity of the ecosystems provides unique habitat to numerous

wildlife species. The undeveloped and undisturbed character of the area offers world-class wilderness recreation opportunities. The Coastal Plain also boarders the 8-million acre Mollie Beattie Wilderness area within the Arctic Refuge.

48.     In short, the ecological, cultural, and wilderness values of the Coastal Plain are exceptional.

<u>The Imperiled Southern Beaufort Sea Population of Polar Bears</u>

49.     In 2008, FWS published its final rule listing the polar bear as a threatened species under the ESA. FWS, Determination of Threatened Status for the Polar Bear (Ursus maritimus) Throughout Its Range, 73 Fed. Reg. 28,212 (May 15, 2008). FWS also published a Special Rule for the Polar Bear, 73 Fed. Reg. 76,249 (Dec. 16, 2008), which specifies the protective measures that apply to the polar bear because of its threatened status.

50.     The Coastal Plain has the highest density of onshore polar bear denning habitat for polar bears in America's Arctic. FWS designated critical habitat for polar bears in Alaska in 2011, including barrier island, sea ice, and terrestrial denning habitat. Designation of Critical Habitat for the Polar Bear (Ursus maritimus) in the United States, 75 Fed. Reg. 76,086, 76,088–91 (Dec. 7, 2010). The vast majority of BLM's oil and gas leasing program area is land designated as terrestrial denning critical habitat.

Case 3:20-cv-00204-SLG   Document 19   Filed 11/02/20   Page 22 of 76

51. The proportion of females denning on land has increased significantly as sea ice diminishes due to climate change. Polar bears are particularly vulnerable to sea ice melt given their life history and specialized habitat needs.

52. The Southern Beaufort Sea (SBS) population is among the most imperiled polar bear populations in the world, having declined dramatically since the 1990s. In addition to climate change, polar bears in the SBS population face threats from a wide range of industrial activities, including onshore and offshore oil and gas development and increased shipping. They are also subject to subsistence hunting and mortality due to interactions with humans where there is a perceived threat to life and property.

53. The data and information on the population dynamics for the SBS polar bears are outdated and incomplete.

54. Noise and visual disturbance from human activity and operation of equipment, especially aircraft and vehicle traffic, have the potential to disturb polar bears nearby. Disturbance of maternal females during the winter denning period can result in premature den abandonment, or earlier den emergences and departures, adversely affecting polar bear cub survival.

<u>BLM's Coastal Plain Leasing Program Process</u>

55. In April 2018, BLM began the National Environmental Policy Act (NEPA) process for the Coastal Plain leasing program when it published a notice of intent to prepare an environmental impact statement for the Coastal Plain oil and gas program in

the Federal Register. Notice of Intent to Prepare an Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing Program, Alaska, 83 Fed. Reg. 17,562 (Apr. 20, 2018).

56.     Numerous groups, including Plaintiffs, and hundreds of thousands of individuals submitted comments to the agency. Plaintiffs' comments outlined myriad legal, technical, and resource issues that the agency needed to thoroughly explain and review before adopting a leasing program.

57.     In spring 2018, working in conjunction with the Arctic Slope Regional Corporation and Kaktovik Inupiat Corporation, SAExploration, Inc. (SAE) applied to BLM for an authorization to conduct three-dimensional (3D) seismic exploration on the Coastal Plain.

58.     According to SAE's Plan of Operations, the goal of its proposal was to identify potential targets for future lease sales on the Coastal Plain. SAE proposed to conduct seismic activities across the entire Coastal Plain, including its lagoons, over the course of two winter seasons.

59.     Several groups, including Plaintiffs and scientific experts on Coastal Plain resources, submitted comments to BLM on the proposed seismic application. These comments explained that the agency should evaluate seismic exploration as part of the Leasing Program EIS, in addition to other issues.

60.    BLM has yet to approve or reject SAE's proposal to conduct seismic exploration on the Coastal Plain. According to BLM statements in a Petroleum News article, as of August 13, 2020, BLM paused its processing of the application, pending BLM's receipt of an updated plan from SAE. To date, BLM has not released a NEPA document analyzing the impacts of SAE's seismic exploration project and application, nor has the agency addressed these comments.

61.    In December 2018, BLM released the draft environmental impact statement (EIS) for the Coastal Plain leasing program and the ANILCA Section 810 Preliminary Evaluation.

62.    Plaintiffs and over one million individuals submitted comments on BLM's draft EIS. The majority of these comments opposed the oil and gas program.

63.    BLM's draft EIS considered a no-action alternative (Alternative A) and three action alternatives — Alternatives B, C, and D, with Alternative D having two subalternatives, Alternatives D1 and D2.

64.    In comments on the draft EIS, Plaintiffs criticized BLM's consideration of alternatives, noting that the agency failed to consider a reasonable range of alternatives and failed to consider numerous viable alternatives. Letter from Alaska Wilderness League et al. to Nicole Hayes, Project Manager, BLM (Mar. 13, 2019).

65.    Plaintiffs proposed multiple alternatives or components of alternatives that provided more protections for the Coastal Plain's resources. Plaintiffs explained how

_____

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 25 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

each proposed alternative or component would be consistent with applicable statutory mandates, including the Tax Act. *Id.*

66. In their comments, Plaintiffs also explained how BLM's proposed program was inconsistent with ANILCA's and the Refuge Act's conservation purposes for the Coastal Plain and otherwise failed to comply with the Refuge Act and ANILCA. *Id.*

67. Plaintiffs also submitted comments criticizing BLM's interpretation and application of the 2,000-acre limitation on surface development. *Id.*

68. Plaintiffs submitted extensive comments on the faults and errors with BLM's analysis of direct, indirect, and cumulative impacts of the proposed oil and gas leasing program for numerous resources. Plaintiffs commented on BLMs failure to consider any site-specific impacts, transboundary impacts, and impacts from climate change, in addition to other fundamental failings. *Id.*

69. These comments also included criticisms of the lease stipulations and required operating procedures, as well as the analysis of the affected environment and environmental consequences for greenhouse gas emissions and climate change, air quality, water, polar bears, caribou, wilderness and recreation, soils, permafrost, vegetation, and wetlands, and subsistence uses and resources, in addition to many others. *Id.*

_____

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 26 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

70.     Plaintiffs also commented extensively on BLM's failures to analyze the impacts to or propose measures for the protection of the wilderness characteristics of the Mollie Beattie Wilderness. *Id.*

71.     Plaintiffs, and in particular the Gwich'in Steering Committee, submitted extensive comments criticizing BLM's ANILCA Section 810 Preliminary Evaluation and the related draft EIS analysis, including raising BLM's failure to consider all affected Gwich'in communities in the analysis, its incomplete and faulty conclusions about the impacts of an oil and gas program on the subsistence resources relied on by the Gwich'in, including caribou and birds, and its incorrect conclusion that the oil and gas leasing program would not significantly restrict subsistence uses for the Gwich'in. *Id.*; Letter from Gwich'in Steering Committee to Nicole Hayes, Project Manager, BLM (Mar. 13, 2019).

72.     BLM did not analyze either the proposed SAE seismic program or the potentially significant impacts of seismic exploration in general on polar bears, tundra, vegetation, permafrost, and other resources in the draft EIS — issues that Plaintiffs raised in their comments. Letter from Alaska Wilderness League et al. to Nicole Hayes, Project Manager, BLM.

73.     Plaintiffs also pointed out that the draft EIS failed to examine impacts to the SBS polar bear population or explain how such impacts could be avoided or mitigated. *Id.* at 273–95.

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

74.    The draft EIS did not adequately consider how current levels of lethal take will adversely affect individual SBS polar bears or the population as a whole, including the cumulative effects to the population when combined with the additional impacts of oil and gas activities on the Coastal Plain. *Id.*

75.    BLM did not consider a range of alternatives or enforceable mitigation measures sufficient to offer a meaningful difference in impacts to polar bears and their critical habitat.

