Brook Brisson (AK Bar No. 0905013)
Suzanne Bostrom (AK Bar No. 1011068)
Bridget Psarianos (AK Bar No. 1705025)
Brian Litmans (AK Bar No. 0111068)
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
Fax: (907) 276-7110
bbrisson@trustees.org
sbostrom@trustees.org
bpsarianos@trustees.org
blitmans@trustees.org

*Attorneys for Plaintiffs Gwich'in Steering
Committee, Alaska Wilderness League, Alaska Wildlife Alliance,
Canadian Parks & Wilderness Society-Yukon,
Defenders of Wildlife, Environment America,
Friends of Alaska National Wildlife Refuges,
National Wildlife Federation, National
Wildlife Refuge Association, Northern
Alaska Environmental Center, Sierra Club,
The Wilderness Society, and Wilderness
Watch*

Karimah Schoenhut (*pro hac vice*)
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
50 F St., NW 8th Floor
Washington, DC 20001
Phone: (202) 548-4584
Fax: (202) 547-6009
karimah.schoenhut@sierraclub.org

*Attorney for Plaintiff Sierra Club*

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| GWICH'IN STEERING COMMITTEE, *et al.*,<br><br>Plaintiffs, | Case No. 3:20-cv-00204-SLG |

v.

DAVID BERNHARDT, *et al.*,

             Defendants,

        and

NORTH SLOPE BOROUGH, *et al.*,

            Intervenor-Defendants.

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (Fed. R. Civ. P. 65)**

**[EXPEDITED RULING REQUESTED BY JANUARY 6, 2020]**

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................... II
INTRODUCTION .................................................................................................. 1
BACKGROUND ..................................................................................................... 2
LEGAL STANDARDS ........................................................................................... 5
ARGUMENT ........................................................................................................... 6
    I.    A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ARE
            NECESSARY ................................................................................................. 6
            A.    Plaintiffs are Likely to Succeed on the Merits. .................................. 6
                    1.    *BLM violated NEPA by failing to take a hard look at the*
                          *impacts of the leasing program under its revised 2,000-acre*
                          *limitation interpretation. ...................................................... 7*
                    2.    *BLM violated NEPA by failing to consider an alternative*
                          *limiting seismic exploration. ................................................ 10*
                    3.    *BLM violated ANILCA and the Refuge Act by failing to adopt*
                          *a program consistent with Refuge purposes. ....................... 11*
             B.    Plaintiffs Will Suffer Irreparable Harm. .......................................... 14
            C.    The Balance of Equities and Public Interest Strongly Favor an
                Injunction. ......................................................................................... 19
    II.    THE COURT SHOULD WAIVE ANY BOND. ................................................. 21
CONCLUSION ...................................................................................................... 22
CERTIFICATE OF COMPLIANCE ................................................................... 23

Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj.
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG   Page ii

Case 3:20-cv-00204-SLG   Document 47-1   Filed 12/15/20   Page 3 of 26

<u>INTRODUCTION</u>

Gwich'in Steering Committee *et al.* (collectively "Plaintiffs") request a temporary restraining order and preliminary injunction (TRO/PI) to prevent Defendants from issuing leases or authorizing seismic exploration in reliance on the challenged Coastal Plain Leasing Program final environmental impact statement (EIS) and record of decision (ROD).

The Coastal Plain of the Arctic National Wildlife Refuge is the biological heart of one of the largest intact ecosystems in the world.[1] It provides habitat for numerous fish and wildlife species, including caribou and polar bears.[2] Its wilderness values offer exceptional recreational experiences.[3] It is sacred land to the Gwich'in because of its importance to the Porcupine Caribou Herd.[4]

The Bureau of Land Management (BLM) conducted a National Environmental Policy Act (NEPA) process for the Coastal Plain Leasing Program.[5] In its ROD, BLM adopted the most damaging and impactful alternative, opening the entire area to oil and gas.[6] On November 17th, BLM issued a notice requesting public comment by December 17th to inform a lease sale.[7] Ten days before public comment ended, BLM issued a notice

---

[1] AR 95222.
[2] *Id.*
[3] AR 95222–23.
[4] Demientieff Dec. at 8.
[5] AR 17685.
[6] AR 205958–9.
[7] Defendants' Notice of Filing, ECF No. 21.

cont…

Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj.
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG   Page 1

for a January 6, 2021 lease sale,[8] relying on the challenged EIS and ROD to issue leases.[9] The leases grant expansive rights and BLM stated it lacks authority to deny lessee's future activities or access.[10] BLM is also proceeding to authorize seismic exploration this winter.[11] A TRO/PI is necessary to prevent irreparable harm to Plaintiffs, their members, and the Coastal Plain.

