Brook Brisson (AK Bar No. 0905013)
Suzanne Bostrom (AK Bar No. 1011068)
Bridget Psarianos (AK Bar No. 1705025)
TRUSTEES FOR ALASKA
121 Fireweed Lane, Suite 105
Anchorage, AK 99503
Phone: (907) 276-4244
Fax: (907) 276-7110
bbrisson@trustees.org
sbostrom@trustees.org
bpsarianos@trustees.org

*Attorneys for Plaintiffs Gwich'in Steering
Committee, Alaska Wilderness League, Alaska Wildlife Alliance,
Canadian Parks & Wilderness Society-Yukon,
Defenders of Wildlife, Environment America,
Friends of Alaska National Wildlife Refuges,
National Wildlife Federation, National
Wildlife Refuge Association, Northern
Alaska Environmental Center, Sierra Club,
The Wilderness Society, and Wilderness
Watch*

Karimah Schoenhut (*pro hac vice*)
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
50 F St., NW 8th Floor
Washington, DC 20001
Phone: (202) 548-4584
Fax: (202) 547-6009
karimah.schoenhut@sierraclub.org

*Attorney for Plaintiff Sierra Club*

# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

GWICH'IN STEERING COMMITTEE, Case No. 3:20-cv-00204-SLG
ALASKA WILDERNESS LEAGUE,
ALASKA WILDLIFE ALLIANCE,
CANADIAN PARKS & WILDERNESS
SOCIETY-YUKON, DEFENDERS OF
WILDLIFE, ENVIRONMENT
AMERICA, INC., FRIENDS OF
ALASKA NATIONAL WILDLIFE
REFUGES, NATIONAL WILDLIFE
FEDERATION, NATIONAL
WILDLIFE REFUGE ASSOCIATION,
NORTHERN ALASKA
ENVIRONMENTAL CENTER,
SIERRA CLUB, THE WILDERNESS
SOCIETY, and WILDERNESS
WATCH,

                Plaintiffs,

      v.

DOUG BURGUM, in his official
capacity as Secretary of the Interior,
UNITED STATES DEPARTMENT OF
THE INTERIOR, BUREAU OF LAND
MANAGEMENT, and U.S. FISH &
WILDLIFE SERVICE,

              Defendants,

               and

NORTH SLOPE BOROUGH, NATIVE
VILLAGE OF KAKTOVIK,
KAKTOVIK IÑUPIAT
CORPORATION, ALASKA OIL AND
GAS ASSOCIATION, AMERICAN
PETROLEUM INSTITUTE, STATE OF
ALASKA, and ALASKA

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG    Page 2 of 74

INDUSTRIAL DEVELOPMENT AND
EXPORT AUTHORITY,

Intervenor-Defendants.

**[PROPOSED] SECOND AMENDED AND FIRST SUPPLEMENTAL
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
(Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487, §§ 303(2)(B),
304(a), Pub. L. No. 96-487, 94 Stat. 2371, 2390, 2393 (1980) & 16 U.S.C. §§ 3101–
3233; National Wildlife Refuge System Administration Act, 16 U.S.C. §§ 668dd–668ee;
National Environmental Policy Act, 42 U.S.C. §§ 4321–4370j; Wilderness Act, 16
U.S.C. §§ 1131–1136; Tax Cuts and Jobs Act, Pub. L. No. 115-97, tit. II, § 20001 131
Stat. 2054, 2235–37 (2017); Endangered Species Act, 16 U.S.C. §§ 1531–1544;
Administrative Procedure Act, 5 U.S.C. §§ 702–706)

Plaintiffs Gwich'in Steering Committee, Alaska Wilderness League, Alaska

Wildlife Alliance, Canadian Parks & Wilderness Society-Yukon, Defenders of Wildlife,

Environment America, Inc., Friends of Alaska National Wildlife Refuges, National

Wildlife Federation, National Wildlife Refuge Association, Northern Alaska

Environmental Center, Sierra Club, The Wilderness Society, and Wilderness Watch

(collectively, Plaintiffs) file this Second Amended and First Supplemental Complaint for

Declaratory and Injunctive Relief, alleging:

## I.    NATURE OF THE CASE

1.      This case asserts challenges to decisions by the Secretary of the U.S.

Department of the Interior (Secretary) regarding unlawful oil and gas leasing programs

for the Coastal Plain of the Arctic National Wildlife Refuge (Arctic Refuge).

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG      Page 3 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 3 of 74

2.      The Coastal Plain of the Arctic Refuge is iconic and sacred. It provides

habitat for numerous fish and wildlife species, including caribou, polar bears, birds, and

wolves. It offers exceptional recreational experiences, in large part because of its

incredible wilderness and wildlife values. It provides subsistence resources for two

Indigenous peoples: the Iñupiat and Gwich'in. It is sacred land to the Gwich'in of Alaska

and Canada because of the importance of the Coastal Plain to the Porcupine Caribou

Herd and the deep cultural and spiritual connection between the Gwich'in and the

caribou.

3.      Because of its exceptional subsistence, wildlife, habitat, and cultural values,

the Coastal Plain has been protected under federal law for decades. Those protections

prohibited oil and gas leasing and development in the area.

4.      This protected status changed in 2017, when tax reform legislation allowed

for an oil and gas leasing program on the Coastal Plain.

5.      During the first Trump administration, the U.S. Department of the Interior

(Interior) and the U.S. Bureau of Land Management (BLM) conducted a rushed process

to complete the environmental analysis and adopt an extensive and harmful leasing

program record of decision (ROD) in 2020 ("2020 ROD" or "2020 Leasing Program")

that did not comply with the law.

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG      Page 4 of 74

Case 3:20-cv-00204-SLG      Document 134-1      Filed 01/13/26      Page 4 of 74

6.     Plaintiffs immediately filed this lawsuit challenging the 2020 Leasing Program and related decisions. Despite that lawsuit, Interior held a lease sale and issued leases in early 2021.

7.     Since that time, Interior and BLM have undertaken numerous actions regarding the oil and gas leasing program. Most recently, BLM issued a final supplemental environmental impact statement (EIS) in 2024, the U.S. Fish and Wildlife Service (FWS) issued a new Biological Opinion ("2025 BiOp") under the Endangered Species Act, the Secretary issued a new record of decision on October 23, 2025 adopting a new leasing program ("2025 ROD" or "2025 Leasing Program"), and the Deputy Secretary of the U.S. Department of the Interior (Deputy Secretary) issued a decision lifting the suspension of activities on the leases.

8.     This action now challenges the original and new decisions and alleges violations of: the Alaska National Interest Lands Conservation Act (ANILCA), Pub. L. No. 96-487, §§ 303(2)(B), 304(a), Pub. L. No. 96-487 94 Stat. 2371, 2390, 2393 (1980) and 16 U.S.C. §§ 3101–3233; the National Wildlife Refuge System Administration Act (Refuge Act), 16 U.S.C. §§ 668dd–668ee, and implementing regulations; Tax Cuts and Jobs Act (Tax Act), Public Law 115-97, tit. II, § 20001, 131 Stat. 2054, 2235–37 (2017),; the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370j; the Wilderness Act, 16 U.S.C. §§ 1131–1136; the Endangered Species Act (ESA), 16 U.S.C.

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 5 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 5 of 74

§§ 1531–1544, and implementing regulations; and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706.

9.     Plaintiffs are seeking to invalidate BLM's unlawful ANILCA Section 810 Final Evaluations and related final EIS and final supplemental EIS analyses, Determination of NEPA Adequacy (DNA), 2020 ROD, 2025 ROD, FWS's 2020 Biological Opinion (BiOp) and 2025 BiOp, and any related or subsequent agency decisions based on those documents, including the leases issued following the January 2021 lease sale and reaffirmed by the Deputy Secretary's October 24, 2025 decision to lift the suspension on those leases, as well as any leases issued in future lease sales.

10.     Plaintiffs seek vacatur and declaratory and injunctive relief against the Secretary, Interior, BLM, and FWS. The agencies' actions and decisions fail to comply with applicable law, are arbitrary, capricious, an abuse of discretion, and not in accordance with the law, in excess of statutory authority, and without observance of the procedures required by law. 5 U.S.C. § 706(2).

## II.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over the parties and subject matter of this action under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (action to compel mandatory duty), 28 U.S.C. § 2201(a) (declaratory relief), 28 U.S.C. § 2202 (injunctive relief), and 16 U.S.C. 1540(g)(1) (ESA citizen-suit claims regarding reliance on 2020 BiOp).

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 6 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 6 of 74

12.     The BLM's issuance of leases in 2021, the final and supplemental EISs, ANILCA Section 810 Final Evaluations, the 2020 ROD and 2025 ROD, FWS's 2020 and 2025 BiOps, and the Deputy Secretary's 2025 lease decision are final agency actions for which Plaintiffs have a right to judicial review under the APA. 5 U.S.C. §§ 701–06.

13.     Defendants' sovereign immunity is waived pursuant to the APA and ESA. 5 U.S.C. § 702; 16 U.S.C. § 1540(g)(1)(A).

14.     Venue is proper in the District of Alaska under 28 U.S.C. § 1391(a)–(c) and (e), as well as 16 U.S.C. § 1540(g)(3)(A), because a substantial part of the events giving rise to the claims occurred within the BLM Alaska State and Arctic District Offices, and the FWS Alaska Regional Office, because many groups are primarily located in or maintain offices in Alaska, and because the lands at issue in the case — the Coastal Plain of the Arctic Refuge — are located in Alaska.

### III.     PARTIES

<u>Plaintiffs</u>

15.     Plaintiff Gwich'in Steering Committee is a 501(c)(3) nonprofit organization based in Fairbanks, Alaska. The Gwich'in Steering Committee is a voice for the 8,000-strong Gwich'in speaking out to protect the sacred calving and nursery grounds of the Porcupine Caribou Herd — the Coastal Plain. The Gwich'in Steering Committee was formed in 1988 in response to proposals to drill for oil in the Coastal Plain. The Gwich'in Steering Committee represents the communities of Arctic Village, Venetie, Fort Yukon,

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 7 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 7 of 74

Beaver, Chalkyitsik, Birch Creek, Canyon Village, Circle, and Eagle Village in Alaska, and Old Crow, Fort McPherson, Tsiigehtchic, Aklavik, and Inuvik in Canada. The mission of the Gwich'in Steering Committee is to ensure the long-term health and viability of the Porcupine Caribou Herd, which sustains the Gwich'in way of life. Protecting the Coastal Plain and the Porcupine Caribou Herd is a human rights issue for the Gwich'in People. The Gwich'in Steering Committee is dedicated to protecting the entire ecosystem that the caribou rely on so that the Gwich'in will have a future in their homeland. As depicted in the map below, the traditional homelands of the Gwich'in generally follow the migratory path of the Porcupine Caribou Herd, but because of how sacred the Coastal Plain is to the Gwich'in, the area is not visited:

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG    Page 8 of 74

Case 3:20-cv-00204-SLG    Document 134-1    Filed 01/13/26    Page 8 of 74



The Gwich'in Steering Committee's goal is to permanently protect the Coastal Plain of the Arctic Refuge. Gwich'in leaders have advocated for permanent protection of the Coastal Plain of the Refuge for decades, since before the passage of ANILCA. The Gwich'in Steering Committee engages in numerous activities to advocate for permanent protection of the Refuge, including public outreach and education, media work, public speaking, and attending conferences and events. The Gwich'in Steering Committee has submitted comments on numerous Refuge decisions and has presented testimony to

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG        Page 9 of 74

Case 3:20-cv-00204-SLG        Document 134-1        Filed 01/13/26        Page 9 of 74

Congress, the United Nations Special Rapporteur on Indigenous Peoples, and at public hearings on the leasing program. The Gwich'in Steering Committee submitted extensive comments on the draft EIS and draft supplemental EIS, including raising issues under ANILCA Section 810 and related to subsistence use of the Coastal Plain's resources.

16. Plaintiff Alaska Wilderness League (AWL) is a nonprofit organization founded in 1993 with over 130,000 members and supporters, including many members in Alaska. AWL's mission is to galvanize support to secure vital policies that protect and defend America's last great wild public lands and waters. AWL advocates for the protection of Alaska's wild lands and waters and works to prevent environmental degradation on Alaska's public lands and waters, including the Arctic Refuge. AWL actively works on issues related to oil and gas development and the protection of the Arctic Refuge. AWL is committed to honoring the human rights and traditional values of the people of the Arctic.

