Brook Brisson (AK Bar No. 0905013)
Suzanne Bostrom (AK Bar No. 1011068)
Bridget Psarianos (AK Bar No. 1705025)
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
Fax: (907) 276-7110
bbrisson@trustees.org
sbostrom@trustees.org
bpsarianos@trustees.org

*Attorneys for Plaintiffs Gwich'in Steering Committee, Alaska Wilderness League, Alaska Wildlife Alliance, Canadian Parks & Wilderness Society-Yukon, Defenders of Wildlife, Friends of Alaska National Wildlife Refuges, National Wildlife Federation, National Wildlife Refuge Association, Northern Alaska Environmental Center, Sierra Club, The Wilderness Society, and Wilderness Watch*

Karimah Schoenhut (*pro hac vice*)
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
50 F St., NW 8th Floor
Washington, DC 20001
Phone: (202) 548-4584
Fax: (202) 547-6009
karimah.schoenhut@sierraclub.org

*Attorney for Plaintiff Sierra Club*

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| GWICH'IN STEERING COMMITTEE, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>DOUG BURGUM, *et al.*, | Case No. 3:20-cv-00204-SLG |

Defendants,

and

NORTH SLOPE BOROUGH, *et al.*,

Intervenor-Defendants.

**PLAINTIFFS' OPENING BRIEF FOR SUMMARY JUDGMENT**
(Civil Rule 56(a), Local Civil Rule 16.3)

TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i
TABLE OF AUTHORITIES ..................................................................................... iii
LIST OF SHORT NAMES AND ACRONYMS ......................................................... ix
INTRODUCTION ................................................................................................. 1
BACKGROUND ................................................................................................... 2
I. The Coastal Plain's Exceptional Values ......................................................... 2
II. Coastal Plain Protections ............................................................................. 4
III. Congress' Authorization of an Oil and Gas Program .................................... 5
IV. Interior's Review Process ............................................................................ 6
A. The 2020 Leasing Program ............................................................................ 6
B. The 2024 Leasing Program ............................................................................ 8
C. The 2025 Leasing Program .......................................................................... 11
PLAINTIFFS' INTERESTS ................................................................................. 13
STANDARDS OF REVIEW ................................................................................ 14
ARGUMENT ...................................................................................................... 15
I. Interior Failed to Fulfill the Coastal Plain's Purposes. .................................. 15
A. ANILCA and the Refuge Act Mandate Protection of the Coastal Plain's Conservation and Subsistence Purposes. ........................................................ 15
B. The Leasing Program Is Inconsistent with the Coastal Plain's Purposes. .......... 17
1. Interior failed to consider and fulfill the Range purposes. ............................. 17
2. Interior failed to fulfill the Coastal Plain's ANILCA and Refuge Act purposes. ............................................................................................................ 19
II. Interior Misinterpreted the 2,000-Acre Limitation. ....................................... 21
III. Interior Violated ANILCA Section 810. ..................................................... 28
A. ANILCA Title VIII Protects Subsistence Users. ............................................ 28
B. Interior Impermissibly Excluded Numerous Gwich'in Communities from Its Subsistence Evaluations. ...................................................................................... 30
1. The plain language of Section 810 is broadly applicable to subsistence users... .......................................................................................................... 31

2. Interior's exclusion of communities is contrary to the record. ....................... 32
C. Interior's Finding of "No Significant Restriction" for Arctic Village and Venetie Is Flawed. ........................................................................................................ 35
IV. Interior Violated the ESA. ......................................................................................... 36
A. The ESA Protects Polar Bears. ................................................................................. 36
B. FWS Relied on Future, Uncertain Mitigation Measures in the 2020 BiOp. ...... 37
C. FWS Relied on Future, Uncertain Mitigation Measures in the 2025 BiOp. ...... 39
D. FWS's No Adverse Modification Finding for Polar Bear Critical Habitat in the 2025 BiOp Is Arbitrary. ......................................................................................... 42
E. BLM's Reliance on the 2020 and 2025 BiOps Violates the ESA. ..................... 47
V. Vacatur is Warranted. ................................................................................................ 47
CONCLUSION ................................................................................................................ 49

## TABLE OF AUTHORITIES

**Cases**

*350 Mont. v. Haaland*,
50 F.4th 1254 (9th Cir. 2022) .......... 47

*Alarcon v. Keller Indus., Inc.*,
27 F.3d 386 (9th Cir. 1994) .......... 23

*Alaska Indus. Dev. & Exp. Auth. v. Biden*,
685 F. Supp. 3d 813 (D. Alaska 2023) .......... 8

*Alaska Oil & Gas Ass'n v. Jewell*,
815 F.3d 544 (9th Cir. 2016) .......... 42

*Alaska v. Jewell*,
No. 3:14-cv-00048-SLG, 2015 U.S. Dist. LEXIS 94574 (D. Alaska July 21, 2015) .. 5

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*,
67 F.3d 723 (9th Cir. 1995) .......... 28

*All. for the Wild Rockies v. U.S. Forest Serv.*,
907 F.3d 1105 (9th Cir. 2018) .......... 48

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987) .......... 29

*Ariz. State Bd. for Charter Schs. v. U.S. Dep't of Educ.*,
464 F.3d 1003 (9th Cir. 2006) .......... 24

*Bottinelli v. Salazar*,
929 F.3d 1196 (9th Cir. 2019) .......... 14

*Butte Env't Council v. U.S. Army Corps of Eng'rs.*,
620 F.3d 570 (9th Cir. 2010) .......... 45

*Cal. Cmtys. Against Toxics v. EPA*,
688 F.3d 989 (9th Cir. 2012) .......... 48

*Chisom v. Roemer*,
501 U.S. 380 (1991) .......... 27

*City of Angoon v. Marsh*,
749 F.2d 1413 (9th Cir. 1984) .......... 28

*City of Tenakee Springs v. Clough*,
915 F.3d 1308, (9th Cir. 1990) ........ 29

*Chong Yia Yang v. Cal. Dep't of Soc. Servs.*,
183 F.3d 953 (9th Cir. 1999) ........ 25

*Clark v. Uebersee Finanz-Korporation*,
332 U.S. 480 (1947) ........ 26

*Coal. to Protect Puget Sound Habitat v. U.S. Army Corps. of Eng'rs*,
417 F. Supp. 3d 1354 (W.D. Wash. 2019) ........ 49

*Corley v. United States*,
556 U.S. 303 (2009) ........ 16

*Ctr. for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) ........ 37, 38, 39

*Ctr. for Biological Diversity v. Salazar*,
804 F. Supp. 2d 987 (D. Ariz. 2011) ........ 38

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
141 F.4th 976 (9th Cir. 2025) ........ 30, 48

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
No. 24-cv-04651m, 2026 U.S. Dist. LEXIS 68386 (N.D. Cal. Mar. 30, 2026) ........ 44

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) ........ 49

*Dudum v. Arntz*,
640 F.3d 1098 (9th Cir. 2011) ........ 12

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
378 F.3d 1059 (9th Cir.) ........ 45, 46

*Gwich'in Steering Comm. v. Bernhardt*,
No. 3:20-cv-00223-SLG, 2021 U.S. Dist. LEXIS 1471 (D. Alaska Jan. 5, 2021) ........ 8

*Hanlon v. Barton*,
740 F. Supp. 1446 (D. Alaska 1988) ........ 29, 35

*Hoonah Indian Ass'n v. Morrison*,
170 F.3d 1223 (9th Cir. 1999) ........ 28

*Humane Soc'y of the U.S. v. Locke*,
626 F.3d 1040 (9th Cir. 2010) .......... 48

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*,
109 F. Supp. 3d 1238 (N.D. Cal. 2015) .......... 49

*Kunaknana v. Clark*,
742 F.2d 1145 (9th Cir. 1984) .......... 30

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 14

*May Trucking Co. v. Or. Dep't of Transp.*,
388 F.3d 1261 (9th Cir. 2004) .......... 26

*Mont. Wildlife Fed'n v. Haaland*,
127 F.4th 1 (9th Cir. 2025) .......... 48, 49

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 14

*N.J. Conservation Found. v. Fed. Energy Regul. Comm'n*,
111 F.4th 42 (D.C. Cir. 2024) .......... 49

*Native Vill. Quinhagak v. United States*,
35 F.3d 388 (9th Cir. 1994) .......... 28

*Nat'l Family Farm Coal. v. EPA*,
960 F.3d 1120 (9th Cir. 2020) .......... 48

*Nat'l Grocers v. Rollins*,
157 F.4th 1143 (9th Cir. 2025) .......... 48

*Nat'l Parks Conserv. Ass'n v. EPA*,
788 F.3d 1134 (9th Cir. 2015) .......... 47

*Nat. Res. Def. Council v. EPA*,
38 F.4th 34 (9th Cir. 2022) .......... 48, 49

*Nw. Forest Res. Council v. Glickman*,
82 F.3d 825 (9th Cir. 1996) .......... 23

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*,
265 F.3d 1028 (9th Cir. 2001) .......... 46

*Pollinator Stewardship Council v. EPA*,
806 F.3d 520 (9th Cir. 2015) .......... 48, 49

*Sierra Club v. Penfold*,
664 F. Supp. 1299 (D. Alaska 1987) .......... 29, 32, 35

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
555 F. Supp. 3d 739 (D. Alaska 2021) .......... 37, 38, 39

*Students for Fair Admis., Inc. v. President & Fellows of Harv. Coll.*,
600 U.S. 181 (2023) .......... 13

*United States v. Am. Trucking Ass'ns*,
310 U.S. 534 (1940) .......... 31

*United States v. Herrera*,
974 F.3d 1040 (9th Cir. 2020) .......... 24

*United States v. Neal*,
776 F.3d 645 (9th Cir. 2015) .......... 14

*United States v. Raddatz*,
447 U.S. 667 (1980) .......... 26

*Wild Fish Conservancy v. Salazar*,
628 F.3d 513 (9th Cir. 2010) .......... 37, 47

*WildEarth Guardians v. U.S. Dep't of Agric. Animal & Plant Health Insp. Serv. Wildlife Servs.*,
135 F.4th 717 (9th Cir. 2025) .......... 47

*Wood v. Burwell*,
837 F.3d 969 (9th Cir. 2016) .......... 48

**Statutes**

5 U.S.C. § 702 .......... 14

5 U.S.C. § 704 .......... 14

5 U.S.C. § 706 .......... 14, 47

16 U.S.C. § 668dd .......... 16, 18

16 U.S.C. § 668ee .......... 16, 17

16 U.S.C. § 1371 .......... 38

16 U.S.C. § 1531 .......... 36

16 U.S.C. § 1532 .......... 36, 44
16 U.S.C. § 1533 .......... 45
16 U.S.C. § 1536 .......... 36, 37, 42
16 U.S.C. § 1538 .......... 38
16 U.S.C. § 3101 .......... 15, 31
16 U.S.C. § 3113 .......... 31
16 U.S.C. § 3120 .......... 28, 29, 30, 31
16 U.S.C. § 3111 .......... 28, 31
16 U.S.C. § 3112 .......... 28, 31
16 U.S.C. § 3113 .......... 31
16 U.S.C. § 3142 .......... 5
16 U.S.C. § 3143 .......... 5
Alaska National Interest Lands Conservation Act,
Pub. L. No. 96-487, § 303 (1980) .......... 4, 5, 15, 16
Alaska National Interest Lands Conservation Act,
Pub. L. No. 96-487, § 304 (1980) .......... 16
Alaska National Interest Lands Conservation Act,
Pub. L. No. 96-487, § 305 (1980) .......... 16, 17
Alaska National Interest Lands Conservation Act,
Pub. L. No. 96-487, § 702 (1980) .......... 5
An Act to Provide for Reconciliation Pursuant to Title II of H. Con. Res. 14,
Pub. L. No. 119-21, § 50104 (2025) .......... 5, 6
Joint Resolution,
Pub. L. No. 119-52, 139 Stat. 701 (2025) .......... 10
Tax Cuts and Jobs Act,
Pub. L. 115-97, § 20001, 131 Stat. 205 (2017) .......... passim