76.    The draft EIS relied primarily on the use of forward looking infrared (FLIR) camera surveys to detect denning bears in advance of activities as a means to mitigate impacts. Plaintiffs submitted comments, including technical analysis from polar bear expert Dr. Steven Amstrup, explaining why such surveys are not effective given recent research demonstrating their shortcomings. *See id.*; Letter from Sierra Club to Nicole Hayes, Project Manager, BLM (Mar. 13, 2019) (attaching Letter from Dr. Steven Amstrup to Nicole Hayes, Project Manager, BLM (Mar. 8, 2019)). In fact, research suggests that a 50% detection rate is probably close to the highest that could reasonably be expected from FLIR surveys. Letter from Sierra Club to Nicole Hayes, Project Manager, BLM, (Sept. 18, 2019) (attaching Letter from Dr. Steven Amstrup to Nicole Hayes, Project Manager, BLM (Sept. 17, 2019)); *see also* Tom Smith *et al.*, *Efficacy of aerial forward-looking infrared surveys for detecting polar bear maternal dens*, 15 PLOS ONE 2 (2020) (finding FLIR detection success rate of only 45% based on empirical data

from a set of industry surveys of northern Alaska). Detection success rates for the Coastal Plain are likely be even lower than the 45% observed in other areas of northern Alaska because of the deeper snow drifts and higher wind speeds prevailing on the Coastal Plain.

77.     In September, BLM issued the final EIS and ANILCA Section 810 Final Evaluation for the leasing program, and identified Alternative B as the preferred alternative. EPA, Environmental Impact Statements, Notice of Availability, 84 Fed. Reg. 49,521 (Sept. 20, 2019).

78.     In the final EIS, BLM modified the acreage available for lease under Alternative D2 to 800,000 acres. 1 U.S. Dep't of the Interior, Bureau of Land Mgmt., Coastal Plain Oil and Gas Leasing Program Final Environmental Impact Statement at 2-3 (2019) [hereinafter FEIS]. Otherwise, BLM did not analyze any new alternatives, including the other alternatives proposed by Plaintiffs.

79.     BLM did not explain its failure to consider an alternative that would not allow seismic exploration on areas not offered for lease in the final EIS. *See* 1 *id.* at 2-44.

80.     BLM did not explain its failure to consider a phased-leasing alternative in the final EIS. *See id.*

81.     BLM did not adequately consider the purposes of the Coastal Plain or ensure that the oil and gas program would protect these purposes, and failed to consider the three purposes of the public land order setting the Refuge aside in 1960. *Id.* at 3-296 to -297; 2 *id*. at app. D at D-3. BLM stated, summarily, that the action alternatives

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 29 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

Case 3:20-cv-00204-SLG   Document 19   Filed 11/02/20   Page 29 of 76

"account for all purposes of the Arctic Refuge." 1 *id.* at 1-2. However, the final EIS does not indicate how the purposes will be met and BLM failed to analyze the impacts to all purposes from the proposed program. *Id.* at 3-296 to -297.

82.     Despite the concerns identified by Plaintiffs and numerous other commenters, BLM's final EIS still failed to adequately analyze the affected environment, the environmental consequences, or ways to mitigate the impacts to numerous resources, including but not limited to greenhouse gas emissions and climate change, air quality, water, polar bears, caribou, wilderness and recreation, soils, permafrost, vegetation and wetlands, and subsistence uses and resources.

83.     In the final EIS, BLM only considered one mitigation measure to protect the wilderness characteristics of the 8-million acre Mollie Beattie Wilderness: a 3-mile buffer around the area that would prohibit surface occupancy and/or not offer those areas for lease, and would also require aircraft to avoid flights below 2,000 feet within the buffer. This measure, however, only applied to Alternative D. *Id.* at 2-18. BLM did not propose, analyze, or adopt other mitigation measures to protect wilderness characteristics of the Mollie Beattie Wilderness and the Coastal Plain. BLM otherwise failed to properly evaluate the impacts of an oil and gas program on the wilderness characteristics of the Mollie Beattie Wilderness and the Coastal Plain. *Id.* at 3-304 to -306.

84.     BLM set out its interpretation of the 2,000-acre limit on surface development of production and support facilities. *Id.* at 1-6 to -7; 2 *id.* at app. S at S-3 to -

_____

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 30 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

9. BLM stated that it cannot authorize anything less than 2,000 acres of development for surface facilities under the terms of the Tax Act. 1 *id.* at 2-44. This interpretation set out what components of oil and gas activities would be included in the limitation. *Id.* It also informed BLM's development scenario and impacts analysis for each alternative. *Id*. at 1-7, 2 *id.* at app. S at S-4; *id.* app. B at B-10, B-22 to -26.

85.     Additionally, BLM explained that it would allow acreage to be reclaimed and then new acreage to be developed, potentially in excess of 2,000 acres over time (but not more than 2,000 acres could be authorized at any given time). *Id.* at app. S at S-5 to -6. In other words, BLM treated the 2,000-acre limitation as a rolling limitation, not a cumulative cap and applied this interpretation to each action alternative. *Id.*

86.     BLM identified the areas of high, medium, and low hydrocarbon potential, including for each action alternative. 1 *id.* 3-46 to -47, 2 *id*. at app. A at Map 3-6, 3-7, 3-8 & 3-9, app. B at B-3 to -5 & Map B-1

87.     BLM's ANILCA Section 810 Final Evaluation relied primarily on the information and analysis in the final EIS. 2 *id.* at app. E at E-2. In the ANILCA Section 810 Final Evaluation, BLM evaluated the impact of the oil and gas leasing program on only four communities: Kaktovik, Nuiqsut, Arctic Village, and Venetie — and failed to evaluate the impacts of an oil and gas leasing program on other communities, despite recognizing many additional communities have subsistence-use connections to Coastal Plain resources. *Id.* at E-3 to -4.

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 31 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

88.    In evaluating the impacts of each alternative on these four communities, BLM incorrectly determined that the alternatives would not significantly restrict subsistence uses for Arctic Village and Venetie. *Id.* at E-4 to -20.

89.    The subsistence resources that BLM evaluated included only fish, marine mammals, and caribou; BLM failed to consider other important food sources that make up the wild foods consumed by the Gwich'in. *Id.* at E-3.

90.    BLM also failed to incorporate the extensive traditional knowledge shared by the Gwich'in about the impacts of oil and gas on their subsistence uses and traditional practices of Coastal Plain resources in the ANILCA Section 810 Final Evaluation.

91.    BLM did not hold a formal ANILCA section 810 hearing or make formal findings under ANILCA section 810(a)(3) for any Gwich'in village.

92.    BLM included Lease Notice 2, which provides that BLM will not approve any exploration or development activity with the potential to "take" marine mammals unless the applicant/operator applies for and provides documentation of compliance with relevant take authorization(s) under the MMPA prior to commencement of oil and gas activities. 1 *id.* at 2-43. Lease Stipulation 5 provides the following requirement/standard: "[c]omply with ESA and [MMPA] requirements." *Id.* at 2-11.

93.    In the final EIS, BLM repeatedly stated that it lacks authority to preclude activities on leases that are "necessary" for "access" to carry out the oil and gas program. *See, e.g.*, 2 *id.* at app. S at S-223.

---

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 32 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

94.     FWS released a modeling study in December 2019 that quantitatively evaluated the impacts to denning bears and cubs on the Coastal Plain from an area-wide seismic survey, taking into account the impact of mitigation measures. Ryan Wilson & George Durner, *Seismic Survey Design and Effects on Maternal Polar Bear Dens*, 84 Jour. Wild. Mgmt. 201 (2019). The study found that extensive timing and geographic restrictions on seismic activities would be needed to protect denning bears and ensure compliance with the Marine Mammal Protection Act (MMPA).

95.     On March 13, 2020, FWS issued the programmatic BiOp for the leasing program analyzing impacts to polar bears and other protected species under FWS's jurisdiction. FWS, Biological Opinion for Coastal Plain Oil and Gas Leasing Program Arctic National Wildlife Refuge (Mar. 13, 2020) [hereinafter BiOp]. The cover letter transmitting the BiOp to BLM lists the documents upon which FWS relied in preparing the BiOp. That list includes the draft EIS, but not the final EIS.

96.     The BiOp concluded that BLM's decision to open the entire Coastal Plain to leasing as described under Alternative B, and subsequent lease sales, will not jeopardize the survival and recovery of polar bears or result in the destruction or adverse modification of the species' designated critical habitat. *Id.* at 128.