<u>BACKGROUND</u>

The Arctic Refuge is America's largest and wildest national wildlife refuge. The 1.5-million-acre Coastal Plain is important habitat for wildlife, including caribou, polar bears, birds, seals, muskox, whales, wolverine, Dall sheep, and wolves.[12]

The Porcupine Caribou Herd, which migrates through Alaska and Canada, relies on the Coastal Plain for calving, post-calving, and insect relief habitat, and for high-protein nutrition away from predators.[13] The Arctic Refuge lies at the heart of the traditional homelands of the Gwich'in. Since time immemorial, the Gwich'in have relied on the Porcupine Caribou Herd for subsistence and their cultural foundation. The

---

[8] Defendants' Notice of Filing, ECF Nos. 40, 40-1.
[9] Ex. 4 at 6 (Detailed Statement of Sale).
[10] Ex. 4 at 5–6 (stating rights of way and easements "will be granted"; BLM "interprets the plain language of this provision as requiring that it authorize" rights of way), 79, 81 (sample lease granting rights to "drill for, extract, remove and dispose of" oil and gas "together with the right to build and maintain necessary improvements thereupon, and including access to those lands"); AR 205965–66.
[11] Ex. 5 (Seismic Pre-Notice) & Ex. 6 (Seismic EA/FONNSI).
[12] AR 93860, 95222.
[13] AR 94545–49.

cont…

Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj.
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG   Page 2

Gwich'in are "caribou people," and call the Coastal Plain "Iizhik Gwats'an Gwandaii Goodlit" — "the Sacred Place Where Life Begins." Gwich'in traditional knowledge instructs that caribou will be harmed by Coastal Plain development.[14]

The majority of the Coastal Plain is designated critical habitat for denning polar bears because the rivers and hills create unique areas of deep snow drifts ideal for denning.[15] In summer, the abundant plants and insects provide nesting and foraging habitat for many birds, which use the Coastal Plain during annual migrations around the world.[16] The Arctic Refuge's wilderness values are incomparable and offer unique scientific and recreation opportunities.[17]

The Coastal Plain has been protected for decades. It was designated in 1960 as the Arctic National Wildlife Range (Range) "[f]or the purpose of preserving unique wildlife, wilderness and recreational values."[18] Congress passed the Alaska National Interest Lands Conservation Act (ANILCA) in 1980, re-designating the Range the Arctic National Wildlife Refuge, expanding it south and west, and recognizing four additional

---

[14] Demientieff Dec. at 7–9, 13–14, 19–21.
[15] AR 94565, 94569.
[16] AR 93860, 94525.
[17] AR 93860, 93862, 95237.
[18] Ex. 1 at 1 (PLO 2214).

cont…

Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj.
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG   Page 3

Case 3:20-cv-00204-SLG   Document 47-1   Filed 12/15/20   Page 6 of 26

purposes.[19] Other than authorizing an expired one-time exploration program, ANILCA prohibited oil and gas activities in the Arctic Refuge.[20]

This changed in 2017. A provision of the Tax Cuts and Jobs Act (Tax Act) directed the Secretary to adopt an oil and gas leasing program for the Coastal Plain.[21] It added an additional purpose for the Coastal Plain: "to provide for an oil and gas program."[22] It mandated two lease sales — the first by the end of 2021.[23] It also limited surface development to a maximum of 2,000 acres.[24] It did not otherwise modify the purposes of the Arctic Refuge or waive other applicable laws.

The Department of the Interior and BLM rushed their environmental review and adopted an extensive and harmful leasing program that is inconsistent with numerous laws and regulations. BLM is taking unprecedented and hasty steps to issue leases based on the flawed final EIS and ROD.

BLM is also proceeding with an intensive three-dimensional seismic exploration program this winter. BLM will notice the environmental assessment for the program on December 16th.[25] As proposed, the seismic program will cover 260,000 acres of the

---

[19] Alaska National Interest Lands Conservation Act (ANILCA), § 303(2)(A), (B), Pub. L. No. 96-487, 94 Stat. 2371 (Dec. 2, 1980).
[20] 16 U.S.C. §§ 3142(a)–(h), 3143.
[21] Tax Act, § 20001, Pub. L. 115-97 (2017).
[22] *Id.* § 20001(b)(2)(B)(iii).
[23] *Id.* § 20001(c)(1)(A).
[24] *Id.* § 20001(c)(3).
[25] Ex. 5 at 1.

cont…

Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj.
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG   Page 4

Coastal Plain, using 12 large and 4 small vibroseis machines to collect data along a dense grid pattern.[26] Operations involve a mobile crew of 180 people operating 24 hours a day, housed in 50 trailers dragged across the tundra by bulldozers every few days.[27] Scouting crews, generators, temporary airstrips, incinerators and waste water discharges, and other industrial activities and equipment would also be needed.[28] Summer clean-up activities would involve 450–600 helicopter landings/take offs.[29] BLM is relying on the Leasing Program EIS and ROD for the seismic program.[30]

## LEGAL STANDARDS

Plaintiffs seeking a TRO/PI must establish: (1) likely success on the merits; (2) likely irreparable harm; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest.[31] A plaintiff can obtain an injunction by meeting the lower bar of showing "serious questions going to the merits were raised and the balance of hardships tips sharply in the [plaintiff's] favor," if the other factors are met.[32] In cases against the government, the balance of equities and public interest factors merge[33] and