17. Plaintiff Alaska Wildlife Alliance (AWA) was founded by Alaskans in 1982 to protect intact ecosystems so that our state's wildlife can be managed for biodiversity and the benefit of present and future generations. AWA has over 1,200 members and supporters. AWA and its members speak out against energy development that unduly threatens vulnerable Alaskan ecosystems and species, including BLM's leasing program for the Coastal Plain. AWA is particularly concerned about impacts to Coastal Plain ecosystems and wildlife, including but not limited to the endangered

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 10 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 10 of 74

Steller's eider and Beaufort Sea polar bears, as well as millions of migrating and nesting shorebirds, the Porcupine and Central Arctic caribou herds, and muskoxen. In addition to threatening wildlife, the leasing program violates the rights of Alaska Natives to subsist on this vibrant landscape. AWA views the Coastal Plain as one of the last unspoiled wild areas in the world and seeks to ensure that protections guaranteed in its designation are honored for wildlife and future generations of Alaskans.

18.     Plaintiff Canadian Parks and Wilderness Society – Yukon (CPAWS Yukon) is one of thirteen chapters of the Canadian Parks and Wilderness Society, which has over 40,000 supporters across Canada. CPAWS Yukon has approximately 220 members and over 2,000 supporters. It was founded in 1992 by Yukoners who wanted to bring attention to conservation issues in the Yukon Territory. CPAWS Yukon aims to preserve vast tracts of the Yukon's most beautiful and ecologically important lands and waters. CPAWS Yukon supports fair and democratic land-use planning that respects the rights of Yukon First Nations, engages all Yukoners, and recognizes the importance of protected areas as a means to promote ecological integrity and a sustainable future for the Yukon. CPAWS Yukon works on issues related to oil and gas activities on the Coastal Plain of the Arctic Refuge, which have the potential to harm the Porcupine Caribou Herd, which is critical to the culture and subsistence ways of life for Indigenous peoples across the northern Yukon and into the Northwest Territories.

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 11 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 11 of 74

19.     Plaintiff Defenders of Wildlife (Defenders) is a nonprofit conservation organization and one of the nation's leading advocates for endangered species and wildlife. Founded in 1947, Defenders is headquartered in Washington, D.C., with field conservation programs throughout the country, including Alaska. Defenders represents approximately 2 million members and supporters nationwide, including more than 7,000 in Alaska. Defenders engages in education, public outreach, science, policy, and litigation, along with legislative and administrative advocacy, to defend the species, ecosystems, and habitats that are central to the organization's mission, including those in the Arctic National Wildlife Refuge. Defenders has worked for decades to safeguard the Arctic Refuge from destructive oil and gas exploration and development. Protecting this vital unit of the National Wildlife Refuge System is key to implementing Defenders' vision to ensure that diverse wildlife populations are secure and thriving, sustained by a healthy and intact network of lands and waters. Defenders also works to support implementation of the FWS's Polar Bear Conservation and Recovery Plan, and to avoid, minimize, or mitigate impacts to polar bears and other wildlife that may arise from current or proposed development activities in the Arctic Refuge and elsewhere in the Arctic.

20.     Plaintiff Environment America, Inc. (Environment America) is an advocacy group comprised of thirty affiliate organizations and members and supporters in every state, including Alaska. Environment America works to protect air, water, and open

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG      Page 12 of 74

Case 3:20-cv-00204-SLG      Document 134-1      Filed 01/13/26      Page 12 of 74

spaces. Environment America engages in independent environmental research and advocates for policies by lobbying and mobilizing the public. Environment America has worked to raise awareness about the harmful impacts of oil and gas on public lands, including the Arctic Refuge, and the need to protect our natural heritage over fossil fuel extraction.

21.     Plaintiff Friends of Alaska National Wildlife Refuges (Friends) is a nonprofit membership-based organization founded in 2005 and based in Homer, Alaska. It is a volunteer driven organization representing over 400 members working to assist FWS to accomplish its congressionally mandated mission for the sixteen national wildlife refuges in Alaska. Friends promotes the conservation of all Alaska National Wildlife Refuges by helping to protect and enhance their habitats and wildlife, including the Arctic Refuge; and by assisting the FWS through outreach to decision-makers, coordinating volunteer efforts on refuges, and providing public education about the recreation opportunities these refuges provide.

22.     Plaintiff National Wildlife Federation (NWF), one of America's largest conservation organizations, has worked across the country to unite Americans from all walks of life in giving wildlife a voice for nearly ninety years. NWF has fifty-two state and territorial affiliates, including an Alaska affiliate, and approximately seven million members and supporters, including hunters, anglers, gardeners, birders, hikers, campers, paddlers, and other outdoor enthusiasts. NWF programs work to protect the 600 million

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG      Page 13 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 13 of 74

acres of public lands owned by all Americans and has a longstanding interest in ensuring these lands are managed properly for fish, wildlife, and communities.

23. Plaintiff National Wildlife Refuge Association is a non-profit organization focused exclusively on protecting and promoting the 850-million-acre National Wildlife Refuge System, the world's largest network of lands and waters set aside for wildlife conservation. Founded in 1975, its mission is to conserve America's wildlife heritage for future generations through strategic programs that enhance the National Wildlife Refuge System and the landscapes beyond its boundaries. With approximately 80% of the land mass of the National Wildlife Refuge System in Alaska, the National Wildlife Refuge Association has throughout its history focused significant resources on protecting and enhancing Refuge System resources in Alaska, including the Arctic Refuge.

24. Plaintiff Northern Alaska Environmental Center (Northern Center) is an Alaska nonprofit environmental organization founded in 1971 with 418 members, approximately fifty-six percent of whom are based throughout Alaska. The Northern Center's mission is to promote the conservation of the environment and sustainable resource stewardship in Interior and Arctic Alaska through education and advocacy, with the goal of ensuring that Alaska's globally significant wildlands remain healthy, biologically diverse, and productive for present and future generations. One of the Northern Center's core focus areas is its Arctic program, through which it works to protect the Arctic, its communities, and vital wildlife habitat and wildlands, including the

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG    Page 14 of 74

Case 3:20-cv-00204-SLG    Document 134-1    Filed 01/13/26    Page 14 of 74

Arctic National Wildlife Refuge, from the harms associated with oil and gas development. Consistent with its mission and vision, the Northern Center seeks to safeguard fish and wildlife resources that support subsistence traditions and a sustainable quality of life for Alaskans, and to amplify the voices of local and rural communities most directly impacted by industrial development. The Northern Center regularly participates in agency decision-making and public processes related to oil and gas development in the Arctic, including the challenged action, and provides its members and the public with information about the environmental, cultural, and subsistence impacts of such development, enabling informed public participation.

25.     Plaintiff Sierra Club is the nation's oldest and largest grassroots environmental organization. The Sierra Club is a national nonprofit organization of approximately 621,400 members dedicated to exploring, enjoying, and protecting the wild places of Earth; to practicing and promoting the responsible use of the Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Alaska Chapter of the Sierra Club has approximately 1,280 members. The Sierra Club's concerns encompass a variety of environmental issues in Alaska, and the organization has long been active on issues related to the protection of the Coastal Plain of the Arctic Refuge.

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 15 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 15 of 74

26.     Plaintiff The Wilderness Society is a nonprofit organization headquartered in Washington, D.C., with offices throughout the country, including a five-person staff in Alaska. Its overall mission is uniting Americans to protect wild places. The Wilderness Society has over a million members, supporters, and followers, many of whom are in Alaska. The goal of its Alaska program is to permanently protect special places in America's Arctic and sub-Arctic, including in the Arctic Refuge. The Wilderness Society has been engaged in Arctic Refuge conservation efforts since the organization's inception in the 1930s and has consistently participated in public processes associated with Arctic Refuge decisions. Among other areas of focus, staff from The Wilderness Society work to advance scientific understanding and conservation policy for highly migratory caribou and fish resources that utilize much of the landscape to complete their life cycles.

27.     Plaintiff Wilderness Watch is a nonprofit organization founded in 1989. Its mission is to defend the nation's 111-million-acre National Wilderness Preservation System. Wilderness Watch advocates for appropriate stewardship according to the requirements of the Wilderness Act of 1964. Wilderness Watch monitors agency stewardship of designated Wilderness in Alaska and organizes its members to participate in public processes in Alaska, including the Arctic Refuge, that impact designated Wilderness.

28.     Plaintiffs participated actively in the administrative processes related to the 2020 Leasing Program and 2025 Leasing Program and 2021 lease sale by submitting

public comments, engaging with experts to review the analysis, giving oral testimony, and engaging their millions of members and supporters to participate in support of Coastal Plain protection to achieve organizational missions and goals. Plaintiffs also have an interest in ensuring that the Secretary, Interior, BLM, and FWS comply with applicable laws.

29. Plaintiffs' members and supporters work, visit, and recreate in and around the Arctic Refuge and on the Coastal Plain, including those lands and waters on the Coastal Plain that are open to oil and gas leasing and activities under the 2020 Leasing Program and 2025 Leasing Program, and plan to return to the Coastal Plain. Plaintiffs' members and supporters also live in and around the Arctic Refuge. Plaintiffs' members and supporters use the Coastal Plain and depend on the health of the subsistence resources in the Coastal Plain and its vicinity to support their subsistence way of life, including to maintain cultural and spiritual practices and their identity. Plaintiffs' members and supporters have health, subsistence, cultural, economic, recreational, scientific, environmental, aesthetic, educational, conservation, and other interests in the Coastal Plain of the Arctic Refuge. Plaintiffs' members and supporters enjoy or use wildlife that inhabit these areas, in particular caribou, polar bears, and birds. Plaintiffs' members and supporters recreate on the Coastal Plain in multiple seasons because of its exceptional wilderness values and the exceptional experience it provides to visitors.

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG    Page 17 of 74

Case 3:20-cv-00204-SLG    Document 134-1    Filed 01/13/26    Page 17 of 74

30.     These interests, their members' and supporters' use and enjoyment of the

Coastal Plain and adjacent areas, and the resources present in the area and that rely on the

area have been, are being, and will continue to be adversely affected by the 2020 Leasing

Program and 2025 Leasing Program and activities in the Coastal Plain, including leasing

the Coastal Plain. The 2020 Leasing Program and 2025 Leasing Program, leases, and oil

and gas activities allowed by the leasing programs — including seismic exploration —

will degrade and harm the natural environment and wildlife and habitat used and enjoyed

by the Plaintiffs' members and supporters, thereby harming the interests of Plaintiffs'

members and supporters. The 2020 Leasing Program and 2025 Leasing Program, leases,

and activities enabled by the leasing program, will also impede Plaintiffs' members'

ability to access subsistence resources in the region or to use subsistence resources that

rely on the Coastal Plain, and impact cultural and spiritual connections and traditions.

31.     Interior's adoption of the 2020 Leasing Program and issuance of the leases

in 2021, as well as the agency's adoption of the 2025 Leasing Program in violation of

ANILCA, the Refuge Act, NEPA, Wilderness Act, Tax Act, and ESA threatens imminent

irreparable harm to the interests of the Plaintiffs and their members. Interior's failure to

adhere to mandated procedures and its reliance on a flawed analysis also harms Plaintiffs'

and their members' and supporters' ability to engage in the public process and ensure

informed decision making and compliance with statutory protections otherwise mandated

for the Coastal Plain.

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 18 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 18 of 74

32. These actual, concrete injuries suffered by Plaintiffs and their members and supporters are fairly traceable to Interior's adoption of the 2020 Leasing Program and 2025 Leasing Program, and BLM's 2021 issuance of leases, and decision to reaffirm the leases in violation of the substantive and procedural protections of these laws, and would be redressed by the relief sought in this case.

33. FWS's deficient 2020 BiOP and 2025 BiOp violate the ESA and APA and threaten imminent, irreparable harm to the interests of Plaintiffs and their members and supporters in the Southern Beaufort Sea (SBS) population of polar bears. These actual, concrete injuries suffered by Plaintiffs and their members and supporters are fairly traceable to the deficient BiOps for the leases and the 2025 Leasing Program and would be redressed by the relief sought in this case.