**Regulations**

50 C.F.R. § 18.126 .......... 41
50 C.F.R. § 402.02 (2019) .......... 43
50 C.F.R. § 402.14 .......... 37

**Other**

163 Cong. Rec. 18880-81 (2017) .................................................................... 18, 27

BLM, INTERIOR, Detailed Statement of Sale (2026), https://www.blm.gov/sites/default/files/docs/2026-04/COASTAL%20PLAIN%20DSS%202026%20WITH%20EXHIBITS.pdf. .......... 12

BLM, INTERIOR, 2026 Coastal Plain Lease Sale Bid Recap (2026), https://www.blm.gov/sites/default/files/docs/2026-06/2026%20Coastal%20Plain%20Lease%20Sale%20Bid%20Recap.pdf. ................ 12

Determination of Threatened Status for the Polar Bear, 73 Fed. Reg. 28,212 (May 15, 2008) .................................................................... 3

Designation of Critical Habitat for the Polar Bear, 75 Fed. Reg. 76,086 (Dec. 7, 2010) .............................................................. 4, 42, 44

H.R. REP. NO. 95-1045, pt. I (1978) .................................................................... 32

H.R. REP. NO. 115-466 (2017) .................................................................... 27

Notice of Lease Sale and Notice of Availability of the Detailed Statement of Sale for the Coastal Plain 2025 Oil and Gas Lease Sale, 89 Fed. Reg. 99,270 (Dec. 10, 2024) .................................................................... 10

Notice of 2026 Coastal Plain Oil and Gas Lease Sale, 91 Fed. Reg. 21,015 (Apr. 20, 2026) .................................................................... 12

Press Release, Interior, Arctic Refuge Lease Sale Yields No Interest (Jan. 8, 2025), https://www.doi.gov/pressreleases/arctic-refuge-lease-sale-yields-no-interest........... 10

WEBSTER'S NEW ENCYCLOPEDIC DICTIONARY 2029, 2032 (2002) ................................ 25

## LIST OF SHORT NAMES AND ACRONYMS

| | |
|---|---|
| AIDEA | Alaska Industrial Development and Export Authority |
| AIR | Aerial Infrared |
| ANILCA | Alaska National Interest Lands Conservation Act |
| APA | Administrative Procedure Act |
| Arctic Refuge | Arctic National Wildlife Refuge |
| BLM | Bureau of Land Management |
| BiOp | Biological Opinion |
| Budget Act | Pub. L. No. 119-21, 139 Stat. 73 (2025) |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FWS | U.S. Fish and Wildlife Service |
| Interior | Department of the Interior |
| Leasing Program | Oil and Gas Leasing Program |
| MMPA | Marine Mammal Protection Act |
| NEPA | National Environmental Policy Act |
| NSO | No Surface Occupancy |
| Range | Arctic National Wildlife Range |
| Refuge Act | National Wildlife Refuge System Administration Act |
| ROD | Record of Decision |

| | |
|---|---|
| SEIS | Supplemental Environmental Impact Statement |
| Secretary | Secretary of the Interior |
| Tax Act | Tax Cuts and Jobs Act |

## INTRODUCTION

The Gwich'in Steering Committee and allied conservation groups (collectively "Groups") seek to protect the Coastal Plain of the Arctic National Wildlife Refuge (Arctic Refuge) from the impacts of an unlawful and harmful oil and gas leasing program (Leasing Program). The Coastal Plain is a place like no other. It is the biological heart of one of the largest intact ecosystems on the planet, providing habitat for numerous bird species, the Porcupine Caribou Herd, and a highly imperiled polar bear population. The Coastal Plain has sustained Indigenous peoples for generations and is the cultural cornerstone of the Gwich'in. Porcupine caribou are so central to the lives of the Gwich'in that they call themselves "caribou people," and call the Coastal Plain "Iizhik Gwats'an Gwandaii Goodlit" — meaning "the Sacred Place Where Life Begins."

Because of the Coastal Plain's exceptional values, oil and gas activities were prohibited for decades. This changed in 2017. A provision of the Tax Cuts and Jobs Act (Tax Act) directed the Secretary of the Interior (Secretary) to establish a leasing program for the Coastal Plain (Leasing Program). Over the past eight years, the U.S. Department of the Interior (Interior) has made several decisions related to the Leasing Program, starting with adopting a Leasing Program in 2020, which was the original subject of this lawsuit and the basis for lease issuance in 2021. Following a 2024 revision of that program, in 2025, the Secretary re-adopted the 2020 Leasing Program and held another lease sale in 2026.

The 2020 and 2025 Leasing Programs and related decisions are plagued by legal violations.[1] Specifically, the U.S. Department of the Interior (Interior) failed to ensure its decision fulfilled the Coastal Plain's purposes, misinterpreted the Tax Act to provide less protection than Congress intended, failed to comply with the Alaska National Interest Lands Conservation Act's (ANILCA) subsistence protections, and violated the Endangered Species Act (ESA) in its findings for polar bears and their critical habitat. Given the serious legal violations, this Court should grant summary judgment and vacate the unlawful decisions.

## BACKGROUND

### I. THE COASTAL PLAIN'S EXCEPTIONAL VALUES

At over 19 million acres, the Arctic Refuge is America's largest and wildest national wildlife refuge.[2] It encompasses boreal forests in the south, glaciers and peaks in the Brooks Range, numerous braided rivers and natural springs, and foothills and tundra that stretch to the Beaufort Sea.[3] It provides habitat for many animals, including caribou, polar and grizzly bears, birds, musk oxen, and wolves.[4] It is our nation's premier wilderness refuge and the wilderness values of the Coastal Plain are incomparable.[5]

---

[1] The 2020 Leasing Program remains relevant because Interior issued leases pursuant to that program and affirmed those leases based on both the 2020 and 2025 Leasing Programs.

[2] AR389261.

[3] AR256716-17.

[4] AR256716, AR256734.

[5] AR256616.

The Porcupine Caribou Herd, which migrates through Alaska and Canada, relies on the Coastal Plain for calving, post-calving, and insect relief habitat away from predators.[6] The herd's migratory path brings it to the Coastal Plain in the early summer, where tens of thousands of calves are born within a few days.[7]

The Arctic Refuge lies within the traditional homelands of two Indigenous people: the Gwich'in and Iñupiat.[8] Both rely on the Refuge's resources for subsistence and culture. As they have since time immemorial, the Gwich'in of Alaska and Canada rely on the Porcupine Caribou Herd.[9] The relationship between the caribou and the Gwich'in is guided by the belief that the caribou have a piece of the Gwich'in in their heart and the Gwich'in have a piece of the caribou in their heart.[10] As a result, the Gwich'in made a pact with the caribou to protect them so the caribou can continue to provide for the Gwich'in.[11] Gwich'in Traditional Knowledge instructs that development on the Coastal Plain will harm the caribou.[12]

The Coastal Plain also provides denning habitat for polar bears, which are protected as a threatened species under the ESA.[13] The Coastal Plain has the highest

---

[6] AR582443-44.
[7] AR434847.
[8] AR389553.
[9] AR376248, AR246643-44, AR389553.
[10] AR246604, AR246616, AR376248, AR390559.
[11] AR246604, AR246616, AR376248, AR390559.
[12] AR376248-49, AR389571.
[13] Determination of Threatened Status for the Polar Bear, 73 Fed. Reg. 28212 (May 15, 2008).

density of onshore denning habitat in America.[14] This is because the unique topography creates areas of deep snowdrifts.[15] The vast majority of the Coastal Plain is designated as terrestrial denning critical habitat under the ESA.[16]

The abundant plants and insects also allow many bird species to nest and forage on the Coastal Plain, which they do as part of their migrations through all of North America's flyways and to six continents.[17]

## II. COASTAL PLAIN PROTECTIONS

Because of its wildlife, cultural, and ecological values, the area was first protected in 1960 as the Arctic National Wildlife Range (Range) "for the purpose of preserving unique wildlife, wilderness and recreational values."[18]

Congress expanded these protections when it enacted ANILCA in 1980.[19] In ANILCA, Congress redesignated the Range as the Arctic Refuge and expanded it from 8.9 to over 19 million acres.[20] In addition to the Range purposes, Congress identified four more purposes for the Arctic Refuge: the conservation of fish and wildlife and their habitats, fulfilling international treaty obligations, providing for subsistence users, and

---

[14] AR434870, AR434988.

[15] AR434867.

[16] AR389524; Designation of Critical Habitat for the Polar Bear, 75 Fed. Reg. 76086, 76088-91 (Dec. 7, 2010) [hereinafter Polar Bear Critical Habitat].

[17] AR434827, AR389466.

[18] AR346827.

[19] Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487, 94 Stat. 2371 (1980) [hereinafter ANILCA].

[20] *Id.* § 303(2).

protecting water quality and quantity.[21] Congress also designated the Range, other than the Coastal Plain, as Wilderness.[22] ANILCA allowed a limited, one-time seismic exploration program, but otherwise prohibited oil and gas development.[23]

## III. CONGRESS' AUTHORIZATION OF AN OIL AND GAS PROGRAM

In the Tax Act, Congress opened the Coastal Plain to oil and gas leasing and activities.[24] The Tax Act repealed ANILCA's oil and gas prohibition for the Coastal Plain and directed the Secretary to establish an oil and gas program.[25] The Tax Act added an oil and gas program as another purpose for the Coastal Plain.[26] It required the Secretary to hold two lease sales of at least 400,000 acres in the areas with the highest hydrocarbon potential.[27] The Tax Act also limited surface development to a maximum of 2,000 acres and authorized the Secretary to issue rights-of-way for the program.[28]

In 2025, Congress enacted budget legislation (Budget Act) that directs the Secretary to hold four lease sales over ten years, roughly every other year.[29] Similar to the Tax Act, it requires the Secretary to offer at least 400,000 acres in the areas with the

[21] *Id.*
[22] *Id.* § 702(3).
[23] 16 U.S.C. §§ 3142(a)-(h), 3143; *Alaska v. Jewell*, 2015 U.S. Dist. LEXIS 94574, at *23 (D. Alaska July 21, 2015).
[24] Tax Cuts and Jobs Act, Pub. L. 115-97, § 20001, 131 Stat. 2054, 2235–37 (2017) [hereinafter Tax Act].
[25] *Id.* § 20001(b)(1), (2)(A).
[26] *Id.* § 20001(b)(2)(B)(iii).
[27] *Id.* § 20001(c).
[28] *Id.* § 20001(c)(2), (3).
[29] An Act to Provide for Reconciliation Pursuant to Title II of H. Con. Res. 14, Pub. L. No. 119-21, § 50104(b)(1), (3)(B), 139 Stat. 72, 142-43 (2025).

highest hydrocarbon potential.[30] It also requires the Secretary to "offer the same terms and conditions as contained in the record of decision" for the 2020 Leasing Program.[31] Finally, it applies the Tax Act's 2,000-acre limitation on surface development and right-of-way provision to future lease sales.[32]

## IV. INTERIOR'S REVIEW PROCESS

### A. The 2020 Leasing Program

The Bureau of Land Management (BLM) initiated the National Environmental Policy Act (NEPA) process and released the draft environmental impact statement (EIS) for a Leasing Program in 2018.[33] Under Alternative B in the draft EIS, the entire Coastal Plain would be open to leasing and seismic exploration.[34]

In 2019, BLM issued the final EIS, identifying Alternative B as its preferred alternative.[35] BLM also set out its interpretation of the 2,000-acre limitation.[36] BLM stated that it could not authorize less than 2,000 acres of development and that it would allow acreage to be reclaimed and then new acreage to be developed, potentially in excess of 2,000 acres.[37]

---

[30] *Id.* § 50104(b)(3)(A).
[31] *Id.* § 50104(b)(2).
[32] *Id.* § 50104(b)(4)-(5).
[33] AR17685-6, AR17690-91.
[34] AR85918, AR86086.
[35] AR17693, AR90181.
[36] AR90238.
[37] AR91634-35, AR90238.