97.     The BiOp acknowledges that there could be harm to polar bears, but did not attempt to quantify those harms or incidental take, stating that the locations of specific exploration and development activities are unknown at the leasing stage and that

quantifying take is not be possible at this stage. *Id*. at 113. The BiOp did not include an incidental take statement.

98.     The BiOp did not acknowledge or discuss the recent FWS study quantitatively estimating the extent of take from area-wide seismic surveys, despite assuming such a survey would occur within two years of the first lease sale. *Id*. at 15.

99.     FWS identified four project design criteria (PDC) that it stated would ensure compliance with Section 7(a)(2) of the ESA. *Id*. at 107–08. Most relevant here are PDCs 1 and 2. PDC 1 provides that, through a "lease notice," BLM will require documentation of compliance with the MMPA before BLM will authorize any on-the-ground oil and gas activities. *Id* at 107. PDC 2 provides that BLM will conduct future "step-down" ESA consultation on a project-by-project basis. *Id*. at 107.

100.     Throughout the BiOp, FWS relies on future MMPA compliance as the primary mechanism to ensure against jeopardy to the polar bear under the ESA. *Id*. at 114–16. In relying on future mitigation measures put in place via future MMPA authorizations, FWS failed to discuss recent studies finding that traditional den detection methods failed to detect the majority of known polar bear maternal dens. The BiOp also failed to address whether a "lease notice" would provide adequate authority to preclude activities on leases in light of DOI and BLM's interpretations of the Tax Act, the MMPA, and the legal effect of "lease notices."

---

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 34 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

101. Regarding critical habitat, the BiOp does not attempt to quantify the total extent of impacts from the program. The BiOp assumes that MMPA compliance and future ESA consultations will ensure against any destruction or adverse modification. *Id*. at 123. The BiOp does not explain this assumption in light of the fact that the MMPA does not include an express standard addressing protection or consideration of designated critical habitat; nor does it address FWS's comments stating that MMPA compliance would not prevent habitat loss due to behavioral avoidance of structures after the construction period. Nor does it address that future consultations will not address the totality of the program's impacts. The BiOp also relies on an interpretation of the 2,000-acre limit under the Tax Act that would restrict the total surface footprint of the oil and gas facilities to no more than 2,000 acres at any point in time. *Id*.

102. The BiOp does not consider the impacts of the direct or indirect greenhouse gas emissions from the Coastal Plain oil and gas development or production on exacerbating climate change related impacts on polar bears. It relies on a May 14, 2008 FWS policy memo to say that such analysis of indirect emissions is not required due to the unavailability of scientific information. The BiOp fails to address existing scientific and technical information that has become available in the last decade that demonstrates such an analysis can indeed be conducted for polar bears.

103.    On August 17, 2020, Secretary Bernhardt signed the ROD for the leasing

program. U.S. Dep't of the Interior & BLM, Coastal Plain Oil and Gas Leasing Program

Record of Decision (2020) [hereinafter ROD].

104.    The ROD adopted Alternative B as the Coastal Plain Leasing Program, the

most extensive alternative considered in the final EIS, opening "the entire program area"

to oil and gas leasing, "and consequently for future potential exploration, development,

and transportation." *Id.* at 2–3.

105.    The ROD adopted the lease stipulations and required operating procedures

(ROPs) considered in the final EIS under that alternative (with only minor changes to two

ROPs and one lease notice). *Id.* at 3, 5; *id.* at app. A.

106.    The ROD stated that the leasing program protects the ANILCA purposes of

the Coastal Plain, but acknowledged that there will be "some potential impact on the

other four purposes." *Id.* at 7–8. The ROD did not discuss the original purposes of the

Arctic National Wildlife Range.

107.    The ROD did not adopt the interpretation of the 2,000-acre limitation set

forth and applied in the final EIS. *Id.* at 2, 4, 5. The ROD indicated that BLM would not

apply the "rolling cap" approach from the final EIS that would have allowed additional

infrastructure beyond the initial 2,000 acres once the previously impacted areas had been

"reclaimed." *Id.* at 12–13. However, the ROD also contained a new interpretation of the

2,000-acre limit that identified and defined what facilities could be included within that

limitation. *Id.* at 11–13. The ROD explained that many facilities that were assumed to be within the 2,000-acre limitation in the final EIS may not actually be counted toward that limitation, including airstrips, barge landings, roads, and gravel mines. *Id*. at 13. BLM based this new interpretation on its conclusion that the facilities counting toward the 2,000-acre limitation needed to be both "production *and* support facilities." *Id.* at 12. The ROD explained that "support" facilities that could be attributed to any other phase of oil and gas activities, such as transportation, exploration, or development, would not be limited by the 2,000-acre cap. In other words, the agency indicated that under this new interpretation that it could authorize far more than 2,000 acres of infrastructure to be present on the Coastal Plain at any given point in time. However, the ROD also stated that the agency would not make specific determinations about which facilities would count toward the 2,000 acres until later in time. *Id.* at 12–13.

108. BLM stated that making the entire Coastal Plain available for leasing will ensure that it is offering the highest hydrocarbon potential areas for lease, and that the agency cannot know which areas have the highest potential until exploration drilling occurs. *Id*. at 17.

109. BLM stated its position in the ROD that it cannot refuse to issue a right-of-way grant or other authorizations necessary for access and that its discretion is superseded by the Tax Act. *Id.* at 9–10.

_____

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 37 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

110. The ROD stated that BLM consulted with FWS on its leasing program in order to fulfill its obligations under section 7(a)(2) of the ESA. *Id*. at 21. The ROD summarized the ESA consultation and recommendations from FWS's BiOp. *Id*. at 23–24.

111. The ROD summarized the ANILCA Section 810 Final Evaluation from the final EIS. *Id*. at 24–27.

## V.    LEGAL BACKGROUND

112. Because of its abundant wildlife and ecological importance, efforts to protect the Arctic National Wildlife Refuge began in the mid-1950s. The area was first formally set aside and granted federal protections in 1960 when it was designated as the Arctic National Wildlife Range (Range). Public Land Order 2214, Establishing the Arctic National Wildlife Range at 1 (Dec. 6, 1960). The Range was designated "for the purpose of preserving unique wildlife, wilderness and recreational values." *Id.*

Alaska National Interest Lands Conservation Act

113. Following statehood and various attempts to address Indigenous land claims and federal conservation land designations, the Alaska National Interest Lands Conservation Act (ANILCA) was passed in 1980. 94 Stat. 2371 (Dec. 2, 1980).

114. Congress passed ANILCA "[i]n order to preserve for the benefit, use, education, and inspiration of present and future generations certain lands and waters in the State of Alaska that contain nationally significant natural, scenic, historic,

archeological, geological, scientific, wilderness, cultural, recreational, and wildlife values." ANILCA § 101(a), 16 U.S.C. § 3101(a).

115.    ANILCA has a broad purpose focused on conservation and subsistence:

It is the intent of Congress in this Act to preserve unrivaled scenic and geological values associated with natural landscapes; to provide for the maintenance of sound populations of, and habitat for, wildlife species of inestimable values to the citizens of Alaska and the Nation, including those species dependent on vast relatively undeveloped areas; to preserve in their natural state extensive unaltered arctic tundra, boreal forest, and coastal rainforest ecosystems; to protect the resources related to subsistence needs; to protect and preserve historic and archeological sites, rivers, and lands, and to preserve wilderness resource values and related recreational opportunities, including but not limited to hiking, canoeing, fishing, and sport hunting, within large arctic and subarctic wild lands and on free-flowing rivers; and to maintain opportunities for scientific research and undisturbed ecosystems.

ANILCA § 101(b), 16 U.S.C. § 3101(b).

116.    Congress also specifically stated that a purpose of ANILCA was to "provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so." ANILCA § 101(c), 16 U.S.C. § 3101(c).

117.    In ANILCA, Congress re-designated the Range as the Arctic National Wildlife Refuge. ANILCA § 303(2)(A). Congress added additional acreage to the south and west of the Range to expand the re-designated Arctic Refuge. *Id.*

118.    Congress recognized four specific purposes for the Arctic Refuge, in addition to those recognized in the 1960 Public Land Order and ANILCA more generally. The ANILCA purposes for the Arctic Refuge are:

(i)     to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, the Porcupine caribou herd (including participation in coordinated ecological studies and management of this herd and the Western Arctic caribou herd), polar bears, grizzly bears, muskox, Dall sheep, wolves, wolverines, snow geese, peregrine falcons and other migratory birds and Arctic char and grayling;

(ii)    to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;

(iii)   to provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents, and

(iv)    to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge.