---

[26] Ex. 6 at 5, 14, 20–21.
[27] *Id.* at 15, 18–19.
[28] *Id.* at 14, 16, 18–20, 22.
[29] *Id.* at 24.
[30] *Id.* at 7, 8, 90, 96.
[31] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (TRO analysis is "substantially identical" to PI).
[32] *All. for the Wild Rockies v. Cottrell* (*Alliance*), 632 F.3d 1127, 1131–32 (9th Cir. 2011).
[33] *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

cont…

Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj.
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG   Page 5

where environmental injury is "sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment."[34]

Courts "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if adopted "without observance of procedure required by law."[35] Courts undertake a "thorough, probing, in-depth review" to ensure that the agency made a "rational connection between the facts found and the conclusions made."[36]

## ARGUMENT

### I. A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ARE NECESSARY.

Plaintiffs meet all four requirements for a TRO/PI and request the Court enjoin BLM from issuing leases or permits in reliance on its flawed EIS and ROD.

#### A. Plaintiffs are Likely to Succeed on the Merits.

Plaintiffs are likely to succeed or, at a minimum, raised serious questions on the merits.[37]

---

[34] *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1124–25 (9th Cir. 2004) (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)).

[35] 5 U.S.C. § 706(2)(A), (D); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[36] *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005).

[37] *Alliance*, 632 F.3d at 1136–37. Plaintiffs present a limited subset of claims in this motion. Plaintiffs do not waive any claims or allegations in their amended complaint, and reserve those for summary judgment.

cont…

Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj.
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG   Page 6

Case 3:20-cv-00204-SLG   Document 47-1   Filed 12/15/20   Page 9 of 26

1. *BLM violated NEPA by failing to take a hard look at the impacts of the leasing program under its revised 2,000-acre limitation interpretation.*

NEPA is "our basic national charter for protection of the environment."[38] NEPA's analysis and disclosure goals are meant to ensure informed agency decision making and public involvement.[39] To fulfill these goals, an agency must take a "hard look" at the direct, indirect, and cumulative impacts of a proposed action.[40] This "hard look" requires a "full and fair discussion of significant environmental impacts."[41]

In the ROD, BLM adopted a position on the Tax Act's 2,000-acre limit never examined in the EIS. Congress restricted the Secretary to only authorize "up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases" to limit environmental impacts.[42]

BLM altered its interpretation of what infrastructure it considered under this provision multiple times. The final EIS counted a broad range of infrastructure toward the

---

[38] 40 C.F.R. § 1500.1(a) (1978). The Council for Environmental Quality (CEQ) recently issued new NEPA regulations, effective September 14, 2020. 85 Fed. Reg. 43,304 (July 16, 2020). CEQ's prior regulations govern this case.

[39] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

[40] *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998).

[41] 40 C.F.R. § 1502.1; *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1102–04 (9th Cir. 2016); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1378–80 (9th Cir. 1998).

[42] Tax Act § 20001(c)(3).

cont…

Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj.
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG   Page 7

2,000-acre cap, including roads, central processing facilities, airstrips, drilling pads, seawater treatment plants, barge landings and storage, and gravel pits and stockpiles.[43] Infrastructure permitted under rights-of-way also counted.[44] BLM included all this infrastructure when calculating the maximum potential development footprint under this limitation.[45] BLM explained it would allow acreage to be reclaimed and new acreage to be developed, potentially in excess of 2,000 acres over time, but was clear that no more than 2,000 acres of development could exist at any given time.[46] This interpretation was central to BLM's analysis and rationale for asserting that it considered the maximum impacts in the EIS.[47]

The ROD expressly rejected this interpretation.[48] Instead, the ROD identified a drastically limited the range of facilities and infrastructure identified as subject to the 2,000-acre cap.[49] The ROD explained many facilities assumed to be within the limitation in the final EIS may not count, including airstrips, barge landings, roads, and gravel mines.[50] BLM concluded that only "production *and* support facilities" counted.[51] Accordingly, "support" facilities that could be attributed to any other phase of oil and gas

---

[43] *See, e.g.*, AR 90183, 90192–93.
[44] AR 91633.
[45] AR 90183.
[46] AR 91634–35.
[47] AR 90187, 91633, 91211, 91223–27.
[48] AR 205958, 205960–61.
[49] AR 205966–69.
[50] *Id.*
[51] *Id.* (emphasis added).

cont…

activities (transportation, exploration, or development) would not be limited by the 2,000-acre cap.[52] The ROD also indicated that the limitation may not apply to infrastructure permitted for rights-of-way.[53] BLM, therefore, indicated it could authorize far more than 2,000 acres of infrastructure by excluding infrastructure the final EIS included under the cap. The ROD also deferred determining which facilities count toward the limitation.[54]

BLM's new interpretation opens the door to far more than 2,000 acres of development. However, BLM never took a hard look at the direct, indirect, and cumulative impacts to the Coastal Plain from its new interpretation. BLM's interpretation in the final EIS was fundamental because it shaped the maximum development footprint and informed BLM's development scenario and impacts analysis under each alternative.[55] By altering this key interpretation in the ROD, after completion of the analysis, BLM violated NEPA by adopting a program without taking the required hard look,[56] rendering the decision arbitrary and capricious.[57]

---

[52] *Id.*

[53] AR 205965–69.