<u>Defendants</u>

34. Defendant Doug Burgum is the Secretary of the U.S. Department of the Interior and is being sued in his official capacity. He was automatically substituted as the Secretary pursuant to Federal Rule of Civil Procedure 25(d). Secretary Burgum is responsible for ensuring that the actions and decisions of Interior, BLM, and FWS comply with all applicable laws and regulations. Secretary Burgum is the official who signed the challenged 2025 ROD.

35. Defendant Interior is an agency of the United States responsible for oversight of BLM and FWS.

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG    Page 19 of 74

Case 3:20-cv-00204-SLG    Document 134-1    Filed 01/13/26    Page 19 of 74

36.     Defendant BLM is an agency within Interior. Under the Tax Act, it is responsible for management of a competitive oil and gas program including the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain.

37.     Defendant FWS is an agency within Interior and is charged with administering units of the National Wildlife Refuge System, including the Arctic Refuge, and with administering the ESA for polar bears (in addition to other terrestrial species).

## IV.     STATEMENT OF FACTS

### The Exceptional Values of the Coastal Plain of the Arctic Refuge

38.     The Arctic Refuge is iconic among America's wildlife refuges. Many consider it to be the crown jewel of the National Wildlife Refuge System, the largest system of public lands and waters managed for wildlife conservation in the world. At over nineteen million acres, the Arctic Refuge is America's largest and wildest national wildlife refuge. It encompasses boreal forests in the south, glaciers in the Brooks Range, the highest peak in Arctic Alaska, numerous braided rivers and natural springs, and the Coastal Plain that borders the Beaufort Sea to the north.

39.     The over 1.5-million-acre Coastal Plain is a vibrant and ecologically rich area that has been referred to as the "Serengeti of the Arctic" and is recognized as the biological heart of the Arctic Refuge. It provides rare and important habitat for many animals, including caribou, polar and grizzly bears, birds, ice seals, musk oxen, and wolves.

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG      Page 20 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 20 of 74

40.     The Porcupine Caribou Herd migrates annually through Alaska and Canada, traveling upwards of 2,700 miles per year — the longest overland migration of any terrestrial mammal. The Porcupine Caribou Herd relies on the Coastal Plain for calving, post-calving, and insect relief habitat, and as a source of high-protein nutrition away from predators.

41.     The herd's migratory path brings it to the Coastal Plain in the early summer, as early as May, where, in a frenzy of activity, tens of thousands of calves are born within a few days of each other. The caribou cows find plentiful and high-protein food on the Coastal Plain to nourish and replenish them after their long journey and the stress of birth. The insect relief attributes of the Coastal Plain are also critical to the herd. The relentless insects of the Arctic are a major problem for the caribou and can even lead to death. The winds, coastline, and aufeis (areas of ice build up along rivers) provide critical and potentially life-saving insect relief.

42.     The Arctic Refuge lies at the heart of the traditional homelands of the Gwich'in. As they have since time immemorial, the Gwich'in of Alaska and Canada rely heavily on the Porcupine Caribou Herd for subsistence and as the foundation of their culture. Indeed, Porcupine caribou are so central to the lives of the Gwich'in that they call themselves the "caribou people," and the Gwich'in name for the Coastal Plain is "Iizhik Gwats'an Gwandaii Goodlit" — which translates to "the Sacred Place Where Life Begins."

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 21 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 21 of 74

43. The relationship between the caribou and the Gwich'in is guided by the belief that the caribou have a piece of the Gwich'in in their heart and the Gwich'in have a piece of the caribou in their heart. As a result, the Gwich'in made a pact with the caribou to protect them so the caribou can continue to provide for the Gwich'in. The Gwich'in have maintained their cultural identity and connection to the Arctic Refuge and the Coastal Plain for millennia.

44. Gwich'in traditional knowledge instructs that the caribou will be harmed by the development of the Coastal Plain, the sacred calving and nursery grounds of the Porcupine Caribou Herd.

45. The Coastal Plain also provides denning habitat for polar bears, which are protected as a threatened species under the ESA. Polar bear populations have been reduced to a precarious state due to impacts from climate change, which will only worsen as warming in the Arctic region continues.

46. The Coastal Plain has the highest density of onshore polar bear denning habitat in America's Arctic. This is because the topography of the Coastal Plain, where the rivers and hills of the Coastal Plain create areas of deep snow drifts, is uniquely different from the rest of Alaska's Arctic. These areas where snow accumulates are ideal denning sites for pregnant polar bears. Maternal denning habitat includes river corridors between the dens and the coast because polar bears move along the rivers to travel between their dens and food sources on the coast.

47.     The abundant plants and insects available in the summer also allow many bird species to nest and forage on the Coastal Plain, which they do as part of their annual migrations through all of North America's flyways and, remarkably, to six continents. Birds begin returning to the Coastal Plain in the spring and remain through late summer and into early fall.

48.     The Arctic Refuge is our nation's premiere wilderness Refuge and the wilderness values of the Coastal Plain are incomparable. The untrammeled nature provides unique opportunities to study and understand ecosystems and functions on a landscape scale. The integrity of the ecosystems provides unique habitat to numerous wildlife species. The undeveloped and undisturbed character of the area offers world-class wilderness recreation opportunities. The Coastal Plain also borders the eight-million-acre Mollie Beattie Wilderness area within the Arctic Refuge.

49.     In short, the ecological, cultural, and wilderness values of the Coastal Plain are exceptional.

<u>The Imperiled Southern Beaufort Sea Population of Polar Bears</u>

50.     In 2008, FWS published its final rule listing the polar bear as a threatened species under the ESA. Determination of Threatened Status for the Polar Bear (Ursus maritimus) Throughout Its Range, 73 Fed. Reg. 28212 (May 15, 2008). FWS also published a Special Rule for the Polar Bear, 73 Fed. Reg. 76249 (Dec. 16, 2008), which

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG      Page 23 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 23 of 74

specifies the protective measures that apply to the polar bear because of its threatened status.

51.     FWS designated critical habitat for polar bears in Alaska in 2011 as three units: sea ice (unit 1), terrestrial denning habitat (unit 2), and barrier island (unit 3). Designation of Critical Habitat for the Polar Bear (Ursus maritimus) in the United States, 75 Fed. Reg. 76086, 76088–91 (Dec. 7, 2010). The vast majority of BLM's oil and gas leasing program area is land designated as terrestrial denning critical habitat as part of unit 2.

52.     The proportion of females denning on land has increased significantly as sea ice diminishes due to climate change. Polar bears are particularly vulnerable to sea ice melt given their life history and specialized habitat needs.

53.     The Southern Beaufort Sea (SBS) population is among the most imperiled polar bear populations in the world, having declined dramatically since the 1990s. In addition to climate change, polar bears in the SBS population face threats from a wide range of industrial activities, including onshore and offshore oil and gas development and increased shipping. They are also subject to subsistence hunting and mortality due to interactions with humans where there is a perceived threat to life and property.

54.     The data and information on the population and population dynamics for the SBS polar bears are outdated and incomplete.

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG      Page 24 of 74

55.     Noise and visual disturbance from human activity and operation of
equipment, especially aircraft and vehicle traffic, have the potential to disturb polar bears.
Disturbance of maternal females during the winter denning period can result in premature
den abandonment, or earlier den emergences and departures, adversely affecting polar
bear cub survival.

BLM's Coastal Plain Leasing Program

56.     In April 2018, BLM began the NEPA process for the Coastal Plain leasing
program. Notice of Intent to Prepare an Environmental Impact Statement for the Coastal
Plain Oil and Gas Leasing Program, Alaska, 83 Fed. Reg. 17562 (Apr. 20, 2018).

57.     Numerous groups, including Plaintiffs, submitted scoping comments to the
agency. Plaintiffs' comments outlined myriad legal, technical, and resource issues that
the agency needed to thoroughly explain and review before adopting a leasing program.

58.     In December 2018, BLM released the draft EIS for the Coastal Plain
leasing program and the ANILCA Section 810 Preliminary Evaluation.

59.     Plaintiffs submitted comments on BLM's draft EIS. In their comments,
Plaintiffs raised numerous, significant legal issues with BLM's analysis. Letter from
Kristen Miller, Conservation Dir., AWL et al., to Nicole Hayes, Project Manager, BLM
(Mar. 13, 2019).

60.     Plaintiffs, and in particular the Gwich'in Steering Committee, also
submitted extensive comments criticizing BLM's ANILCA Section 810 Preliminary

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 25 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 25 of 74

Evaluation and the related draft EIS analysis. *Id.*; Letter from Bernadette Demientieff, Exec. Dir., Gwich'in Steering Comm., to Nicole Hayes, Project Manager, BLM (Mar. 13, 2019).

61.     In September 2019, BLM issued the final EIS and ANILCA Section 810 Final Evaluation for the 2020 Leasing Program and identified Alternative B as the preferred alternative. Environmental Impact Statements, Notice of Availability, 84 Fed. Reg. 49521 (Sept. 20, 2019). Alternative B made the entire Coastal Plain open to leasing and exploration and included the fewest protections of the alternatives analyzed.

62.     FWS prepared a biological opinion pursuant to the ESA in support of BLM's 2020 Leasing Program. FAIRBANKS FISH AND WILDLIFE FIELD OFF., FWS, BIOLOGICAL OPINION FOR COASTAL PLAIN OIL AND GAS LEASING PROGRAM ARCTIC NATIONAL WILDLIFE REFUGE (2020) [hereinafter 2020 BiOp]. The 2020 BiOp evaluated Alternative B from the final EIS. Among other significant legal errors with the 2020 BiOp, FWS relied on future compliance with the Marine Mammal Protection Act (MMPA) as the primary mechanism to ensure that the 2020 Leasing Program would not likely result in jeopardy to polar bears under the ESA. *Id.* at 114–16. The 2020 BiOp also

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 26 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 26 of 74

assumed that MMPA compliance and future ESA consultations would ensure against any destruction or adverse modification of polar bear critical habitat. *Id.* at 123.[1]

63.     On August 17, 2020, the Secretary signed the 2020 ROD for the 2020 Leasing Program. BLM, INTERIOR, Coastal Plain Oil and Gas Leasing Program Record of Decision (2020) [hereinafter ROD].

64.     The ROD adopted Alternative B as the Coastal Plain Leasing Program, the most extensive alternative considered in the final EIS, opening "the entire program area" to oil and gas leasing, "and consequently for future potential exploration, development, and transportation." *Id.* at 2–3.

65.     The ROD did not adopt the interpretation of the 2,000-acre limitation set forth and applied in the final EIS. *Id.* at 2, 4, 5. Instead, the ROD contained a new interpretation of the 2,000-acre limit that identified and defined what facilities could be included within that limitation. *Id.* at 11–13. The ROD explained that many facilities that were assumed to be within the 2,000-acre limitation in the final EIS may not actually be counted toward that limitation, including airstrips, barge landings, roads, and gravel

---

[1] Pursuant to 16 U.S.C. § 1540(g)(2)(A)(i), on August 24, 2020, Plaintiffs provided notice of intent to sue to Interior, BLM, and FWS regarding BLM's unreasonable and unlawful reliance on the 2020 BiOp, in violation of its substantive duty under section 7(a)(2) of the ESA to ensure against jeopardy and destruction or adverse modification of critical habitat for the polar bear. *See* Ex. A, ECF No. 19-1. Plaintiffs amended their complaint on November 2, 2020, to include those claims. *See* First Am. Compl., ECF No. 19.

---

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF

*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 27 of 74

mines. *Id.* at 13. BLM based this new interpretation on its conclusion that the facilities counting toward the 2,000-acre limitation needed to be both "production *and* support facilities." *Id.* at 12. The ROD explained that "support" facilities that could be attributed to any other phase of oil and gas activities, such as transportation, exploration, or development, would not be limited by the 2,000-acre cap. In other words, the agency indicated that under this new interpretation, it could authorize far more than 2,000 acres of infrastructure to be present on the Coastal Plain at any given point in time. However, the ROD also stated that the agency would not make specific determinations about which facilities would count toward the 2,000 acres until later in time. *Id.* at 12–13.

66.     On November 17, 2020, BLM issued the public notice of a Call for Nominations and Comments for the Coastal Plain Alaska Oil and Gas Lease Sale, 85 Fed. Reg. 73292 (Nov. 17, 2020).