BLM's ANILCA Section 810 Final Evaluation, released concurrently, relied on the information and analysis in the final EIS.[38] In that evaluation, BLM analyzed the impact of the Leasing Program on only four communities — Kaktovik, Nuiqsut, Arctic Village, and Venetie — despite recognizing many additional communities have subsistence ties to Coastal Plain resources.[39] In evaluating the impacts of each action alternative, BLM determined that none would significantly restrict subsistence uses for Arctic Village and Venetie.[40]

The U.S. Fish and Wildlife Service (FWS) also prepared a biological opinion (BiOp) under the ESA evaluating Alternative B.[41] In the 2020 BiOp, FWS relied on future compliance with the Marine Mammal Protection Act (MMPA) to find that the 2020 Leasing Program would not jeopardize polar bears or adversely modify their critical habitat.[42]

In 2020, the Secretary signed the record of decision (ROD), adopting Alternative B and opening the entire Coastal Plain to oil and gas leasing and activities.[43] The Secretary did not, however, adopt the interpretation of the 2,000-acre limitation from the

---

[38] AR90849.
[39] AR90850-51.
[40] AR90858-67.
[41] AR676.
[42] AR791-93, AR800.
[43] AR205951-6038.

final EIS.[44] Instead, the Secretary outlined a new interpretation that excluded many facilities, including potentially airstrips, barge landings, roads, and gravel mines.[45]

BLM held the first lease sale in early 2021.[46] The Alaska Industrial Development and Export Authority (AIDEA) leased seven tracts; two private companies each leased one tract.[47]

### B. The 2024 Leasing Program

After taking office, President Biden issued an executive order noting the "alleged legal deficiencies" of the 2020 Leasing Program and directing the Secretary to review the program, conduct a new analysis as needed, and pause activities.[48] Following her review, the Secretary concluded that there were legal defects with the 2020 Leasing Program, including the "failure...to properly interpret" the 2,000-acre limitation.[49] Because of the legal errors, the Secretary halted activities and suspended the leases.[50]

---

[44] AR205958, AR205960-61.

[45] AR205967-69.

[46] AR522183-84, AR522270. Groups unsuccessfully sought a preliminary injunction to stop the lease sale. *Gwich'in Steering Comm. v. Bernhardt*, 2021 U.S. Dist. LEXIS 1471 (D. Alaska Jan. 5, 2021).

[47] AR522273-302, AR522303-08, AR522309-15. These companies later relinquished their leases. *Alaska Indus. Dev. & Exp. Auth. v. Biden*, 685 F. Supp. 3d 813, 845 n.188 (D. Alaska 2023).

[48] AR522318-24.

[49] AR522325-26.

[50] AR522325-26, AR522327-28; *see also Alaska Indus. Dev. & Exp. Auth.*, 685 F. Supp. 3d at 859 (upholding lease suspension).

In 2021, Interior began a supplemental NEPA process to try to address the legal errors and issued the draft supplement EIS (SEIS) in 2023.[51] One of the action alternatives considered was Alternative B, which was substantially the same as the alternative adopted in the 2020 ROD.[52] Interior did not carry forward the Secretary's prior interpretation of the 2,000-acre limitation.[53] Instead, Interior explained that the limitation operated as a cap that, once reached, prohibits any additional disturbance even if areas are reclaimed.[54] Interior also explained that both on- and off-lease infrastructure would count towards the limitation, including infrastructure for development, production, and transportation operations, and that the limit applies to gravel mines, pads, airstrips, and roads.[55]

In late 2024, Interior issued the final SEIS.[56] The final SEIS considered four action alternatives, including Alternative B and a new alternative: Alternative D2.[57] Alternative D2 made 400,000 acres of land available for lease to meet the mandate for a second lease sale and estimated that only 995 acres would be developed.[58] Alternative D2 included

---

[51] AR207244-45, AR389234-35.
[52] AR387844.
[53] AR387839.
[54] AR387839.
[55] AR387839-40.
[56] AR207247.
[57] AR389296-97.
[58] AR389297.

more stringent stipulations and required operating procedures (ROPs) than the other alternatives.[59]

The final SEIS also included the ANILCA Section 810 Final Evaluation.[60] Despite acknowledging that twenty-two communities have subsistence ties to Coastal Plain resources, Interior again only analyzed the impacts on Kaktovik, Nuiqsut, Arctic Village, and Venetie.[61] Interior determined that none of the alternatives may result in a significant restriction for Arctic Village or Venetie, and did not conduct formal hearings or make further findings.[62]

The Secretary then issued a ROD adopting Alternative D2 ("2024 ROD" or "2024 Leasing Program").[63] In doing so, the Secretary explained that the more limited Leasing Program best protected the Coastal Plain's resources and met the statutory purposes.[64] BLM held the second lease sale in late 2024 but received no bids.[65]

---

[59] AR389296-97.

[60] AR390773-813.

[61] AR390775-76.

[62] AR390788-89, AR390791, AR390793, AR390796, AR390803.

[63] AR758739-40. In 2025, Congress passed, and the President signed, a resolution under the Congressional Review Act purporting to disapprove this decision. Joint Resolution, Pub. L. No. 119-52, 139 Stat. 701 (2025).

[64] AR519743, AR519746-47, AR519750.

[65] Notice of Lease Sale and Notice of Availability of the Detailed Statement of Sale for the Coastal Plain 2025 Oil and Gas Lease Sale, 89 Fed. Reg. 99270 (Dec. 10, 2024); Press Release, Interior, Arctic Refuge Lease Sale Yields No Interest (Jan. 8. 2025), https://www.doi.gov/pressreleases/arctic-refuge-lease-sale-yields-no-interest.

### C. The 2025 Leasing Program

Following his inauguration, President Trump directed the Secretary to pause implementation of the 2024 Leasing Program and re-adopt the 2020 Leasing Program.[66] The Secretary then directed Interior to re-adopt the 2020 Leasing Program.[67]

BLM did not conduct a new NEPA analysis to evaluate re-adopting the 2020 Leasing Program and the Secretary issued the 2025 ROD adopting Alternative B.[68] Like the 2020 Leasing Program, the 2025 Leasing Program makes the entire program area available for leasing and seismic exploration.[69] The Secretary explained that BLM would not follow the 2,000-acre limit interpretation contained in the 2024 final SEIS and ROD.[70] The Secretary instead set out an interpretation that closely tracked the 2020 ROD.[71] The Secretary also summarily stated that Alternative B "takes into account the other purposes" of the Arctic Refuge.[72] And the Secretary relied on the ANILCA Section 810 Final Evaluation from the 2024 final SEIS to support the new decision.[73]

For its part, FWS issued a 2025 BiOp evaluating re-adopting Alternative B from the SEIS.[74] FWS determined that the 2025 Leasing Program was not likely to jeopardize

---

[66] AR522366-70.
[67] AR522371-72.
[68] AR522114, AR522123-24.
[69] AR522115.
[70] AR522119-20.
[71] AR522118-20.
[72] AR522122; *see also* AR522123.
[73] AR522126.
[74] AR521099-1442.

the continued existence of polar bears or to destroy or adversely modify critical habitat.[75] FWS did not specifically address AIDEA's leases.

Interior then lifted the suspensions on AIDEA's leases.[76] Interior "affirm[ed] the leases without modification under the 2025" ROD.[77] Interior explained that it had reviewed the 2019 final EIS and 2024 final SEIS.[78] The agency noted that the leases were issued pursuant to the 2020 ROD, which had adopted Alternative B, and that the 2025 ROD reinstated Alternative B.[79] Interior explained that AIDEA's "leases are fully consistent with the 2025 ROD as originally issued."[80]

BLM then conducted another lease sale, explaining that the offered tracts, lease stipulations, and ROPs were those set out in the 2025 ROD.[81] The agency stated it would implement the interpretation of the 2,000-acre limitation contained in the 2025 ROD.[82] The agency opened bids on June 5; nine bids were received on five tracts.[83]

---

[75] AR521365-66, AR521369-72.

[76] AR522428-33.

[77] AR522428.

[78] AR522432.

[79] AR522428, AR522432.

[80] AR522432.

[81] Notice of 2026 Coastal Plain Oil and Gas Lease Sale, 91 Fed. Reg. 21015 (Apr. 20, 2026); BLM, INTERIOR, Detailed Statement of Sale 1 (2026), https://www.blm.gov/sites/default/files/docs/2026-04/COASTAL%20PLAIN%20DSS%202026%20WITH%20EXHIBITS.pdf. The Court may take judicial notice of documents on agency websites. *Dudum v. Arntz*, 640 F.3d 1098, 1101 n.6 (9th Cir. 2011).

[82] BLM, *supra* note 81 at 6.

[83] BLM, INTERIOR, 2026 Coastal Plain Lease Sale Bid Recap (2026), https://www.blm.gov/sites/default/files/docs/2026-06/2026%20Coastal%20Plain%20Lease%20Sale%20Bid%20Recap.pdf.

## PLAINTIFFS' INTERESTS

Groups have standing because their members will suffer injuries in fact, which are traceable to the Secretary's actions, and would be redressed by a favorable decision.[84] Groups' missions include protecting public lands and wildlife, and each works to protect the Coastal Plain.[85] Their members and supporters use and enjoy the Arctic Refuge and the Coastal Plain, including for recreation, guiding, wildlife viewing, and scientific research.[86] The Gwich'in Steering Committee, as the voice for the Gwich'in Nation, advocates to permanently protect the Coastal Plain because of their deep cultural, spiritual, and subsistence interests in the Porcupine Caribou Herd.[87] The Secretary's decisions adopting leasing programs and leasing the Coastal Plain without full compliance with the law poses a substantial risk to Groups' interests and members' use

---

[84] *See Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 199 (2023) (stating associational standing test).

[85] *See* Ex. 1 ¶¶ 6-16, 19-26; Ex. 5 ¶¶ 6-8; Ex. 6 ¶¶ 4-17, 26-27; Ex. 8 ¶¶ 4-15; Ex. 9 ¶¶ 6-12; Ex. 10 ¶¶ 6-15; Ex. 11 ¶¶ 4-9; Ex. 12 ¶¶ 5-13, 15-26; Ex. 13 ¶¶ 3, 5-14; Ex. 14 ¶¶ 5-7, 12-17, 20; Ex. 15 ¶¶ 3-4, 7, 9-12; Ex. 17 ¶¶ 2, 6-17, 19; Ex. 18 ¶¶ 4-11.