*Id*. § 303(2)(B).

119.    ANILCA section 305 also recognized that existing protective mandates not in conflict with ANILCA would remain in place:

[a]ll proclamations, Executive orders, public land orders and other administrative actions in effect on the day before the date of the enactment of this Act with respect to units of the National Wildlife Refuge System in the State shall remain in force and effect except to the extent that they are inconsistent with this Act or the Alaska Native Claims Settlement Act, and in such case, the provisions of such Acts shall prevail.

120.    The original three purposes of the Range and the four additional ANILCA purposes are all statutory purposes that apply to the Coastal Plain. ANILCA § 305; FWS, Arctic Nat'l Wildlife Refuge Revised Comprehensive Conservation Plan and Envtl. Impact Statement at 1-21 (Jan. 2015).

121.     ANILCA section 304(c) also withdrew all National Wildlife Refuges "from all forms of appropriation or disposal under the public land laws, including location, entry and patent under the mining laws."

122.     Additionally, Congress designated the majority of the Range (approximately 8 million acres, excluding the Coastal Plain) as Wilderness. ANILCA § 702(3). This Wilderness area was subsequently named the Mollie Beattie Wilderness after the first female director of the U.S. Fish and Wildlife Service.

123.     The potential development of the Coastal Plain for oil and gas was also addressed in ANILCA. Other than authorizing a one-time surface exploration program that has now expired, ANILCA § 1002(a)–(h), 16 U.S.C. § 3142(a)–(h), ANILCA section 1003 imposed a prohibition on oil and gas development in the Arctic Refuge, including the Coastal Plain. 16 U.S.C. § 3143. The Coastal Plain was also specifically "withdrawn from all forms of entry or appropriation under the mining laws, and from operation of the mineral lease laws, of the United States." ANILCA § 1002(i), 16 U.S.C. § 3142(i).

124.     Title VIII of ANILCA recognizes that subsistence uses are a public interest and provides a framework to consider and protect subsistence uses in agency decision-making processes. 16 U.S.C. §§ 3111–3126. In enacting Title VIII, Congress found that "the continuation of the opportunity for subsistence uses . . . is essential to Native physical, economic, traditional, and cultural existence." ANILCA § 810(1), 16 U.S.C 3111(1).

125.    ANILCA broadly defines "subsistence use" as "the customary and traditional uses by rural Alaska residents of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation; for the making and selling of handicraft articles out of nonedible byproducts of fish and wildlife resources taken for personal or family consumption; for barter, or sharing for personal or family consumption; and for customary trade." ANILCA § 803, 16 U.S.C. § 3113.

126.    Under ANILCA section 810, if an agency is going to withdraw, reserve, lease, or otherwise allow the use, occupancy, or disposition of land, the agency conducts what is often referred to as a "tier-1 analysis" to determine the proposed action's impact on subsistence uses. ANILCA § 810(a), 16 U.S.C. § 3120(a). The agency "shall evaluate the effect of such use, occupancy, or disposition on subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes." *Id.* In doing so, the agency must also consider cumulative impacts.

127.    If the agency conducts the tier-1 analysis and determines that the activities will not "significantly restrict subsistence uses," then the agency issues a Finding of No Significant Restriction and section 810's requirements are met. *Id.*

128.    ANILCA also mandates that the agency provide public notice and hold hearings in potentially affected communities if it makes a finding that the action may

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 42 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

significantly restrict subsistence uses under section 810. ANILCA § 810(a)(2), 16 U.S.C. § 3120(a)(2).

129. If the agency finds that the proposed action would "significantly restrict subsistence uses," the agency then conducts a "tier-2" analysis. In that analysis, the agency can only move forward if it finds that the restriction on subsistence is necessary and consistent with sound public land management principals; involves the minimum amount of public lands necessary to accomplish the purpose of the proposed action; and the agency takes reasonable steps to minimize the adverse impacts to subsistence uses and resources. ANILCA § 810(a)(1)–(3), 16 U.S.C. § 3120(a)(1)–(3).

130. When an agency prepares an EIS under NEPA, the ANILCA section 810 evaluation is included as part of that process. ANILCA § 810(b), 16 U.S.C. § 3120(b).

131. To guide administration of refuges in Alaska, ANILCA states that "[e]ach refuge shall be administered by the Secretary . . . in accordance with the laws governing the administration of units of the National Wildlife Refuge System, and this Act." ANILCA § 304(a).

132. ANILCA also mandates that for Wilderness, "[e]xcept as otherwise expressly provided for in this Act wilderness designated by this Act shall be administered in accordance with applicable provisions of the Wilderness Act governing areas designated by that Act as wilderness." *Id.* § 707.

_____

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 43 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

Case 3:20-cv-00204-SLG   Document 19   Filed 11/02/20   Page 43 of 76

National Wildlife Refuge System Administration Act

133.    The National Wildlife Refuge System Administration Act (Refuge Act) governs the administration of the entire National Wildlife Refuge System. 16 U.S.C. § 668dd. It mandates that the Secretary, acting solely through FWS, administer and manage the National Wildlife Refuge System, which includes the Arctic Refuge. *Id.* § 668dd(a)(1).

134.    The mission of the National Wildlife Refuge System "is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." *Id.* § 668dd(a)(2); *see also* 50 C.F.R. § 25.11(b).

135.    Under the Refuge Act, each refuge "shall be managed to fulfill the mission of the System, as well as the specific purposes for which that refuge was established." 16 U.S.C. § 668dd(a)(3)(A); *see also* 16 U.S.C. § 668ee(10) (defining "purposes of the refuge" to include those "purposes specified in or derived from the law, . . . [or] public land order . . . establishing, authorizing, or expanding a refuge, refuge unit, or refuge subunit").

136.    The Refuge Act also identifies multiple purposes for administration of the National Wildlife Refuge System, including "conservation of fish, wildlife, and plants, and their habitats," "ensur[ing] that the biological integrity, diversity, and environmental

health of the System are maintained," and "to contribute to the conservation of the ecosystems of the United States." *Id.* § 668dd(a)(4)(A–C); *see also* 50 C.F.R. § 25.11(b).

The Wilderness Act

137. In passing the Wilderness Act, Congress sought "to secure for the American people of present and future generations the benefits of an enduring resource of wilderness." 16 U.S.C. § 1131(a).

138. To achieve this goal, it established the National Wilderness Preservation System and mandated that areas designated as Wilderness "be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, the preservation of their wilderness character, and for the gathering and dissemination of information regarding their use and enjoyment as wilderness." 16 U.S.C. § 1131(a).

139. Wilderness is defined in relation to what it is not: is it not areas where man and his own works dominate the landscape. *Id.* § 1131(c). Instead, Wilderness is "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." *Id.*

140. Wilderness is defined as an undeveloped area protected and managed to preserve it:

_____

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 45 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

*Id.*

141.    The Wilderness Act recognizes the following public purposes for Wilderness: "recreational, scenic, scientific, educational, conservation, and historical use." *Id.* § 1133(b).

142.    The Wilderness Act mandates that "each agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character." 16 U.S.C. § 1133(b); *see also id*. § 1133(a) (noting that the purposes of the Wilderness Act supplement the purposes that national wildlife refuges "are established and administered").

<u>Tax Cuts and Jobs Act of 2017</u>

143.    In late 2017, Congress passed An Act to Provide for Reconciliation Pursuant to Titles II and V of the Concurrent Resolution on the Budget for Fiscal Year

2018, Pub. L. 115-97, H.R. 1, title II (Tax Act), which repealed section 1003 of ANILCA as it applied to the Coastal Plain. *Id*. § 20001(b)(1).

144. That legislation directs the Secretary to "establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain." *Id.* § 20001(b)(2)(A).

145. The Tax Act also amended ANILCA section 303(2)(B) (the Arctic Refuge purposes section) to include an additional purpose for the Coastal Plain: "to provide for an oil and gas program on the Coastal Plain." *Id.* § 20001(b)(2)(B)(iii). The Tax Act did not otherwise modify the purposes of the Arctic Refuge or waive or alter any other applicable laws.