[54] AR 205968–69.

[55] AR 90187, 91633, 91211, 91223–27.

[56] *See Great Basin Res Watch*, 844 F.3d at 1104 ("[A] post-EIS analysis—conducted without any input from the public—cannot cure deficiencies in an EIS.").

[57] *See supra* Legal Standards at 6.

cont…

2.     *BLM violated NEPA by failing to consider an alternative limiting seismic exploration.*

BLM violated NEPA by failing to consider a reasonable range of alternatives with regard to seismic exploration or adequately explaining its decision not to consider alternatives. Agencies must consider "alternatives to the proposed action."[58] The alternatives analysis "is the heart of the environmental impact statement."[59] Agencies are required to "look at every reasonable alternative" within the "nature and scope of the proposed action."[60] "Feasible alternatives" that meet a project's purposes and needs "should be considered in detail."[61] Agencies must explain the exclusion of alternatives from analysis.[62] "A viable but unexamined alternative renders the [EIS] inadequate."[63] Agencies cannot consider "essentially identical" alternatives.[64]

All the action alternatives allowed seismic across the entire Coastal Plain; BLM failed to consider an alternative that would close any areas to seismic.[65] Plaintiffs asked BLM to analyze alternatives that did not open the entire Coastal Plain to seismic

---

[58] 42 U.S.C. § 4332(C)(iii).

[59] 40 C.F.R. § 1502.14; *see also* 40 C.F.R. § 1502.2(d).

[60] *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008) (quotation omitted).

[61] *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1052 (9th Cir. 2013).

[62] 40 C.F.R. § 1502.14(a).

[63] *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) (quotation omitted).

[64] *Friends of Yosemite Valley*, 520 F.3d at 1039.

[65] AR 90326.

cont…

Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj.
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG   Page 10

exploration.[66] BLM provided no reasoned explanation for its refusal to do so. In response to comments, BLM only stated that it did not consider closing areas to exploration because seismic can be done across the entire Coastal Plain.[67] This circular reasoning does not adequately explain failing to consider this viable alternative. The Tax Act does not mandate allowing seismic across the entire Coastal Plain.[68] Considering an alternative that would close portions of the Coastal Plain — particularly those that would not be open to leasing — is consistent with both the Tax Act and BLM's legal obligations to protect the Coastal Plain. BLM's failure to consider closing areas to seismic made for "essentially identical" alternatives and negated "a real, informed choice" between them.[69] BLM's failure to consider, or provide an adequate explanation for not considering, an alternative that would limit seismic exploration was arbitrary and contrary to NEPA.[70]

> 3. *BLM violated ANILCA and the Refuge Act by failing to adopt a program consistent with Refuge purposes.*

In 1960, the Secretary recognized three purposes for the Range: wildlife, wilderness, and recreation.[71] In ANILCA, Congress added four additional purposes, in addition to ANILCA's overarching conservation and subsistence purposes: "to conserve fish and wildlife populations and habitats in their natural diversity," "to fulfill

---

[66] AR 61175.
[67] AR 91970.
[68] Tax Act § 20001.
[69] *Friends of Yosemite Valley*, 520 F.3d at 1039.
[70] *See supra* Legal Standards at 6.
[71] Ex. 1 at 1.

cont…

Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj.
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG   Page 11

international treaty obligations . . . with respect to fish and wildlife and their habitats," "to provide . . . for continued subsistence uses," and "to ensure . . . water quality and necessary water quantity."[72] Congress retained existing protective mandates not in conflict with ANILCA, including Public Land Orders.[73] The Refuge Act also mandates that refuge purposes include those from original designations.[74] Accordingly, the original Range purposes and the ANILCA purposes are all purposes of the Coastal Plain.[75]

The Tax Act added an additional purpose for the Coastal Plain (an oil and gas program), but did not modify existing purposes or elevate oil and gas over existing purposes.[76] Congress was clear that it was not repealing or altering application of any existing legal mandates.[77] ANILCA and the Refuge Act mandate that any Leasing Program protect all of the purposes, including the Range purposes.[78]

---

[72] ANILCA § 303(2)(B); 16 U.S.C. § 3101(a), (b).

[73] ANILCA § 305.

[74] 16 U.S.C. § 668ee(10) ("[P]urposes of the refuge" include "purposes specified in or derived from the law, . . . [or] public land order . . . establishing . . . a refuge . . . ."); *see also* Ex. 2 at 5 (FWS Policy at 1.16) ("When we acquire an addition to a refuge under an authority different from the authority used to establish the original refuge, the addition also takes on the purpose(s) of the original refuge unless Congress determines otherwise . . . .").

[75] *See* AR 93851, 93856–58 (describing three Range purposes and recognizing seven purposes of the Coastal Plain).

[76] Tax Act § 20001(b)(2)(B)(iii).

[77] *See, e.g.*, Ex. 3 at 2–3 (Murkowski Floor Statement) ("We have not preempted the environmental review process. . . . All [] relevant laws, regulations, and Executive Orders will apply under our language. . . . [W]e did not waive NEPA or any other environmental laws.").