67.     On December 7, 2020, during the public comment period on the call for nominations, BLM issued a Notice of 2021 Coastal Plain Oil and Gas Lease Sale and Notice of Availability of Detailed Statement of Sale, 85 Fed. Reg. 78865 (Dec. 7, 2020).

68.     Plaintiffs submitted comments on December 17, 2020, raising numerous issues with the lease sale, including the legal issues identified in this lawsuit. Letter from Bernadette Demientieff, Exec. Dir., Gwich'in Steering Comm., et al. to Chad Padgett, State Director, BLM (Dec. 17, 2020).

---

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 28 of 74

69.     On December 18, 2020, BLM issued an Amended Detailed Statement of

Sale. *See generally* BLM., INTERIOR, Amendment to the Detailed Statement of Sale (Dec.

18, 2020).

70.     BLM held the lease sale and opened the sealed bonus bids on January 6,

2021. The Alaska Industrial Development and Export Authority (AIDEA) was the high

bidder on nine tracts (tracts 16, 17, 22, 23, 24, 26, 27, 30, and 31). BLM, 2021 COASTAL

PLAIN LEASE SALE BID RECAP (2021),

https://www.blm.gov/sites/default/files/docs/2021-01/BLM-Alaska_2021-Coastal-Plain-

Sale-Bid-Recap_20210106.pdf. Knik Arm Services LLC was the high bidder on one tract

(tract 25). Regenerate Alaska, Inc. was the high bidder on one tract (tract 29). *Id.*

71.     On January 13, 2021, the Secretary approved the issuance of seven leases to

AIDEA for tracts 16, 17, 24, 26, 27, 30, and 31; AIDEA did not finalize leases for tracts

22 and 23. INTERIOR, DECISION TO ISSUE COASTAL PLAIN LEASES (2021).

72.     BLM finalized the other two leases for Knik Arm Services LLC and

Regenerate Alaska, Inc., but the lessees later relinquished them.

73.     On January 21, 2021, President Biden issued Executive Order 13990, in

which the President noted the "alleged legal deficiencies" of the 2020 Leasing Program,

and directed the Secretary to review the program, conduct a new analysis as needed, and

place a "temporary moratorium on all activities" relating to the 2020 Leasing Program.

Exec. Order No. 13990, 86 Fed. Reg. 7037, 7039 (Jan. 25, 2021).

---

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 29 of 74

74.     On June 1, 2021, the Secretary issued Secretarial Order 3401, wherein the Secretary concluded that there were legal defects with the 2020 Leasing Program, "including, but not limited to: (1) insufficient analysis under the National Environmental Policy Act (NEPA), including the failure to adequately analyze a reasonable range of alternatives in the [final EIS]; and (2) failure in the August 17, 2020, Record of Decision [] to properly interpret Section 20001 of Public Law 115-97 (Tax Act)," namely, the Secretary's interpretation of the 2,000-acre limitation set out in the 2020 ROD. Sec'y of Interior, Order No. 3401 (June 1, 2021).

75.     As a result of the findings of legal error, the Secretary directed "a temporary halt on all Department activities related to the Program in the Arctic Refuge." *Id.*

76.     That same day, the Principal Deputy Assistant Secretary for Land and Minerals Management (Principal Deputy Secretary) issued a Suspension of Operations and Production Decision to the three lease holders, suspending the leases. *See, e.g.*, Letter from Laura Daniel Davis, Principal Deputy Assistant Sec'y, Land and Mineral Mgmt., Interior, to AIDEA, Decision: Suspension of Operations and Production (June 1, 2021). In those decisions, the Principal Deputy Secretary reiterated the two legal errors in the Secretary's Order, explained Interior's legal conclusion regarding the improper interpretation of the 2,000-acre limitation in the Tax Act, and explained that there may be other legal errors as well. *Id.*

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 30 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 30 of 74

77.     In August 2021, BLM began the NEPA process to supplement the EIS by announcing a scoping comment period. Notice of Intent to Prepare a Supplemental Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing Program, Alaska, 86 Fed. Reg. 41989 (Aug. 4, 2021).

78.     Groups, including Plaintiffs, submitted extensive comments outlining the problems with the final EIS and related analyses and identifying legal and factual issues that BLM needed to address in the supplemental EIS. Letter from Kristen Miller, Conservation Dir., AWL, et al., to Serena Sweet, Project Manager, BLM (Oct. 4, 2021); Letter from Bernadette Demientieff, Exec. Dir., Gwich'in Steering Comm. to Serena Sweet, Project Manager, BLM (Oct. 4, 2021).

79.     In September 2023, BLM issued the draft supplemental EIS. Notice of Availability of the Draft Coastal Plain Oil and Gas Leasing Program Supplemental Environmental Impact Statement, 88 Fed. Reg. 62104 (Sept. 8, 2023).

80.     The draft supplemental EIS considered three action alternatives that varied in the amount of land made available for lease and the stipulations and ROPs considered. 1 INTERIOR ET AL., COASTAL PLAIN OIL AND GAS LEASING PROGRAM DRAFT SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT 2-2 to -4 (2023). The action alternatives also varied in the number of acres that BLM assumed would be developed under the development scenario and the 2,000-acre limitation. *Id.*

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 31 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 31 of 74

81.     One of the action alternatives considered in the draft supplemental EIS was Alternative B, which is substantially the same as Alternative B considered in the final EIS and selected in the 2020 ROD. *Id*. at 2-4. The draft supplemental EIS did not carry forward the Secretary's interpretation of the 2,000-acre limitation set out in the 2020 ROD. *Id*. at 1-9. Instead, BLM explained that it interpreted the provision to operate as a hard cap that, once reached, prohibits any additional disturbance even if previously disturbed areas are reclaimed. *Id*. The agency also explained that both on- and off-lease infrastructure would count toward the limit, and that the infrastructure subject to the limitation included infrastructure for development, production, and transportation of oil and gas. *Id.* BLM also explained that the limit applies to gravel mines used to provide gravel to build oil and gas facilities, as well as gravel pads, gravel airstrips, and roads. *Id*. at 1-9–1-10.

82.     Groups, including Plaintiffs, submitted extensive comments on the draft supplemental EIS and the ANILCA Section 810 Preliminary Evaluation. Letter from Kristen Miller, Conservation Dir., AWL, et al., to Serena Sweet, Project Manager, BLM & Bobbie Jo Skibo, Project Manager, FWS (Nov. 7, 2023); Letter from Bernadette Demientieff, Exec. Dir., Gwich'in Steering Comm. to Serena Sweet, Project Manager, BLM & Bobbie Jo Skibo, Project Manager, FWS (Nov. 7, 2023).

83.     Groups' comments identified legal and factual issues in the draft supplemental EIS and ANILCA Section 810 Preliminary Evaluation that continued to be

in error under numerous federal laws, including those raised in this lawsuit. *See generally* Letter from Kristen Miller, Conservation Dir., AWL, et al. to Serena Sweet, Project Manager, BLM & Bobbie Jo Skibo, Project Manager, FWS (Nov. 7, 2023); Letter from Bernadette Demientieff, Exec. Dir., Gwich'in Steering Comm. to Serena Sweet, Project Manager, BLM & Bobbie Jo Skibo, Project Manager, FWS (Nov. 7, 2023).

84. In November 2024, Interior issued the final supplemental EIS. Notice of Availability of the Final Coastal Plain Oil and Gas Leasing Program Supplemental Environmental Impact Statement, Alaska, 89 Fed. Reg. 88805 (Nov. 8, 2024).

85. The final supplemental EIS considered four action alternatives, including Alternative B as previously set out and a new alternative based on comments on the draft supplemental EIS: Alternative D2. 1 INTERIOR ET AL., COASTAL PLAIN OIL AND GAS LEASING PROGRAM FINAL SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT 2-4 to -5 (2024). This alternative made 400,000 acres of land available for lease to meet the mandate for a second lease sale and estimated that 995 acres would be developed under the 2,000-acre limitation. *Id.* at 2-5. This alternative also included more stringent stipulations and ROPs than the other action alternatives. *See id.* at 2-4 to -5.

86. The final supplemental EIS carried forward the interpretation of the 2,000-acre limitation set out in the draft supplemental EIS. *Id.* at 1-9–1-10.

87. The final supplemental EIS also included the ANILCA Section 810 Final Evaluation. 3 *id.* app. F (ANILCA Section 810 Final Evaluation).

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG      Page 33 of 74

Case 3:20-cv-00204-SLG      Document 134-1      Filed 01/13/26      Page 33 of 74

88.     The ANILCA Section 810 Final Evaluation relied on the analysis in the final supplemental EIS. *Id*. at F-2. Despite acknowledging that twenty-two communities have subsistence ties to Coastal Plain resources, Interior only analyzed the impact of the leasing program on four communities: Kaktovik, Nuiqsut, Arctic Village, and Venetie. *Id.* at F-3 to -4.

89.     Interior determined in the ANILCA Section 810 Final Evaluation that none of the alternatives may result in a significant restriction on subsistence for Arctic Village or Venetie, including in the cumulative case. *Id.* at F-16 to -17, F-19, F-21, F-24, F-31.

90.     In December 2024, the Secretary issued a record of decision adopting a new leasing program ("2024 ROD" or "2024 Leasing Program"). Notice of Availability of the Record of Decision for the Final Supplemental Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing Program, Alaska, 89 Fed. Reg. 101042 (Dec. 13, 2024).[2]

91.     In the 2024 ROD, the Secretary selected Alternative D2 from the final supplemental EIS. BLM, INTERIOR, COASTAL PLAIN OIL AND GAS LEASING PROGRAM RECORD OF DECISION at 2 (2024) [hereinafter 2024 ROD]. The Secretary explained that, under that alternative, 400,000 acres would be made available for leasing to comply with

---

[2] Congress recently passed, and the President signed, a resolution purporting to disapprove this decision pursuant to the Congressional Review Act. Pub. L. No. 119-52, 139 Stat. 701 (2025).

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 34 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 34 of 74

the Tax Act, but the remaining 1,165,500 acres would not be available for leasing "in order to protect and conserve important surface resources and resources uses in the areas." *Id.* at 5.

92.     The Secretary also imposed various restrictions on the acreage available for leasing to "further protect important surface resources and resources uses." *Id*.

93.     The Secretary explained that adopting Alternative D2 "provides the most comprehensive framework for addressing the diverse management needs of the Coastal Plain and its resources." *Id.* at 6. She went on to explain that it "protects important subsistence resources and uses and recognizes important cultural links between tribes and the Coastal Plain and seeks to protect lands for values and resources important to the tribes." *Id.*

94.     The Secretary specifically found that Alternative D2 "provides the best combination of management options to meet the purpose of and need for the Coastal Plain oil and gas leasing program in consideration of the statutory requirements and management concerns identified through the Leasing [supplemental] EIS process." *Id*.

95.     Regarding the Arctic Refuge's purposes, the Secretary explained that Alternative D2 "ensures a proper balance of [the statutory purpose of the Tax Act] with the other statutory purposes of the Arctic Refuge." *Id*. She also stated that "Alternative D2 best ensures the Refuge purposes will be carried out in conjunction with administration of an oil and gas leasing program on the Coastal Plain." *Id.* at 9.

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 35 of 74

96.     BLM noticed the second lease sale in late 2024. Notice of Lease Sale and
Notice of Availability of the Detailed Statement of Sale for the Coastal Plain 2025 Oil
and Gas Lease Sale, 89 Fed. Reg. 99270 (Dec. 10, 2024).

97.     BLM received no bids. Press Release, Interior, Arctic Refuge Lease Sale
Yields No Interest (Jan. 8. 2025), https://www.doi.gov/pressreleases/arctic-refuge-lease-
sale-yields-no-interest.

98.     Following his inauguration, President Trump issued Executive Order
14153, wherein he directed the Secretary to undertake certain actions to pause
implementation of the 2024 Leasing Program and re-adopt the 2020 Leasing Program.
Exec. Order No. 14153, 90 Fed. Reg. 8347 (Jan. 29, 2025).

99.     The Secretary then issued an order withdrawing Secretarial Order 3401 and
directing Interior to take steps to issue a new decision re-adopting the 2020 Leasing
Program. Sec'y of the Interior, Order No. 3422 (Feb. 3, 2025).