[86] *See* Ex. 1 ¶¶ 6, 27-29; Ex. 2 ¶¶ 5, 9, 11, 17; Ex. 3 ¶¶ 4-5, 10-16; Ex. 4 ¶¶ 3, 5-15; Ex. 6 ¶¶ 21, 24; Ex. 7 ¶¶ 3-8; Ex. 8 ¶¶ 16-19; Ex. 10 ¶¶ 16-17; Ex. 11 ¶ 11; Ex. 12 ¶¶ 14, 35-52; Ex. 13 ¶¶ 15, 17; Ex. 14 ¶¶ 10-11, 18, 29; Ex. 15 ¶¶ 15-16; Ex. 16 ¶¶ 2-4, 6, 18-19; Ex. 17 ¶¶ 6, 22, 27-32; Ex. 18 ¶¶ 12, 17; Ex. 19 ¶¶ 3, 5, 7-25.

[87] *See* Ex. 5 ¶¶ 6-7; Ex. 9 ¶¶ 6-7, 13-16, 18-19, 21-23, 25.

and enjoyment of the Coastal Plain and its resources.[88] A favorable decision from the Court invalidating the challenged decisions would redress these injuries.[89]

## STANDARDS OF REVIEW

Courts review agency actions under the Administrative Procedure Act (APA).[90] Courts "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory...limitations," or undertaken "without observance of procedure required by law."[91] Agency actions are unlawful when the agency:

> relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[92]

Interpretation of a statute is a question of law,[93] and courts are "guided by the fundamental canons of statutory construction."[94]

---

[88] *See* Ex. 1 ¶¶ 30-39; Ex. 2 ¶¶ 21-23; Ex. 3 ¶¶ 18-20; Ex. 4 ¶¶ 10, 16, 18-24; Ex. 5 ¶¶ 16-21; Ex. 6 ¶¶ 18-20, 22-25, 28; Ex. 7 ¶¶ 10, 12-14; Ex. 8 ¶¶ 20-25; Ex. 9 ¶¶ 24, 26-28, 31-33, 38-42; Ex. 10 ¶¶ 18-19; Ex. 11 ¶¶ 10-14; Ex. 12 ¶¶ 31-34, 53-60; Ex. 13 ¶¶ 16, 18-20; Ex. 14 ¶¶ 18-19, 21-1; Ex. 15 ¶¶ 13-14, 17-21; Ex. 16 ¶¶ 9-18, 20-24; Ex. 17 ¶¶ 18, 20-21, 23-26, 33-34, 37-45; Ex. 18 ¶¶ 15-17; Ex. 19 ¶¶ 26-39.

[89] *See* Ex. 1 ¶¶ 40-42; Ex. 2 ¶ 23; Ex. 3 ¶ 20; Ex. 4 ¶ 24; Ex. 5 ¶ 22; Ex. 6 ¶ 28; Ex. 7 ¶ 14; Ex. 8 ¶ 26; Ex. 9 ¶ 43; Ex. 10 ¶ 19; Ex. 11 ¶ 14; Ex. 12 ¶ 60; Ex. 13 ¶ 21; Ex. 14 ¶ 34; Ex. 15 ¶ 21; Ex. 16 ¶ 24; Ex. 17 ¶ 46; Ex. 18 ¶ 18; Ex. 19 ¶ 39.

[90] 5 U.S.C. §§ 702, 704.

[91] *Id.* § 706(2)(A), (C), (D).

[92] *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[93] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394, 412-13 (2024).

[94] *Bottinelli v. Salazar*, 929 F.3d 1196, 1199 (9th Cir. 2019) (quoting *United States v. Neal*, 776 F.3d 645, 692 (9th Cir. 2015)).

## ARGUMENT

### I. INTERIOR FAILED TO FULFILL THE COASTAL PLAIN'S PURPOSES.

Interior violated ANILCA and the National Wildlife Refuge System Administration Act (Refuge Act) by adopting a program that fails to: (1) recognize and fulfill the original Range purposes; and (2) fulfill the ANILCA conservation and subsistence purposes. Instead, for both the 2020 and 2025 Leasing Programs, Interior adopted an expansive oil and gas program that the agency acknowledged would have considerable impacts to Coastal Plain resources. This unlawfully elevates the oil and gas program over the Coastal Plain's conservation and subsistence purposes.

#### A. ANILCA and the Refuge Act Mandate Protection of the Coastal Plain's Conservation and Subsistence Purposes.

The Coastal Plain has been protected for decades because of its exceptional values.[95] These values are embodied in both the Range and ANILCA purposes. The original Range purposes include "preserving unique wildlife, wilderness and recreational values."[96] The ANILCA purposes are "to conserve fish and wildlife populations and habitats in their natural diversity," "to fulfill international treaty obligations...with respect to fish and wildlife and their habitats," "to provide...the opportunity for continued subsistence uses," and "to ensure...water quality and necessary water quantity."[97] ANILCA additionally recognizes broad conservation and subsistence purposes.[98] The

[95] *Supra* Background II.
[96] AR346827.
[97] ANILCA § 303(2)(B).
[98] 16 U.S.C. § 3101.

Refuge Act also includes broad conservation purposes, including "conservation of fish, wildlife, and plants, and their habitats," "ensur[ing] that the biological integrity, diversity, and environmental health of the System are maintained," and "contribut[ing] to the conservation of the ecosystems of the United States."[99]

ANILCA mandates that the Coastal Plain be managed to achieve its purposes.[100] ANILCA also directs that the public land orders originally establishing a refuge unit "shall remain in force and effect" unless inconsistent with ANILCA.[101] Similarly, the Refuge Act defines the "purposes of the refuge" to include those "purposes specified in or derived from the law,...[or] public land order...establishing, authorizing, or expanding a refuge."[102] The Refuge Act similarly requires that refuge management fulfill refuge-specific purposes as well as the purposes of the National Wildlife Refuge System.[103] Taken together, these authorities mandate that the Coastal Plain be managed to fulfill all of its purposes: the Range purposes, ANILCA purposes, and Refuge Act purposes.

The Tax Act added an additional purpose: "to provide for an oil and gas program on the Coastal Plain."[104] In adding this industrial purpose, Congress did not elevate it or otherwise supersede the Coastal Plain's conservation and subsistence purposes.[105]

---

[99] *Id.* § 668dd(a)(4)(A)-(C).
[100] ANILCA §§ 303(2)(B), 304(a).
[101] *Id.* § 305.
[102] 16 U.S.C. § 668ee(10).
[103] *Id.* § 668dd(a)(3)(A).
[104] Tax Act § 20001(b)(2)(B)(iii).
[105] *See Corley v. United States*, 556 U.S. 303, 314 (2009) (explaining statutes are interpreted to give effect to all provisions).

### B. The Leasing Program Is Inconsistent with the Coastal Plain's Purposes.

Contrary to ANILCA and the Refuge Act's mandates, the 2020 and 2025 Leasing Programs fail to fulfill and give effect to all the Coastal Plain's purposes, impermissibly elevating the oil and gas purpose. First, Interior failed to account for, and therefore failed to fulfill, the Range purposes. Second, Interior's adoption of the most expansive, impactful Leasing Program failed to protect the resources and values embodied in the Coastal Plain's ANILCA and Refuge Act purposes.

#### *1. Interior failed to consider and fulfill the Range purposes.*

Interior failed to account for the Range purposes or explain how those purposes would be met. Interior only considered the five ANILCA-specific purposes in evaluating the Leasing Program.[106] In the final SEIS, Interior claimed that the Range purposes "were superseded" by ANILCA and the Tax Act.[107] This is incorrect as a matter of law.

ANILCA provides that public land orders in effect when ANILCA was enacted "shall remain in force and effect except to the extent that they are inconsistent with this Act."[108] The Refuge Act defines the "purposes of the refuge" to include those "purposes specified in or derived from the law,...[or] public land order...establishing, authorizing, or expanding a refuge."[109] It also mandates that "each refuge shall be managed to fulfill the

[106] AR389285-87, AR522116, AR522122-23, AR90195, AR90534-35, AR90836, AR205963-64.

[107] AR389286-87; *see also* AR91979, AR92047 (response to comments on DEIS indicating Range purposes no longer apply).

[108] ANILCA § 305.

[109] 16 U.S.C. § 668ee(10).

mission of the System, as well as the specific purposes for which that refuge was established."[110] Taken together, these authorities are clear that the Range purposes continue to be purposes of the Coastal Plain and needed to be accounted for and met.[111]

To the extent Interior claims that the Tax Act overrode the Range purposes, that conclusion lacks legal support. On the contrary, when Congress was considering the Tax Act, Senator Murkowski, the sponsor of the Leasing Program provision, stated that Congress did not intend to waive or override other protective mandates, specifically stating that "[a]ll relevant laws, regulations, and executive orders will apply under our language...We did not waive NEPA or any other environmental laws."[112]

Further, the argument that the Tax Act overrides the Range purposes is inconsistent with Interior's recognition that the Tax Act did not override the ANILCA purposes.[113] ANILCA's purposes and the Range purposes are similarly focused on protecting wildlife, habitat, land, and personal uses. It makes no sense that ANILCA's purposes would remain, but the similar Range purposes would not.

Without recognizing the Range purposes or including them in its analysis, Interior could not ensure that an oil and gas program would be consistent with all of the Coastal

---

[110] *Id.* § 668dd(a)(3)(A); *see also id.* § 668dd(a)(4)(D) (directing "the Secretary shall...ensure that the mission of the System...and the purposes of each refuge are carried out").

[111] *See also* AR434572 (recognizing Range purposes still applicable).

[112] 163 Cong. Rec. 18880-81 (2017) (statement of Sen. Murkowski); *see also* Ex. 20 at 3 ("[W]e have not preempted the environmental review process...All relevant laws, all regulations, and executive orders will apply under this language.").

[113] AR522123.

Plain's purposes. While there is overlap between the Range and ANILCA purposes, they are not identical. The Range purposes specifically include "preserving unique...wilderness and recreation values."[114] Interior needed to consider these purposes and ensure that any leasing program would fulfill them. Instead, the agency adopted a leasing program that would have the greatest impacts to these values.[115] By failing to acknowledge the Range purposes and thereby failing to adopt a program that met them, the Secretary failed to comply with its statutory obligations, rendering the decision contrary to law.

2. *Interior failed to fulfill the Coastal Plain's ANILCA and Refuge Act purposes.*

Interior improperly elevated the oil and gas purpose over ANILCA's and the Refuge Act's conservation and subsistence purposes. This is demonstrated by several facts, including that the 2020 and 2025 Leasing Programs open the entire Coastal Plain to leasing with the fewest protections in place;[116] allow seismic exploration across the entire Coastal Plain, on leased and unleased areas;[117] and that the Secretary's interpretation of the 2,000-acre limitation would allow far greater than 2,000 acres of surface

---

[114] AR346827.

[115] AR389620-24 & AR90531-33 (final SEIS and EIS describing how Alternative B would have the greatest impacts to recreation), AR389633-35 & AR90543-44 (final SEIS and EIS describing how Alternative B would have the greatest impacts to wilderness characteristics, qualities, and values).

[116] AR522121, AR205959-60.