146. The Tax Act requires the Secretary to hold two lease sales — the first within four years, the second within seven — from the enactment of that legislation. Each lease sale must offer at least 400,000 acres and include "those areas that have the highest potential for the discovery of hydrocarbons." *Id.* § 20001(c).

147. The Tax Act also limited surface development to a maximum of 2,000 acres for production and support facilities by stating that BLM: "shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any areas covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section." *Id.* § 20001(c)(3).

148.    The National Environmental Policy Act (NEPA) is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).[1] NEPA's twin aims are to ensure that federal agencies take a hard look at the environmental impacts of their proposed actions before taking an action and to ensure that agencies provide relevant information to the public so the public can play a role in both the decision-making process and the implementation of the decision. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, 1502.16. By focusing the agency's attention on the environmental consequences of its proposed action, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after an agency has committed resources. 42 U.S.C. § 4332(2)(C).

149.    NEPA requires federal agencies to prepare a detailed environmental impact statement (EIS) for every major federal action that will have a significant impact on the quality of the human environment. 42 U.S.C. § 4332. An EIS is required to "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers

---

[1] The Council on Environmental Quality (CEQ) recently issued new regulations implementing NEPA, which take effect September 14, 2020. Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act ("Final Rule"), 85 Fed. Reg. 43,304 (July 16, 2020). CEQ's prior regulations govern the EIS and ROD and all references are to those prior regulations.

and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

150. An EIS must consider (1) "the environmental impact of the proposed action," (2) "any adverse environmental impacts that cannot be avoided," (3) "alternatives to the proposed action," (4) "the relationship between local short-term uses . . . and the maintenance and enhancement of long-term productivity," and (5) "any irreversible and irretrievable commitments of resources." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1502.16.

151. The alternatives analysis is the heart of a NEPA document, and NEPA's implementing regulations direct agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). The alternatives considered should include those "that will avoid or minimize adverse effects of the actions upon the quality of the human environment." *Id.* § 1500.2(e).

152. In its alternatives' analysis, the agency must "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." *Id.* § 1502.14; *see also id.* § 1505.1(e). This requires the agency to "[d]evote substantial treatment to each alternative considered in detail . . . so that reviewers may evaluate their comparative merits." *Id.* § 1502.14(b).

153.    An EIS must "state how alternatives considered in it and decisions based on it will or will not achieve the requirements of [NEPA] and other environmental laws and policies." *Id*. § 1502.2(d). For alternatives that are excluded from agency analysis, the agency must explain that decision. *Id.*

154.    NEPA requires agencies to analyze the direct, indirect, and cumulative environmental effects of the alternatives, including the proposed action, as well as the means to mitigate against those adverse environmental consequences. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.14, 1502.16, 1508.7.

155.    An "effect" as used in NEPA and its implementing regulations "includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8(b); *see also id.* § 1508.14 (defining "[h]uman environment . . . to include the natural and physical environment and the relationship of people with that environment").

156.    Direct effects "are caused by the action and occur at the same time and place." *Id.* § 1508.8(a).

157.    Indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). Indirect effects include "induced changes in the pattern of land use" and "related effects on air and water and other natural systems, including ecosystems." *Id.*

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 50 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

Case 3:20-cv-00204-SLG   Document 19   Filed 11/02/20   Page 50 of 76

158. Cumulative impact is defined as:

the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

*Id.* § 1508.7.

159. Mitigation includes consideration of how to avoid impacts completely by not taking a certain action or parts of an action; minimize impacts by limiting the degree or magnitude of the action and its implementation; address the impact by repairing, rehabilitating, or restoring the affected environment; reduce the impact over time through preservation and maintenance; and compensate for the impact. *Id.* § 1508.20.

<u>Endangered Species Act</u>

160. Congress enacted the ESA to protect and conserve threatened and endangered species and the ecosystems upon which they depend. 16 U.S.C. § 1531(b), (c)(1).

161. The goal of the ESA is not only to temporarily save endangered and threatened species from extinction, but also to recover these species to the point where they are no longer in danger of extinction, and thus no longer in need of ESA protection. *Id*. §§ 1531(b) (purposes), 1532(3) (definitions).

162. The National Marine Fisheries Service and FWS jointly administer the ESA. As relevant here, FWS has responsibility for administering the ESA and performing

Case 3:20-cv-00204-SLG   Document 19   Filed 11/02/20   Page 51 of 76

consultations for the polar bear. 50 C.F.R. § 402.01(b). The BLM is the action agency for purposes of the Coastal Plain oil and gas leasing program.

163. Section 7(a)(2) of the ESA obligates federal agencies to ensure "that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species ore result in the destruction or adverse modification of [critical] habitat." 16 U.S.C. § 1536(a)(2).

164. To fulfill this substantive duty, Section 7(a)(2) imposed procedural obligations on federal agencies to consult with FWS. *Id.*

165. The ESA prescribes a multi-step process to ensure compliance with its substantive provisions by federal agencies. A federal agency proposing to take an action must inquire of the Secretary of Interior whether any threatened or endangered species "may be present" in the area of the proposed action. 16 U.S.C. § 1536(c)(1). If the answer is affirmative, the agency shall conduct a biological assessment to determine whether such species "is likely to be affected" by the action. *Id*.

166. If the action agency determines that the action is "likely to adversely affect" the listed species, formal consultation with the Secretary is required. 50 C.F.R. § 402.14(b); *id*. at § 402.02, 402.14(a); 16 U.S.C. § 1536(a)(3). Formal consultation concludes with the FWS's issuance of a biological opinion under Section 7(b)(3) of the ESA. 50 C.F.R. § 402.02. The FWS and the action agency must each utilize the "best

_____

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 52 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

scientific and commercial data available" during the consultation process. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).

167. In a biological opinion, the FWS must determine whether the federal action subject to the consultation is likely to jeopardize the listed species or destroy or adversely modify critical habitat. 16 U.S.C. § 1536(b)(4). The biological opinion must include a summary of the information upon which the opinion is based, an evaluation of the current status of the listed species, the effects of the action, and the cumulative effects. 50 C.F.R. § 402.14(g)(2), (g)(3).

168. The "effects of the action" include "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action." 50 C.F.R. § 402.02. Cumulative effects are "effects of future State or private activities . . . that are reasonably certain to occur within the action area of the Federal action[.]" *Id*.

169. Programmatic consultation is:

a consultation addressing an agency's multiple actions on a program, region, or other basis . . . such as: (1) Multiple similar, frequently occurring, or routine actions expected to be implemented in particular geographic areas; and (2) A proposed program, plan, policy, or regulation providing a framework for future proposed actions.

50 C.F.R. § 402.02.

_____

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 53 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

170. Where an action is authorized by a statute that allows the agency to take incremental steps toward completing the action, the action agency may only proceed with or authorize the incremental steps if:

(1) [t]he biological opinion does not conclude that the incremental step would violate section 7(a)(2); (2) [t]he Federal agency continues consultation with respect to the entire action and obtains biological opinions, as required, for each incremental step; (3) [t]he Federal agency fulfills its continuing obligation to obtain sufficient data upon which to base the final biological opinion on the entire action; (4) [t]he incremental step does not violate section 7(d) of the Act concerning irreversible or irretrievable commitment of resources; and (5) [t]here is a reasonable likelihood that the entire action will not violate section 7(a)(2) of the Act.

50 C.F.R. § 402.14(k).

171. A biological opinion cannot limit its review of an agency action in a manner that segments the analysis and thereby allows for a piecemeal approach to the brink of jeopardy or destruction or adverse modification of critical habitat. *See Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 522–23 (9th Cir. 2010).

172. A biological opinion must analyze the entire action before making a decision that may affect listed species or their habitat, including a programmatic decision. *See Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988).

173. After FWS adds the direct and indirect effects of the action to the environmental baseline and cumulative effects, it must make its determination of "whether the action is likely to jeopardize the continued existence of a listed species." 16 U.S.C. § 1536(b)(3), (b)(4); 50 C.F.R. § 402.14(h). In evaluating whether an action will

jeopardize the continued existence of a listed species, the biological opinion must

evaluate whether the action "reasonably would be expected, directly or indirectly, to

reduce appreciably the likelihood of" the recovery of a listed species in the wild, even if

the Service concludes the action would not reduce the likelihood of survival. *Nat'l*

*Wildlife Fed'n v. Nat'l Marine Fisheries Serv*., 524 F.3d 917, 931–32 (9th Cir. 2008)

(interpreting 50 C.F.R § 402.02).