[78] ANILCA §§ 304(a), 305; 16 U.S.C. § 668dd(a)(3)(A).

cont…

Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj.
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG   Page 12

Case 3:20-cv-00204-SLG   Document 47-1   Filed 12/15/20   Page 15 of 26

BLM impermissibly ignored the Range purposes. The draft EIS did not acknowledge these purposes.[79] In the final EIS, BLM summarily stated that the action alternatives "account for all purposes of the Arctic Refuge."[80] But BLM failed to identify the Range purposes; it only considered the ANILCA purposes.[81] The ROD summarily stated that the leasing program protects the Coastal Plain's purposes, referring only to "the other four [ANILCA] purposes."[82] BLM did not acknowledge or explain how the leasing program was consistent with and protective of the Range purposes. Instead, BLM summarily stated in response to comments that the Range purposes no longer apply.[83] This is contrary to Congress' intent and BLM does not explain this conclusion.[84]

By improperly excluding the Range purposes, the Secretary could not ensure that the oil and gas program is consistent with all Refuge purposes, as mandated by ANILCA and the Refuge Act. BLM needed to consider these purposes specifically and address how the program ensured their protection. Far from doing so, the program adopted will have the greatest impacts on the Range purposes of the alternatives considered.[85] By

---

[79] AR 85916, 85922, 85930, 85656, 61211–13.

[80] AR 90188.

[81] AR 90534–35 (setting out Refuge purposes and not including Range purposes), 90836 (failing to include Range purposes).

[82] AR 205963–64.

[83] AR 91979 (stating recreation is not a current purpose), 92047 (stating the Tax Act superseded Range purposes), 93224 (identifying the Refuge purposes without Range purposes).

[84] *See supra* notes 73, 74, 76, 77.

[85] *See, e.g.*, AR 90531–33 (explaining alternative B has impacts on recreation "throughout nearly the entire program area" that will be greater than impacts of other

cont…

Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj.
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG   Page 13

failing to acknowledge the Range purposes and thereby failing to adopt a program that protects them, the Secretary failed to consider an important aspect of the problem; this is arbitrary and not in accordance with the law.[86]

In sum, Plaintiffs have shown likely success on the merits, or at least raised serious questions going to the merits.

**B.    Plaintiffs Will Suffer Irreparable Harm.**

"Environmental injury, by its nature, . . . is often permanent or at least of long duration, *i.e.*, irreparable."[87] The Coastal Plain, its resources, and Plaintiffs' and their members' interests will be irreparably harmed by lease issuance and seismic exploration.[88]

BLM proposes to issue leases covering the entire Coastal Plain.[89] The Secretary explained to Congress that the "rights conferred under these leases are extraordinary" and the leases "guarantee rights of way."[90] The leases do not retain BLM's ability to outright

---

alternatives), 90543–44 (explaining alternative B has the most impacts to wilderness characteristics).

    [86] *See supra* Legal Standards at 6.

    [87] *Amoco Prod. Co.*, 480 U.S. at 545, abrogated in part on other grounds by *Winter*, 555 U.S. 7; *see also N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843 (9th Cir. 2007).

    [88] Because of these harms from BLM's actions, Plaintiffs have standing. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000) (standing test).

    [89] Ex. 4 at 13, 15–20.

    [90] H. Comm. on Appropriations, Department of the Interior Budget Request for FY2021 (1:53:40) (Mar. 11, 2020), video available at https://appropriations.house.gov/events/hearings/department-of-the-interior-budget-request-for-fy2021).

cont…

Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj.
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG   Page 14

reject oil and gas proposals or include no-surface occupancy restrictions for the entire lease.[91] Simply put, BLM loses authority to fully preclude development and impacts once leases are issued.

The template lease indicates BLM intends to broadly grant the right to develop, as well as rights to access leases through rights-of-way and easements.[92] It does not clearly limit, or retain BLM's authority to limit, surface disturbance to 2,000 acres across the Coastal Plain.[93] Instead, BLM repeatedly stated it lacks authority to preclude oil and gas activities.[94]

The leases constitute an irretrievable commitment of resources. Once issued, BLM no longer has full authority to deny or limit activities on the leases by their terms, even if there are significant impacts. Even assuming BLM can impose conditions later, under the lease terms, it can only impose "reasonable" conditions not "inconsistent with, or unduly burdensome" on the rights granted.[95] These leases commit these areas to oil and gas for decades.[96] A key issue here is whether BLM conducted an adequate analysis of the

---

[91] Ex. 4 at 5–6, 81–83; *Conner v. Burford*, 848 F.2d 1441, 1451 (9th Cir. 1998) ("[T]he sale of a[n] . . . oil or gas lease [that does not prohibit surface occupancy] constitutes the 'point of commitment;' after the lease is sold the government no longer has the ability to prohibit potentially significant inroads on the environment.").

[92] Ex. 4 at 81; *see also* AR 90199–200, 91979, 205959 n.4, 205975, 206003 (stating BLM is required to issue rights of way even in areas under no-surface occupancy stipulations).