100.    In September 2025, FWS issued the 2025 BiOp evaluating BLM's proposal
to re-adopt Alternative B as analyzed in the supplemental EIS (which is substantially the
same as Alternative B from the 2019 final EIS). Memorandum from Holly Carroll,
Acting Field Supervisor, N. Alaska Fish & Wildlife Off., FWS, to Deputy State Dir.,
BLM, Programmatic Biological Opinion for the Coastal Plain Oil and Gas Leasing
Program in the Arctic National Wildlife Refuge (Sept. 23, 2025) [hereinafter 2025 BiOp].

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 36 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 36 of 74

101.    In the 2025 BiOp, FWS determined that the 2025 Leasing Program and oil and gas activities enabled by it, such as seismic exploration, were not likely to jeopardize the continued existence of the polar bear and not likely to destroy or adversely modify designated critical habitat for the polar bear. *Id.* at 230–37.

102.    FWS found that disturbance to undetected maternal dens would cause the death of 20.2 cubs, and "decreased survival probability" of 272.4 cubs, of which 38 cubs would die. BiOp at 227–28. FWS stated that the proposed action would result in the death of 58.2 cubs-of-the-year over the life of the Leasing Program. *Id*. at 228.

103.    In making its finding that the 2025 Leasing Program was not likely to jeopardize polar bears, FWS assumed that these cub deaths would not impact the SBS population because the mother polar bear would be available to breed during the next mating season. *Id*. at 229, 231.

104.    In making its finding that Alternative B was not likely to jeopardize polar bears, FWS relied on no surface occupancy (NSO) lease stipulations and methods to detect dens prior to activities occurring to protect denning bears. *See, e.g*., *id.* at 131–32, 135, 140.

105.    Regarding its finding that no destruction or adverse modification of critical habitat was likely, FWS concluded that if the 2,000 acres of surface infrastructure occur within terrestrial denning habitat unit 2 of FWS's designated critical habitat on the Coastal Plain, then 557,508 acres of unit 2 would be subject to long-term habitat loss and

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG      Page 37 of 74

Case 3:20-cv-00204-SLG      Document 134-1      Filed 01/13/26      Page 37 of 74

alteration by disturbance due to oil and gas development and construction. *Id.* at 150.

FWS asserted that, because this represents 15% of unit 2 "as a whole," such loss was only

a "small subset" of unit 2, and the remaining portion of unit 2 within the Coastal Plain

would "still provide sufficient denning opportunities." *Id*. at 177.

106.    In reaching this conclusion, FWS relied on the existence of other critical

habitat to assert that no destruction or adverse modification of polar bear critical habitat is

likely. FWS did not evaluate the local effects of impairing denning habitat in high-density

denning areas on the Coastal Plain. FWS also did not consider baseline conditions or

impairment of unit 2 critical habitat outside the Arctic Refuge boundaries. Instead, the

agency assumed, without analysis, that such habitat is free of adverse alteration.

107.    FWS relied on the 2,000-acre limitation imposed by section 20001(c)(3) of

the Tax Act in assessing impacts and to ensure against jeopardy and destruction or

adverse modification of polar bear critical habitat. *Id.* at 226–28, 235–36. Specifically,

FWS relied on BLM's interpretation of that provision set out in the 2024 final

supplemental EIS. *Id.*

108.    FWS did not specifically address or analyze the impacts of AIDEA's seven

Coastal Plain leases in the 2025 BiOp.

109.    In October 2025, BLM issued a DNA evaluating the adoption of

Alternative B from the 2024 final supplemental EIS. BLM, INTERIOR, DETERMINATION

OF NEPA ADEQUACY (Oct. 22, 2025) [hereinafter DNA].

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 38 of 74

110.    In the DNA, BLM determined that the 2024 ROD, 2024 final supplemental EIS, 2020 ROD, and 2019 final EIS "fully cover[] the proposed action" and "fully cover[] this proposal and constitute[] BLM's compliance with the requirements of NEPA." *Id.* at 9. BLM accordingly concluded that "[p]reparation of a new [environmental assessment] or EIS is not required to select, in a new ROD, a different plan alternative from the range of alternatives analyzed in the 2019 Final EIS and the 2024 Final SEIS." *Id.* (citation omitted).

111.    The Secretary then issued the 2025 ROD adopting Alternative B from the 2024 final supplemental EIS, replacing the 2024 Leasing Program. INTERIOR, COASTAL PLAIN OIL AND GAS LEASING PROGRAM, RECORD OF DECISION at 4 (2025) [hereinafter 2025 ROD].

112.    Alternative B as adopted in the 2025 ROD makes the entire program area available for oil and gas leasing and adopts various stipulations and required operating procedures. *Id.* at 5. It is substantially the same as the 2020 Leasing Program. *Id.* at 13–14.

113.    The Secretary stated in the 2025 ROD that the 2019 final EIS and 2024 final supplemental EIS satisfy the agencies' NEPA obligations for the leasing program, including for lease sales for the next 5 years without any additional NEPA analysis. *Id.* at 5.

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG      Page 39 of 74

Case 3:20-cv-00204-SLG      Document 134-1      Filed 01/13/26      Page 39 of 74

114.     The Secretary explained in the 2025 ROD that BLM interprets the right-of-way provision in the Tax Act "as requiring that [the agency] authorize any such rights-of-way necessary to carry out the Coastal Plain oil and gas project" under the Tax Act and section 50104 of Public Law 119-21, 139 Stat. 72, 142–43 (2025), the 2025 budget reconciliation legislation. *Id.* at 7.

115.     The Secretary explained that BLM would not follow the interpretation of the 2,000-acre limitation contained in the 2024 final supplemental EIS and 2024 ROD. *Id.* at 9–10. The Secretary instead set out an interpretation that closely tracked the 2020 ROD's interpretation and could allow facilities and infrastructure to encompass significantly more than 2,000 acres of the Coastal Plain. *Id*. at 8–10.

116.     The Secretary also set out his interpretation of Congress' directive in the 2017 and 2025 tax legislation regarding the leasing program and terms and conditions for future lease sales. *Id.* at 10–11.

117.     The Secretary explained that adopting Alternative B met Congress' directives by making the entire program area "available for oil and gas leasing, and consequently, for potential oil and gas exploration and development." *Id.* at 11.

118.     The Secretary also stated that Alternative B as adopted "takes into account the other purposes" of the Arctic Refuge. *Id*. at 12; *see also id.* at 13.

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG      Page 40 of 74

119. Regarding ANILCA Section 810, the Secretary did not evaluate the impact of Alternative B on any additional communities, relying on the ANILCA Section 810 Final Evaluation from the 2024 final supplemental EIS. *Id*. at 16.

120. The Secretary determined that Alternative B would not result in a significant restriction on subsistence uses for any Gwich'in community. *Id.* at 17. The Secretary determined that, with the cumulative case, there may be a significant restriction on subsistence use only for the community of Kaktovik. *Id*.

121. The Secretary also determined that making the entire program area available for oil and gas leasing was the minimum amount of land necessary under the law, *id.* at 18, and that the stipulations and required operating procedures adopted in the 2025 ROD minimize impacts to subsistence uses and resources. *Id*. at 18–19.

122. Following the Secretary's adoption of the 2025 Leasing Program, the Deputy Secretary then issued a decision lifting the suspensions on AIDEA's seven leases. Letter from Katharine MacGregor, Deputy Sec'y, Interior, to AIDEA, Decision: Suspension of Operations and Production (Oct. 24, 2025), ECF No. 126-1.

123. In that decision, the Deputy Secretary "affirmed the leases without modification" under the 2025 ROD. *Id.* at 1. The Deputy Secretary explained that Interior reviewed the 2019 final EIS and 2024 final supplemental EIS in making the decision. *Id*. at 5. She noted that the leases were issued pursuant to the 2020 ROD, which had adopted Alternative B, and the 2025 ROD reinstated Alternative B. *Id.* at 1, 5. She then explained

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG    Page 41 of 74

Case 3:20-cv-00204-SLG    Document 134-1    Filed 01/13/26    Page 41 of 74

that the "seven leases are fully consistent with the 2025 ROD as originally issued and are adequately supported by the underlying record." *Id.* at 5.

124. The Deputy Secretary's decision did not address the fact that AIDEA's leases were issued pursuant to the 2020 BiOp. *Id.* at 1–6. Nor did it address whether the agency intended to rely on the 2025 BiOp instead of, or in addition to, the 2020 BiOp, in reaffirming and unsuspending the leases. *Id.*

125. Pursuant to 16 U.S.C. § 1540(g)(2)(A), on December 19, 2025, Plaintiffs provided by email notice of intent to sue to the Secretary, Interior, BLM, and FWS regarding BLM's violation of its substantive duty under section 7(a)(2) of the ESA to ensure against jeopardy and destruction or adverse modification of critical habitat for the polar bear due to its reliance on the legally defective 2025 BiOp and changed Tax Act interpretation. Letter from Bridget Psarianos, Staff Att'y, Trs. for Alaska, & Karimah Schoenhut, Staff Att'y, Sierra Club, to Doug Burgum, Sec'y of the Interior, et al. (Dec. 19, 2025).

## V.    LEGAL BACKGROUND

126. Because of its abundant wildlife and ecological importance, efforts to protect the Arctic National Wildlife Refuge began in the mid-1950s. The area was first formally set aside and granted federal protection in 1960 when it was designated as the Arctic National Wildlife Range (Range). Public Land Order 2214, Establishing the Arctic National Wildlife Range, 25 Fed. Reg. 12598, 12598–99 (Dec. 6, 1960). The Range was

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG    Page 42 of 74

Case 3:20-cv-00204-SLG    Document 134-1    Filed 01/13/26    Page 42 of 74

designated "for the purpose of preserving unique wildlife, wilderness and recreational values." *Id.* at 12598.

Alaska National Interest Lands Conservation Act

127.    Following statehood and various attempts to address Indigenous land claims, subsistence protection, and federal conservation land designations, Congress enacted ANILCA in 1980. ANILCA, Pub. L. No. 96-487, 94 Stat. 2371.

128.    Congress enacted ANILCA "[i]n order to preserve for the benefit, use, education, and inspiration of present and future generations certain lands and waters in the State of Alaska that contain nationally significant natural, scenic, historic, archeological, geological, scientific, wilderness, cultural, recreational, and wildlife values." ANILCA § 101(a), 16 U.S.C. § 3101(a).

129.    ANILCA has a broad purpose focused on conservation and subsistence:

It is the intent of Congress in this Act to preserve unrivaled scenic and geological values associated with natural landscapes; to provide for the maintenance of sound populations of, and habitat for, wildlife species of inestimable values to the citizens of Alaska and the Nation, including those species dependent on vast relatively undeveloped areas; to preserve in their natural state extensive unaltered arctic tundra, boreal forest, and coastal rainforest ecosystems; to protect the resources related to subsistence needs; to protect and preserve historic and archeological sites, rivers, and lands, and to preserve wilderness resource values and related recreational opportunities including but not limited to hiking, canoeing, fishing, and sport hunting, within large arctic and subarctic wild lands and on free-flowing rivers; and to maintain opportunities for scientific research and undisturbed ecosystems.

ANILCA § 101(b), 16 U.S.C. § 3101(b).

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG    Page 43 of 74

Case 3:20-cv-00204-SLG    Document 134-1    Filed 01/13/26    Page 43 of 74

130. Congress also specifically stated that a purpose of ANILCA was to "provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so." ANILCA § 101(c), 16 U.S.C. § 3101(c).

131. In ANILCA, Congress re-designated the Range as the Arctic National Wildlife Refuge. ANILCA § 303(2)(A). Congress added additional acreage to the south and west of the Range to expand the re-designated Arctic Refuge. *Id.*

132. Congress recognized four specific purposes for the Arctic Refuge, in addition to those recognized in the 1960 Public Land Order and ANILCA more generally. The ANILCA purposes for the Arctic Refuge are:

    (i)    to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, the Porcupine caribou herd (including participation in coordinated ecological studies and management of this herd and the Western Arctic caribou herd), polar bears, grizzly bears, muskox, Dall sheep, wolves, wolverines, snow geese, peregrine falcons and other migratory birds and Arctic char and grayling;

    (ii)    to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;

    (iii)    to provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents, and

    (iv)    to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge.

*Id.* § 303(2)(B).