[117] AR522121, AR205959-60.

development.[118] Overall, Interior adopted a leasing program that would do the greatest harm to resources that are meant to be protected by the purposes.[119]

Interior's statements that the 2020 Leasing Program would met Refuge purposes are unsupported by the record and contradicted by numerous findings about the adverse impacts to resources.[120] Interior attempted to justify the 2025 Leasing Program as being consistent with the Coastal Plain's purposes by stating that the agency was acting pursuant to Congress' direction in the Budget Act.[121] The Budget Act's reference to the terms and conditions of the 2020 ROD does not negate that Interior had options available to better protect Refuge purposes. A program that made fewer acres available for lease, opened areas to leasing on a rolling basis as needed to offer 400,000 acres per lease sale, did not allow off-lease seismic, authorized less than 2,000 acres of surface disturbance, or imposed additional measures deemed necessary to comply with protective mandates

[118] *See infra* Argument II; AR522118-20, AR205966-67.

[119] AR389287 (chart identifying purposes and related resources for SEIS), AR389377 (air quality), AR389415 (soil resources), AR389428–29 (water resources), AR389443-50 (wetlands and vegetation), AR389459-65 (fish, fish habitat, and aquatic species), AR389484-92 (birds and bird habitat), AR389506-14 (caribou and caribou habitat), AR389536-43 (polar bears), AR389571-79 (subsistence uses and resources); *see also* AR90535 (chart), AR90257, AR90297-98, AR90313-14, AR90342-43, AR90369-72, AR90392-97, AR90433-39, AR90480-81, AR90483 (similar findings in EIS).

[120] AR205963-64.

[121] AR522120-23; *see also* AR205963-64 (2020 ROD stating Congress balanced the purposes and mandated a leasing program).

could still comply with Congress' directive for a Leasing Program and lease sales while providing greater protection for the Coastal Plain's resources.[122]

Interior needed to ensure that the Leasing Program fulfilled the Coastal Plain's conservation and subsistence purposes. Instead, it adopted the most expansive, impactful program on the erroneous ground that Congress required it. Interior had an obligation to fulfill the statutory purposes and to adopt something less impactful and could do so while still complying with Congress' directives for the Leasing Program and lease sales. Its failure to do so is arbitrary and violates ANILCA and the Refuge Act.

## II. INTERIOR MISINTERPRETED THE 2,000-ACRE LIMITATION.

Interior's interpretation of the 2,000-acre limitation is contrary to the Tax Act and could lead to significantly greater harm to the Coastal Plain than Congress intended. The Tax Act directs that "[t]he Secretary shall establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain."[123] The law mandates that,

> [i]n administering this section, the Secretary shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section.[124]

---

[122] *See* AR519747 & AR519750 (2024 ROD explaining more limited Leasing Program best protects purposes); *see also* AR21333 (FWS draft EIS comments stating Alternative D2 best protects purposes).

[123] Tax Act § 20001(b)(2).

[124] *Id*. § 20001(c)(3).

There are two fundamental flaws in Interior's interpretation of the Tax Act in its 2025 ROD, both of which it carried over from the 2020 Leasing Program.[125]

First, Interior adopted an unduly restrictive interpretation of the phrase "production and support facility" to improperly limit what infrastructure would count toward the 2,000-acre limit.[126] Interior's interpretation requires that any facility be both a "production *and* support facility."[127] Thus, Interior narrowed what it considered applicable to only "a facility for production or a facility supporting production."[128] Based on that interpretation, Interior concluded that many facilities would fall outside the scope of the limit if they do not directly relate to production and instead relate to transportation, exploration, or development.[129] One example demonstrating the overbreadth of its interpretation is that, if an airstrip is immediately adjacent to a production site, that airstrip may count toward the limitation, but an airstrip further away from a production site would not.[130]

Second, Interior treated the 2,000-acre limit as a rolling total, rather than a hard limit on the total acreage that could be impacted.[131] Interior concluded that, using reclamation, it could allow greater than 2,000 acres of surface development.[132] Interior's

---

[125] AR91634-35, AR205968.
[126] AR522119.
[127] AR522119.
[128] AR522119.
[129] AR522119.
[130] AR522119.
[131] AR522119.
[132] AR522119.

interpretations create loopholes that negate the meaningfulness of the limitation, contrary to Congress' intent.

Instead, the text, context, and legislative history of the Tax Act indicate Congress intended the 2,000-acre limit to broadly cap the amount of surface infrastructure on the Coastal Plain.[133] Interior's interpretation of the phrase "production and support facilities" contradicts Congress' intent that the 2,000-acre limitation minimize impacts to the Coastal Plain. Interior's interpretation functionally rewrites the language to only encompass two limited categories: "production facilities" and "production support facilities." Congress would have understood, as Interior did in adopting the program, that permanent gravel infrastructure typically is built at the development and production stages, and that it includes a broad range of infrastructure.[134] Had Congress intended "support facilities" to be limited in scope to only those directly linked to production facilities, Congress could have said "production support facilities." It did not.

That Congress intended "support" facilities to encompass the broad range of infrastructure necessary to support the oil and gas program[135] — not just the gravel production pad and immediately adjacent facilities — is reinforced by Congress'

---

[133] *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 830-31 (9th Cir. 1996) (indicating when interpreting a statute, courts look first to the plain language, and interpret provisions in context, including the statute's purposes); *Alarcon v. Keller Indus., Inc.*, 27 F.3d 386, 389 (9th Cir. 1994) (indicating courts can look to legislative history when statutory language is unclear).

[134] AR390597-605.

[135] *See, e.g.*, AR390600-07 (discussing infrastructure that might be built at the development and production phases).

examples of what constitutes a support facility. Congress stated the limit "includ[es] airstrips and any area covered by gravel berms or piers for support of pipelines."[136] Pipelines and airstrips are related to transportation.[137] Those examples and Congress' use of the word "including" illustrate that Congress intended the limit to apply to facilities that are not used just for production but to permanent infrastructure that supports the oil and gas program broadly, including for transportation.[138] Interior's attempt to parse out certain infrastructure on the basis that it is not for "production" is inconsistent with the non-exclusive examples Congress used that includes non-production infrastructure. It is also inconsistent with the reality that pipelines, roads, and a broad range of other infrastructure are inherently needed to support production but often occur away from production facilities.

The plain language also indicates Congress did not intend to allow for a rolling 2,000-acre cap. Instead, Congress included the phrase "up to 2,000 surface acres" in addition to the clause "during the term of the leases under the oil and gas program under this section." Interior's interpretation of the provision as allowing for more than 2,000

---

[136] Tax Act § 20001(c)(3).

[137] AR390597.

[138] *See Ariz. State Bd. for Charter Schs. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1007 (9th Cir. 2006) (indicating "including" is used as a term of illustration to provide an example of the preceding principle); *United States v. Herrera*, 974 F.3d 1040, 1048 (9th Cir. 2020) (explaining use of the word "include" with a list is construed as non-exhaustive). To the extent Interior is asserting that any infrastructure for rights-of-way or easements are mandated under the program and, therefore, not subject to this cap, that is likewise contrary to the Tax Act and Congress' intent.

acres of infrastructure reads out and negates the meaningfulness of the phrase "up to." The definition of "up to" is "to or at the top" and "indicate[s] a limit or boundary."[139] By using the phrase "up to," Congress indicated its intent to create a hard limit on the amount of infrastructure that could be built. Had Congress intended to allow for greater than 2,000 acres of surface development, it could have included the modifier "at any given time" or expressly referenced reclamation. Congress' use of the phrase "during the term of the leases under the oil and gas program under this section" also does not reflect that Congress intended for there to be a rolling cap or reclamation that could allow for greater impacts from the oil and gas program.[140] The more reasonable interpretation is that Congress intended the limit to apply to any leases issued under the program.

The context of the 2,000-acre limit also reinforces that Congress intended the provision to apply broadly to limit the footprint of permanent infrastructure on the Coastal Plain. The heading for the 2,000-acre language frames that subsection as relating to "Surface Development."[141] "Surface development" is not limited to only production facilities. In addition, while the 2,000-acre language is nested in the subsection directing Interior to conduct two lease sales, the initial language of the 2,000-acre limitation expressly directs the Secretary to apply the cap "[i]n administering this section" —

---

[139] WEBSTER'S NEW ENCYCLOPEDIC DICTIONARY 2029, 2032 (2002).

[140] *See* AR522119.

[141] Tax Act § 20001(c)(3); *Chong Yia Yang v. Cal. Dep't of Soc. Servs.*, 183 F.3d 953, 958-59 (9th Cir. 1999) (looking to heading to ascertain intent).

meaning, the entirety of Section 20001 of the Tax Act.[142] When read as a whole and put in the context of Section 20001, it is clear that Congress' intent was that the 2,000-acre limit would be a hard cap on the footprint of any permanent infrastructure under the leasing program.

The Court should also read the limitation in light of the purposes of the provision.[143] In passing the Section 20001 of the Tax Act, Congress was trying to reduce impacts to the Coastal Plain — as demonstrated by the fact that it maintained the Coastal Plain's conservation and subsistence purposes.[144] Given that context, the driving purpose behind the 2,000-acre limit is best understood to minimize the impacts to the Coastal Plain. It makes no sense to read into the language numerous loopholes undermining the acreage cap and the conservation and subsistence purposes of the Refuge.[145]

These interpretations are consistent with the legislative history. Both the conference report and the summary of the Chairman's Mark version of the legislation, which contained the same 2,000-acre language Congress ultimately enacted, characterized the provision as a limit on the total footprint of direct impacts to the land

[142] Tax Act § 20001(c)(3).

[143] *May Trucking Co. v. Or. Dep't of Transp.*, 388 F.3d 1261, 1268 (9th Cir. 2004) (looking to statute's purposes).

[144] *See supra* Argument I.

[145] *See United States v. Raddatz*, 447 U.S. 667, 676 n.3 (1980) (stating courts "cannot 'impute to Congress a purpose to paralyze with one hand what it sought to promote with the other'" (quoting *Clark v. Uebersee Finanz-Korporation*, 332 U.S. 480, 489 (1947))).

surface.[146] Numerous statements from Senator Lisa Murkowski, the chair of the committee that drafted Section 20001, reinforce that Congress intended the 2,000-acre limit to be a maximum cap on the total number of acres with permanent infrastructure.[147] There was no discussion about limiting the cap to only production-support facilities or allowing for a rolling total based on reclamation. The Court should not read expansive loopholes into the provision when Congress was otherwise silent.[148]

Overall, the plain language, context, purpose, and legislative history confirm that the 2,000-acre limitation was intended to be a hard cap on the total amount of permanent infrastructure that could be allowed. Interior's unlawful interpretation is contrary to the Tax Act and, therefore, arbitrary.

---

[146] H.R. REP. NO. 115-466, at 675 (2017) (Conf. Rep.) (indicating Section 20001 "authorizes the development of up to 2,000 surface acres of federal land on the Coastal Plain"); Ex. 21 ("[T]he text limits surface development on federal land on the Coastal Plain to 2,000 acres.").

[147] *See, e.g.*, Ex. 20 at 3 ("We also have limited surface development to just 2,000 federal acres within the 1.5 million-acre 1002 Area...[W]e are talking about 2,000 total federal acres, just 1/10,000th of ANWR itself.); Ex. 22 at 1 (indicating purpose of the meeting was to "consider opening a very small portion of Alaska's 1002 area to responsible energy development" and that "what Alaskans are asking for is to develop just 2,000 federal acres within it—about one ten-thousandth of ANWR"); 163 Cong. Rec. 18880-81 (2017) ("That is why surface development will cover up to, but no more, than 2,000 Federal acres...We are asking instead for 2,000 Federal acres—about one ten-thousandth of all of ANWR.").

[148] *See Chisom v. Roemer*, 501 U.S. 380, 396 (1991).