174.    Where an agency relies upon mitigation measures to ensure against

jeopardy, such mitigation measures must be reasonably certain to occur. *Id.*, 524 F.3d at

936 n.17.

175.    If the biological opinion concludes that an action is likely to result in

jeopardy to a listed species, the biological opinion must set forth the reasonable and

prudent alternatives that would avoid this ESA violation. 16 U.S.C. § 1536(b)(3)(A); 50

C.F.R. §§ 402.02, 402.14(h)(3).

176.    Regardless of the conclusion reached in the biological opinion, the action

agency has an independent duty to ensure that its actions are not likely to jeopardize the

continued existence of listed species. 16 U.S.C. § 1536(a)(2).

177.    An agency cannot satisfy its duty to ensure against jeopardy if it relies on a

legally flawed biological opinion. *Center for Biological Diversity v. U.S. Bureau of Land*

*Mgmt*., 698 F.3d 1101, 1127–28 (9th Cir. 2012). An agency's reliance on a biological

opinion also fails to satisfy its duty to ensure against jeopardy where the action agency

fails to discuss information about the action that would undercut the conclusions of the biological opinion. *Id.*

178.    To satisfy the obligations of ESA section 7(a)(2), the action agency must reinitiate consultation "where discretionary Federal involvement or control over the action has been retained or is authorized by law," and either "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered" or "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence." 50 C.F.R. § 402.16(a)(2), (3).

179.    The ESA prohibits any "person" from "taking" individual members of an endangered species, as well as threatened species protected from such take by species-specific regulations or a "special rule." 16 U.S.C. § 1538(a)(1)(B), (G). For polar bears, the species-specific "special rule" prohibits incidental take from an activity "within the current range of the polar" bear unless the taking has been authorized or exempted under the Marine Mammal Protection Act. 50 C.F.R. § 17.40(q); *see also* 16 U.S.C. § 1361 *et seq.* (regulating killing and disturbance of marine mammals.).

180.    Under the ESA, "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" or any attempt to do the above actions. 16 U.S.C. § 1532(19). "Harm" means an "act which actually kills or injures wildlife. Such act may

include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. "Harass" means "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id*.

181. Incidental take means "takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. § 402.02.

182. If a biological opinion concludes that the agency action is not likely to jeopardize the continued existence of a listed species, but results in incidental take, the Service provides an Incidental Take Statement (ITS) that must include the amount or extent of anticipated take due to the federal action, reasonable and prudent measures to minimize the take, and terms and conditions that must be observed when implementing those measures. 16 U.S.C. § 1536(b)(4).

183. Framework programmatic action means a Federal action that approves a framework for the development of future action(s) that are authorized, funded, or carried out at a later time, and any take of a listed species would not occur unless and until those future action(s) are authorized, funded, or carried out and subject to further section 7 consultation. 50 C.F.R. § 402.02. An incidental take statement is not required for

framework programmatic actions. *Id.* § 402.14(i)(6). Mixed programmatic action means a Federal action that approves an action that will not be subject to further section 7 consultation, and also approves a framework for the development of future actions. *Id.* § 402.02. For a mixed programmatic action, an incidental take statement is required at the programmatic level only for those program actions that are reasonably certain to cause take and are not subject to further section 7 consultation. *Id.* § 402.14(i)(6).

Administrative Procedure Act

184.    Courts review agency actions under the Administrative Procedure Act (APA). 5 U.S.C. §§ 702, 704.

185.    Under the APA, Courts "hold unlawful and set aside agency actions, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in excess of statutory authority, or made "without observance of procedure required by law." *Id.* § 706(2)(A)–(D).

**CLAIMS FOR RELIEF**

**COUNT I**
*(Violation of ANILCA and Refuge Act; Failure to Adopt a Leasing Program Consistent with Purposes of the Coastal Plain)*

186.    Plaintiffs incorporate by reference all preceding paragraphs.

187.    Public Land Order 2214 established three purposes of the Range: "preserving unique wildlife, wilderness and recreational values."

188. ANILCA recognized four additional purposes for the Arctic Refuge:

(i) to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, the Porcupine caribou herd (including participation in coordinated ecological studies and management of this herd and the Western Arctic caribou herd), polar bears, grizzly bears, muskox, Dall sheep, wolves, wolverines, snow geese, peregrine falcons and other migratory birds and Arctic char and grayling;

(ii) to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;

(iii) to provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents, and

(iv) to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and quantity within the refuge.

ANILCA § 303(2)(B).

189. The original three purposes of the Range and the four additional ANILCA purposes all apply to the Coastal Plain and must be given effect. ANILCA § 305; 16 U.S.C § 668ee(10).

190. The Tax Act added an additional purpose for the Coastal Plain: "to provide for an oil and gas program on the Coastal Plain." Pub. L. 115-97, tit. 2, § 20001(b)(2)(B).

191. ANILCA governs the administration of the Arctic Refuge. It mandates that the Arctic Refuge "shall be administered by the Secretary, subject to valid existing rights, in accordance with the laws governing the administration of units of the National Wildlife Refuge system, and this act." ANILCA § 304(a).

_____

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 59 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

192.     The Refuge Act also governs the administration of all refuges and the National Wildlife Refuge System. 16 U.S.C. § 668dd. It mandates that each refuge "shall be managed to fulfill the mission of the System, as well as the specific purposes for which that refuge was established." *Id.* § 668dd(a)(3)(A).

193.     The Secretary failed to adopt an oil and gas program consistent with and protective of the Coastal Plain's conservation purposes because he: (a) disregarded the original Range purposes; (b) failed to consider and adopt an alternative that was consistent with and protective of the seven conservation purposes, (c) failed to consider and adopt lease stipulations and required operating procedures that were consistent with and protective of the conservation purposes, and (d) failed to accurately or adequately analyze and limit the impacts of an oil and gas leasing program on the conservation purposes, in addition to other reasons.

194.     The Secretary also failed to provide an adequate explanation of how the program he adopted complies with and fulfills the seven conservation purposes of the Coastal Plain.

195.     The Secretary's failure to consider and adopt an oil and gas program consistent with and protective of all seven of the conservation purposes of the Coastal Plain of the Arctic Refuge or to adequately explain how the program was consistent with protection of the conservation purposes of the Refuge violates ANILCA and the Refuge Act, and was arbitrary, capricious, and not in accordance with the law and was without

observance of the procedure required by ANILCA, the Refuge Act, and the APA. 5
U.S.C. § 706(2).

## COUNT II
*(Violation of NEPA; Failure to Consider a Reasonable Range of Alternatives)*

196.    Plaintiffs incorporate by reference all preceding paragraphs.

197.    NEPA requires agencies to consider a reasonable range of alternatives. 43
U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500.2, 1502.2, 1502.14, 1505.1. Agencies must, to
the fullest extent possible, include "reasonable alternatives to proposed actions that will
avoid or minimize adverse effects of these actions upon the quality of the human
environment." 40 C.F.R. § 1500.2(e). The EIS must also state how the alternatives
considered will meet both NEPA and other environmental laws and policies, including
the Refuge Act and ANILCA, and must discuss the reasons for eliminating any
alternatives from detailed study. *See id.* §§ 1502.2(d), 1502.14(a).

198.    BLM failed to consider a reasonable range of alternatives in the EIS that
would protect the Coastal Plain's exceptional resources and limit oil and gas development
consistent with law.

199.    BLM failed to consider a reasonable range of alternatives in the Coastal
Plain Leasing Program EIS because BLM failed to consider an alternative or alternatives
that had the potential to reduce the adverse effects on the Coastal Plain and better protect
the purposes of the Arctic Refuge. Viable, unconsidered alternatives or components of

alternatives include, but are not limited to: (a) phased-leasing of only 400,000 acres of the highest hydrocarbon areas; (b) allowing less than 2,000 acres of surface development; (c) prohibiting seismic exploration on areas of the Coastal Plain not offered for lease; and (d) more protective lease stipulations and required operating procedures to protect Coastal Plain resources, uses, and users.