[93] Ex. 4 at 80–83; *see supra* Argument I.A.1.

[94] *See supra* note 10.

[95] Ex. 4 at 81.

[96] AR 91211–12 (outlining 85+ years of activities).

cont…

Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj.
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG   Page 15

impacts of the leasing program and adopted sufficient mitigation measures to incorporate into these leases prior to issuance. Had BLM engaged in an adequate analysis, it might have chosen not to lease certain areas, adopted stricter mitigation measures, or closed areas to certain activities, like seismic exploration.[97]

Instead, lessees will obtain the right to undertake seismic operations, conduct exploratory drilling, build gravel mines, and construct roads, drilling pads, pipelines, and other infrastructure on the fragile arctic tundra, and to access leases.[98] These activities will result in lasting and permanent damage to the Coastal Plain.[99] Plaintiffs will be irreparably harmed by BLM's issuance of the leases because the agency will have issued the leases without conducting the required analysis and ensuring necessary protections are in place, while foreclosing its ability to deny oil and gas activities. A court recently confirmed that "[t]he activities associated with these leases and the rights granted to the lease holders can unquestionably significantly affect the quality of the human/natural

---

[97] *See S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009) ("The likelihood of irreparable environmental injury without adequate study of the adverse effects and possible mitigation is high.").

[98] Ex. 4 at 81.

[99] Blackledge Dec. at 9; Baraff Dec. at 12–14; Brouwer Dec. at 8–10; Brown Dec. at 10; Demientieff Dec. at 15, 17, 20; DesLauriers Dec. at 7, 11–12; Itchoak Dec. at 8–10, 19–22; Kolton Dec. at 10–11; Lang Dec. at 6–9; Maisch Dec. at 13–15; Mather Dec. at 6–7; Mauer Dec. at 7–8, 10–14; Nickas Dec. at 6–7, 9–10; Raskin Dec. at 9–10; Rider Dec. at 5, 7–9; Ritzman Dec. at 12–18; Schmitt Dec. at 9–13; Stone-Manning Dec. at 6–7; Thompson Dec. at 4–8; Tritt Dec. at 11–13; Whitten Dec. at 6–9; Whittington-Evans Dec. at 11–14, 16, 24–25; Witschard Dec. at 8–10, 16–19; Yarnell Dec. at 11, 13–19.

cont…

Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj.
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG   Page 16

environment."[100] Indeed, these activities will irreparably harm the Coastal Plain, and the wildlife and people that use it, including Plaintiffs' members.[101]

Seismic exploration activities — proposed to start January 21st — will cause long-term, permanent damage to the ecosystem. BLM is relying on the final EIS as the basis of its seismic analysis.[102] As explained by numerous scientists in comments on the EIS, seismic activities will lead to "significant, extensive, and long-lasting direct, indirect, and cumulative impacts."[103] The terrain, snow, and other conditions on the Coastal Plain are highly variable, making it particularly susceptible to damage.[104] Seismic operations leave visible tracks across the land and cause long-term damage to vegetation, permafrost, and

---

[100] *W. Watersheds Project v. Zinke*, 336 F. Supp. 3d 1204, 1239 (D. Idaho 2018); *see also id.* at 1240–41 (surveying similar cases); *Sierra Club v. Marsh*, 872 F.2d 497, 499–504 (1st Cir. 1989) (discussing how agency decisions made in violation of NEPA can cause irreparable environmental harm); *S. Utah Wilderness All. v. Allred*, 2009 WL 765882, at *2 (D.D.C. Jan. 17, 2009) (explaining because leasing is when the agency irreversibly commits resources, irreparable harm is shown and granting TRO).

[101] Blackledge Dec. at 6–10; Baraff Dec. at 10, 12–16; Brouwer Dec. at 7–10; Brown Dec. at 10–11; Demientieff Dec. at 15, 17, 20; DesLauriers Dec. at 6–7, 10–11; Itchoak Dec. at 8–10, 14, 18–22; Kolton Dec. at 10–11; Lang Dec. at 4, 6–10; Maisch Dec. at 13–16; Mather Dec. at 5–7; Mauer Dec. at 7–8, 10–18; Nickas Dec. at 6–7, 9–10; Raskin Dec. at 9–11; Rider Dec. at 5, 7–9; Ritzman Dec. at 10–19; Schmitt Dec. at 8–14; Stone-Manning Dec. at 7; Thompson Dec. at 4–8; Tritt Dec. at 11–13; Whitten Dec. at 5–11; Whittington-Evans Dec. at 10–29; Witschard Dec. at 8–13, 15–19; Yarnell Dec. at 13–21.

[102] *Supra* note 30.

[103] AR 21650, 30501–07, 204734.