133. ANILCA Section 305 also recognized that existing protective mandates not in conflict with ANILCA would remain in place:

[a]ll proclamations, Executive orders, public land orders, and other administrative actions in effect on the day before the date of the enactment of this Act with respect to units of the National Wildlife Refuge System in the State shall remain in force and effect except to the extent that they are inconsistent with this Act or the Alaska Native Claims Settlement Act, and in any such case, the provisions of such Acts shall prevail.

134.    The original three purposes of the Range and the four additional ANILCA purposes are all statutory purposes that apply to the Coastal Plain. ANILCA § 305; FWS, ARCTIC NATIONAL WILDLIFE REFUGE REVISED COMPREHENSIVE CONSERVATION PLAN AND ENVIRONMENTAL IMPACT STATEMENT 1-21 (2015).

135.    ANILCA Section 304(c) also withdrew all National Wildlife Refuges "from all forms of appropriation or disposal under the public land laws, including location, entry and patent under the mining laws."

136.    Additionally, Congress designated the majority of the Range (approximately eight million acres, excluding the Coastal Plain) as Wilderness. ANILCA § 702(3). This Wilderness area was subsequently named the Mollie Beattie Wilderness after the first female Director of the U.S. Fish and Wildlife Service. Mollie Beattie Wilderness Area Act, Pub. L. No. 104-167, 110 Stat. 1451 (1996).

137.    The potential development of the Coastal Plain for oil and gas was also addressed in ANILCA. Other than authorizing a one-time surface exploration program that expired in the 1980s, ANILCA § 1002(a)–(h), 16 U.S.C. § 3142(a)–(h), ANILCA Section 1003 imposed a prohibition on oil and gas development in the Arctic Refuge, including the Coastal Plain. 16 U.S.C. § 3143. The Coastal Plain was also specifically

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG        Page 45 of 74

"withdrawn from all forms of entry or appropriation under the mining laws, and from operation of the mineral lease laws, of the United States." ANILCA § 1002(i), 16 U.S.C. § 3142(i).

138. Title VIII of ANILCA recognizes that the protection of subsistence uses and resources is in the national interest and provides a framework to consider and protect subsistence uses in agency decision-making processes. 16 U.S.C. §§ 3111–3126. In enacting Title VIII, Congress found that "the continuation of the opportunity for subsistence uses . . . is essential to Native physical, economic, traditional, and cultural existence." ANILCA § 801(1), 16 U.S.C 3111(1).

139. ANILCA broadly defines "subsistence use" as "the customary and traditional uses by rural Alaska residents of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation; for the making and selling of handicraft articles out of nonedible byproducts of fish and wildlife resources taken for personal or family consumption; for barter, or sharing for personal or family consumption; and for customary trade." ANILCA § 803, 16 U.S.C. § 3113.

140. Under ANILCA Section 810, if an agency is going to "withdraw, reserve, lease, or otherwise" allow the "use, occupancy, or disposition of" land, the agency conducts what is often referred to as a "tier-1 analysis" to determine the proposed action's impact on subsistence uses. ANILCA § 810(a), 16 U.S.C. § 3120(a). The agency "shall evaluate the effect of such use, occupancy, or disposition on subsistence uses and

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG      Page 46 of 74

Case 3:20-cv-00204-SLG      Document 134-1      Filed 01/13/26      Page 46 of 74

needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes." *Id.* In doing so, the agency must also consider cumulative impacts.

141.    If the agency conducts the tier-1 analysis and determines that the activities will not "significantly restrict subsistence uses," then the agency issues a Finding of No Significant Restriction and Section 810's requirements are met. *Id.*

142.    ANILCA also mandates that the agency provide public notice and hold hearings in potentially affected communities if it makes a finding that the action may significantly restrict subsistence uses under Section 810. ANILCA § 810(a)(2), 16 U.S.C. § 3120(a)(2).

143.    If the agency finds that the proposed action would "significantly restrict subsistence uses," the agency then conducts a "tier-2" analysis. In that analysis, the agency can only move forward if it finds that the restriction on subsistence is necessary and consistent with sound public land management principles; involves the minimum "amount of public lands necessary to accomplish the purposes of" the proposed action; and the agency takes reasonable steps to minimize the adverse impacts to subsistence uses and resources. ANILCA § 810(a)(1)–(3), 16 U.S.C. § 3120(a)(1)–(3).

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG    Page 47 of 74

Case 3:20-cv-00204-SLG    Document 134-1    Filed 01/13/26    Page 47 of 74

144.     When an agency prepares an EIS under NEPA, the ANILCA Section 810 evaluation and substantive findings are included as part of that process. ANILCA § 810(b), 16 U.S.C. § 3120(b).

145.     To guide the administration of refuges in Alaska, ANILCA states that "[e]ach refuge shall be administered by the Secretary . . . in accordance with the laws governing the administration of units of the National Wildlife Refuge System, and this Act." ANILCA § 304(a).

146.     ANILCA also mandates that, for Wilderness, "[e]xcept as otherwise expressly provided for in this Act wilderness designated by this Act shall be administered in accordance with applicable provisions of the Wilderness Act governing areas designated by that Act as wilderness." *Id*. § 707.

## National Wildlife Refuge System Administration Act

147.     The National Wildlife Refuge System Administration Act (Refuge Act) governs the administration of the entire National Wildlife Refuge System. 16 U.S.C. § 668dd. It mandates that the Secretary, acting solely through FWS, administer and manage the National Wildlife Refuge System, which includes the Arctic Refuge. *Id.* § 668dd(a)(1).

148.     The mission of the National Wildlife Refuge System "is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 48 of 74

the United States for the benefit of present and future generations of Americans." *Id.* § 668dd(a)(2); *see also* 50 C.F.R. § 25.11(b).

149.    Under the Refuge Act, each refuge "shall be managed to fulfill the mission of the System, as well as the specific purposes for which that refuge was established." 16 U.S.C. § 668dd(a)(3)(A); *see also* 16 U.S.C. § 668ee(10) (defining "purposes of the refuge" to include those "purposes specified in or derived from the law, . . . [or] public land order . . . establishing, authorizing, or expanding a refuge, refuge unit, or refuge subunit").

150.    The Refuge Act also identifies multiple purposes for the administration of the National Wildlife Refuge System, including "conservation of fish, wildlife, and plants, and their habitats," "ensur[ing] that the biological integrity, diversity, and environmental health of the System are maintained," and "to contribute to the conservation of the ecosystems of the United States." *Id.* § 668dd(a)(4)(A)–(C); *see also* 50 C.F.R. § 25.11(b).

<u>National Environmental Policy Act</u>

151.    Congress enacted NEPA to ensure that the federal government protected and enhanced the natural environment, and engaged with the public in doing so. 42 U.S.C. § 4331.

152.    NEPA's twin aims are to ensure that federal agencies take a hard look at the environmental impacts of their proposed actions before taking an action and to ensure

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG      Page 49 of 74

Case 3:20-cv-00204-SLG      Document 134-1      Filed 01/13/26      Page 49 of 74

that agencies provide relevant information to the public so the public can play a role in both the decision-making process and the implementation of the decision. *See generally* 42 U.S.C. §§ 4331, 4332(1).

153.    NEPA requires federal agencies to prepare a detailed environmental impact statement (EIS) for every major federal action that will have a significant impact on the quality of the human environment. 42 U.S.C. §§ 4332(2)(C), 4336(b)(1).

154.    An EIS must consider (1) "reasonably foreseeable environmental effects of the proposed agency action," (2) "any reasonably foreseeable adverse environmental effects which cannot be avoided," (3) "a reasonable range of alternatives to the proposed action," (4) "the relationship between local short-term uses . . . and the maintenance and enhancement of long-term productivity," and (5) "any irreversible and irretrievable commitments of Federal resources." 42 U.S.C. § 4332(2)(C).

155.    A federal agency is required to prepare an environmental assessment (EA) if (1) the "proposed agency action . . . does not have a reasonably foreseeable significant effect on the quality of the human environment," or (2) "if the significance of such effect is unknown." 42 U.S.C. § 4336(b)(2). There are certain limited exceptions to these requirements. 42 U.S.C. § 4336(a).

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 50 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 50 of 74

156.    In enacting the Wilderness Act, Congress sought "to secure for the American people of present and future generations the benefits of an enduring resource of wilderness." 16 U.S.C. § 1131(a).

157.    To achieve this goal, Congress established the National Wilderness Preservation System and mandated that areas designated as Wilderness "be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, the preservation of their wilderness character, and for the gathering and dissemination of information regarding their use and enjoyment as wilderness." 16 U.S.C. § 1131(a).

158.    Wilderness is defined in relation to what it is not: is it not areas where people and their works dominate the landscape. *Id.* § 1131(c).

159.    Wilderness is defined as an undeveloped area protected and managed to preserve it:

> An area of wilderness is further defined to mean in this Act an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition;

and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

*Id.*

160.    The Wilderness Act mandates that "each agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character." 16 U.S.C. § 1133(b); *see also id.* § 1133(a) (noting that the purposes of the Wilderness Act supplement the purposes that national wildlife refuges "are established and administered" for).

<u>Tax Cuts and Jobs Act of 2017</u>

161.    In late 2017, Congress enacted the Tax Act, which repealed section 1003 of ANILCA as it applied to the Coastal Plain. Tax Cuts and Jobs Act, Pub. L. No. 115-97, tit. II, § 20001(b)(1), 131 Stat. 2054, 2236 (2017).

162.    That legislation directs the Secretary to "establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain." *Id.* § 20001(b)(2)(A).

163.    The Tax Act also amended ANILCA section 303(2)(B) (the Arctic Refuge purposes section) to include an additional purpose for the Coastal Plain: "to provide for an oil and gas program on the Coastal Plain." *Id.* § 20001(b)(2)(B)(iii). The Tax Act did not otherwise modify the purposes of the Arctic Refuge or waive or alter any other applicable laws.

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG    Page 52 of 74

Case 3:20-cv-00204-SLG    Document 134-1    Filed 01/13/26    Page 52 of 74

164.    The Tax Act requires the Secretary to hold two lease sales — the first within four years, the second within seven — from the enactment of that legislation. *Id.* § 20001(c). Each lease sale must offer at least 400,000 acres and include "those areas that have the highest potential for the discovery of hydrocarbons." *Id.*

165.    The Tax Act states that "[t]he Secretary shall issue any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out this section." *Id.* § 20001(c)(2).

166.    The Tax Act also limited surface development to a maximum of 2,000 acres for production and support facilities by stating that BLM: "shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any areas covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section." *Id.* § 20001(c)(3).

## Public Law 119-21

167.    Section 50104 of Public Law 119-21, budget reconciliation legislation enacted in July 2025, includes additional requirements for future lease sales under the Coastal Plain Oil and Gas Leasing Program. An Act to Provide for Reconciliation Pursuant to Title II of H. Con. Res. 14, Pub. L. No. 119-21, § 50104, 139 Stat. 72, 142–43 (2025).

168.    It states that, in addition to the lease sales mandated under the Tax Act, the Secretary "shall conduct not fewer than 4 lease sales area-wide under the oil and gas program by not later than 10 years after the date of enactment of this Act." *Id*. § 50104(b)(1). The specific schedule for those lease sales is "no later than 1 year after the date of enactment," "not later than 3 years after the date of enactment," "not later than 5 years after the date of enactment," and "not later than 7 years after the date of enactment." *Id*. § 50104(b)(3)(B).

169.    It stated that the acreage offered must be at least 400,000 acres in each lease sale of those areas that have the "highest potential for the discovery of hydrocarbons." *Id*. § 50104(b)(3)(A).

170.    It also states that "[i]n conducting lease sales . . . the Secretary shall offer the same terms and conditions as contained in the record of decision described in the notice of availability of the [BLM] entitled 'Notice of Availability of the Record of Decision for the Final Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing Program, Alaska' (85 Fed. Reg. 51754 (August 21, 2020))." *Id.* § 50104(b)(2).

171.    It states that the right-of-way and 2,000-acre limitation on surface development provisions in the Tax Act apply to leases issued in those future lease sales. *Id*. § 50104(b)(4)–(5).

172.    Congress enacted the ESA to protect and conserve threatened and endangered species and the ecosystems upon which they depend. 16 U.S.C. § 1531(b), (c)(1).