## III. INTERIOR VIOLATED ANILCA SECTION 810.

ANILCA Section 810 mandates both a specific process and substantive protections for subsistence.[149] Interior violated Section 810 in both the 2020 and 2025 subsistence evaluations because: (1) it impermissibly excluded many Gwich'in communities from evaluation, and (2) its finding of "no significant restriction" for Arctic Village and Venetie is legally flawed and inconsistent with the record.

### A. ANILCA Title VIII Protects Subsistence Users.

Title VIII recognizes the importance of and seeks to protect subsistence uses for Alaska Natives.[150] To achieve this, Section 810 mandates that BLM evaluate whether land use decisions will "significantly restrict" subsistence uses.[151] "Subsistence use" is broadly defined and resources that are culturally important, even if not dominant food sources, must be considered.[152]

---

[149] 16 U.S.C. § 3120.

[150] *Id.* §§ 3111-3112; *City of Angoon v. Marsh*, 749 F.2d 1413, 1419 (9th Cir. 1984).

[151] 16 U.S.C. § 3120.

[152] *See id.* §§ 3111(1), 3113; *see also Native Vill. of Quinhagak v. United States*, 35 F.3d 388, 394 (9th Cir. 1994) (stating ANILCA contains "clear congressional directive to protect the cultural aspects of subsistence living"); *Hoonah Indian Ass'n v. Morrison*, 170 F.3d 1223, 1225 (9th Cir. 1999) ("The subsistence issue is cultural as well as economic."); *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 731 (9th Cir. 1995) ("Subsistence needs are not limited to maintaining a sufficient food supply, but include customary and traditional practices.").

Section 810 is not just procedural; it imposes substantive requirements to protect subsistence.[153] The initial inquiry, referred to as tier 1, addresses three distinct factors for each alternative and includes consideration of cumulative impacts.[154] The agency must evaluate the action's potential effect on subsistence in terms of reductions or restrictions on abundance, availability, and access.[155] The agency must then determine whether the proposed action may impose a significant restriction on subsistence uses.[156] The question of whether there may be a significant restriction is a low bar.[157] It is not a balance-of-probabilities test or a "more likely than not" standard.[158]

A finding of no significant restriction ends the evaluation.[159] However, if the agency finds that the action may significantly restrict subsistence uses, the agency moves to the tier 2 analysis, where the agency evaluates "the availability of other lands" and "other alternatives" that "would reduce or eliminate" the impacts.[160] This inquiry requires

---

[153] *City of Tenakee Springs v. Clough*, 915 F.3d 1308, 1311-12 (9th Cir. 1990); *see also Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544 (1987) ("[T]he underlying substantive policy the process was designed to effect [is the] preservation of subsistence resources.").

[154] 16 U.S.C. § 3120(a); *see also Sierra Club v. Penfold*, 664 F. Supp. 1299, 1307 (D. Alaska 1987) (holding cumulative impacts must be considered), *aff'd*, 857 F.2d 1307 (9th Cir. 1988)

[155] 16 U.S.C. § 3120(a).

[156] *Id.*

[157] *Sierra Club*, 664 F. Supp. at 1307, *rev'd on other grounds*, 480 U.S. 531 (1987).

[158] *Hanlon v. Barton*, 740 F. Supp. 1446, 1448-49 (D. Alaska 1988).

[159] *Id.*

[160] 16 U.S.C. § 3120.

the agency to provide notice and hold hearings in affected communities.[161] After receiving public input, the agency either modifies the proposed action to avoid the significant restrictions on subsistence or, if modification is not possible, makes a formal determination that the restriction is necessary, involves the "minimal amount of public lands necessary" and that "reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources."[162]

### B. Interior Impermissibly Excluded Numerous Gwich'in Communities from Its Subsistence Evaluations.

Interior acknowledged that 22 Alaskan communities, including Gwich'in communities, make customary and traditional use of subsistence resources from the Coastal Plain, but then limited its Section 810 evaluation to only four communities: Kaktovik, Nuiqsut, Arctic Village, and Venetie.[163] Interior explained that it was reviewing just these four communities because "[t]hey are the closest to the program area and have subsistence uses in or near the program area or rely heavily on resources that use the program area."[164] That is, in both the 2025 and 2020 Leasing Programs, Interior excluded Gwich'in communities from the evaluation based on geographic proximity,

---

[161] *Id.* § 3120(a)(1), (2).

[162] *Id.* § 3120(a)(3), (d); *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 1004-05 (9th Cir. 2025) (describing multi-tiered process); *Kunaknana v. Clark*, 742 F.2d 1145, 1151 (9th Cir. 1984) (same).

[163] AR390523-24, AR390775, AR90849-50. BLM purported to hold a subsistence hearing in Fort Yukon for the SEIS despite not otherwise evaluating the proposed actions on Fort Yukon and without making a "may significantly restrict" finding for that community. AR390803.

[164] AR390562, AR390775, AR90850.

physical use of the program area, and whether they heavily used resources. Legally, Interior's approach contravenes Section 810. Factually, it is not supported by the record.

1. *The plain language of Section 810 is broadly applicable to subsistence users.*

Section 810 states that the agency "shall evaluate the effect of such use, occupancy, or disposition on subsistence uses and needs."[165] Congress broadly defined "subsistence uses" to include use of resources for consumption, clothing, tools, handicrafts, barter, sharing, and customary trade.[166] The plain language of the statute does not limit application of Section 810 to only those subsistence users in close geographical proximity to the project area, require actual use of the area, or mandate heavy resource use.[167]

The purposes of ANILCA and Section 810 reinforce that Congress sought to broadly protect subsistence uses and needs.[168] Interpreting Section 810 to restrict consideration to only those communities with close geographic proximity, actual physical use of the area, and heavy use of resources would artificially limit the otherwise broad protections Congress put in place.[169] Interior's approach is also inconsistent with the

---

[165] 16 U.S.C. § 3120(a).

[166] *Id.* § 3113.

[167] *See supra* note 133 (outlining statutory interpretation approach)

[168] 16 U.S.C. §§ 3101, 3111, 3112; *see also supra* note 133.

[169] *See United States v. Am Trucking Ass'ns*, 310 U.S. 534, 542 (1940) (explaining courts interpret statutes "to give effect to the intent of Congress").

realities of Alaska's expanse and the migratory nature of many subsistence resources.[170] That is why courts have interpreted Section 810 to impose a low threshold at tier 1.[171] Indeed, in enacting ANILCA, Congress stated that protection of subsistence uses "was one of the most important concerns."[172]

To comply with Section 810, Interior should have conducted a tier 1 analysis and evaluated potential restrictions for all Gwich'in communities with identified subsistence uses of Coastal Plain resources, regardless of geographic proximity, physical use of the Coastal Plain, or heavy resource use. Interior impermissibly raised the statutory threshold.

*2. Interior's exclusion of communities is contrary to the record.*

The record also does not support the agency's failure to evaluate more Gwich'in communities. In the final EIS and SEIS, Interior recognized that "22 Alaskan communities have documented customary and traditional uses for caribou" from the Central Arctic and Porcupine caribou herds and that "use of caribou among the 22 Alaskan study communities is high."[173] These 22 communities include all Alaska Gwich'in communities.[174] As Interior acknowledged, many of these communities "have

---

[170] *See, e.g.*, AR390523 & AR90459 (acknowledging subsistence resources migrate through the Coastal Plain and are harvested elsewhere).

[171] *Sierra Club*, 664 F. Supp. at 1307.

[172] H.R. REP. NO. 95-1045, pt. I, at 181 (1978); *see also supra* note 133 (explaining legislative history can be used to discern Congress' intent).

[173] AR390533-35, AR90467.

[174] AR389865 & AR90736 (maps).

reported geographic, historic/prehistoric, or cultural ties to the Arctic Refuge."[175] Interior further explained that the communities were identified because the Federal Subsistence Board determined each community has "a long-established, consistent pattern of use, incorporating beliefs and customs which have been transmitted from generation to generation" for the Porcupine and Central Arctic caribou herds.[176] In the final SEIS, Interior specifically noted the "strong cultural and subsistence connection" between the nine Alaska Gwich'in communities and the Arctic Refuge.[177] Interior recognized that Gwich'in communities "are highly reliant on the Porcupine Caribou Herd even though some communities are on the periphery" of the herd's range.[178] Interior also acknowledged extensive and important food sharing networks and that "some communities rely on these sharing networks as a primary source of caribou."[179] Further, numerous public comments explained the importance of Coastal Plain subsistence resources across Gwich'in communities.[180]

---

[175] AR90460 AR390523.

[176] AR390523, AR90459-60.

[177] AR390523. Interior also noted the importance of the Arctic Refuge to Canadian Gwich'in communities. AR390523-24, AR90460.

[178] AR390535.

[179] AR390535.

[180] *See, e.g.,* AR363085 (describing caribou sharing beyond Arctic Village), AR376256-57 & AR376262-64 (outlining use of Coastal Plain subsistence resources), AR390639 ("Many of our people still depend heavily on the Chinook salmon, and we trade heavily with Arctic Village relatives. So the development in the coastal plain will affect all of our people.").

Interior also acknowledged that there could be adverse impacts to these communities from an oil and gas program. Interior stated that "[h]arvest and sharing patterns of 22 Alaska communities...are relevant if…oil and gas activities changes caribou availability or abundance for those users."[181] Interior explained that "[i]n all cases, future development would affect subsistence uses of species of major importance for the subsistence study communities."[182] Interior further noted that Gwich'in communities "have the potential to experience indirect impacts associated with caribou."[183] Importantly, in evaluating the cumulative impacts to subsistence, Interior conceded that there could be impacts to subsistence to all communities who rely on the two herds, including changes in abundance and availability.[184]

In short, there is considerable evidence demonstrating subsistence use of Coastal Plain resources beyond the four communities that Interior evaluated. Yet Interior did not include other Gwich'in communities in its subsistence evaluations. Interior's decision to exclude additional Gwich'in communities is contrary to the record.

---

[181] AR390533, AR90467; *see also* AR390776 (Section 810 evaluation acknowledging that 22 communities "could be affected by impacts on caribou abundance and availability").

[182] AR389560, AR90471.

[183] AR389560, AR90471; *see also* AR389564 & AR90474 (recognizing small changes can have larger impacts on subsistence harvest, including reduced harvests and impacts to food sharing).

[184] AR389583, AR90471, AR90484.

### C. Interior's Finding of "No Significant Restriction" for Arctic Village and Venetie Is Flawed.

Interior incorrectly found that none of the action alternatives would impose a significant restriction on subsistence uses for Arctic Village and Venetie.[185] The threshold for this finding is low: "it is triggered whenever 'the contemplated action may significantly restrict subsistence uses.'"[186] Interior's conclusion that there would not be a significant restriction to Arctic Village and Venetie from the Leasing Program is both legally and factually flawed.[187]

Interior's finding turned on its conclusion that "large-scale displacement and consequent large decreases in the abundance of [Porcupine Caribou Herd] available for subsistence use is unlikely."[188] As a legal matter, by requiring "large" scale and "likely" impacts, Interior improperly raised the statutory threshold.[189] Factually, Interior's conclusion is inconsistent with its findings about the program's potential impacts on subsistence.[190] As a result, its subsistence evaluations are arbitrary.

---

[185] *See* AR390777-803, AR90858-67.

[186] *Sierra Club*, 664 F. Supp. at 1307.

[187] *See also* Plaintiffs' Opening Brief, *Native Village of Venetie Tribal Government v. Burgum*, No. 3:20-cv-00223-SLG, (June 12, 2026) (incorporated here by reference).