200.    Consideration of a more protective alternative or alternative components would be consistent with BLM's and Department of the Interior's statutory mandates, the purpose and need of the Coastal Plain leasing program, and the nature and scope of the proposed program.

201.    BLM failed to adequately explain its failure to consider viable alternatives that would reduce the impacts to the Coastal Plain and provide more protections for Coastal Plain resources. To the extent BLM provided any explanation for failing to consider viable alternatives, that explanation was arbitrary and capricious.

202.    For each of the above reasons, BLM failed to consider a reasonable range of alternatives, including viable alternatives proposed by the Plaintiffs, rendering the final EIS and ROD arbitrary, capricious, and not in accordance with the law, and its adoption of the final EIS and ROD was done without observance of the procedures required by NEPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

### COUNT III
*(Violation of NEPA; Failure to Assess the Direct, Indirect, and Cumulative Impacts and to Adequately Consider Mitigation Measures)*

203. Plaintiffs incorporate by reference all preceding paragraphs.

204. Pursuant to NEPA, agencies must take a "hard look" at the consequences, environmental impacts, and adverse effects of their proposed actions, consider alternatives to the proposed action, and evaluate mitigation measures. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, 1502.14, 1502.16. NEPA requires that an EIS include an assessment of the cumulative impacts of the proposed action together with the impacts of past, present, and reasonably foreseeable activities. *Id.* § 1508.7.

205. NEPA's implementing regulations require that an EIS discuss the means to mitigate adverse environmental consequences. *Id.* §§ 1502.14(f), 1502.16(h). Mitigation includes, but is not limited to, avoiding, minimizing, rectifying, or compensating for adverse project impacts to the environment. *Id.* § 1508.20.

206. BLM violated NEPA and its implementing regulations in its evaluation and adoption of an oil and gas leasing program because BLM failed to take a hard look at the potential direct, indirect, and cumulative impacts of the Coastal Plain leasing program. These violations include, but are not limited to, BLM's evaluation of the impacts on greenhouse gas emissions and climate change, air quality, water, polar bears, caribou, wilderness and recreation, soils, permafrost, vegetation and wetlands, and subsistence uses and resources. BLM also failed to adequately analyze the impacts from reasonably foreseeable activities related to the oil and gas program, including but not limited to seismic exploration. BLM also failed to take a hard look at the potential impacts

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 63 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

associated with and resulting from a scenario where infrastructure with a footprint exceeding 2,000 acres would be authorized at any given time.

207.    The EIS also fails to provide a reasonably thorough discussion of the effectiveness of mitigation measures to reduce direct, indirect, or cumulative effects from the oil and gas program on Coastal Plain resources. These violations include, but are not limited to, BLM's failure to analyze or prescribe mitigation measures in the form of lease stipulations and/or required operating procedures that will limit the direct, indirect, and cumulative impacts to resources. These resources include, among others: greenhouse gas emissions and climate change, air quality, water, polar bears, caribou, wilderness and recreation, soils, permafrost, vegetation and wetlands, and subsistence uses and resources.

208.    BLM's cursory analysis of the implementation and anticipated effectiveness of the proposed mitigation measures is insufficient to show that the agency has properly evaluated the environmental consequences of its action or ways to address those consequences.

209.    For each of the above reasons, BLM failed to take a hard look at the direct, indirect, and cumulative impacts of the Coastal Plain leasing program, including failing to analyze the effectiveness of the proposed mitigation measures, rendering the final EIS and ROD arbitrary, capricious, and not in accordance with the law and its adoption of the

final EIS and ROD was done without observance of the procedure required by NEPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

## COUNT IV
*(Violation of ANILCA; Failure to Comply with Section 810)*

210. Plaintiffs incorporate by reference all preceding paragraphs.

211. Pursuant to ANILCA section 810, agencies must consider effects and restrictions upon subsistence resources and uses, and actions which would significantly restrict subsistence uses may only be undertaken if BLM finds that such actions are necessary, involve the minimal amount of public lands necessary, and if the adverse effects to subsistence are minimized. 16 U.S.C. § 3120(a).

212. BLM's ANILCA Section 810 Final Evaluation fails to comply with the law for multiple reasons, including, but not limited to: (a) BLM improperly excluded many Gwich'in communities that use the subsistence resources of the Coastal Plain and that would be affected by the proposed action; (b) BLM failed to consider important subsistence resources that would be affected by its proposed action, including but not limited to migratory waterfowl; (c) BLM failed to consider all subsistence uses that would be affected by its proposed action, including but not limited to traditional sharing and bartering practices; (d) BLM's finding that there would not be significant restrictions to subsistence uses for Arctic Village and Venetie from its proposed action is based on flawed analysis and findings and fails to consider traditional knowledge; (e) BLM relied

_____

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 65 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

on the flawed analysis in the final EIS as the basis for its ANILCA Section 810 Final Evaluation; and (f) BLM did not adequately analyze alternatives in the final EIS that would be more protective of lands and resources that are important for key subsistence resources and uses.

213. For the above reasons, BLM's ANILCA Section 810 Final Evaluation was arbitrary, capricious, and not in accordance with the law and was without observance of the procedure required by ANILCA and the APA. 5 U.S.C. § 706(2).

**COUNT V**
*(Violation of the Wilderness Act; Failure to Protect Wilderness)*

214. Plaintiffs incorporate by reference all preceding paragraphs.

215. The Wilderness Act mandates that "each agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character." 16 U.S.C. § 1133(b).

216. An agency has a duty to preserve Wilderness from activities outside the Wilderness area that degrade the area's wilderness characteristics. *Id.*

217. In adopting the oil and gas program for the Coastal Plain, the Secretary failed to protect the wilderness character of the Mollie Beattie Wilderness.

218. These violations include, but are not limited to: (a) failing to analyze the impacts of an oil and gas program on the Mollie Beattie Wilderness, including mitigation

measures to protect the wilderness characteristics of the area, and (b) adopting an oil and gas program that degrades the wilderness characteristics of the Mollie Beattie Wilderness.

219.    The Secretary's decision to adopt a leasing program that does not evaluate the impacts to and that degrades the wilderness character of the Mollie Beattie Wilderness was arbitrary, capricious, and not in accordance with the law, and was without observance of the procedure required by law, in violation of the Wilderness Act, and the APA. 5 U.S.C. § 706(2).

## COUNT VI
*(Violation of the Tax Act; Failure to Properly Interpret and Implement the 2,000-Acre Provision)*

220.    Plaintiffs incorporate by reference all preceding paragraphs.

221.    The Tax Act mandates that the Secretary "shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any areas covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section." Pub. L. 115-97, tit. 2, § 20001(c)(3).

222.    The Secretary and BLM interpret the "up to 2,000 surface acres" provision to mean that BLM could not authorize any amount of surface development less than 2,000 acres for purposes of its alternatives analysis.

223.    BLM applied this unlawful interpretation to reject proposed alternatives.

---

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 67 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

224.    The Secretary and BLM also interpret the 2,000-acre provision to only apply to facilities that qualify as both "production and support facilities." Based on this interpretation, the Secretary and BLM indicate they will exclude a range of facilities and infrastructure from the 2,000 acre limit, thereby allowing infrastructure to cover more than 2,000 acres at any given time.

225.    The Secretary and BLM also indicated that the right-of-way provision is not subject to the 2,000-acre provision.

226.    The Secretary's and BLM's adoption of an oil and gas leasing program based on these incorrect interpretations is inconsistent with the Tax Act.

227.    For each of the above reasons, the Secretary's and BLM's interpretation of the Tax Act's 2,000-acre provision for the Coastal Plain and adoption of an oil and gas program based on that interpretation was arbitrary, capricious, and not in accordance with the law and in excess of statutory authority, in violation of the Tax Act, and the APA. 5 U.S.C. § 706(2).

## COUNT VII
*(Violation of ESA Section 7 and the APA; FWS's Failure to Prepare a Legally Sufficient BiOp)*

228.    Plaintiffs incorporate by reference all preceding paragraphs.

229.    The ESA requires FWS to prepare a BiOp that uses the best scientific and commercial data available to evaluate whether BLM's leasing program is likely to jeopardize the continued existence of any endangered or threatened species or destroy or

adversely modify designated critical habitat. 16 U.S.C. § 1536(a)(2). FWS must draw a rational connection between the facts found and the conclusions it draws.