[104] AR 21650, 30501, 204729.

cont…

Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj.
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG   Page 17

hydrologic regimes.[105] These impacts will last for decades, if not forever.[106] These

impacts are not localized; they impact migratory animals that rely on the Coastal Plain for

habitat and nutrition.[107] Plaintiffs use the Coastal Plain for recreation, subsistence,

wildlife viewing, and to experience wilderness.[108] The Gwich'in have a deep cultural and

spiritual connection to the Coastal Plain and the wildlife that relies on it.[109] These

interests will be harmed by seismic operations and the scars it will leave behind.[110]

---

[105] AR 21634–50, 58728–43, 58747–65, 204729–74; Ex. 6 at 52, 83; Blackledge Dec. at 9; Baraff Dec. at 10, 13–14; Brouwer Dec. at 9–10; Brown Dec. at 10–11; Demientieff Dec. at 15–17; DesLauriers Dec. at 4, 7, 10–12; Itchoak Dec. at 8, 17–18; Kolton Dec. at 7, 11–12; Lang Dec. at 7–8; Maisch Dec. at 13–15; Mather Dec. at 6; Mauer Dec. at 12–14; Nickas Dec. at 7, 9–10; Raskin Dec. at 9; Rider Dec. at 8–9; Ritzman Dec. at 14, 17–18; Schmitt Dec. at 13; Stone-Manning Dec. at 7; Thompson Dec. at 8; Tritt Dec. at 11–13; Whitten Dec. at 6; Whittington-Evans Dec. at 11, 16, 22, 24–25; Witschard Dec. at 8, 13, 16–17; Yarnell Dec. at 11, 13–14, 16–17. *Cf. Se. Alaska Conservation Council*, 413 F. Supp. 3d at 980 (recognizing environmental harm taking decades to regenerate is irreparable).

[106] AR 21650, 204757; AR 86017 (BLM acknowledging long-term harm from seismic).

[107] AR 61384.

[108] Blackledge Dec. at 6, 9; Baraff Dec. at 12; Brouwer Dec. at 7–8; Brown Dec. at 6–8; Demientieff Dec. at 6–8; DesLauriers Dec. at 3–10; Itchoak Dec. at 16–18; Kolton Dec. at 8–9; Lang Dec. at 3–8; Maisch Dec. at 3–9; Mather Dec. at 3–5; Mauer Dec. at 5–9; Nickas Dec. at 7–9; Raskin Dec. at 7–9; Rider Dec. at 7–9; Ritzman Dec. at 10–16; Schmitt Dec. at 8; Stone-Manning Dec. at 7; Thompson Dec. at 3–5, 8; Tritt Dec. at 3–6; Whitten Dec. at 4–9; Whittington-Evans Dec. at 10–12, 17–22; Witschard Dec. at 4–15, 17–18; Yarnell Dec. at 5–14, 20.

[109] Demientieff Dec. at 6–9, 18–21; Tritt Dec. at 3–7, 12–13.

[110] Demientieff Dec. at 16–17; Tritt Dec. at 11–13; *see Alliance*, 632 F.3d at 1135 (harms to use of an area are "actual and irreparable injury" showing "likelihood of irreparable injury").

cont…

Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj.
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG   Page 18

Case 3:20-cv-00204-SLG   Document 47-1   Filed 12/15/20   Page 21 of 26

In sum, BLM is rushing to issue leases and approve seismic under the challenged program, which will likely cause irreparable harm to the Coastal Plain and Plaintiffs' interests.[111]

## C. The Balance of Equities and Public Interest Strongly Favor an Injunction.

Lease issuance and seismic activities will harm the Coastal Plain's resources and Plaintiffs' and members' interests and uses. There is a well-established "public interest in preserving nature and avoiding irreparable environmental injury."[112]

The Coastal Plain is the biological heart of the Arctic Refuge. It has been protected since 1960 in recognition of its exceptional, unique values.[113] Polar bears, caribou, birds, and other wildlife are used and enjoyed by Alaskans, and valued across the United States and Canada.[114] There is a significant public interest in preserving the status quo while this case is resolved.

---

[111] *See, e.g.*, *W. Watersheds Project v. Schneider*, 417 F. Supp. 3d 1319, 1334 (D. Idaho 2019) (granting injunction where agency was rushing permits and leases under challenged plan).

[112] *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc), *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008); *Seattle Audubon Soc'y v. Evans*, 771 F. Supp. at 1096, *aff'd*, 952 F.2d 297 (9th Cir. 1991).

[113] Ex. 1 at 1.

[114] Blackledge Dec. at 6, 9–10; Baraff Dec. at 9–10, 12; Brouwer Dec. at 7–10; Brown Dec. at 6–8; Demientieff Dec. at 15, 17, 20; DesLauriers Dec. at 4–6, 12–13; Itchoak Dec. at 17–18; Kolton Dec. at 10–12; Lang Dec. at 4–6; Maisch Dec. at 5, 11–12; Mather Dec. at 4–6; Mauer Dec. at 6–9, 14–15; Nickas Dec. at 7–9; Raskin Dec. at 7–10; Rider Dec. at 5–9; Ritzman Dec. at 11–16, 18–19; Schmitt Dec. at 8–11; Stone-Manning Dec. at 7; Thompson Dec. at 3–8; Tritt Dec. at 3–7; Whitten Dec. at 3–5, 7–9;

cont…

Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj.
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG   Page 19

BLM and the permittee may assert economic interests in the lease sale and seismic proposal; those do not overcome the equities in favor of an injunction. Where plaintiffs are likely to succeed on the merits, "the public interest in preserving nature and avoiding irreparable environmental injury outweighs economic concerns."[115] Where irreparable environmental harm is likely, "[m]ore than pecuniary harm must be demonstrated" to avoid a preliminary injunction.[116] Any economic benefits to the government or permittees based on violations of law are outweighed by environmental concerns.[117] Regardless, the economic interests will not be lost, only delayed pending resolution of the case.