173.    The goal of the ESA is not only to save endangered and threatened species from extinction, but also to recover these species to the point where they are no longer in danger of extinction, and thus no longer in need of protection under the ESA. *Id*. §§ 1531(b) (purposes), 1532(3) (definitions).

174.    The National Marine Fisheries Service and FWS jointly administer the ESA. Relevant here, FWS has responsibility for administering the ESA and performing interagency consultations for the polar bear. 50 C.F.R. § 402.01(b). BLM is the action agency for purposes of the Coastal Plain leasing program.

175.    Section 7(a)(2) of the ESA obligates federal agencies to ensure "that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat." 16 U.S.C. § 1536(a)(2).

176.    To fulfill this substantive duty, section 7(a)(2) imposes procedural obligations on federal agencies to consult with FWS. *Id.*

177.    The ESA prescribes a multi-step process to ensure compliance with its substantive provisions by federal agencies. A federal agency proposing to take an action

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 55 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 55 of 74

must inquire of the Secretary whether any threatened or endangered species "may be present in the area of" the proposed action. 16 U.S.C. § 1536(c)(1). If the answer is affirmative, the agency shall conduct a biological assessment to determine whether such species "is likely to be affected" by the action. *Id*.

178.    If the action agency determines that the action is "likely to adversely affect" the listed species, formal consultation with the Secretary is required. 50 C.F.R. § 402.14(b); *id*. at § 402.02, 402.14(a); 16 U.S.C. § 1536(a)(3). Formal consultation concludes with FWS's issuance of a biological opinion under Section 7(b)(3) of the ESA. 16 U.S.C. § 1536(b)(3); 50 C.F.R. § 402.02. FWS and the action agency must each utilize the "best scientific and commercial data available" during the consultation process. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).

179.    In a biological opinion, FWS must determine whether the federal action subject to the consultation is likely to jeopardize the listed species or destroy or adversely modify critical habitat. 16 U.S.C. § 1536(a)(2), (b)(4). The biological opinion must include a summary of the information upon which the opinion is based, an evaluation of the current status of the listed species, the effects of the action, and the cumulative effects. 50 C.F.R. § 402.14(g)(2)–(3).

180.    The "effects of the action" include "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action." 50 C.F.R. § 402.02. Cumulative

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG    Page 56 of 74

Case 3:20-cv-00204-SLG    Document 134-1    Filed 01/13/26    Page 56 of 74

effects are "effects of future State or private activities . . . that are reasonably certain to occur within the action area of the Federal action[.]" *Id*.

181. Programmatic consultation is:

a consultation addressing an agency's multiple actions on a program, region, or other basis . . . such as: (1) Multiple similar, frequently occurring, or routine actions expected to be implemented in particular geographic areas; and (2) A proposed program, plan, policy, or regulation providing a framework for future proposed actions.

*Id*.

182. A biological opinion must analyze the entire action before an agency may make a decision that may affect listed species or their habitat, including a programmatic decision. *See Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988).

183. After FWS adds the direct and indirect effects of the action to the environmental baseline and cumulative effects, it must make its determination of "whether the action is likely to jeopardize the continued existence of a listed species."; 50 C.F.R. § 402.14(h); 16 U.S.C. § 1536(b)(3), (b)(4). In evaluating whether an action will jeopardize the continued existence of a listed species, the biological opinion must evaluate whether the action "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of . . . the . . . recovery of a listed species in the wild," even if the FWS concludes the action would not reduce the likelihood of survival. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 931–32 (9th Cir. 2008) (quoting 50 C.F.R § 402.02).

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 57 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 57 of 74

184. Where an agency relies on mitigation measures to ensure against jeopardy, such mitigation measures must be reasonably certain to occur. *Id.* at 936 n.17.

185. If the biological opinion concludes that an action is likely to result in jeopardy to a listed species, the biological opinion must set forth the reasonable and prudent alternatives that would avoid this ESA violation. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §§ 402.02, 402.14(h)(2).

186. Regardless of the conclusion reached in the biological opinion, the action agency has an independent duty to ensure that its actions are "not likely to jeopardize the continued existence of" listed species. 16 U.S.C. § 1536(a)(2).

187. An agency cannot satisfy its duty to ensure against jeopardy if it relies on a legally flawed biological opinion. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1127–28 (9th Cir. 2012). An agency's reliance on a biological opinion also fails to satisfy its duty to ensure against jeopardy where the action agency fails to discuss information about the action that would undercut the conclusions of the biological opinion. *Id.*

188. To satisfy the obligations of ESA Section 7(a)(2), the action agency must reinitiate consultation "where discretionary Federal involvement or control over the action has been retained or is authorized by law" and either "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered" or "the identified action is subsequently modified in a

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 58 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 58 of 74

manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence." 50 C.F.R. § 402.16(a)(2)–(3).

<u>Administrative Procedure Act</u>

189.   Courts review agency actions under the Administrative Procedure Act (APA). 5 U.S.C. §§ 702, 704.

190.   Under the APA, Courts "hold unlawful and set aside agency actions, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory . . . authority," or made "without observance of procedure required by law." *Id.* § 706(2)(A)–(D).

191.   When an agency changes policy or course, it must "supply a reasoned analysis for the change." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). More specifically, it must acknowledge the change in course, show that the new rule is permissible under the statute, express that it is a better policy, and provide good reasons for the change in policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). When reversing a policy, an agency may not simply discard prior factual findings without reasoned explanation. *Id.* Instead, when a policy change rests on new factual findings that contradict prior findings and circumstances, the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Id.*

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG      Page 59 of 74

Case 3:20-cv-00204-SLG      Document 134-1      Filed 01/13/26      Page 59 of 74

## CLAIMS FOR RELIEF

## COUNT I

*(Violation of ANILCA and Refuge Act; Failure to Adopt a Leasing Program Consistent with Purposes of the Coastal Plain)*

192.    Plaintiffs re-allege, as if fully set forth here, every allegation contained in paragraphs 1–191.

193.    Public Land Order 2214 established three purposes of the Range: "preserving unique wildlife, wilderness and recreational values." 25 Fed. Reg. 12598, 12598 (Dec. 6, 1960).

194.    ANILCA recognized four additional purposes for the Arctic Refuge:

(i)     to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, the Porcupine caribou herd (including participation in coordinated ecological studies and management of this herd and the Western Arctic caribou herd), polar bears, grizzly bears, muskox, Dall sheep, wolves, wolverines, snow geese, peregrine falcons and other migratory birds and Arctic char and grayling;

(ii)    to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;

(iii)   to provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents, and

(iv)    to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and quantity within the refuge.

ANILCA § 303(2)(B).

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG      Page 60 of 74

Case 3:20-cv-00204-SLG      Document 134-1      Filed 01/13/26      Page 60 of 74

195. The original three purposes of the Range and the four additional ANILCA purposes all apply to the Coastal Plain and must be given effect. ANILCA § 305; 16 U.S.C § 668ee(10).

196. The Tax Act added an additional purpose for the Coastal Plain: "to provide for an oil and gas program on the Coastal Plain." Tax Act § 20001(b)(2)(B).

197. Congress did not alter the other purposes of the Refuge or prioritize the oil and gas purpose over the other purposes.

198. ANILCA governs the administration of the Arctic Refuge. It mandates that the Arctic Refuge "shall be administered by the Secretary, subject to valid existing rights, in accordance with the laws governing the administration of units of the National Wildlife Refuge system, and this act." ANILCA § 304(a).

199. The Refuge Act also governs the administration of all refuges and the National Wildlife Refuge System. 16 U.S.C. § 668dd. It mandates that each refuge "shall be managed to fulfill the mission of the System, as well as the specific purposes for which that refuge was established." *Id.* § 668dd(a)(3)(A).

200. In both the 2020 ROD and 2025 ROD, the Secretary failed to adopt an oil and gas leasing program consistent with and protective of the Coastal Plain's conservation and subsistence purposes because he disregarded the original Range purposes and failed to adopt an alternative that was consistent with and protective of the conservation and subsistence purposes.

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG    Page 61 of 74

Case 3:20-cv-00204-SLG    Document 134-1    Filed 01/13/26    Page 61 of 74

201.    The Secretary also failed to provide an adequate explanation of how the 2020 Leasing Program and 2025 Leasing Program comply with and fulfill the original Range and conservation and subsistence purposes of the Coastal Plain.

202.    The Secretary's failures in both the 2020 ROD and 2025 ROD to consider and adopt an oil and gas program consistent with and protective of all  of the conservation and subsistence purposes of the Coastal Plain of the Arctic Refuge or to adequately explain how the 2020 Leasing Program and the leases issued pursuant to it, and the 2025 Leasing Program was consistent with protection of the conservation and subsistence purposes of the Coastal Plain of the Arctic Refuge violates ANILCA and the Refuge Act, and was arbitrary, capricious, and not in accordance with the law and was without observance of the procedures required by ANILCA, the Refuge Act, and the APA. 5 U.S.C. § 706(2).

## COUNT II
*(Violation of the ANILCA, the Refuge Act, and the APA; Failure to Explain a Change in Agency Decision)*

203.    Plaintiffs re-allege, as if fully set forth here, every allegation contained in paragraphs 1–191.

204.    When an agency changes policy or course, it must acknowledge the change in course, show that the new rule is legally permissible, express that it is a better policy, and provide good reasons for the change in policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). When a policy change rests on changed factual findings,

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG      Page 62 of 74

Case 3:20-cv-00204-SLG      Document 134-1      Filed 01/13/26      Page 62 of 74

the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Id.*

205.    ANILCA mandates that the Arctic Refuge "shall be administered by the Secretary, subject to valid existing rights, in accordance with the laws governing the administration of units of the National Wildlife Refuge system, and this act." ANILCA § 304(a).

206.    The Refuge Act mandates that each refuge "shall be managed to fulfill the mission of the System, as well as the specific purposes for which that refuge was established." *Id.* § 668dd(a)(3)(A).

207.    The Secretary previously determined that the 2024 Leasing Program best met the Refuge Act's and ANILCA's statutory mandates, specifically that it "best ensures the Refuge purposes will be carried out" and "involves the minimal amount of public lands necessary to comply with" the Tax Act. 2024 ROD at 9, 19. That determination was based on factual findings about what protections were necessary to ensure the protection of those purposes.

208.    Contrary to these findings, the Secretary determined in the 2025 ROD that re-adopting Alternative B would meet the mandates of ANILCA and the Refuge Act. 2025 ROD at 12–13, 18.

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG        Page 63 of 74

Case 3:20-cv-00204-SLG        Document 134-1        Filed 01/13/26        Page 63 of 74

209.    The Secretary failed to adequately explain the change in position that the 2025 Leasing Program would protect the Arctic Refuge's conservation and subsistence purposes.

210.    By failing to explain the change in position and contradictory findings, the Secretary failed to show that the 2025 Leasing Program is permissible and includes the measures necessary to protect the conservation and subsistence purposes of the Arctic Refuge.

211.    The Secretary's failure to demonstrate that the 2025 ROD is permissible under ANILCA and the Refuge Act, and to provide the required justification for the change in policy to support the 2025 ROD, renders the 2025 ROD arbitrary, capricious, and not in accordance with the law and in excess of statutory authority, in violation of ANILCA, the Refuge Act, and the APA. 5 U.S.C. § 706(2).

## COUNT III
*(Violation of ANILCA; Failure to Comply with Section 810)*

212.    Plaintiffs re-allege, as if fully set forth here, every allegation contained in paragraphs 1–191.

213.    Pursuant to ANILCA Section 810, agencies must consider effects and restrictions upon subsistence resources and uses. Actions that would significantly restrict subsistence uses may only be undertaken if the agency finds that such actions are necessary, involve the minimal amount of public lands necessary, and if the adverse effects to subsistence are minimized. 16 U.S.C. § 3120(a).

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF

*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG      Page 64 of 74

214.     BLM's ANILCA Section 810 Final Evaluation in the 2019 final EIS and 2024 final supplemental EIS, the related NEPA analyses in the 2019 final EIS and 2024 final supplemental EIS, and the Secretary's ANILCA Section 810 findings in the 2020 ROD and 2025 ROD fail to comply with ANILCA Section 810 for multiple reasons, including, but not limited to: (a) BLM improperly excluded many Gwich'in communities that rely on and use the subsistence resources of the Coastal Plain and that would be affected by the proposed action from its evaluation; (b) BLM failed to consider all subsistence uses that would be affected by its proposed action, including but not limited to traditional sharing and bartering practices; and (c) BLM's finding that there would not be significant restrictions to subsistence uses for Arctic Village and Venetie is based on a flawed analyses and findings and fails to consider traditional knowledge.