[188] AR90858, AR390788-89.

[189] *Sierra Club*, 664 F. Supp. at 1307; *Hanlon*, 740 F. Supp. at 1448-49 (explaining only a threat of reduction is required, and that it need not be likely).

[190] *Supra* Argument III.B.2.

## IV. Interior Violated the ESA.

The ESA requires BLM to consult with FWS to ensure the Leasing Program does not jeopardize polar bears or adversely modify their critical habitat. In the 2020 BiOp, FWS violated the ESA by relying on unspecified and uncertain mitigation measures to reach its conclusions. FWS made similar legal errors in the 2025 BiOp. Further, FWS's finding in the 2025 BiOp that the Leasing Program would not cause adverse modification of critical habitat is fundamentally flawed because FWS only considered impacts to the terrestrial denning critical habitat unit (Unit 2) as a whole, failed to consider localized effects, and erroneously assumed other areas of Unit 2 are free of any adverse modification. For these same reasons, BLM's reliance on the 2020 and 2025 BiOps is unlawful.

### A. The ESA Protects Polar Bears.

Congress enacted the ESA to protect and conserve threatened and endangered species and the ecosystems they depend on.[191] To achieve these objectives, the ESA mandates that agencies ensure their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat."[192] Critical habitat includes "physical or biological features…essential to the conservation of the species and which…may require special management considerations or protection."[193]

[191] 16 U.S.C. § 1531(b).
[192] *Id.* § 1536(a)(2).
[193] *Id.* § 1532(5)(A).

The action agency's duty to consult under ESA Section 7 is triggered when its actions "may affect" a listed species or critical habitat.[194] Formal consultation concludes with FWS's issuance of a BiOp, in which FWS determines whether the proposed action is likely to jeopardize the listed species or destroy or adversely modify critical habitat.[195] Although FWS may rely on mitigation measures when making its findings, such measures must be reasonably specific and certain to occur.[196]

The action agency's duties do not end with the completion of formal consultation. Section 7 imposes an ongoing, substantive duty on an action agency to ensure against jeopardy or destruction or adverse modification of critical habitat. Agencies violate this duty by relying on an invalid BiOp.[197]

### B. FWS Relied on Future, Uncertain Mitigation Measures in the 2020 BiOp.

FWS improperly relied on to-be-determined MMPA requirements to meet its ESA obligations in the 2020 BiOp, which BLM relied on to issue AIDEA's leases.[198] Polar bears are protected under both the ESA and the MMPA. While both statutes prohibit

---

[194] *Id.* § 1536(a)(3); 50 C.F.R. § 402.14(a).

[195] 16 U.S.C. § 1536(b)(4).

[196] *Ctr. for Biological Diversity v. Bernhardt* (*CBD*), 982 F.3d 723, 743-45 (9th Cir. 2020); *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt. (SILA)*, 555 F. Supp. 3d 739, 796-801 (D. Alaska 2021).

[197] *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010).

[198] *Supra* Background IV.A.

take,[199] they are distinct and FWS cannot rely on to-be-determined MMPA requirements to meet its ESA obligations.

The Ninth Circuit's holding in *Center for Biological Diversity v. Bernhardt* (*CBD*) and this Court's holding in *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management* (*SILA*) control.[200] In both cases, the courts rejected FWS's vague statements in the BiOps that future MMPA compliance would ensure against jeopardy of polar bears and adverse modification of critical habitat.[201]

Similar to the BiOps rejected in *CBD* and *SILA*, FWS repeatedly relied on MMPA compliance to reach its ESA conclusions in the 2020 BiOP. For example, FWS's no jeopardy conclusion stated that a "key protection built into the [Leasing] Program" is BLM's commitment to ensure MMPA compliance because, if "incidental take associated with an action meets the MMPA standard of negligible impact," then "there should be little potential" for the action to jeopardize the species.[202] In its no-adverse-modification conclusion, FWS stated "the requirement to obtain MMPA incidental take authorization[s]...[will] contribute to the protection of critical habitat, directly by requiring means to effect least practicable impacts but also indirectly by minimizing

---

[199] 16 U.S.C. § 1371(a), (a)(5)(A) (MMPA take prohibition); *id.* § 1538(a)(1)(B) (ESA take prohibition).

[200] *CBD*, 982 F.3d at 743-45; *SILA*, 555 F. Supp. 3d at 796-801; *see also Ctr. for Biological Diversity v. Salazar*, 804 F. Supp. 2d 987, 994, 1001-04 (D. Ariz. 2011) (applying same standards for programmatic BiOp).

[201] *CBD*, 982 F.3d at 743-45; *SILA*, 555 F. Supp. 3d at 796-801.

[202] AR807-08.

disturbance, which could otherwise affect access to or use of critical habitat for denning, resting, or movements."[203] This is nearly the same language found unlawful in *SILA*.[204] FWS also repeatedly relied on MMPA compliance in its impacts findings throughout the 2020 BiOp.[205] FWS did not otherwise identify specific, reasonably certain mitigation measures.

As the Ninth Circuit explained in *CBD*, the fact that activities may be subject to future MMPA permitting "does not preclude or preempt FWS's responsibility to include the mitigation measures that it relies upon in a [BiOp]. The agency cannot refer to future, unstated authorizations under the MMPA to fulfill its obligations under [the ESA]."[206] FWS's approach here is similarly unlawful.

### C. FWS Relied on Future, Uncertain Mitigation Measures in the 2025 BiOp.

In the 2025 BiOp, FWS improperly relied on two measures that were neither specific nor certain to occur: (1) no surface occupancy (NSO) lease stipulations to limit infrastructure, and (2) pre-activity aerial den detection surveys to protect denning bears.

First, FWS repeatedly relied on the proposition that polar bears and their habitat will be protected by NSO stipulations.[207] Importantly, FWS factored NSO protections into its assumptions regarding impacts to denning bears and its adverse modification

[203] AR813.
[204] 555 F. Supp. 3d at 797.
[205] *See e.g.*, AR789, AR791, AR793.
[206] *CBD*, 982 F.3d at 745.
[207] *See e.g.*, AR521265-66, AR521270, AR521287.

conclusion.[208] However, FWS lacked a reasonable basis to rely on NSO stipulations because BLM had repeatedly stated that — regardless of NSO stipulations — it cannot deny proposed rights-of-way that are necessary for oil and gas activities under the Tax Act's right-of-way provision.[209] FWS generally acknowledged that areas subject to NSO stipulations may still be impacted by roads and pipeline crossings but there is no indication FWS factored this into its analysis.[210]

On the contrary, when assessing the number of dens that could be impacted by disturbance from production, FWS presumed that NSO stipulations would eliminate the potential for disturbance of over 38% of otherwise at-risk dens.[211] FWS accordingly reduced the number of dens further considered in its quantitative analysis of impacts.[212] In other words, FWS assumed NSO stipulations would prevent disturbance, despite Interior's position that activities and infrastructure could still occur on NSO leases because of the Tax Act's right-of-way provision.

A second flaw is FWS's assumption that industry would detect and avoid polar bear dens using methods BLM did not require. FWS repeatedly stated that industry would

---

[208] AR521302 (assuming 35.8% of denning habitat would be protected by NSO stipulations), AR521311-13 (assuming NSO stipulations would protect 13.7% of terrestrial denning habitat), AR521371-72 (no adverse modification conclusion relying on NSO stipulations).

[209] *See e.g.*, AR389298 (final SEIS), AR522139 (2025 ROD).

[210] AR521265, AR521276.

[211] AR521287-88.

[212] AR521311 (assuming NSO and other stipulations would result in only 154.0 dens being disturbed), AR521362 (jeopardy analysis relying on 154.0 dens being disturbed).

use aerial infrared (AIR) surveys to locate dens prior to on-the-ground activities, thereby avoiding polar bears by maintaining a buffer around detected dens.[213] FWS factored AIR surveys into its quantitative assessment by assuming that 41% of dens within areas otherwise subject to disturbance would be detected, and therefore not disturbed.[214]

But BLM did not specifically require AIR surveys. Instead, BLM only required that operators "make efforts to locate occupied polar bear dens within and near areas of operation, utilizing appropriate tools, such as infrared imagery and/or polar bear scent-trained dogs."[215] FWS attempted to justify its assumption that AIR surveys will in fact be used by reasoning that ground-based or hand-held infrared imagery and dogs are not reliable or effective.[216] But that does not change that BLM only required "appropriate tools" be used, which is not the same as specifically requiring AIR surveys. FWS also asserted that industry will use AIR surveys because they are typically used on the North Slope.[217] AIR surveys are typical because existing MMPA authorizations expressly require them for other areas on the North Slope.[218] Nothing in the record supports FWS's assumption that operators would voluntarily undertake AIR surveys on the Coastal Plain

[213] AR521275.

[214] AR521288 (assuming AIR surveys reduce potentially exposed dens from 273.2 to 161.2), AR521277 (assuming AIR surveys result in 5.7 fewer dens impacted by seismic exploration annually). Groups do not concede that a single AIR survey can detect 41% of dens, but that issue is not before the Court. *See* AR376883-86, AR376979-82.

[215] AR522150.

[216] AR521281.

[217] AR521275, AR521281.

[218] 50 C.F.R. § 18.126(b)(1).

absent a legal requirement to do so. At a minimum, the lack of a requirement to do AIR surveys in the 2025 Leasing Program creates uncertainty about whether AIR surveys will be used, rendering FWS's assumption arbitrary. As a result, FWS's jeopardy determination fails to consider the full impact of the program on cub survival.

### D. FWS's No Adverse Modification Finding for Polar Bear Critical Habitat in the 2025 BiOp Is Arbitrary.

FWS must ensure that an agency action is not likely to result in the destruction or adverse modification of critical habitat.[219] FWS designated three units of polar bear critical habitat: sea ice, terrestrial denning (Unit 2), and barrier islands.[220] In designating Unit 2, FWS protected not only the habitat suitable for dens, referred to in the 2025 BiOp as "suitable maternal denning habitat," but also adjacent habitat used for travel and to feed and acclimate cubs free from human disturbance.[221] The Coastal Plain encompasses 1,193,000 acres of Unit 2, including 12,900 acres of suitable maternal denning habitat, primarily along rivers.[222]

[219] 16 U.S.C. § 1536(a)(2).

[220] Polar Bear Critical Habitat, 75 Fed. Reg. at 76120-22.

[221] *Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 561 (9th Cir. 2016); Polar Bear Critical Habitat, 75 Fed. Reg. at 76114-15, 76117 (identifying absence of human disturbance as a feature).

[222] AR521305, AR521309. The Coastal Plain encompasses approximately 18,400 acres of suitable maternal denning habitat, and 12,900 acres is within Unit 2. AR521266, AR521270.




**Figure 29. Polar bear maternal denning habitat in the high, medium, and low potential areas of the Coastal Plain.**

223

In the 2025 BiOp, FWS applied its regulation defining "adverse modification" as "a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species."[224] FWS found that up to 15% of Unit 2 would be adversely affected by disturbance from proximity to permanent infrastructure, but then concluded that this level of impact did not constitute adverse modification.[225] FWS acknowledged that 557,500 acres of Unit 2 could be permanently impacted by habitat alteration due to disturbance around the 2,000-acre development footprint.[226]

---

[223] AR521268.
[224] 50 C.F.R. § 402.02 (2019).
[225] AR521314, AR521371.
[226] *See e.g.*, AR521312.