230. FWS failed to consider relevant and available studies in the BiOP, including, but not limited to, its model for estimating quantitative take of polar bears from seismic activities, and recent science on the limitations of den detection technology (i.e., FLIR).

231. In issuing the BiOp for polar bears, FWS relies on a "lease notice" indicating that BLM will require documentation of compliance with the MMPA prior to authorizing any on-the-ground oil and gas activities, but FWS failed to consider whether the lease notice would be enforceable in light of BLM's authority under the Tax Act with regard to "necessary access," DOI's interpretation of the MMPA, and DOI and BLM's interpretation of the legal effect of lease notices. As a result, it is not reasonably certain that BLM could refuse to authorize oil and gas activities that fail to comply with the MMPA.

232. FWS also failed to consider the impact of the whole oil and gas program on critical habitat, including, but not limited to: (1) FWS's unlawful and unreasonable conclusion that MMPA compliance will prevent loss or degradation of critical habitat; (2) FWS's unlawful conclusion that "step-down" consultations and consultations on MMPA authorizations will prevent such loss because those consultations will each reflect only a

piecemeal analysis; and (3) FWS's deficient analysis of polar bear critical habitat impacts from the entire program.

233. Finally, FWS failed to address impacts to polar bears as a result of greenhouse gas emissions produced from oil and gas activities on the Coastal Plain and those emissions' contribution to exacerbating or hastening climate change effects.

234. FWS's failure to consider the best available science, its reliance on uncertain mitigation measures to avoid jeopardy, and its failure to analyze the impacts of the whole oil and gas program on critical habitat and consider impacts from increased greenhouse gas emissions each render the BiOp arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and without observance of the requirements of the ESA and its implementing regulations, and the APA. 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706.

## Count VIII
*(Violation of ESA Section 7; BLM's Unreasonable Reliance on BiOp)*

235. Plaintiffs incorporate by reference all preceding paragraphs.

236. Under Section 7 of the ESA, BLM must ensure that its actions are not likely to jeopardize the continued existence of listed species or result in destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2). An agency's reliance on a legally flawed biological opinion to authorize an action violates this duty.

---

237.    The BiOp is legally flawed and inadequate with regard to evaluating the potential impacts of the leasing program on polar bears (as set out in Count VII).

238.    BLM violated the ESA by unreasonably relying on this legally deficient BiOp.

239.    BLM also violated the ESA because it has repudiated its authority to preclude activities on the Coastal Plain that are "necessary" to "access" leased oil and gas, contrary to the assumptions in the BiOp. BLM asserts throughout the final EIS and ROD that its discretion to preclude activities on the Coastal Plain is constrained by the Tax Act. BLM's position makes it uncertain whether BLM can, as a matter of law, preclude activities that may jeopardize polar bears. But the BiOp's "no jeopardy" conclusion for polar bears is predicated on the understanding that BLM would deny authorizations for activities unless and until the lessees or applicants obtain advance permission for incidental take under the Marine Mammal Protection Act from FWS, or a letter from FWS indicating that no such take will occur.

240.    BLM also violated its duty to ensure against destruction or adverse modification of polar bear critical habitat by altering its interpretation of the Tax Act's 2,000 acre limit after completing consultation with FWS. The BiOp relied on BLM's position set out in the final EIS that the total footprint of surface disturbance would be capped at 2,000 acres at any given time. BLM changed its position regarding that

interpretation in the ROD. As a result, BLM cannot ensure that the impacts to critical habitat will be limited as the BiOp assumed.

241.    BLM's continued reliance on the BiOp to ensure that its leasing program on the Coastal Plain will not jeopardize the survival of polar bears or adversely modify or destroy polar bear critical habitat is unreasonable, violates its duties under the ESA and its implementing regulations, is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and is without observance of the requirements of the ESA and its implementing regulations, and the APA. 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706.

## Count IX
### (*Violation of ESA Section 7; BLM's Failure to Reinitiate Consultation*)

242.    Plaintiffs incorporate by reference all preceding paragraphs.

243.    After completing consultation with FWS and obtaining the BiOp that concluded "no jeopardy" and "no adverse modification or destruction of critical habitat" regarding polar bears, BLM issued the ROD that (1) repudiated its authority to enforce the BiOp's conditions regarding MMPA compliance, and (2) changed its position regarding the interpretation of the 2,000-acre limitation, on which the BiOp relied.

244.    Each of these changes constitutes "new information [that] reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered" and "modif[ication of the agency action] in a manner that causes

Case 3:20-cv-00204-SLG   Document 19   Filed 11/02/20   Page 72 of 76

an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence." 50 C.F.R. § 402.16(a)(2),(3).

245.    BLM violated its duties under the ESA by failing to reinitiate consultation on its leasing program to address interpretations of its authority that were not considered in the BiOp, and which undercut the premises on which FWS based the conclusions in the BiOp.

246.    BLM's failure to reinitiate consultation is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and without observance of the requirements of the ESA and its implementing regulations, and the APA. 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706.

## **REQUEST FOR RELIEF**

Plaintiffs respectfully request that this Court grant the following relief:

1.    Declare that in issuing the final EIS, ROD, and ANILCA Section 810 Final Evaluation, the Secretary, DOI, and BLM violated ANILCA, the Refuge Act, NEPA, the Wilderness Act, the Tax Act, the ESA, and the APA; declare that in issuing the BiOp the Secretary, DOI, and FWS violated the ESA and the APA; declare that the invalid final EIS, ROD, ANILCA Section 810 Final Evaluation, and BiOp cannot serve as the basis for any future actions, including decisions to conduct a lease sale or issue leases; and

_____

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 73 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

declare that the actions as set forth above are arbitrary, capricious, an abuse of discretion or not in accordance with law and without observance of procedure required by law;

2. Vacate and set aside as unlawful any and all agency approvals and underlying analysis documents, including the final EIS, ROD, ANILCA Section 810 Final Evaluation, and BiOp, as well as any decisions and documents based on the unlawful actions, including decisions to lease and leases;

3. Enter appropriate injunctive relief, including prohibiting BLM from authorizing any activities under the Coastal Plain leasing program in reliance on the unlawful final EIS, ROD, ANILCA Section 810 Final Evaluation, or BiOp;

4. Award Plaintiffs all reasonable costs and fees as authorized by law; and

5. Grant such other relief as this Court deems just and proper.

Respectfully submitted this 2nd day of November, 2020,

 s/ Brook Brisson       
Brook Brisson (AK Bar No. 0905013)
Suzanne Bostrom (AK Bar No. 1011068)
Bridget Psarianos (AK Bar No. 1705025)
Brian Litmans (AK Bar No. 0111068)
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
Fax: (907) 276-7110
bbrisson@trustees.org
sbostrom@trustees.org
bpsarianos@trustees.org
blitmans@trsutees.org

*Attorneys for Plaintiffs Gwich'in Steering*
*Committee, Alaska Wilderness League,*
*Canadian Parks & Wilderness Society-Yukon,*
*Defenders of Wildlife, Environment America,*
*Friends of Alaska National Wildlife Refuges,*
*National Wildlife Federation, National*
*Wildlife Refuge Association, Northern*
*Alaska Environmental Center, Sierra Club,*
*The Wilderness Society, and Wilderness*
*Watch*

 s/ Karimah Schoenhut (consent)
Karimah Schoenhut (*pro hac vice*)
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
50 F St., NW 8th Floor
Washington, DC 20001
Phone: (202) 548-4584
Fax: (202) 547-6009
karimah.schoenhut@sierraclub.org
*Attorney for Plaintiff Sierra Club*

FIRST AMENDED COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 75 of 76
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG

Case 3:20-cv-00204-SLG   Document 19   Filed 11/02/20   Page 75 of 76

## CERTIFICATE OF SERVICE

I certify that on November 2, 2020, I caused a copy of the FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF to be electronically filed with the Clerk of the Court for the U.S. District Court of Alaska using the CM/ECF system, which will send electronic notification of such filings to the attorneys of record in this case.

 s/ Brook Brisson
Brook Brisson

Case 3:20-cv-00204-SLG   Document 19   Filed 11/02/20   Page 76 of 76