Plaintiffs also seek to compel compliance with laws meant to protect the environment. Preventing a project from moving forward until the required environmental analysis occurs "comports with the public interest."[118] Indeed, agency compliance with the law "invokes a public interest of the highest order: the interest in having government

_____

Whittington-Evans Dec. at 10–26; Witschard Dec. at 4–8, 14–16; Yarnell Dec. at 7–10.

[115] *Lands Council*, 537 F.3d at 1005; *see Nat'l Parks Conservation Ass'n. v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001) (holding loss of revenues "does not outweigh the potential irreparable damage to the environment").

[116] *N. Alaska Envtl. Ctr. v. Hodel*, 803 F.2d 466, 471 (9th Cir. 1986).

[117] *See Alliance*, 632 F.3d at 1138–39 (holding temporary jobs do not outweigh the public interest in avoiding environmental injury); *Or. Natural Res. Council v. Goodman*, 505 F.3d at 889–90 ("[T]he risk of permanent ecological harm outweighs the temporary economic harm that [the permittee] may suffer.").

[118] *S. Fork Band Council of W. Shoshone of Nev.*, 588 F3d at 728.

*cont…*

Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj.
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG   Page 20

officials act in accordance with law."[119] Accordingly, these factors — balance of equities and public interest — are satisfied.

## II.   THE COURT SHOULD WAIVE ANY BOND.

While courts must consider whether a bond is necessary to indemnify wrongfully enjoined parties, there is a well-established "public interest" exception, and courts can decline to impose bonds to avoid frustrating public interest litigation.[120]

Plaintiffs seek to further the strong public interest in preventing irreparable harm to the Coastal Plain and ensuring compliance with environmental laws. Plaintiffs are non-profit organizations and the imposition of a substantial bond would hinder their ability to commence citizen actions and effectively deny their right to protect the public interest through the courts.[121] To safeguard the important public rights at issue in this case, the Court should waive the bond requirement or require only a nominal bond.[122]

---

[119] *Seattle Audubon Soc'y*, 771 F. Supp. at 1096; *see also E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1254–55 (9th Cir. 2018).

[120] *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325–26 (9th Cir. 1985); *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999).

[121] Blackledge Dec. at 11; Baraff Dec. at 16–17; Brouwer Dec. at 10–11; Demientieff Dec. at 21–22; Isherwood Dec. at 3–5; Itchoak Dec. at 22–23; Kolton Dec. at 13–14; Nickas Dec. at 10–11; Raskin Dec. at 11; Rider Dec. at 10; Schmitt Dec. at 15–16; Stone-Manning Dec. at 7–8; Whittington-Evans Dec. at 29–31.

[122] *See, e.g.*, *W. Watersheds Project*, 417 F. Supp. 3d at 1335 (waiving bond for public interest case).

Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj.
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG   Page 21

<u>CONCLUSION</u>

The Court should grant Plaintiffs' motion for a TRO/PI enjoining lease and permit

issuance in reliance on the EIS and ROD and waive any bond.

Respectfully submitted this 15th day of December, 2020.

s/ Brook Brisson
Brook Brisson (AK Bar No. 0905013)
Suzanne Bostrom (AK Bar No. 1011068)
Bridget Psarianos (AK Bar No. 1705025)
Brian Litmans (AK Bar No. 0111068)
TRUSTEES FOR ALASKA

*Attorneys for Plaintiffs Gwich'in Steering
Committee, Alaska Wilderness League, Alaska
Wildlife Alliance, Canadian Parks &
Wilderness Society-Yukon, Defenders of
Wildlife, Environment America, Friends of
Alaska National Wildlife Refuges, National
Wildlife Federation, National Wildlife Refuge
Association, Northern Alaska Environmental
Center, Sierra Club, The Wilderness Society,
and Wilderness Watch*

s/ Karimah Schoenhut (consent)

Karimah Schoenhut (*pro hac vice*)
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM

*Attorney for Plaintiff Sierra Club*

Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj.
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG  Page 22

<u>CERTIFICATE OF COMPLIANCE</u>

      Pursuant to Local Civil Rule 7.4(a)(3), I certify that this memorandum complied with the type-volume limitation of 7.4(a)(1) because it contains 5,646 words, excluding the parts exempted by Local Civil Rule 7.4(a)(4).

                __ s/ Brook Brisson_____
                Brook Brisson

Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj.
*Gwich'in Steering Committee v. Bernhardt*, Case No. 3:20-cv-00204-SLG   Page 23

Case 3:20-cv-00204-SLG   Document 47-1   Filed 12/15/20   Page 26 of 26