215.     For the above reasons, BLM's ANILCA Section 810 Final Evaluations, the analyses in the 2019 final EIS and 2024 final supplemental EIS, the Secretary's findings in the 2020 ROD and 2025 ROD, the issuance of leases based on the 2020 ROD, and the 2025 decision to affirm and lift the suspension of the 2020 leases were arbitrary, capricious, and not in accordance with the law and their actions were without observance of the procedure required by ANILCA and the APA. 5 U.S.C. § 706(2).

## COUNT IV
### *(Violation of NEPA; Failure to Conduct NEPA analysis)*

216.     Plaintiffs re-allege, as if fully set forth here, every allegation contained in paragraphs 1–191.

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 65 of 74

217. Pursuant to NEPA, agencies must conduct an analysis of the environmental effects of proposed agency actions. 42 U.S.C. §§ 4332, 4336.

218. If the proposed agency action "has a reasonably foreseeable significant effect on the quality of the human environment," the agency must prepare an EIS. 42 U.S.C. § 4336(b)(1). If the proposed agency action "does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance is unknown," the agency must prepare an EA. 42 U.S.C. § 4336(b)(2).

219. NEPA does not contemplate the use of a DNA, and a DNA is not a NEPA analysis.

220. The Secretary's adoption of the 2025 Leasing Program has reasonably foreseeable significant effects on the Coastal Plain and its resources.

221. BLM issued a DNA, which is not a NEPA document, to support adoption of the 2025 Leasing Program.

222. The agency did not prepare a NEPA analysis — either an EA or EIS — to support its decision to adopt the 2025 ROD.

223. A NEPA analysis was necessary to consider the impacts of the Secretary's interpretation of the 2,000-acre limitation set forth in the 2025 ROD, which had not been previously evaluated in the prior NEPA analyses, as well as the 2025 budget reconciliation legislation, in addition to other changed circumstances and information.

224.    The Secretary and BLM's use of a DNA and failure to prepare a NEPA analysis to support its decision to adopt the 2025 ROD violates NEPA, and was arbitrary, capricious, and not in accordance with the law and was without observance of the procedure required by NEPA and the APA. 5 U.S.C. § 706(2).

**COUNT V**
*(Violation of the Wilderness Act; Failure to Protect Wilderness)*

225.    Plaintiffs re-allege, as if fully set forth here, every allegation contained in paragraphs 1–191.

226.    The Wilderness Act mandates that "each agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character." 16 U.S.C. § 1133(b).

227.    An agency has a duty to preserve Wilderness from activities outside the Wilderness area that degrade the area's wilderness characteristics. *Id.*

228.    In adopting the 2020 Leasing Program and 2025 Leasing Program, the Secretary failed to protect the wilderness character of the Mollie Beattie Wilderness.

229.    The Secretary's decisions to adopt the 2020 Leasing Program and 2025 Leasing Program and issue leases that will degrade the wilderness character of the Mollie Beattie Wilderness was arbitrary, capricious, and not in accordance with the law, and was without observance of the procedure required by law, in violation of the Wilderness Act, and the APA. 5 U.S.C. § 706(2).

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG        Page 67 of 74

Case 3:20-cv-00204-SLG        Document 134-1        Filed 01/13/26        Page 67 of 74

## COUNT VI
*(Violation of the Tax Act; Failure to Properly Interpret and Implement the 2,000-Acre Provision)*

230.    Plaintiffs re-allege, as if fully set forth here, every allegation contained in paragraphs 1–191.

231.    The Tax Act mandates that the Secretary "shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any areas covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section." Tax Act § 20001(c)(3).

232.    In both the 2020 ROD and 2025 ROD, the Secretary interpreted the "up to 2,000 surface acres" provision to mean that BLM cannot authorize any amount of surface development less than 2,000 acres.

233.    The Secretary also interpreted the 2,000-acre provision to only apply to facilities that qualify as both "production and support facilities." Based on this interpretation, the Secretary indicated that a range of facilities and infrastructure will be excluded from the 2,000-acre limit, thereby allowing infrastructure to cover more than 2,000 acres at any given time.

234.    The Secretary also indicated that the right-of-way provision is not subject to the 2,000-acre provision.

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 68 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 68 of 74

235. The Secretary's adoption of the 2020 Leasing Program and the 2025 Leasing Program and issuance of leases based on these incorrect interpretations is inconsistent with the Tax Act.

236. For each of the above reasons, the Secretary's interpretation of the Tax Act's 2,000-acre provision for the Coastal Plain and adoption of the 2020 Leasing Program and 2025 Leasing Program and issuance and reaffirmation of leases based on its unlawful interpretation was arbitrary, capricious, and not in accordance with the law and in excess of statutory authority, in violation of the Tax Act, and the APA. 5 U.S.C. § 706(2).

## COUNT VII
*(Violation of ESA Section 7 and the APA; FWS's Failure to Prepare a Legally Sufficient 2025 BiOp)*

237. Plaintiffs re-allege, as if fully set forth here, every allegation contained in paragraphs 1–191.

238. The ESA requires FWS to prepare a BiOp that uses the best scientific and commercial data available to evaluate whether the effects of BLM's leasing program are likely to jeopardize the continued existence of any endangered or threatened species or destroy or adversely modify designated critical habitat. 16 U.S.C. § 1536(a)(2).

239. In the 2025 BiOp, FWS improperly relied on NSO lease stipulations and den detection methods to protect denning bears, but such protective measures are not specified and are uncertain to occur.

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 69 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 69 of 74

240.    In the 2025 BiOp, FWS concluded that the 2025 Leasing Program is not likely to jeopardize polar bears. This conclusion is based on the unreasonable assumption that extensive cub death would not impact the SBS population and an underestimation of the likelihood of such cub deaths.

241.    FWS's conclusion that there would be no adverse modification of polar bear critical habitat is also flawed because FWS improperly relied on the existence of other critical habitat to conclude that destruction or adverse modification of critical habitat is not likely despite impairment of a substantial portion of unit 2 habitat within the Coastal Plain. FWS's conclusion also masked the local impacts of impairing the highest density terrestrial denning areas within unit 2.

242.    FWS relied on an interpretation of the Tax Act's 2,000-acre limit that reduces impacts to polar bears and habitat, but the Secretary disavowed this interpretation in the 2025 ROD.

243.    For these reasons, FWS failed to analyze the true extent of likely disturbance to polar bears and likely adverse modification of critical habitat from the 2025 Leasing Program in the 2025 BiOp.

244.    FWS's failure to analyze the full scope of impacts of the 2025 Leasing Program on polar bears and their critical habitat renders the BiOp arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and without observance of

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG      Page 70 of 74

Case 3:20-cv-00204-SLG      Document 134-1      Filed 01/13/26      Page 70 of 74

the requirements of the ESA and its implementing regulations and the APA. 16 U.S.C. §

1536(a)(2); 5 U.S.C. § 706.

**COUNT VIII**

*(Violation of ESA Section 7; FWS's Failure to Prepare a Legally Sufficient 2020 BiOp
and BLM's Unreasonable Reliance on 2020 BiOp)*

245.    Plaintiffs re-allege, as if fully set forth here, every allegation contained in

paragraphs 1–191.

246.    Under Section 7 of the ESA, BLM must ensure that its actions are not

likely to jeopardize the continued existence of listed species or result in destruction or

adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2). An agency's reliance on

a legally flawed biological opinion to authorize an action violates this duty.

247.    Vague statements relying on future MMPA compliance are insufficient to

support FWS's no-jeopardy and no-adverse-modification determinations under the ESA.

248.    FWS's "no jeopardy" conclusion for polar bears in the 2020 BiOp was

predicated on the understanding that BLM would deny authorizations for activities unless

and until the lessees or applicants obtain advance permission for incidental take under the

MMPA from FWS, or a letter from FWS indicating that no such take will occur.

249.    FWS also concluded in the 2020 BiOp that MMPA compliance will prevent

loss or degradation of critical habitat.

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 71 of 74

Case 3:20-cv-00204-SLG     Document 134-1     Filed 01/13/26     Page 71 of 74

250.    FWS violated the ESA and APA because the 2020 BiOp is legally flawed and inadequate regarding its evaluation of the potential impacts of the leasing program on polar bears.

251.    BLM violated the ESA by unreasonably relying on the legally deficient 2020 BiOp for the lease sale in January 2021.

252.    BLM's reliance on the 2020 BiOp with regard to the 2021 lease sale violated its duties under the ESA and its implementing regulations, was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and was without observance of the requirements of the ESA and its implementing regulations and the APA. 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706.

### REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court grant the following relief:

1.    Declare that, in issuing the 2019 final EIS, 2020 BiOp, 2020 ROD, 2021 leases, 2024 final supplemental EIS and ANILCA Section 810 Final Evaluation, 2025 ROD, 2025 Lease Decision, and any related oil and gas leases, the Secretary, Interior, and BLM violated ANILCA, the Refuge Act, NEPA, the Wilderness Act, the Tax Act, the ESA, and the APA; declare that, in issuing the 2020 BiOp and 2025 BiOp, the Secretary, Interior, and FWS violated the ESA and the APA; declare that the invalid 2019 final EIS, 2020 BiOp, 2020 ROD, 2024 supplemental final EIS and ANILCA Section 810 Final Evaluation, 2025 ROD, 2025 BiOp, and 2025 Lease Decision cannot serve as the

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG      Page 72 of 74

Case 3:20-cv-00204-SLG      Document 134-1      Filed 01/13/26      Page 72 of 74

basis for any agency actions, including the decisions to conduct a lease sale and issue leases; and declare that the actions as set forth above are arbitrary, capricious, an abuse of discretion or not in accordance with law and without observance of procedure required by law;

2.      Vacate and set aside as unlawful any and all agency approvals and underlying analysis documents, including the 2019 final EIS, 2020 BiOp, 2020 ROD, ANILCA Section 810 Final Evaluation and the related final supplemental EIS subsistence analysis, 2025 ROD, and 2025 BiOp, as well as any decisions and documents based on the unlawful actions, including the 2025 Leasing Decision and any other leasing decisions and leases;

3.      Enter appropriate injunctive relief, including prohibiting the Secretary, Interior, or BLM from authorizing any activities under the Coastal Plain leasing program in reliance on the unlawful the 2019 final EIS, 2020 BiOp, 2020 ROD, 2024 supplemental final EIS and ANILCA Section 810 Final Evaluation, 2025 ROD, 2025 BiOp, and 2025 Lease Decision, or leases and lease sale decisions;

4.      Award Plaintiffs all reasonable costs and fees as authorized by law; and

5.      Grant such other relief as this Court deems just and proper.

Respectfully submitted this ___ day of January, 2026,


_____
Brook Brisson (AK Bar No. 0905013)

_____
[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG      Page 73 of 74

Suzanne Bostrom (AK Bar No. 1011068)
Bridget Psarianos (AK Bar No. 1705025)
Trustees for Alaska
121 W. Fireweed Lane, Suite 105
Anchorage, AK 99503
Phone: (907) 276-4244
Fax: (907) 276-7110
bbrisson@trustees.org
sbostrom@trustees.org
bpsarianos@trustees.org

*Attorneys for Plaintiffs Gwich'in Steering
Committee, Alaska Wilderness League,
Canadian Parks & Wilderness Society-Yukon,
Defenders of Wildlife, Environment America,
Friends of Alaska National Wildlife Refuges,
National Wildlife Federation, National
Wildlife Refuge Association, Northern
Alaska Environmental Center, Sierra Club,
The Wilderness Society, and Wilderness
Watch*

_____
Karimah Schoenhut (*pro hac vice*)
Sierra Club Environmental Law Program
50 F St., NW 8th Floor
Washington, DC 20001
Phone: (202) 548-4584
Fax: (202) 547-6009
karimah.schoenhut@sierraclub.org

*Attorney for Plaintiff Sierra Club*

_____

[PROPOSED] SECOND AM. & FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF
*Gwich'in Steering Committee v. Burgum*, Case No. 3:20-cv-00204-SLG     Page 74 of 74