FWS nonetheless concluded that the Leasing Program would not cause adverse modification because this represents only 15% of Unit 2 "as a whole," and the remainder of Unit 2 would not be impaired.[227]

This rationale is flawed for three reasons. First, by definition, all critical habitat possesses physical and biological features essential for recovery and requires special management.[228] FWS's assertions that there would be no adverse modification on the basis that 15% represents a "small subset" of Unit 2 "as a whole"[229] is contrary to the statute.[230] FWS's approach "authorizes piecemeal diminution of critical habitat, which, by definition, has already been deemed 'essential.' The statutory text, by contrast, prohibits adverse modification entirely."[231] Indeed, the regulatory definition applied by FWS was recently vacated because it is inconsistent with the statute.[232] Further, while some courts have recognized a *de minimis* loss of critical habitat may not result in

---

[227] AR521314, AR521371.

[228] 16 U.S.C. § 1532(5)(A)(i); Polar Bear Critical Habitat, 75 Fed. Reg. at 76120-22.

[229] AR521314; AR521371.

[230] *Ctr. for Biological Diversity v. U.S. Dep't. of the Interior*, No. 24-cv-04651m, 2026 U.S. Dist. LEXIS 68386, *46-51 (N.D. Cal. March 30, 2026).

[231] *Id*. at *46 (quoting 16 U.S.C. § 1532(5)(A)). Additionally, FWS asserted that critical habitat would not be appreciably diminished because only 1.1% of critical habitat across all three units would be impaired "as a whole." AR521372. This conclusion is unlawful for the same reasons.

[232] *Ctr. for Biological Diversity*, 2026 U.S. Dist. LEXIS 68386, at *72.

adverse modification, the loss was far smaller than 15%, among other distinctions.[233] Here, FWS has not demonstrated that 15% impairment is *de minimis*.

Instead, FWS asserted that the direct 2,000-acre footprint of development is unlikely to occur entirely within the 12,900 acres of suitable maternal denning habitat, and that those 12,900 acres of suitable maternal denning habitat would not be entirely within the 557,500 acres altered by disturbance.[234] In other words, FWS asserted the direct destruction of suitable maternal denning habitat would be less than 2,000 acres, and not all suitable maternal denning habitat would be adversely modified by disturbance. But FWS failed to evaluate how much suitable maternal denning habitat would be within that 557,500-acre area of long-term disturbance.[235] More broadly, by focusing on suitable maternal denning habitat, FWS failed to support its conclusion that impacting 557,500 acres of Unit 2 would not appreciably diminish the value of that habitat for survival and recovery. FWS's rationale amounts to revising the geographic scope of the critical habitat designation without following the ESA.[236]

---

[233] *See, e.g.*, *Butte Env't Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 570, 936, 944, 948 (9th Cir. 2010) (affirming no adverse modification where action destroyed less than 1% of critical habitat and there was no evidence that agency hid impacts via a large-scale analysis).

[234] AR521312, AR521371.

[235] FWS's assertions regarding NSO stipulations, AR521370-71, do not substitute for this analysis for two reasons: (1) FWS failed to evaluate how many of the 12,900 acres would remain vulnerable to long-term disturbance outside NSO areas, and (2) NSO stipulations are not reasonably certain. *Supra* Argument IV.C.

[236] 16 U.S.C. § 1533(b)(2); *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1075-77 (9th Cir. 2004), *amended by*, 387 F.3d 968 (9th Cir. 2004).

Second, FWS's conclusion that no adverse modification would occur because other portions of Unit 2 would remain unimpaired impermissibly masks localized impacts, contrary to Ninth Circuit precedent.[237] Polar bears use some portions of Unit 2 in higher densities than other areas.[238] Notably, the highest-density denning areas on the Coastal Plain overlap with the high hydrocarbon potential area — meaning, these areas are the most likely to be industrialized.[239] But there is no indication that FWS evaluated the localized impacts of whether impairment of the highest-density denning areas would diminish the value of Unit 2 habitat. Instead, FWS repeatedly relied on the rationale that 557,500 acres is a "small subset" of critical habitat "as a whole."[240] FWS, therefore, violated the ESA.[241]

Third and finally, FWS's no adverse modification conclusion implicitly assumes that the remaining portions of Unit 2 (roughly 85%) are free of adverse alteration.[242] That assumption is unsupported and internally inconsistent with FWS's acknowledgment that the footprint of infrastructure creates a much broader area of disturbance that impairs the value of denning habitat, and that such development is occurring in other areas on the

---

[237] *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1035-37 (9th Cir. 2001) (holding agency failed to appropriately evaluate project's localized impact in no jeopardy finding); *cf. Gifford*, 378 F.3d at 1075 (explaining FWS must consider local effects).

[238] *See* AR521233 & AR376866 (maps), FWS2025_24380.

[239] AR90423, AR521286.

[240] AR521135, AR521312, AR521314, AR521371.

[241] *Supra* note 237.

[242] AR521135, AR521312, AR521314, AR521371.

North Slope.[243] FWS's failure to consider the condition of Unit 2 outside of the Coastal Plain, or explain its assumption that these areas are unimpaired, to justify its no adverse modification conclusion is arbitrary.[244]

### E. BLM's Reliance on the 2020 and 2025 BiOps Violates the ESA.

BLM relied on the 2020 BiOp for its 2020 Leasing Program and to issue AIDEA's leases.[245] BLM relied on the 2025 BiOp for its 2025 Leasing Program and for the 2026 lease sale.[246] BLM's unreasonable reliance violates its independent, substantive ESA duties.[247]

## V. VACATUR IS WARRANTED.

Vacatur "is the presumptive remedy under the APA,"[248] which directs that courts "shall...hold unlawful and set aside [the] agency action."[249] Accordingly, the Court should vacate the 2019 ANILCA Section 810 Final Evaluation, 2020 BiOp, 2020 ROD,

---

[243] AR521205, AR521285-86, AR52189, FWS2025_24370-71.

[244] *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015) ("[A]n internally inconsistent analysis is arbitrary and capricious.").

[245] AR205977-80, AR522184 (notice explaining BLM would issue leases pursuant to 2020 ROD).

[246] AR522125.

[247] *See Wild Fish*, 628 F.3d at 532.

[248] *WildEarth Guardians v. U.S. Dep't of Agric. Animal & Plant Health Inspection Serv. Wildlife Servs.*, 135 F. 4th 717, 739 (9th Cir. 2025) (quoting *350 Mont. v. Haaland*, 50 F.4th 1254, 1273 (9th Cir. 2022)).

[249] 5 U.S.C. § 706(2).

2021 leases, 2024 ANILCA Section 810 Final Evaluation, 2025 BiOp, 2025 ROD, 2025 Lease Decision, and any leases issued in the 2026 lease sale.[250]

Interior may argue that vacatur is not warranted. It is Interior's burden to show that deviation from the presumptive remedy is warranted.[251] It cannot. Courts remand without vacatur when there could be serious environmental harm from vacating.[252] Courts also "weigh the seriousness of the agency's errors against 'the disruptive consequences of an interim change that may itself be changed.'"[253] The Ninth Circuit has cautioned that remand without vacatur "is a remedy used sparingly in this circuit."[254]

This case is not one of the "rare" or "limited" cases where remand without vacatur is warranted.[255] BLM's errors are serious and undercut core statutory purposes and

---

[250] Based on this Court's prior order, Order on Mots. for a Briefing Schedule, ECF No. 164, Groups will not further address the need to vacate AIDEA's leases here but note that courts often vacate lease decisions to remedy legal errors. *See, e.g.*, *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 51-52 (9th Cir. 2025) (affirming vacatur of leases because of "fundamental" flaws).

[251] *Nat. Grocers v. Rollins*, 157 F.4th 1143, 1171 (9th Cir. 2025); *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121-22 (9th Cir. 2018).

[252] *Nat. Res. Def. Council v. EPA*, 38 F.4th 34, 51-52 (9th Cir. 2022); *Nat'l Family Farm Coal. v. EPA*, 960 F.3d 1120, 1144\-45 (9th Cir. 2020); *see, e.g.*, *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532-33 (9th Cir. 2015) (vacating where leaving rule in place "risks more potential environmental harm").

[253] *Pollinator*, 806 F.3d at 532 (quoting *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012)).

[254] *Wood v. Burwell*, 837 F.3d 969, 976 (9th Cir. 2016).

[255] *Ctr. for Biological Diversity*, 141 F.4th at 1014; *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010).

mandates.[256] The agency adopted leasing programs that do not fulfill the Coastal Plain's purposes, are inconsistent with the Tax Act, failed to protect subsistence, and failed to protect polar bears.[257] Regarding the disruptive consequences, the critical focus is on environmental harm.[258] Importantly, vacatur would not cause any harm to the Coastal Plain. To the contrary, vacatur could make the resulting decision more protective by ensuring Interior fully considers all impacts and complies with the law before implementing the Leasing Program and issuing leases. Further, any potential disruptive consequences are entitled to less weight because it is unlikely that Interior could re-adopt the same decision on remand given the nature of the agency's errors.[259]

## CONCLUSION

For the foregoing reasons, the Court should grant Groups' Motion for Summary Judgment and vacate the challenged decisions.

---

[256] *See N.J. Conservation Found. v. Fed. Energy Regul. Comm'n*, 111 F.4th 42, 64 (D.C. Cir. 2024) (vacating decision where substantive errors undercut fundamental statutory purposes); *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015) (explaining ESA's protective mandates favor vacatur).

[257] *See supra* Argument I-IV.

[258] *Pollinator*, 806 F.3d at 532.

[259] *See Mont. Wildlife Fed'n*, 127 F.4th at 51 (vacating leases because it was unlikely agency could adopt same decision, regardless of disruptive consequences); *Nat. Res. Def. Council*, 38 F.4th at 51-52 (vacating because not possible to predict if agency would reach same outcome); *Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*, 417 F. Supp. 3d 1354, 1368 (W. D. Wash. 2019) (noting courts consider whether "the flaws were so fundamental that is it unlikely the same [decision] would result after further analysis"); *cf. Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1093 (9th Cir. 2014) (explaining companies presuming permitting outcomes assume the risk).

Respectfully submitted this 12th day of June, 2026,

s/ Brook Brisson
Brook Brisson (AK Bar No. 0905013)
Suzanne Bostrom (AK Bar No. 1011068)
Bridget Psarianos (AK Bar No. 1705025)
TRUSTEES FOR ALASKA

*Attorneys for Plaintiffs Gwich'in Steering Committee, Alaska Wilderness League, Alaska Wildlife Alliance, Canadian Parks & Wilderness Society-Yukon, Defenders of Wildlife, Friends of Alaska National Wildlife Refuges, National Wildlife Federation, National Wildlife Refuge Association, Northern Alaska Environmental Center, Sierra Club, The Wilderness Society, and Wilderness Watch*

s/ Karimah Schoenhut (consent)
Karimah Schoenhut (*pro hac vice*)
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM

*Attorneys for Plaintiff Sierra Club,*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.4(a)(3), I certify that this brief contains 11,722 words, excluding the parts of the brief exempted by Local Civil Rule 7.4(a)(4), in compliance with the word limits requested in Plaintiffs' Unopposed Motion to File Overlength Opening Brief for Summary Judgment, filed concurrently.

s/ Brook Brisson
Brook Brisson

## CERTIFICATE OF SERVICE

I certify that on June 12, 2026, I caused a copy of the PLAINTIFFS' OPENING BRIEF FOR SUMMARY JUDGMENT and supporting exhibits to be electronically filed with the Clerk of the Court for the U.S. District Court of Alaska using the CM/ECF system.

s/Brook Brisson
Brook Brisson