ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

MARK ARTHUR BROWN (Florida Bar. No. 0999504)
Senior Trial Attorney, Wildlife & Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 532-3103
mark.brown@usdoj.gov

PAUL A. TURCKE (Idaho Bar No. 4759)
Trial Attorney, Natural Resources Section
1290 West Myrtle Street, Suite 500
Boise, ID 83702
Tel: (202) 532-5994
paul.turcke@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| GWICH'IN STEERING COMMITTEE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DOUG BURGUM, *et al.*,<br><br>Defendants,<br><br>and<br><br>NORTH SLOPE BOROUGH, *et al.*,<br><br>Intervenor-Defendants. | Case No. 3:20-cv-00204-SLG |

NATURAL RESOURCES DEFENSE COUNCIL, *et al.*,

Plaintiffs,

v.

DOUG BURGUM, *et al.*,

Defendants,

and

NORTH SLOPE BOROUGH, *et al.*,

Intervenor-Defendants.

Case No. 3:20-cv-00205-SLG

NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT, *et al.*,

Plaintiffs,

v.

DOUG BURGUM, *et al.*,

Defendants,

and

NORTH SLOPE BOROUGH, *et al.*,

Intervenor-Defendants.

Case No. 3:20-cv-00223-SLG

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ........ 1

BACKGROUND ........ 2

I. Creation of the Program ........ 2

II. Implementation, Suspension, and Modification of the Program ........ 4

III. Evolution to Address Executive and Congressional Direction ........ 5

IV. Resumption of Litigation ........ 9

V. Additional Relevant Statutes ........ 9

A. The Refuge Act ........ 10

B. National Environmental Policy Act ........ 10

C. ANILCA Section 810 ........ 11

D. National Historic Preservation Act ........ 12

E. Endangered Species Act ........ 12

STANDARD OF REVIEW ........ 15

ARGUMENT ........ 16

I. Plaintiffs Lack Jurisdiction to Challenge the 2020 ROD and BiOp ........ 17

II. The Program Properly Addresses Statutory Purposes ........ 18

A. Defendants Acknowledged and Balanced Statutory Purposes ........ 19

B. A Refuge Act Compatibility Determination Was Not Required ........ 24

C. Defendants Sufficiently Explained Any Change in Position ........ 27

III. Plaintiffs Seek Premature Review Involving the Tax Act's 2,000 Acre Provision ........ 28

IV. BLM Complied with NEPA ........ 33

V. BLM Reasonably Addressed ANILCA Section 810 .................................. 37

VI. Defendants Complied with the NHPA ....................................................... 40

VII. FWS Prepared Legally Sufficient BiOps .................................................. 44

A. BLM and FWS Properly Utilize a Framework Programmatic Consultation to Analyze Phases of the Program .............................. 45

B. FWS Properly Acknowledged Potential Future MMPA Analysis ........................................................................................... 50

C. FWS Properly Considered Effects of the Program That Are Reasonably Certain to Occur ......................................................... 52

D. FWS Properly Accounted for Expected Population Decline and Loss of Female Cubs ................................................................. 55

E. The Record Supports FWS's No Adverse Modification Finding for Polar Bear Critical Habitat in the 2025 BiOp ............................. 60

VIII. BLM Reasonably Relied on the FWS BiOps ............................................. 68

IX. Remedy ...................................................................................................... 69

CONCLUSION ..................................................................................................... 71

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) ........ 29

*Alaska Indus. Dev. & Exp. Auth. v. Biden*,
685 F. Supp. 3d 813 (D. Alaska 2023) ........ 2, 4, 9. 27

*Alaska Indus. Dev. & Exp. Auth. v. U.S. Dep't of the Interior*,
No. 3:24-cv-00051-SLG, 2025 WL 903331 (D. Alaska Mar. 25, 2025) ........ 2, 4, 5, 6

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ........ 70

*Am. Rivers v. Nat'l Marine Fishers. Serv.*,
126 F.3d 1118 (9th Cir. 1997) ........ 17

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987) ........ 12

*Ark Initiative v. Tidwell*,
816 F.3d 119 (D.C. Cir. 2016) ........ 21

*Bennett v. Spear*,
520 U.S. 154 (1997) ........ 44, 69

*Boudette v. Barnette,*
923 F.2d 754 (9th Cir.1991) ........ 21

*Bowman Transp. Inc. v. Ark.-Best Freight Sys.*,
419 U.S. 281 (1974) ........ 15

*Bureau of Land Management*,
555 F. Supp. 3d 739 (D. Alaska 2021) ........ 51

*Butte Env't Council v. U.S. Army Corps of Eng'rs*,
620 F.3d 936 (9th Cir. 2010) ........ 65

*Cal. Cmtys. Against Toxics v. EPA*,
688 F.3d 989 (9th Cir. 2012) ........ 69, 70

*Cal. ex rel. Becerra v. Azar*,
950 F.3d 1067 (9th Cir. 2020) ........ 27

*Center for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) ........ 51

*Center for Biological Diversity v. Salazar*,
804 F. Supp. 2d 987 (D. Ariz. 2011) .................................................................... 52

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
543 U.S. 157 (2004)................................................................................... 20

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
141 F.4th 976 (9th Cir. 2025) ..................................................................... 11

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
No. 24-cv-04651, 2026 WL 898264 (N.D. Cal. Mar. 30, 2026) ............................ 14, 62

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
807 F.3d 1031 (9th Cir. 2015) ..................................................................... 46

*Defs. of Wildlife v. U.S. Dep't of Navy*,
733 F.3d 1106 (11th Cir. 2013) ................................................................... 47

*Earth Island Inst. v. Ruthenbeck*,
490 F.3d 687 (9th Cir. 2007) ....................................................................... 30

*Earth Island Inst. v. U.S. Forest Serv.*,
87 F.4th 1054 (9th Cir. 2023) ...................................................................... 34

*FCC v. Fox Television Studios, Inc.*,
556 U.S. 502 (2009)................................................................................... 27

*Friends of Animals v.Haaland*,
997 F.3d 1010 (9th Cir. 2021) ..................................................................... 15

*Fund For Animals v. Clark*,
27 F. Supp. 2d 8 (D.D.C. 1998)..................................................................... 26

*Gen. Elec. Uranium Mgmt. Corp. v. U.S. Dep't of Energy*,
764 F.2d 896 (D.C. Cir. 1985)....................................................................... 21

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
378 F.3d 1059 (9th Cir. 2004) ..................................................................... 47

*Gwich'in Steering Comm. v. Bernhardt*, No.,
3:20-cv-00204-SLG, 2021 WL 46703 (D. Alaska Jan. 5, 2021)................................... 2

*Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*,
914 F.2d 1174 (9th Cir. 1990) ..................................................................... 34

*Hells Canyon All. v. U.S. Forest Serv.*,
227 F.3d 1170 (9th Cir. 2000) ..................................................................... 22

*Izaak Walton League of Am., Inc. v. Kimbell*,
516 F. Supp. 2d 982 (D. Minn. 2007)....................22

*Izaak Walton League of Am., Inc. v. Kimbell*,
No. CV 06-3357 (JRT/RLE), 2008 WL 11383666 (D. Minn. May 21, 2008)....................23

*Izaak Walton League of Am., Inc. v. Tidwell*,
No. CIV. 06-3357 RT/LIB, 2015 WL 632140 (D. Minn. Feb. 13, 2015)....................23

*Kern Cnty. Farm Bureau v. Allen*,
450 F.3d 1072 (9th Cir. 2006)....................58

*Kunaknana v. Clark*,
742 F.2d 1145 (9th Cir. 1984)....................11, 37, 38

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................16

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990)....................30

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989)....................35, 60

*Montana Wilderness Association v. Connell*,
725 F.3d 988 (9th Cir. 2013)....................43

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................15, 58

*N. Alaska Env't Ctr. v. Kempthorne*,
457 F.3d 969 (9th Cir. 2006)....................34

*N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*,
No. 3:18-CV-00030-SLG, 2018 WL 6424680 (D. Alaska Dec. 6, 2018)....................35

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003)....................30

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
524 F.3d 917 (9th Cir. 2008)....................51

*Native Vill. of Point Hope v. Salazar*,
680 F.3d 1123 (9th Cir. 2012)....................17

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004)....................21

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
475 F.3d 1136 (9th Cir. 2007) ........ 57

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.*,
117 F.3d 1520 (9th Cir. 1997) ........ 34

*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998) ........ 31

*PDK Lab'ys Inc. v. U.S. Drug Enf't Agency*,
362 F.3d 786 (D.C. Cir. 2004) ........ 45

*Pit River Tribe v. U.S. Forest Serv.*,
469 F.3d 768 (9th Cir. 2006) ........ 9

*Pres. Coal., Inc. v. Pierce*,
667 F.2d 851 (9th Cir. 1982) ........ 24

*Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*,
898 F.2d 1410 (9th Cir. 1990) ........ 69

*Rio Grande Silvery Minnow v. U.S. Bureau of Reclamation*,
601 F.3d 1096 (10th Cir. 2010) ........ 17

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ........ 10, 11

*Rock Creek All. v. U.S. Fish & Wildlife Serv.*,
663 F.3d 439 (9th Cir. 2011) ........ 65

*Russell Country Sportsmen v. U.S. Forest Serv.*,
668 F.3d 1037 (9th Cir. 2011) ........ 36

*Rutherford v. United States*,
146 S. Ct. 1320 (2026) ........ 21

*S. Utah Wilderness All. v. Norton*,
326 F. Supp. 2d 102 (D.D.C. 2004) ........ 12, 42

*S. Utah Wilderness All. v. Palma*,
707 F.3d 1143 (10th Cir. 2013) ........ 31

*San Carlos Apache Tribe v. United States*,
417 F.3d 1091 (9th Cir. 2005) ........ 12

*San Juan Citizens All. v. Norton*,
586 F. Supp. 2d 1270 (D.N.M. 2008) ........ 42

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
747 F.3d 581 (9th Cir. 2014) .......... 50, 57, 60

*San Luis & Delta-Mendota Water Auth. v. Locke*,
776 F.3d 971 (9th Cir. 2014) .......... 58

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*,
605 U.S. 168 (2025) .......... 11

*Sierra Trail Dogs Motorcycle & Recreation Club v. U.S. Forest Serv.*,
470 F. Supp. 3d 1186 (D. Nev. 2020) .......... 36

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
555 F. Supp. 3d 739 (D. Alaska 2021) .......... 51

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
701 F. Supp. 3d 862 (D. Alaska 2023) .......... 34

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
No. 3:25-cv-00356-SLG, 2026 WL 215560 (D. Alaska Jan. 27, 2026) .......... 17, 33

*Texas v. United States*,
523 U.S. 296 (1998) .......... 31

*Toilet Goods Ass'n v. Gardner*,
387 U.S. 158 (1967) .......... 30

*Town of Superior v. U.S. Fish & Wildlife Serv.*,
913 F. Supp. 2d 1087 (D. Colo. 2012) .......... 26

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
671 F.3d 1113 (9th Cir. 2012) .......... 35

*Truckers United for Safety v. Fed. Highway Admin.*,
139 F.3d 934 (D.C. Cir. 1998) .......... 30

*Tulelake Irrigation Dist. v. U.S. Fish & Wildlife Serv.*,
40 F.4th 930 (9th Cir. 2022) .......... 25

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,
878 F.3d 725 (9th Cir. 2017) .......... 15

*Valley Cmty. Pres. Comm'n v. Mineta*,
373 F.3d 1078 (10th Cir. 2004) .......... 12

*Vermonters for a Clean Env't, Inc. v. Madrid*,
73 F. Supp. 3d 417 (D. Vt. 2014) .......... 22

*Westlands Water Dist. v. U.S. Dep't of Interior*,
376 F.3d 853 (9th Cir. 2004) .......... 33

*Wilderness Soc'y v. U.S. Bureau of Land Mgmt.*,
822 F. Supp. 2d 933 (D. Ariz. 2011) .......... 42

*Wind River Multiple-Use Advocs. v. Espy*,
835 F. Supp. 1362 (D.Wyo.1993) .......... 21

*Wyoming v. U.S. Dep't of Agric.*,
661 F.3d 1209 (10th Cir. 2011) .......... 21

**Statutes**

16 U.S.C. § 1362(13) .......... 46

16 U.S.C. § 1362(6)-(8) .......... 46

16 U.S.C. § 1371(a) .......... 46

16 U.S.C. § 1371(a)(1)-(6) .......... 46

16 U.S.C. § 1371(a)(5)(D)(i)(I) .......... 46

16 U.S.C. § 1373 .......... 46

16 U.S.C. § 1532(16) .......... 62

16 U.S.C. § 1532(19) .......... 14

16 U.S.C. § 1532(20) .......... 62

16 U.S.C. § 1532(3) .......... 66

16 U.S.C. § 1532(5)(A)(i) .......... 63

16 U.S.C. § 1532(5)(A)(ii) .......... 63

16 U.S.C. § 1532(6) .......... 62

16 U.S.C. § 1536(a)(2) .......... 13, 60, 62, 63

16 U.S.C. § 1536(b)(3)(A) .......... 13, 60, 62, 63

16 U.S.C. § 1536(b)(4) .......... 14

16 U.S.C. § 1536(o)(2) .......... 14

16 U.S.C. § 1540(g)(1) .......... 68

16 U.S.C. § 3112(1) .......... 11

16 U.S.C. § 3120(a)(1)-(3) .......... 11
16 U.S.C. § 3120(a)(3)(A) .......... 37
16 U.S.C. § 3142(h)(6) .......... 3
16 U.S.C. § 3143 .......... 3
16 U.S.C. § 668dd(a)(2) .......... 24
16 U.S.C. § 668dd(a)(3)(A) .......... 10, 24
16 U.S.C. § 668dd(a)(4)(D) .......... 10, 25
16 U.S.C. § 668dd(c) .......... 26
16 U.S.C. § 668dd(d)(1)(A) .......... 10, 25
16 U.S.C. § 668ee(1) .......... 10
16 U.S.C. §§ 668dd(a)(1)-(2) .......... 10
16 U.S.C. §§ 668dd-ee .......... 10
42 U.S.C. § 4332(C) .......... 10
5 U.S.C. § 706 .......... 44
5 U.S.C. § 706(2) .......... 15
5 U.S.C. § 801(f) .......... 9
5 U.S.C. §§ 701-706 .......... 15
Pub. L. No 119-21, 139 Stat. 72 (2025) .......... 6, 70
Pub. L. No. 115-97, 131 Stat. 2054 (2017) .......... 3, 4, 20, 29
Pub. L. No. 119-52, 139 Stat. 701 (2025) .......... 9
Pub. L. No. 96-487, 94 Stat. 2371 (1980) .......... 3, 20, 24

**Regulations**

36 C.F.R. § 800.14 .......... 41
36 C.F.R. § 800.14(b)(2)(iii) .......... 42
36 C.F.R. § 800.2 .......... 41
36 C.F.R. § 800.4 .......... 12, 41
36 C.F.R. § 800.4(d)(1) .......... 12

36 C.F.R. § 800.4(d)(1)(i) .... 12
36 C.F.R. § 800.5 .... 41
36 C.F.R. § 800.6 .... 41
36 C.F.R. § 800.6(a) .... 41
36 C.F.R. § 800.6(a)(1) .... 41
50 C.F.R. § 216.3 .... 45
50 C.F.R. § 402.02 .... passim
50 C.F.R. § 402.02 (2018) .... 14
50 C.F.R. § 402.02 (2019) .... 60
50 C.F.R. § 402.14(a) .... 13
50 C.F.R. § 402.14(c)(4) .... 14
50 C.F.R. § 402.14(i) .... 14

**Other Authorities**

81 Fed. Reg. 7214 (Feb. 11, 2016) .... 64, 67
83 Fed. Reg. 35178 (July 25, 2018) .... 64
84 Fed. Reg. 44976 (Aug. 27, 2019) .... 64, 65, 67
89 Fed. Reg. 24268 (Apr. 5, 2024) .... 65
90 Fed. Reg. 8433 (Jan. 29, 2025) .... 5, 70

## INTRODUCTION

These cases seek review of U.S. Department of the Interior decisions concerning the Arctic National Wildlife Refuge ("ANWR") Coastal Plain Oil and Gas Leasing Program (the "Program"). Congress mandated that the Secretary of the Interior establish and administer the Program. Following years of environmental review, Interior responded to Congress's command by establishing the Program through a Record of Decision ("ROD") signed on August 17, 2020. After oil and gas leases were issued in January 2021 and various decisions on the leases and Program were made involving separate litigation, Interior issued a new ROD in October 2025, reaffirming the validity of the previously-issued leases. Interior's 2025 ROD is consistent with the two Congressional actions that directly addressed the Program in 2025. Plaintiffs in these actions amended their respective complaints several times, and now challenge the merits of the Bureau of Land Management ("BLM") 2020 and 2025 RODs and related U.S. Fish and Wildlife Service ("FWS") biological opinions ("BiOps").

The Program makes the Coastal Plain available for oil and gas leasing while prescribing various measures to meet resource objectives and mitigate impacts of any future activities in the Coastal Plain. The 2025 ROD establishes the Program but does not authorize *any* on-the-ground activities. Future on-the-ground actions, including exploration and development proposals, require separate decisions and may require additional, project-specific environmental analyses. Even so, the ROD contains certain

measures, such as Lease Stipulations and Required Operating Procedures ("ROPs"), designed to reduce and mitigate any adverse impacts.

The Court's sole task here is to conduct Administrative Procedure Act ("APA") review of Defendants' operative final agency actions, namely the 2025 ROD and BiOp, consistent with statutory guidance. Defendants thoroughly analyzed the Program's potential impacts and addressed all relevant statutory duties. Defendants' approval of the Program is not arbitrary or capricious. The Court should deny Plaintiffs' motions and enter judgment for Defendants.

## BACKGROUND

These motions address the latest evolution "in a series of cases involving a Congressional program to develop oil and gas resources in the Coastal Plain." *Alaska Indus. Dev. & Exp. Auth. v. U.S. Dep't of the Interior* (*AIDEA II*), No. 3:24-cv-00051-SLG, 2025 WL 903331, at *1 (D. Alaska Mar. 25, 2025); *see also Alaska Indus. Dev. & Exp. Auth. v. Biden* (*AIDEA I*), 685 F. Supp. 3d 813 (D. Alaska 2023); *Gwich'in Steering Comm. v. Bernhardt*, No. 3:20-cv-00204-SLG, 2021 WL 46703 (D. Alaska Jan. 5, 2021). After a quick review of those cases and discussion of the establishment and initial development of the Program, Defendants describe the recent procedural developments giving rise to the decisions that Plaintiffs now challenge.

### I. Creation of the Program

Congress designated the Refuge through the Alaska National Interest Lands

Conservation Act ("ANILCA"), Pub. L. 96-487, 94 Stat. 2371 (1980). In doing so, Congress expanded the pre-existing Arctic National Wildlife Range by approximately 9.2 million acres to include a total of approximately 19.3 million acres, of which approximately 8 million acres were designated as wilderness. *See* AR205961. ANILCA Section 1003 prohibited "production of oil and gas . . . until authorized by an Act of Congress." 94 Stat. at 2452 (codified at 16 U.S.C. § 3143). But ANILCA Section 1002 carved out a 1.56 million acre area – known as the Coastal Plain or "1002 Area" – and directed the Secretary to submit a report to Congress containing, among other things, recommendations on whether "further exploration for, and the development and production of, oil and gas within the coastal plain should be permitted[.]" 94 Stat. at 2452 (codified at 16 U.S.C. § 3142(h)(6)). The Secretary's 1987 report recommended "making available for consideration the entire Arctic Refuge coastal plain for oil and gas leasing." AR95458.

Congress did not act on this recommendation until the Tax Cuts and Jobs Act of 2017 ("Tax Act"), which mandates that "[t]he Secretary shall establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain." Pub. L. 115-97, § 20001(b)(2)(A), 131 Stat. 2054, 2236 (Dec. 22, 2017). The Act further amends ANILCA to make "provid[ing] for an oil and gas program on the Coastal Plain" an enumerated statutory purpose of the Refuge. *Id.* § 20001(b)(2)(B). Additionally, "Congress set

statutory parameters" for the Program by adopting a schedule for conducting its first two lease sales, directing that the Secretary issue any "necessary" rights of way, authorize "up to 2,000 acres . . . to be covered by production and support facilities," and prescribing that the Program be managed "in a manner similar to the administration of lease sales" in the National Petroleum Reserve in Alaska. *AIDEA II*, 2025 WL 903331, at *2 (summarizing Tax Act §§ 20001(b)(3), (c)(1), (c)(2), and (c)(3)).

BLM addressed this Congressional direction by conducting an environmental analysis culminating in a September 2019 Final Environmental Impact Statement ("EIS") concerning the Program, AR90163-93729, followed by an August 2020 ROD signed by the Secretary, AR205952-206038. FWS issued its first BiOp concerning the Program on March 13, 2020. AR265483.

### II. Implementation, Suspension, and Modification of the Program

BLM opened bids for the Program's first lease sale on January 6, 2021, and one week later executed lease agreements with AIDEA, the high bidder on seven tracts covering 365,775 acres. *See AIDEA II*, 2025 WL 903331, at *2; AR522270-72 (bid summary); AR522273-74 (Notice of Decision to issue leases).

In 2021, Interior suspended the leases and "instituted a 'temporary halt on all Department activities related to the Program'" pending "supplemental environmental review." *AIDEA I*, 685 F. Supp. 3d at 826 (quoting Secretarial Order 3401, AR522325). AIDEA challenged that suspension, but this Court concluded that the suspension was

within Interior's authority. *Id*. at 834.

In September 2023, Interior issued a decision canceling AIDEA's leases after completing a draft supplemental environmental impact statement. AIDEA again brought suit before this Court. *See AIDEA II*, 2025 WL 903331, at *3; AR522349-55. In July 2024, Interior completed its supplemental environmental review of the Program as reflected by the Final Supplemental EIS ("SEIS"). *See* AR389255-391356. In November 2024, FWS issued a new BiOp for the Program. *See* AR519820-520107. In December 2024 Interior issued a new ROD, AR519735-819, which selected SEIS Alternative D2 designating the "statutory minimum" of 400,000 acres for leasing while making the remaining 1,163,500 acres unavailable for leasing, AR519748.

## III. Evolution to Address Executive and Congressional Direction

On the first day of his second term in office, President Trump signed Executive Order 14153, Unleashing Alaska's Extraordinary Resource Potential, declaring, in part, that "[i]t is the policy of the United States to . . . expedite the permitting and leasing of energy and natural resource projects in Alaska[.]" Exec. Order 14153 (Jan. 20, 2025), *reprinted in* 90 Fed. Reg. 8433, 8347 (Jan. 29, 2025); AR522366. The Executive Order directs the Secretary to "take all necessary steps" to address certain aspects of the Program, including initiating additional leasing, reinstating the 2020 EIS/ROD, rescinding the 2024 SEIS/ROD, and rescinding the decision canceling AIDEA's leases. *Id*. at 8348; AR522367. Secretary's Order 3422 directed various Assistant Secretaries to

submit a plan to implement these agency actions. AR522371-22.

While Interior was formulating these plans, this Court vacated the lease cancellation decision in March 2025, finding that Interior had failed to comply with applicable regulations requiring that Interior first obtain a court order. *See AIDEA II*, 2025 WL 903331, at *7-8. The leases were thus restored to their suspended status in effect prior to the cancellation decision.

The President signed the One Big Beautiful Bill Act ("OBBBA") into law on July 4, 2025. *See* Pub. L. No 119-21, 139 Stat. 72 (2025). Section 50104 addresses the Program, directing the Secretary to conduct "not fewer than 4 lease sales area-wide under [the Program] by not later than 10 years after the date of enactment of this Act." *Id*. § (b)(1). Each lease sale shall include "not fewer than 400,000 acres area-wide" with "the highest potential for the discovery of hydrocarbons." *Id*. § (b)(3)(A). Congress further directed that, in conducting these lease sales, "the Secretary shall offer the same terms and conditions as contained in" the 2020 ROD, and that the rights of way and 2,000-acre surface development provisions of the Tax Act "shall apply to leases awarded[.]" *Id*. §§ (b)(2), (b)(4), and (b)(5).

During this same timeframe, Interior was taking steps to reinstate the Program consistent with Congressional direction. On June 2, 2025, BLM transmitted a biological assessment in conjunction with its re-initiation of consultation on the Program under the Endangered Species Act ("ESA"). *See* AR520514. On June 13, 2025, BLM issued a

determination addressing compliance with the National Historic Preservation Act ("NHPA"). *See* AR520813-16. On August 15, 2025, the National Marine Fisheries Service ("NMFS") transmitted a BiOp addressing the Program. *See* AR520834-521096. And on September 23, 2025, FWS transmitted its BiOp addressing the Program. *See* AR521099-442. Thereafter, BLM issued a Determination of NEPA Adequacy ("DNA") for its proposal to adopt Alternative B from the 2024 SEIS in a new ROD. *See* AR522061. The DNA discussed applicable criteria and concluded that existing analysis from the 2019 EIS, as supplemented by the 2024 SEIS, "fully covers the proposed action" and otherwise constitutes BLM's compliance with the National Environmental Policy Act ("NEPA"). AR522066-69.

In October 2025, Interior issued a new ROD signed by the Secretary. *See* AR522105-176. The ROD recounts the Program's background, AR522111-14, explaining that in its most recent evaluation, BLM considered the 2019 EIS and 2024 SEIS and BiOps (including the 2025 BiOps following re-initiation of consultation), among other things, in making the decision presented in the ROD. AR522114. The ROD explained that the OBBBA "re-affirmed and amplified" the Congressional directive that BLM establish and administer a competitive oil and gas program, including direction to take specific actions and adopt explicit terms and conditions for lease sales. AR522116. The ROD further notes that "[a]n area-wide leasing program across an area with terms and conditions becomes ineffectual if it is not paired with a corresponding

scope and terms and conditions that apply to the exploration, development, production and transportation of oil and gas." AR522121. For those reasons, the ROD adopts Alternative B of the 2024 SEIS, with modifications, which makes the entire Coastal Plain available for leasing, subject to lease stipulations and required operating procedures formulated in accordance with BLM's analysis and the OBBBA. AR522114-15. However, the ROD "does not authorize any specific on-the-ground activity associated with the exploration for or development of oil and gas resources within the Coastal Plain." AR522115. Proposals for any such future activities, including exploration and development, "may require further environmental analysis and compliance based on the project-specific proposal and would be addressed in separate decisions." *Id*.

Following issuance of the 2025 ROD, Interior took additional actions. In one of those actions, Interior issued a Decision signed by the Deputy Secretary terminating suspension of AIDEA's previously issued leases and placing them in "active status." AR522428. This Decision was based upon a review of "the entirety of the record, including the 2019 EIS and 2024 SEIS and their associated reviews, and the 2025 ROD[.]" AR522432. Additionally, BLM issued a Decision acknowledging the return of AIDEA's leases to active status, while addressing other requests made by AIDEA to reduce the rental rate, increase the primary lease term, and amend the lease term based on tolling for the time that the leases were in suspended status. *See* AR522435-43.

Finally, on December 11, 2025, the President signed into law a resolution of

disapproval of the 2024 ROD under the Congressional Review Act ("CRA"). *See* Pub. L. No. 119-52, 139 Stat. 701 (Dec. 11, 2025). Pursuant to the CRA, the 2024 ROD is thus treated as though it "had never taken effect," 5 U.S.C. § 801(f), and Interior may not promulgate a ROD that is "substantially the same" as the 2024 ROD without specific Congressional approval. *Id.* at § (b)(2).

### IV. Resumption of Litigation

These cases were originally filed in 2020 but were stayed in 2021 following suspension of the Program. Following issuance of the 2025 ROD, the parties conferred on steps for resuming the litigation, and the Court issued orders addressing supplementation of the administrative records, filing of amended complaints, and a merits briefing schedule. Pursuant thereto, Plaintiffs have each filed motions for summary judgment. Defendants submit this brief as an opposition and cross-motion and request entry of judgment in all three cases for Defendants as a matter of law.[1]

### V. Additional Relevant Statutes

Plaintiffs' most recent amended complaints raise claims under various statutes,

---

[1] This Court has indicated that a motion for summary judgment "is an appropriate mechanism to seek review of an agency action." *AIDEA I*, 685 F. Supp. 3d at 829 n.56 (citations omitted); *see also Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006) (indicating a court may direct entry of summary judgment to any party based on review of the administrative record).

which are reviewable, where applicable, under the APA.

A. The Refuge Act

The National Wildlife Refuge System Administration Act, 16 U.S.C. §§ 668dd-ee ("Refuge Act") establishes the Refuge System, a "national network" of lands for conservation, management, and restoration of fish, wildlife, and plant resources. *Id*. §§ 668dd(a)(1)-(2). Each refuge "shall be managed to fulfill the mission of the System, as well as the specific purposes for which that refuge was established[.]" *Id*. § 668dd(a)(3)(A). In the event of conflict between the mission of the System and a refuge purpose, such conflict "shall be resolved in a manner that first protects the purposes of the refuge[.]" *Id*. § 668dd(a)(4)(D). The Secretary is authorized to permit a "use" within the System whenever he determines the use is "compatible" with applicable purposes. *Id*. § 668dd(d)(1)(A); *see also* § 668ee(1) (defining "compatible use" as a use that "will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge").

B. National Environmental Policy Act

NEPA seeks to ensure that federal agencies consider the environmental impacts of proposed major federal actions. 42 U.S.C. § 4332(C). NEPA requires agencies to take a "hard look" at the environmental consequences of a proposed federal action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). For "major Federal actions significantly affecting the quality of the human environment" an agency must

prepare an EIS, 42 U.S.C. § 4332(C).

"Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed – rather than unwise – agency action." *Robertson*, 490 U.S. at 351. "NEPA is purely procedural" – "an 'agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.'" *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 177 (2025) (quoting *Robertson*, 490 U.S. at 350).

C. ANILCA Section 810

ANILCA Title VIII provides that "the utilization of the public lands in Alaska is to cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands[.]" 16 U.S.C. § 3112(1). ANILCA Section 810 creates a "procedural mechanism which insures . . . local input into the administrative decisionmaking process" with respect to subsistence uses and needs, *Kunaknana v. Clark*, 742 F.2d 1145, 1150-51 (9th Cir. 1984), and it identifies determinations that the agency must make before proceeding with actions that significantly restrict subsistence uses, *see* 16 U.S.C. § 3120(a)(1)-(3). Section 810 "does not prohibit all federal land use actions which would adversely affect subsistence resources" but rather "sets forth a procedure through which such effects must be considered and provides that actions which would significantly restrict subsistence uses can only be undertaken if they are necessary and if the adverse effects are minimized." *Ctr. for Biological Diversity v. BLM*, 141 F.4th 976,

1004 (9th Cir. 2025) (citing *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544 (1987)).

D. National Historic Preservation Act

The NHPA "is essentially a procedural statute and does not impose a substantive mandate" on BLM. *Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1085 (10th Cir. 2004); *see also San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1097 (9th Cir. 2005) (NHPA duties "are chiefly procedural in nature" (citation omitted)). Under applicable regulations, BLM undertakes identification of historic properties and evaluation of an undertaking's effect on them. *See* 36 C.F.R. § 800.4. If BLM determines "that either there are no historic properties present or there are historic properties present but the undertaking will have no effect upon them" it must provide documentation of this finding to the State Historic Preservation Officer ("SHPO"), any Tribal Historic Preservation Officer(s) ("THPO"), and provide the documentation to the public. *Id*. § 800.4(d)(1). Where BLM finds no adverse effect and the SHPO "agree[s] with this determination, Section 800.4(d)(1) makes clear that 'that [sic] the agency official's responsibilities under [NHPA] section 106 are fulfilled.'" *S. Utah Wilderness All. v. Norton*, 326 F. Supp. 2d 102, 115 (D.D.C. 2004) (quoting 36 C.F.R. § 800.4(d)(1)(i)).

E. Endangered Species Act

ESA Section 7(a)(2) requires federal action agencies to consult with FWS and/or

NMFS whenever a proposed federal action "may affect" a threatened or endangered species or designated critical habitat that falls under their respective jurisdiction. The purpose of consultation is to ensure that any action federal agencies authorize, fund, or carry out "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). To "jeopardize the continued existence" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. "Destruction or adverse modification" of critical habitat is also defined as the "direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id.*

Through ESA consultation, Congress tasked FWS with developing an expert biological opinion and "detailing how the agency action affects the species or its critical habitat." 16 U.S.C. 1536(b)(3)(A). When performing this inquiry, FWS evaluates whether the agency action is likely to jeopardize listed species or destroy or adversely modify designated critical habitat. *Id*. § 1536(a)(2). "A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably

certain to occur." 50 C.F.R. § 402.02 ("effect of the action").[2]

If FWS determines that the project will not violate the jeopardy or adverse modification prohibitions of ESA Section 7(a)(2), but anticipates the project will cause "take"[3] of a listed species, FWS provides an incidental take statement with the BiOp. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). If the action agency implements the project as proposed and complies with the terms and conditions of the incidental take statement ("ITS"), ESA Section 7(o)(2) exempts the specified level of take from the ESA Section 9 take prohibition. 16 U.S.C. § 1536(o)(2).

Action agencies may encompass in their consultation requests a number of similar individual actions within a given geographic area, 50 C.F.R. § 402.14(c)(4). A "programmatic consultation" may address multiple actions on a program, regional, or

---

[2] A federal district court recently vacated some provisions of the FWS's ESA Section 7 regulations, including portions of the "effects of the action" and "destruction or adverse modification" regulations at 50 C.F.R. § 402.02. *See Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, No. 24-cv-04651, 2026 WL 898264, at *25 (N.D. Cal. Mar. 30, 2026). The court reinstated the regulations previously in effect. Those regulations included the "reasonably certain to occur" standard as part of the definition of "indirect effects." *See* 50 C.F.R. § 402.02 (2018) ("Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur."). FWS here applied the post-2019 definition, *i.e.*, "*Destruction or adverse modification* means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." FWS2025_421. However, as noted below, the post-2019 addition of the "as a whole" language was non-substantive and merely carried forward past agency practice. Thus, the change in operative regulations is inconsequential to FWS's analysis in this BiOp.

[3] The term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

other basis. *Id*. § 402.02 (defining "programmatic consultation").

## STANDARD OF REVIEW

The APA waives sovereign immunity and provides for judicial review of agency decisions, 5 U.S.C. §§ 701-706. In such review a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction," or "without observance of procedure required by law." *Id*. § 706(2) . "Under the arbitrary and capricious standard, the scope of review is deferential and narrow, and the court is not to substitute its judgment" for that of the agency. *Friends of Animals v. Haaland*, 997 F.3d 1010, 1015 (9th Cir. 2021). An agency must "articulate a satisfactory explanation for its action," and a court may find an agency decision arbitrary and capricious only if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 732-33 (9th Cir. 2017) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (citation modified). A court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id*. (quoting *Bowman Transp. Inc. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 286 (1974)).

When reviewing agency action under the APA, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority[.]" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). To resolve the meaning of disputed statutory language, a court shall adopt the interpretation that the court, "after applying all relevant interpretive tools, concludes is best." *Id.* at 400. "Careful attention to the judgment of the Executive Branch may help inform that inquiry." *Id.* at 412-13.

## ARGUMENT

Plaintiffs' claims are all deficient as a matter of law. They lack jurisdiction to challenge the 2020 ROD and BiOp because those actions have been superseded by subsequent agency decisions. Turning to the merits, the 2025 ROD reasonably addresses the various statutory purposes relating to the Program. Plaintiffs' procedural challenges under statutes like NEPA, ANILCA Section 810, and the NHPA all fail because BLM performed the relevant analyses. Plaintiffs' arguments primarily miss the mark because they overlook the programmatic nature of the ROD – any activities with impacts to Coastal Plain resources will not occur until the agencies conduct further analyses and issue future decisions. And in complying with the ESA, FWS evaluated the Program at the appropriate species-level scale, used the best available scientific information, and reasonably concluded that the 2025 ROD is not likely to jeopardize polar bears or destroy or adversely modify polar bear critical habitat.

### I. Plaintiffs Lack Jurisdiction to Challenge the 2020 ROD and BiOp

As a threshold matter, any of Plaintiffs' claims purporting to challenge the 2020 ROD and 2020 BiOp fail for lack of jurisdiction. These agency actions are no longer in effect. As Plaintiffs acknowledge, the leases issued pursuant to the 2020 BiOp and ROD were cancelled but then reinstated pursuant to the 2025 ROD. *See* Third Am. Compl. ¶ 123, Case No. 20-cv-204, Dkt. 143. As a result, Plaintiffs cannot establish jurisdiction for any purported challenges to the 2020 BiOp and ROD.

The doctrine of mootness requires a live controversy at all stages of federal court proceedings. A claim thus becomes moot when the challenged agency action is superseded by a new agency action. *See Am. Rivers v. Nat'l Marine Fishers. Serv.*, 126 F.3d 1118, 1124 (9th Cir. 1997), *as amended* (Sept. 16, 1997); *Rio Grande Silvery Minnow v. U.S. Bureau of Reclamation*, 601 F.3d 1096, 1110-11 (10th Cir. 2010).

There remain no jurisdictionally valid claims targeting the 2020 BiOp and ROD. Those agency actions no longer represent final agency action. Any obligations or consequences now flow from the 2025 BiOp and ROD. Similarly, Plaintiffs' claims concerning the 2020 BiOp and ROD have become moot because the Court "could no longer grant effective relief as to the now non-operative" 2020 BiOp and ROD. *Native Vill. of Point Hope v. Salazar*, 680 F.3d 1123, 1131 (9th Cir. 2012); *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, No. 3:25-cv-00356-SLG, 2026 WL 215560, at *5 (D. Alaska Jan. 27, 2026) ("The Court agrees that Plaintiffs' claims as to the

November 2025 Decision are moot as that Decision has been superseded by the December 2025 Decision.”).

These considerations apply in various ways to the pending motions for summary judgment. In some instances, Plaintiffs’ argument focuses on the now superseded documents, like the 2019 EIS, 2020 ROD, or 2020 BiOp. Such arguments fail for lack of jurisdiction. In other instances, Plaintiffs offer citations to the earlier superseded documents, alongside citations to an operative decision like the 2024 SEIS or 2025 ROD. A jurisdictionally valid claim can exist insofar as it is based on the operative agency action. Thus, to the extent Plaintiffs contend that these operative decisions are unlawful, Defendants address such claims, in turn, below.

## II. The Program Properly Addresses Statutory Purposes

Defendants considered and reasonably balanced applicable statutory purposes while addressing the Tax Act’s directive to establish and administer the Program. Plaintiffs’ threshold arguments fail to show that BLM ignored any procedural requirement or reached irrational conclusions.

Plaintiffs each raise statutory purpose arguments. The Gwich’in Steering Committee Plaintiff group in Case No. 20-204 (“Gwich’in Plaintiffs”) argue that BLM ignored a legal requirement to consider original Range purposes and further argue that BLM unlawfully elevated the Program over other statutory purposes. Pls.’ Opening Br.

for Summ. J. ("Gwich'in Br.") 27-33, Case No. 20-cv-204, Dkt. 168.[4] The Natural Resources Defense Council Plaintiff group in Case No. 20-205 ("NRDC Plaintiffs") similarly argue the ROD fails to address all statutory purposes, fails to adequately "protect" designated Wilderness, and lacks a Refuge Act compatibility determination. Pls.' Opening Br. Under L.R. 16.3(C) ("NRDC Br.") 16-23, Case No. 20-cv-205, Dkt. 172. Finally, the Native Village of Venetie Plaintiffs group in Case No. 20-223 ("Venetie Plaintiffs") echo the arguments about statutory purposes and a compatibility determination and further argue that the 2025 ROD unlawfully reverses the position taken in the 2024 ROD. Pls.' Opening Br. Under L.R. 16.3 ("Venetie Br.") 20-29, Case No. 20-cv-223, Dkt. 158.

### <u>A</u>. <u>Defendants Acknowledged and Balanced Statutory Purposes</u>

The 2025 ROD acknowledges and reasonably addresses all relevant statutory purposes. Plaintiffs fail to demonstrate the omission of a required procedural step and fail to show any unlawful action relating to statutory purposes underlying the Program.

ANILCA Section 303(2) designated ANWR and established four statutory purposes relating to (i) conserving fish and wildlife populations; (ii) fulfilling international fish and wildlife treaty obligations; (iii) providing "the opportunity for continued subsistence uses by local residents;" and (iv) ensuring water quality and quantity within the Refuge. 94 Stat. at 2390. The Tax Act added a fifth purpose of

---

[4] Citations to pleadings refer to the ECF-stamped page numbers, not internal page numbers.

providing "for an oil and gas program on the Coastal Plain." Tax Act § 20001(b)(2)(B), 131 Stat. at 2236.

The SEIS discusses the ANWR statutory purposes; Table 1-2 of the SEIS spells out each of the five statutory Refuge purposes and identifies the SEIS sections "describing impacts" on each purpose. AR389286-87. The 2025 ROD explains that, within this array of purposes, "Congress has mandated more specific management within particular areas[.]" AR522122. For example, Congress has mandated that 8 million acres within ANWR be managed as wilderness, and that the 1.56 million acre Coastal Plain be managed for an oil and gas program. Still, in establishing the Program, BLM implements the fifth purpose – to establish an oil and gas program – "in light of" the other four ANWR purposes and in such a manner "that the fifth purpose does not defeat the other four." *Id*. To that end, the selected Alternative B incorporates lease stipulations and ROPs in furtherance of the other four statutory purposes, such as by providing for protection of polar bears, the Porcupine Caribou Herd, subsistence uses, and water quality. AR522122-23.

There is no merit to Plaintiffs' contention that the Program undermines ANWR purposes. Because Congress mandated that Interior create the Program, Plaintiffs' preferred views that the original four ANWR purposes predominate would violate the "settled rule that [a court] must, if possible, construe a statute to give every word some operative effect." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 167 (2004). In

other words, Plaintiffs would have the Court rule that the statutory purposes they prefer override the one that they wish didn't exist. The tension between ANWR statutory purposes is "a classic land use dilemma" regularly faced by land management agencies that must make planning level allocations between uses that are in tension, if not "sharply inconsistent[,]" with one another. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 60 (2004). Contrary to Plaintiffs' view, the law "does not contemplate that every acre of [ANWR] be managed for every [statutory purpose]," but rather that an agency is afforded broad discretion when determining how to address a range of sometimes competing statutory purposes or uses. *Wind River Multiple-Use Advocs. v. Espy*, 835 F. Supp. 1362, 1372 (D.Wyo.1993), *aff'd,* 85 F.3d 641 (10th Cir.1996); *Ark Initiative v. Tidwell*, 816 F.3d 119, 128 (D.C. Cir. 2016); *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1268 (10th Cir. 2011). A court reviews an agency's implementation of conflicting statutory purposes under a deferential reasonableness standard. *Gen. Elec. Uranium Mgmt. Corp. v. U.S. Dep't of Energy*, 764 F.2d 896, 905 (D.C. Cir. 1985).[5]

[5] If BLM's approach to addressing the ANILCA statutory purposes (as modified by the Tax Act) is not the best reading of the statute, then Congressional direction to establish the Program arguably reflects the maxim *expressio unius est exclusio alterius* – that direction to create the Program "creates a presumption" that the "omissions [of other statutory purposes in the Coastal Plain] should be understood as exclusions." *Boudette v. Barnette,* 923 F.2d 754, 756-57 (9th Cir.1991); *Rutherford v. United States*, 146 S. Ct. 1320 (2026). In other words, this presumption would support the interpretation that oil and gas development is the dominant purpose in the Coastal Plain to the exclusion of other purposes, just as the Mollie Beattie Wilderness reflects a dominant purpose of wilderness character to the exclusion of oil and gas development.

The NRDC Plaintiffs contend that BLM was required to better assure that future activities within the Coastal Plain will not "impinge on the wilderness character of the designated Mollie Beattie Wilderness." NRDC Br. at 22-23. But insofar as they contend the 8 million acres of ANWR wilderness should preclude any prospect of future oil and gas development of the Coastal Plain, "this argument is foreclosed by the plain language of the Act." *Hells Canyon All. v. U.S. Forest Serv.*, 227 F.3d 1170, 1179 (9th Cir. 2000), *as amended* (Nov. 29, 2000). ANILCA, as amended by the Tax Act, provides that wilderness and the Program are both valid uses within ANWR. And Plaintiffs' cited authority only demonstrates the necessity of waiting to raise this concern until a proposed agency activity makes plausible some calculable impact to wilderness character. *See Vermonters for a Clean Env't, Inc. v. Madrid*, 73 F. Supp. 3d 417, 434 (D. Vt. 2014) (rejecting plaintiffs' Wilderness Act degradation claim after considering specific decibel levels of background noise measurements and modeled decibel levels of noise attributable to proposed wind energy project); *Izaak Walton League of Am., Inc. v. Kimbell*, 516 F. Supp. 2d 982, 989–90 (D. Minn. 2007) (the "key question" in resolving a "degrad[ation] of wilderness character" claim turns on "various factors" involving the proposed "agency activity").[6] Plaintiffs' claim is not justiciable in this context, but even

---

[6] Plaintiffs' citation to *Izaak Walton League* suffers other defects. The cited 2007 district court decision considered plaintiffs' Count III Wilderness Act claim. *See Izaak Walton League*, 516 F. Supp. 2d at 987. It denied cross motions for summary judgment on that claim without prejudice for development of a factual record. *Id*. at 990. At plaintiffs' request, the court later certified entry of final judgment on all claims except Count III. *Izaak Walton League of Am., Inc. v. Kimbell*, No. CV 06-3357 (JRT/RLE),

if the Court were to address the merits, Plaintiffs cannot provide any factual basis that establishment of the Program, or even issuing leases, has some tangible impact within the designated wilderness.

Finally, the Gwich'in and Venetie Plaintiffs contend that BLM "ignored" the historical purposes of the Arctic National Wildlife Range and thus erred "as a matter of law." Gwich'in Br at 29; Venetie Br. at 23-24. Interior has adopted the best statutory reading that ANILCA supersedes the statement of purposes for the Range. AR389286 (the original purposes of the Range "were superseded by Section 303(2)(B) of ANILCA" as amended by the Tax Act). For starters, Plaintiffs' argument is based on the 1960 Public Land Order 2214, which only in passing states that "[f]or the purpose of preserving unique wildlife, wilderness, and recreational values" the identified 8,900,000 acres of lands is "withdrawn from all forms of appropriation under the public lands laws[.]" AR346827; *see also* Gwich'in Br. at 31. This passing reference, for the purpose of foreclosing competing claims under the public land laws, hardly countermands Congress's more recent directive to establish and administer the Program. Plaintiffs' argument makes little practical sense, because wildlife protection was a Range purpose

---

2008 WL 11383666, at *1 (D. Minn. May 21, 2008). Following eventual development of the factual record regarding the noise impacts of the disputed snowmobile trail, the district court rejected plaintiffs' claim and upheld the Forest Service's conclusion that any "increase in snowmobile sounds" audible within "a small portion of the affected wilderness" did not violate the Wilderness Act. *Izaak Walton League of Am., Inc. v. Tidwell*, No. CIV. 06-3357 RT/LIB, 2015 WL 632140, at *15 (D. Minn. Feb. 13, 2015).

carried into ANILCA, while preserving recreational values was not. *See* ANILCA Section 303(2), 94 Stat. at 2390. And Congress further addressed "preserving" wilderness in ANILCA by designating the second-largest wilderness area in the country. *See* ANILCA Section 702(3), 94 Stat. at 2418. Finally, as explained above, the Tax Act's direction to create the Program in the Coastal Plain's 1.56 million acres leaves no room for Plaintiffs' contrary suggestions.

B. A Refuge Act Compatibility Determination Was Not Required

Establishing the Program is one of ANWR's statutory purposes, so Plaintiffs' argument that FWS was required to determine whether the Program was a "compatible use" under the Refuge Act makes little sense. *See* NRDC Br. at 16-20; Venetie Pls.' Br. at 27-29.[7] In short, Congress already answered that question.

The Refuge Act reflects a hierarchical structure. At the broadest level, it establishes the "mission of the System" for conservation, management, and restoration of fish, wildlife, and plant resources. 16 U.S.C. § 668dd(a)(2). Within this mission, each refuge has Congressionally prescribed "purposes" and "shall be managed to fulfill the mission of the System, as well as the specific purposes for which that refuge was established[.]" *Id.* § 668dd(a)(3)(A). In the event of a conflict between the mission of

[7] Amici similarly address this issue. *See* Amici States' Br. in Supp. of Pls. 19-21, Case No. 20-cv-205, Dkt. 174-1. Of course, amici cannot raise issues beyond those presented by the parties. *Pres. Coal., Inc. v. Pierce*, 667 F.2d 851, 862 (9th Cir. 1982). But an amicus brief that simply retraces Plaintiffs' arguments is similarly unhelpful. The Court has broad discretion to consider it, but the Amici States' brief provides little assistance in ruling on the pending motions.

the System and a refuge purpose, such conflict "shall be resolved in a manner that first protects the purposes of the refuge[.]" *Id.* § 668dd(a)(4)(D). Compatibility determinations are required for "uses" that differ from express statutory purposes – the Secretary is authorized to permit a "use" within the System whenever he determines the use is "compatible" with applicable purposes. *Id.* § 668dd(d)(1)(A); *see also* § 668ee(1) (defining "compatible use" as a use that "will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge"). Thus, while statutory purposes may be considered "co-equal," a "use" is subservient to a refuge "purpose" and can only proceed to the extent it is found to be compatible with the purposes for which the refuge was established. *Tulelake Irrigation Dist. v. U.S. Fish & Wildlife Serv.*, 40 F.4th 930, 937 (9th Cir. 2022).

Plaintiffs' arguments thus falter under the plain text of the Refuge Act. Establishing the Program is an ANWR purpose, not a use that may or may not conflict with a Refuge purpose. The Act does not require Interior to determine the compatibility of a purpose – Congress made that determination in ANILCA, as amended by the Tax Act. The ROD "does not authorize any specific on-the-ground activity" but makes clear that any such use(s) will be addressed in future decisions which "may require further environmental analysis and compliance based on the project-specific proposal[.]" AR522115. Plaintiffs' demand for a tautological determination – that a ROD

establishing the Program is compatible with the ANWR purpose of establishing the Program – finds no support in the Refuge Act.

Additional authority confirms this result. The Refuge Act itself exempts certain undertakings from a compatibility determination. The exceptions include "activities . . . performed by persons authorized to manage such area[s]," or activities addressed "by express provision of law[.]" *Id*. § 668dd(c). Furthermore, FWS guidance clarifies that a compatibility determination is not required "where legal mandates supersede those requiring compatibility." National Wildlife Refuge System Uses Compatibility, 603 FW § 2.10.B(1) (Nov. 17, 2000), available at https://www.fws.gov/policy-library/603fw2 (last visited July 17, 2026). Indeed, where "legal mandates provide that we must allow certain activities, we should not prepare a compatibility determination." *Id*. And case law cements this interpretation. *See Fund For Animals v. Clark*, 27 F. Supp. 2d 8, 11-12 (D.D.C. 1998); *see also Town of Superior v. U.S. Fish & Wildlife Serv*., 913 F. Supp. 2d 1087, 1110 (D. Colo. 2012), *aff'd sub nom*., *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677 (10th Cir. 2015).

In *Town of Superior*, the court found that "a compatibility determination is not required for the acquisition of land" directed by statute. *Id*. at 1111. Section 20001 of the Tax Act, which legally mandates the implementation of an oil and gas program on the Coastal Plain, supersedes the requirements of Section (d) of the Refuge Act. Interior therefore has no obligation to prepare a compatibility determination. Indeed, if a

hypothetical compatibility determination somehow concluded that oil and gas leasing was incompatible, the Secretary would still be required by multiple statutes to establish and administer the Program.

The ROD effectuates Congressional direction to establish and administer the Program. The Refuge Act does not require Interior to determine whether the ROD is compatible with establishing the Program.

C. Defendants Sufficiently Explained Any Change in Position

The Venetie Plaintiffs argue that the 2025 ROD's selection of Alternative B unlawfully changes position as compared to the 2024 ROD's selection of Alternative D2. Venetie Br. at 25-26 (citing *FCC v. Fox Television Studios, Inc.*, 556 U.S. 502, 515-16 (2009). This argument is easily rejected.

The 2025 ROD provides a reasoned explanation for making certain changes from the 2024 ROD. "Courts do not provide 'heightened review'" of a change in policy. *AIDEA I*, 685 F. Supp. 3d at 849 (quoting *Cal. ex rel. Becerra v. Azar*, 950 F.3d 1067, 1096 (9th Cir. 2020)). Rather, review focuses on whether the agency displays awareness of changing position, adopts a change permissible under the relevant statute, and provides "good reasons" for a change that the agency "believes" to be better. *AIDEA I*, 685 F. Supp. 3d at 849 (quoting *Fox*, 556 U.S. at 515). These requirements are met here. Interior states that the 2025 ROD policy "is superior to the 2024 ROD as a matter of law" because the 2024 ROD "is clearly inconsistent" with the OBBBA. AR522120. Again,

Alternative D2 "offered the Tax Act's statutory minimum acreage of 400,000 acres for a second lease sale" while Alternative B "offers the opportunity to lease the entire 1.56 million acre" Coastal Plain. AR522123-24. The 2025 ROD works through the various OBBBA lease sale timing/acreage provisions and rationally concludes that "the area made available for leasing in the 2024 ROD is clearly not sufficient to support the required 4 lease sales of at least 400,000 acres each." AR522120.[8]

In sum, the Court should enter judgment for Defendants on all of Plaintiffs' statutory purpose and interpretation arguments. The 2025 ROD reasonably addresses the statutorily-enumerated ANWR purposes. It was not necessary for Interior to determine whether establishing the Program was compatible with the Congressionally-prescribed purpose of establishing the Program. And the 2025 ROD properly explained that selecting Alternative B was better than the 2024 ROD's selection of Alternative D2 when the latter would not allow BLM to comply with the intervening direction in the OBBBA.

## III. Plaintiffs Seek Premature Review Involving the Tax Act's 2,000 Acre Provision

Plaintiffs also erroneously seek to challenge the 2025 ROD's discussion about the Tax Act's provision addressing future surface disturbance. *See* Gwich'in Br. at 33-39; NRDC Br. at 43-45; Venetie Br. at 45-49. But again, the ROD does not authorize

[8] Whatever doubt there may have been about the viability of the 2024 ROD under the Tax Act and the OBBBA is laid to rest by Congress's disapproval of that ROD under the CRA. Even if the 2025 ROD's justification is inadequate (it is not), it makes little sense to require the agency to explain why it is departing from a ROD that Congress has now affirmatively prohibited it from implementing.

disturbance of a single acre – any potential surface disturbance may require "further environmental analysis and compliance based on the project-specific proposal and would be addressed in separate decisions." AR522115.

The Tax Act provides that the Secretary "shall authorize up to 2,000 surface acres . . . to be covered by production and support facilities . . . during the term of leases" issued under the Program. Tax Act § 20001(c)(3). The 2025 ROD generally interprets this as a "directive" that BLM must not "deny or unreasonably limit development of production and support facilities on the Coastal Plain until 2,000 surface acres are covered" by such facilities. AR522118. However, it will only be in a future decision "implementing" this provision that BLM will determine whether to approve, limit, or deny any application for production and support facilities. *Id.*; *see also* AR522119 ("no definitive application of these principles to particular types of development need be reached at this early stage given the uncertainty and hypothetical nature of projected development").

Plaintiffs' claims are therefore not ripe for review. The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also . . . protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *overruled on other grounds by Califano v.*

*Sanders*, 430 U.S. 99 (1977). A case is not "'ripe' for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990); *see also Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).

Even purely legal challenges to an agency policy or regulation are generally not ripe for review until claims are raised "in the context of a specific application" of the regulation or policy instead of a "generalized challenge." *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 163-64 (1967); *see also Nat'l Park Hosp. Ass'n*, 538 U.S. at 812 ("[W]e conclude that judicial resolution of the question presented here should await a concrete dispute about a particular concession contract."); *Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687, 696 (9th Cir. 2007) (finding challenge to regulations not applied to any "specified project" are "not fit for judicial decision"), *aff'd in part, rev'd in part on other grounds*, *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009); *see also Truckers United for Safety v. Fed. Highway Admin.*, 139 F.3d 934, 938 (D.C. Cir. 1998). In considering whether an agency action is ripe for review, the Supreme Court has directed that courts consider three factors: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual

development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998).

These considerations can warrant judicial restraint in the oil and gas leasing context. For example, the court in *Southern Utah Wilderness Alliance v. Palma* withheld review, noting that "[a]ny harm to [plaintiff's] members' enjoyment of the lands at issue "'rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" 707 F.3d 1143, 1160 (10th Cir. 2013) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). The court further concluded that "the validity of [plaintiff's] claims will be best adjudicated once the facts have been further developed and it becomes clear what type of oil and gas development [the lessee] will ultimately be allowed to engage in, if any." *Id*.

Plaintiffs present a similar abstract disagreement over policy. Plaintiffs' concern could only become cognizable "[i]f a lessee discovers oil or gas, [and] seek[s] approval to develop the resources by submitting the relevant applications and plans." AR522118. Plaintiffs do not articulate concrete application or effects of their feared interpretation of the 2,000-acre provision. Nor could they, for even BLM's "hypothetical unconstrained scenario" forecasts that "development" of applicable facilities such as laying gravel for an anchor pad or construction of a central processing facility will not occur for roughly seven years. AR390596-97. The Court should wait for such a potentiality to arise, and

address BLM's interpretation of relevant Tax Act provisions in the context of a concrete proposal for a future project.

Based on the foregoing, the Court should decline Plaintiffs' suggestion to rule on their hypothetical concerns about how some statement in the 2025 ROD will dictate future implementation efforts relating to the 2,000-acre provision. Regardless, the 2025 ROD presents a reasoned interpretation of the statutory provision that withstands review. This starts with an overarching observation that BLM "must not deny or unreasonably limit development of production and support facilities" until 2,000 surface acres of the Coastal Plain are covered by such facilities. AR522118. Plaintiffs provide no basis to dispute this straightforward interpretation. The 2025 ROD further explains that "production" may be viewed as a separate and distinct activity from other Program activities, such that any future decision will require BLM to determine whether a proposed facility is a "production and support facility," and if so, whether such proposed facilities will cover federal land in the Coastal Plain. *Id*. In numerous instances, the discussion clarifies that "no definitive application of these principles" is being presented "given the uncertainty and hypothetical nature of projected development[.]" AR522119. Plaintiffs cannot demonstrate that the 2025 ROD's discussion of the 2,000-acre provision constitutes legal error.

## IV. BLM Complied with NEPA

Defendants also complied with NEPA. The NRDC Plaintiffs first contend that the 2019 EIS considered an insufficient range of alternatives. NRDC Br. at 24-28. They further contend that the 2024 SEIS violated the range of alternatives requirement because it included "only one alternative that is viable under the OBBBA's terms and conditions mandate." *Id*. at 28-30. The Venetie Plaintiffs echo this argument, Venetie Br. at 58-60, and separately contend that a supplemental NEPA analysis was required. *Id*. at 50-57. These arguments must be rejected under controlling precedent.

First, the arguments concerning the 2019 EIS (without consideration of the 2024 SEIS) are of no consequence. The 2025 ROD is based on the range of alternatives and supplemental analysis of the 2024 SEIS. AR522114, 522123-24 (summarizing an "expanded" range of alternatives including five alternatives analyzed in detail). Plaintiffs fail to meet their jurisdictional burden to challenge the range of alternatives in the 2019 EIS. *See Sovereign Iñupiat*, 2026 WL 215560, at *5.

The arguments challenging the range of alternatives in the 2024 SEIS fare no better. Plaintiffs' invocation of the OBBBA inverts the range of alternatives analysis. NRDC Br. at 30 (claiming BLM considered only one alternative meeting OBBBA requirements); Venetie Br. at 58 (same). An agency's choice of alternatives is governed by a "rule of reason," under which an EIS "need not consider an infinite range of alternatives, only reasonable or feasible ones." *Westlands Water Dist. v. U.S. Dep't of*

*Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (citation omitted). The range of reasonable alternatives depends on the "nature and scope of the proposed action." *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1538 (9th Cir. 1997) (citation omitted). And an agency need not consider alternatives "which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 914 F.2d 1174, 1180 (9th Cir. 1990). This Court has rejected arguments similar to those made here, that theoretical alternatives could exist to "vary" areas open to leasing or seismic exploration, NRDC Br. at 30, because such alternatives would be "inconsistent" with a leasing program and "statutory mandates." *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, 701 F. Supp. 3d 862, 879 (D. Alaska 2023), *aff'd in part, rev'd in part and remanded sub nom. Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976 (9th Cir. 2025) (quoting *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006)). And it is with the OBBBA's "Congressional objective of [Coastal Plain] oil and gas development in mind . . . that BLM's alternatives analysis is evaluated." *Sovereign Iñupiat*, 701 F. Supp. 3d at 880. BLM considered a proper range of alternatives in the 2024 SEIS. And Plaintiffs' contention that the directives of the Tax Act and OBBBA narrowed Interior's options in choosing between alternatives is insufficient as a matter of law because the Ninth Circuit has "repeatedly held that an agency satisfies NEPA when it

considers only two alternatives—action and no action." *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1065 (9th Cir. 2023).

For similar reasons, BLM properly utilized a DNA and reasonably concluded that supplemental NEPA analysis was not required. *See* Venetie Br. at 51-54. The DNA meaningfully explains that environmental effects of the proposed action lie within the scope of those already analyzed in existing NEPA documents, and that no new circumstances, new information or unanalyzed effects warrant supplemental analysis. AR522061. This Court has upheld BLM's use of a DNA in similar circumstances involving a North Slope programmatic leasing decision. *See N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*, No. 3:18-CV-00030-SLG, 2018 WL 6424680, at *2-3 (D. Alaska Dec. 6, 2018), *aff'd*, 983 F.3d 1077 (9th Cir. 2020). Moreover, supplementation is required only when new information shows effects "to a significant extent not already considered." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989); *see also Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012) (deferring to an agency's determination that new information did not show a "seriously different" picture of environmental effects).

Venetie Plaintiffs' further arguments addressing cultural resources are similarly flawed. *See* Venetie Br. at 54-57. BLM properly observed that a ROD establishing the Program and authorizing issuance of leases "would have no direct impacts" on cultural resources, yet the SEIS still considered "potential impacts on cultural resources" from

future "on-the-ground activities." AR389552. Again, NEPA imposes a procedural requirement to disclose potential environmental impacts, and the SEIS states that potential impacts from future activities could be "adverse, regional, and long term." AR389553. Regardless, any such effects on historic properties will be identified and resolved "through avoidance, minimization, or mitigation" through the NHPA Section 106 process. AR389554. Plaintiffs have failed to address, let alone show the legal insufficiency of, this approach at the relevant context of a programmatic decision on a leasing program.

Finally, Plaintiffs' various arguments about range of alternatives and supplementation must be rejected upon proper consideration of the context. An agency is not locked into some rigid view of options for a final decision based on the range of alternatives or the prospect of supplementation. Rather, an agency has broad discretion to adopt a final decision that is a "minor variation" or "qualitatively within the spectrum" of alternatives presented in the NEPA document. *Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1048 (9th Cir. 2011) (citation modified); *see also Sierra Trail Dogs Motorcycle & Recreation Club v. U.S. Forest Serv.*, 470 F. Supp. 3d 1186, 1192-93 (D. Nev. 2020). Insofar as Plaintiffs would suggest some procedural roadblock precluded BLM from varying acreages available for leasing or seismic exploration, BLM had discretion to select those options because they were variations of or within the spectrum of alternatives considered. Plaintiffs really complain that BLM made all of the

Coastal Plain available for leasing, yet NEPA provides no basis for disputing BLM's choice to do that consistent with the plain language of the Tax Act and OBBBA.

### V. BLM Reasonably Addressed ANILCA Section 810

The 2025 ROD properly addressed BLM's responsibilities under ANILCA Section 810. The Gwich'in and Venetie Plaintiffs' claims to the contrary fail to show that the relevant determinations were arbitrary and capricious. *See* Gwich'in Br. at 40-47; Venetie Br. at 29-36.

BLM closely conformed its Section 810 analysis to controlling precedent. *See Kunaknana*, 742 F.2d at 1151 ("Congress intended a two-step process: first, the agency determines whether the contemplated action may significantly restrict subsistence use; if it may, the agency must comply with the notice and hearing procedures."). BLM considered subsistence evaluations conducted for the 2019 EIS, as well as the 2024 SEIS, which included a 2018 public meeting in Kaktovik, and "at the [2023] request of the Gwich'in Tribes" further public meetings in Arctic Village, Venetie, Fort Yukon, and Utqiagvik. AR522127. BLM found that adoption of Alternative B "may result in a significant restriction on subsistence uses." *Id.*

As a result, BLM conducted a Tier 2 analysis that similarly tracked *Kunaknana* and complied with the law. *See id.* (citing 16 U.S.C. § 3120(a)(3)(A), (B), and (C)). The ROD summarized and explained the agency's determination on each of the three statutory inquiries. AR522127-29. The ROD's discussion reflects the more detailed

consideration of these factors in the Section 810 Evaluation (AR390773-813). In particular, the ROD detailed measures taken to minimize impacts to subsistence uses, including "development of strict mitigation measures similar to those used on BLM-administered lands in the NPR-A." AR522128; *see Kunaknana*, 742 F.2d at 1151 (noting "protective lease conditions and stipulations in order to preclude *future* restrictions on subsistence uses that might be caused by activity permitted by the NPR–A leasing program"). As in *Kunaknana*, "the agency examined the relevant factors and did not err in its judgment" and "articulated rational connection between the facts found [by the agency] and the choice made." 742 F.2d at 1151 (bracketing in original).

Finally, BLM's Section 810 compliance as reflected in the ROD and EIS is appropriate at the program-level. With any proposal for future project-level activities:

> BLM will consider alternatives to avoid adverse effects and incompatible development to subsistence resources and uses and subsistence access before any on-the-ground activities are approved. This will be done through subsequent NEPA analysis, which will be conducted before any construction or operation permits or approvals are issued.

AR522129 (ROD); *see also* AR390774 (SEIS) ("Section 810 analyses would occur with future project-specific proposals").

Plaintiffs' threshold arguments that BLM unlawfully limited its Section 810 analysis to four communities find no support in the record. *See* Gwich'in Br. at 42; Venetie Br. at 31. The Section 810 evaluation states that BLM recognized "the importance of the program area to caribou" and considered "relevant data on subsistence

uses of caribou by 22 Alaskan communities" as described in Section 3.4.3 of the SEIS, disclosing these communities could experience "potential indirect impacts related to caribou abundance or availability." AR390775; *see also* AR389560 (SEIS discussion of impacts on "22 Alaska caribou study communities and seven Canadian user groups"); AR391058-65 (Tables N-20 and N-21 showing available caribou harvest summary data for these communities). This analysis recognizes that Gwich'in People, in Alaska and Canada, "have a unique cultural connection to the program area" and considers these "broader cultural impacts," emphasizing resource abundance, availability, and subsistence access. AR390775. Plaintiffs are simply wrong in suggesting that BLM limited its subsistence use analysis to four communities.

Plaintiffs are similarly incorrect in suggesting that BLM failed consider "traditional and customary practices." Venetie Br. at 34 and n.115 (contending the Section 810 evaluation contains "a single reference to sharing"). In fact, the Section 810 evaluation meaningfully addresses sharing of caribou harvest between subsistence communities. AR390775, -776, -800 (twice), -803, -806. And Appendix D details Traditional Knowledge, including on subsistence use, that explains that subsistence activities "are central" to cultural identity, including activities associated with subsistence such as "processing subsistence foods, sharing, and teaching the younger generations[.]" AR390629; *see also* AR390644, -653, -659, -705, -727, -743.

Additionally, Plaintiffs erroneously contend that BLM unlawfully excluded consideration of waterfowl in its Section 810 evaluation. Venetie Br. at 33. Plaintiffs offer two record cites for this proposition which contradict one another. *See id*. n.111. The 2019 discussion includes waterfowl along with other resources that "may be culturally important" but "do not comprise the majority of wild foods consumed[.]" AR90850. But the 2024 Section 810 analysis limits this description to polar bears and furbearers and says that "while waterfowl is harvested in lesser quantities in the study communities, it is an important subsistence use and cultural activity with high rates of community participation." AR390775. Plaintiffs therefore could not seek remand to address exclusion of waterfowl from the subsistence analysis, because the Section 810 analysis upon which the 2025 ROD was based plainly considered waterfowl.

Defendants' ANILCA Section 810 analysis carefully followed controlling precedent. Defendants' conclusions were reasonable and based upon substantial evidence. These efforts amply satisfy Section 810 for a program-level decision, and will be reviewed and updated, as appropriate, in project-level analyses of any future ground-disturbing activities. The Court should enter judgment for Defendants on the ANILCA Section 810 claims.

## VI. Defendants Complied with the NHPA

Defendants further complied with applicable NHPA procedural requirements. The Venetie Plaintiffs contend that BLM failed to consider "landscape-level historic

properties" or otherwise violated the NHPA. Venetie Br. at 37-42. In conformance with applicable regulations and settled precedent, BLM addressed its NHPA obligations through a programmatic agreement and explained that further NHPA evaluation will occur for any future project-specific activity. Plaintiffs fall far short of showing that this approach was arbitrary and capricious.

The Advisory Council on Historic Preservation ("ACHP") regulations provide a detailed structure to guide NHPA Section 106 analysis. These regulations outline the steps to be taken by the action agency (here BLM), which may include defining the undertaking's "area of potential effects" ("APE") and identifying historic properties within the APE (36 C.F.R. § 800.4), determining whether an adverse effect(s) may result from the undertaking (*id*. § 800.5), and if so, considering alternatives or modifications to the undertaking to avoid, minimize, or mitigate adverse effects (*id*. § 800.6). At each step the regulations address the agency's consultation options (or obligations) vis-à-vis the SHPO and any THPO, consulting parties, the public, and ACHP. *See*, *e.g*., *id*. § (a) (describing continuing consultation "with the SHPO/THPO and other consulting parties" regarding resolution of adverse effects); *id*. § (a)(1) (prescribing notice to be provided to ACHP); *see also id*. § 800.2.

However, an agency may adopt "program alternatives" to implement Section 106. *See id*. § 800.14. Here, various parties entered into "a programmatic agreement to govern the implementation of a particular program or the resolution of adverse effects from

certain complex project situations or multiple undertakings." *Id.* § (b); *see* AR28755 (ACHP letter transmitting PA); AR28756-781 (Final PA including ACHP and SHPO signatures); AR522126 (2025 ROD explaining BLM has addressed NHPA Section 106 through the PA). "Compliance with the procedures established by an approved [PA] satisfies the agency's section 106 responsibilities for all individual undertakings of the program covered by the agreement[.]" 36 C.F.R. § 800.14(b)(2)(iii); *see also Norton*, 326 F. Supp. 2d at 115-16 ("The Court, in its deferential review of agency action, places great weight on the fact that the instant agency action received the approval of the very entities charged with overseeing compliance with NHPA.").

This outcome is even more clear when considering the nature of the ROD's programmatic leasing decision. As BLM explained to the Venetie Plaintiffs in preparing the 2024 SEIS, NHPA Section 106 requirements for establishment of the Program have been addressed through the PA, but eligibility and other consideration relating to historic properties may occur "during implementation" or "in consideration of site-specific projects and subsequent NEPA analysis." AR390135. The Program ROD "does not authorize any specific activities, so it cannot currently have a negative impact on cultural resources[.]" *San Juan Citizens All. v. Norton*, 586 F. Supp. 2d 1270, 1294 (D.N.M. 2008). Plaintiffs attempt no more than a "general programmatic attack that is not subject to judicial review in the absence of a site-specific agency action." *Id.*; *see also Wilderness Soc'y v. U.S. Bureau of Land Mgmt.*, 822 F. Supp. 2d 933, 951 (D. Ariz.

2011), *aff'd*, 526 F. App'x 790 (9th Cir. 2013). Plaintiffs' purported reliance on *Montana Wilderness Association v. Connell*, 725 F.3d 988 (9th Cir. 2013), only reinforces this outcome. *See* Venetie Br. at 41-42. Unlike the ROD establishing the Program, Plaintiffs themselves note that the monument plan in *Connell* was not "solely" a programmatic decision but "also authorize[d] specific uses[.]" *Id*. (quoting *Connell*, 725 F.3d at 1008). Moreover, *Connell* did not involve a PA, but rather BLM's failure to conduct field survey efforts to identify historic and cultural resources in accordance with BLM guidance directing that such surveys precede authorization of the new or increased off-highway vehicle traffic in dispute. *Id*. at 1005-06.

Finally, Plaintiffs' contention that BLM failed to consult "with the Tribes" is plainly rebutted by the record. Venetie Br. at 44. Plaintiffs assert "Interior never consulted with the Tribes to apply the National Register criteria[.]" *Id*. (citing AR520510, AR209871). But these pages reflect the "consultation activities" sections of the 2024 and 2025 PA annual reports. The 2024 report states that BLM consulted on two projects and received responses from the Venetie Plaintiffs, but that neither project ever proceeded. AR209871. The 2025 report explains that no consultation occurred because no undertakings were considered since distributing the 2024 report. AR520510. And the 2025 report addresses Plaintiffs' effort to seek eligibility for a landscape-level designation of "the Sacred Place Where Life Begins." AR520510-11. Furthermore, BLM engaged in significant consultation efforts with Tribes (including Venetie

Plaintiffs) in formulating the PA. *See* AR22261-314, 31211-14, 31875-78, 33513-18, 33526-55.

Defendants have properly satisfied the NHPA's procedural requirements. The Court should enter judgment for Defendants on the NHPA claim.

## VII. FWS Prepared Legally Sufficient BiOps

The Gwich'in and NRDC Plaintiffs challenge the merits of the "no jeopardy" BiOps issued by FWS in 2020 and 2025, respectively. *See* Third Am. and Suppl. Compl. Count VII ¶¶ 237-244 (2025 BiOp), Case No. 20-cv-204, Dkt. 143; *id.* Count VIII ¶¶ 245-250 (2020 BiOp); Third Am. and Suppl. Compl. Count V ¶¶ 102-114, 116-117 (2020 BiOp), Case No. 20-cv-205, Dkt. 150; *id.* Count X ¶¶ 144-158, 160-163 (2025 BiOp). Claims concerning alleged improper administration of the ESA (e.g., consulting and issuing a BiOp under Section 7 of the Act) are reviewed under the APA, 5 U.S.C. § 706. *Bennett v. Spear*, 520 U.S. 154, 175 (1997). As noted above, Plaintiffs' claims regarding the 2020 BiOp are moot following issuance of the 2025 BiOp. However, to the extent Plaintiffs' claims are reviewable at all, the record before the Court supports *both* the 2020 and 2025 BiOps. Neither the NRDC Plaintiffs nor the Gwich'in Plaintiffs have demonstrated any improper administration of the ESA on the part of FWS regarding the 2025 BiOp.

The issuance of the 2025 BiOp also renders harmless any alleged errors in the 2020 BiOp. Consistent with the OBBBA, the proposed actions considered in each BiOp

concern the same Program area, contain identical terms and conditions, and involve the same Reasonably Foreseeable Development Scenario. Even if the Court finds there is jurisdiction to review the 2020 BiOp (there is not) and further finds an aspect of that document to be deficient, the presumptive remedy would entail FWS issuing a new, fully-ESA compliant BiOp.[9] FWS has already done so via the 2025 BiOp, which serves as the basis for ESA compliance for Department's ensuing leasing-related decisions, including its 2025 decision affirming AIDEA's leases as originally issued in 2021. *See PDK Lab'ys Inc. v. U.S. Drug Enf't Agency*, 362 F.3d 786, 799 (D.C. Cir. 2004). Given the mootness of arguments concerning the 2020 BiOp and the inconsequence of any alleged errors therein, and to avoid an unnecessarily lengthy and complicated discussion, the remaining argument focuses on the 2025 BiOp.

### A. BLM and FWS Properly Utilized a Programmatic Consultation to Analyze Phases of the Program

The 2025 BiOp analyzed the effects of all phases of the Program over a period of 85 years, including development and reclamation. FWS2025_378-79. Because BLM's Program will encompass a wide range of actions over a long period of time, BLM and FWS agreed to utilize a "programmatic consultation" incorporating project design criteria ("PDC") to ensure ESA compliance. FWS2025_381. BLM will not approve any activity

---

9 For example, the NRDC Plaintiffs (NRDC Br. 31-32) and the Gwich'in Plaintiffs (Gwich'in Br. 49-51) only challenge the FWS reliance on future Marine Mammal Protection Act ("MMPA") measures with respect to the 2020 BiOp (which is moot) but do not raise similar arguments against the 2025 BiOp (NRDC Br. 32-42; Gwich'in Br. 51-54).

that may affect ESA-listed species or critical habitat until it completes any necessary "step-down" ESA consultations with FWS. *Id.* In short, FWS analyzed the effects of hypothetical activities that could be authorized over the duration of the entire proposed Program but acknowledged that additional ESA consultations will be required and MMPA authorizations may be required, over time, as site-specific development is proposed.[10]

The Ninth Circuit has affirmed the use of programmatic consultations where, as here, the agency action establishes procedures for additional ESA consultations on site-specific projects. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,* 807 F.3d 1031, 1053 (9th Cir. 2015) ("We also conclude that deferral of ITSs to second level

---

[10] The MMPA establishes a general "moratorium" prohibiting the taking or importation of marine mammals, including marine mammal parts and products. 16 U.S.C. § 1371(a); *see also id.* § 1362(6)-(8) (defining "marine mammal," "marine mammal products," and "moratorium"); *id.* § 1371(a)(1)-(6) (describing exceptions); *id.* § 1373 (authorizing regulations on take and importation). Under the MMPA, "take" means "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id.* § 1362(13); 50 C.F.R. § 216.3. The MMPA provides some exceptions to the moratorium on taking marine mammals. For example, upon request "by [U.S. citizens] who engage in a specified activity (other than commercial fishing) within a specific geographic region, the Secretary [of the Interior] shall authorize, for periods of not more than 1 year, [. . .] the incidental, but not intentional, taking by harassment of small numbers of marine mammals of a species or population stock [. . .] if the Secretary finds that such harassment during each period concerned will have a negligible impact on such species or stock." 16 U.S.C. § 1371(a)(5)(D)(i)(I). While the 2025 ROD does not itself require authorizations under the MMPA, applications for future, on-the-ground exploration or development activities may involve a request for incidental take authorizations under the MMPA, triggering further, project-specific MMPA reviews by FWS and/or NMFS.

analysis was appropriate[.]"); *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1068 (9th Cir. 2004) ("We have previously approved programmatic environmental analysis supplemented by later project-specific environmental analysis."); *see also Defs. of Wildlife v. U.S. Dep't of Navy*, 733 F.3d 1106, 1122 (11th Cir. 2013) ("The record indicates that the NMFS analyzed the entire action, including both the installation and operation phases . . . in its biological opinion, and the Navy's and the NMFS's decision to analyze impacts from operations again in a future consultation does not undermine their existing consultation or the resulting biological opinion."). Based on these authorities, FWS and BLM reasonably decided to analyze the Program using a programmatic consultation approach in the 2025 BiOp.

The 2025 BiOp also appropriately reflects the nature of the Program. The Program makes areas of the Refuge available for lease sales and potential future oil-and-gas exploration, development, and production, but lease issuance itself does not authorize ground-disturbing activity. FWS2025_607 ("Issuance of an oil and gas lease would not authorize ground disturbing activities[.]"); AR521152 ("Issuance of an oil and gas lease does not have any direct effects on ESA-listed species or their habitat since it does not authorize drilling or any other ground disturbing activities[.]"). Instead, before BLM may authorize any on-the-ground oil-and-gas activity, a permittee must submit a site-specific plan, demonstrate compliance with applicable lease stipulations and required operating procedures, and BLM must complete any required additional NEPA analysis

and ESA Section 7 consultation. *Id*. ("Therefore, no tracts leased in the future offering would result in certain or immediate ground-disturbing activities; nor would such activities occur without project-specific NEPA analysis or ESA consultation."). FWS thus evaluated the effects of projected Program activities over the 85-year development timeframe while recognizing that future site-specific, ground-disturbing authorizations remain subject to additional environmental review, ESA compliance, and project-specific requirements.

For polar bears, FWS analyzed the species' status, the environmental baseline, the effects of the action, and cumulative effects in the action area. FWS recognized that loss of sea-ice habitat is the primary threat to polar bears, *see id*., that the two U.S. subpopulations—the Chukchi Sea polar bear subpopulation and the Southern Beaufort Sea subpopulation—are "likely stable" and "likely decreased or declined," respectively, AR521180; and that "protection of terrestrial denning and summering habitats is and will likely be, important to supporting the long-term persistence of polar bears." AR521194. FWS then analyzed the Program's potential effects on polar bears, including long-term loss of habitat (i.e., direct impacts from gravel fill), disturbance associated with development, production, and abandonment activities, human-bear conflicts, impacts to prey, vehicle collisions, and spills. AR521262. For the denning impacts, although the location of future infrastructure is not known for the Program, FWS used a conservative, highest-impact scenario. FWS assumed that, if all development occurred within

Terrestrial Denning Habitat, up to 2,000 acres (8 km²) of Terrestrial Denning Habitat would be impacted in the long term, which is 0.2 percent of the Terrestrial Denning Habitat. AR521266. Under that scenario, FWS estimated disturbance to a total of 154 dens over the 85-year timeframe, resulting in an anticipated impact to 292.6 cubs, or 3.44 cubs per year. AR521292. FWS also considered the demographic significance of those effects. It estimated the impacts to denning female polar bears, the demographic group most important to annual recruitment, would be limited to short-term, temporary behavioral changes. AR521291-93. Considering the Program's effects on designated polar bear critical habitat, FWS concluded that the Program is not expected to appreciably reduce the value of designated critical habitat for the survival and recovery of polar bears. AR521316.

FWS also considered the Program's protective framework. For example, ROP 10 requires permittees to protect polar bear denning locations by (1) attempting to locate polar bear dens utilizing appropriate tools; (2) observing a 1-mile operational exclusion zone around all known polar bear dens during the denning season; (3) using the den habitat map developed by the U.S. Geological Survey when conducting activities; and (4) restricting the timing of the activity to limit disturbance around dens. AR521422-23. FWS also recognized that Lease Stipulation 1 includes prohibitions on permanent oil and gas infrastructure in polar bear habitat. AR521265. Moreover, as noted above, any future exploration and development authorizations would be subject to future step-down

ESA Section 7 consultations. AR521100. After adding the effects of the action and cumulative effects to the environmental baseline in light of the species' status, FWS reasonably concluded that the Program (including its protective framework) is not likely to jeopardize the continued existence of polar bears species or result in destruction or adverse modification of critical habitat. AR521360. FWS's programmatic "no jeopardy" determination is reasoned, record-supported, and should be upheld. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601-02 (9th Cir. 2014).

## B. FWS Properly Acknowledged Potential Future MMPA Analysis

The NRDC Plaintiffs (NRDC Br. at 32) and the Gwich'in Plaintiffs (Gwich'in Br. at 49) contend that, because the BiOps recognize that certain future activities may require authorization under the MMPA, FWS's assessment of anticipated effects on polar bears is inadequate under the ESA. The argument misapprehends both the action on which FWS consulted and the regulations that govern consultation on such actions. As noted above, there is no viable claim regarding the 2020 BiOp. And the 2025 BiOp analyzes a Program that authorizes no on-the-ground activity and exempts no take. And its conclusions rest on FWS's own analysis of the Program's anticipated effects—not on any future MMPA measure. Each case Plaintiffs invoke involved the opposite: a BiOp that authorized take of a specific project, or whose substantive conclusion leaned on MMPA mitigation that did not yet exist.

Contrary to Plaintiffs' assertions, the fact that a future action may require MMPA analysis does not render the 2025 BiOp's assessment of anticipated effects on polar bears to be inadequate for ESA purposes. *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020), involved the BOEM's approval of a specific offshore oil drilling and production facility. FWS estimated that the project may result in the nonlethal incidental take of an unspecified number of polar bears and lethal incidental take of one polar bear over the life of the project, and FWS exempted such take in an incidental take statement. *Id.* at 749. *National Wildlife Federation v. National Marine Fisheries Service* similarly involved a BiOp that analyzed operations of specific dams that were known to result in the incidental take of ESA-listed salmon. 524 F.3d 917, 923 (9th Cir. 2008). Here, by contrast, no incidental take of polar bears is authorized by the 2025 BiOp. Unlike the specific projects analyzed in *Center for Biological Diversity* and *National Wildlife Federation,* the BiOp here analyzes the Program, which does not currently authorize any specific, on-the-ground project. And unlike the BiOp in *Center for Biological Diversity*, FWS here did not rely on future mitigation measures to authorize incidental take or reach its "no jeopardy" conclusion regarding establishment of the Program.

The Gwich'in Plaintiffs' reliance on *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management (SILA)*, 555 F. Supp. 3d 739 (D. Alaska 2021), is unavailing. Unlike the 85-year program analyzed in the BiOp here, that case involved the

Willow Project Master Development Plan – a detailed development proposal far removed from BLM's decision to establish a leasing program. *Id.* at 751. Like the BiOp at issue in *Center for Biological Diversity,* the BiOp in *SILA* included an ITS exempting specified take of polar bears. *Id.* at 802. The Gwich'in Plaintiffs' reliance on *Center for Biological Diversity v. Salazar*, 804 F. Supp. 2d 987, 994, 1001-04 (D. Ariz. 2011) is also unavailing. The BiOp there assessed effects of *ongoing* operations involving groundwater pumping and water consumption at Fort Huachuca. *Id.* at 992. By contrast, the 2025 BiOp here does not currently authorize any on-the-ground activities that will affect polar bears. For purposes of the programmatic 2025 BiOp, the FWS appropriately addressed the relevant proposed action and acknowledged that proposals for future action may involve additional MMPA analysis.

### C. FWS Properly Considered Effects of the Program That Are Reasonably Certain to Occur

In its 2025 BiOp, FWS properly considered all effects of the Program that it determined to be reasonably certain to occur while acknowledging that future, on-the-ground actions will be subject to additional ESA consultations. Any effects on listed species and/or critical habitat will be fully assessed through project-specific ESA consultations. For example, the 2025 BiOp recognizes that 358,100 acres (~23%) would be subject to NSO restrictions, and 585,400 acres (~37%) would be subject to timing limitations. FWS2025_345. Furthermore, BLM will not approve any activity that may affect ESA-listed species or critical habitat until it completes its obligations under

applicable requirements of the ESA including, where applicable, step-down ESA consultations. FWS2025_345.

The Gwich'in Plaintiffs assert that NSO lease stipulations to limit infrastructure were neither specific nor certain to occur. Gwich'in Br. at 51. The NRDC Plaintiffs also assert that FWS improperly relied on the NSO provision of Lease Stipulation 1. NRDC Br. at 34.

Although Plaintiffs suggest that NSO lease stipulations here may not operate to deny proposed rights-of-way that are necessary for oil and gas activities under the Tax Act's rights-of-way provision, *see* Gwich'in Br. at 51, and would allow roads, pipelines, and gravel mines to be built in NSO areas, *see* NRDC Br. at 34, Plaintiffs neglect to mention that *all* site-specific actions will need to be permitted through step-down ESA consultations and any necessary MMPA authorizations. FWS2025_00411 ("As specific step-down projects are proposed in this multi-stage oil and gas Program, more precise information about the nature and extent of the activities–including the scale and location of the activities and a description of the particular technologies to be employed–will be considered and evaluated in step-down ESA consultations and other analyses (e.g., NEPA) as appropriate."). Contrary to the Plaintiffs' characterizations, the purported exception(s) for certain rights-of-way activities do not swallow the rule that such activities remain subject to the requirements of both the ESA and the MMPA.

For example, the NRDC Plaintiffs criticize the 2025 BiOp's alleged reliance on ROP 10, which provides that BLM would impose measures to "[p]rotect grizzly bear, polar bear, and seal denning and birthing locations," *see* FWS 2025_417, and Lease Stipulation 1, which establishes an NSO setback along selected rivers and streams, *see* FWS2025_657. *See* NRDC Br. at 33-34, 37. FWS accounted for the number of dens that could be exposed to disturbance in relation to the percentage of maternal denning habitat that will be off limits to development. FWS2025_532-33. And FWS reasonably concluded that "[i]ssuance of oil and gas leases under the Proposed Action would have no direct impacts on polar bears because by itself a lease does not authorize any on the ground oil and gas activities." FWS2025_536. Prior to authorizing any future, on-the-ground activities, BLM will conduct step-down ESA Section 7 consultation as appropriate. FWS2025_386. FWS did not err in concluding that the Program, subject to ROP 10 and Lease Stipulation 1, is not likely to jeopardize polar bears.

For similar reasons, the Gwich'in Plaintiffs are also incorrect to suggest that the 2025 BiOp is invalid because BLM did not specifically require the use of aerial infrared ("AIR") surveys to locate polar bear dens prior to on-the-ground activities as described in the 2025 BiOp. Gwich'in Br. at 53. FWS explained the basis of its determination that operators would undertake AIR surveys:

> Though ROP 10 does not require a specific den detection method be used, we feel it is reasonable to assume that an aerial infrared (AIR) survey would be conducted for seismic surveys, rather than ground-based den detection surveys methods, since seismic surveys are expected to cover

> such a large area (542,000 acres (2,193 km²)), and the use of AIR imagery is the typical method used to locate dens over large areas.

AR521275. Contrary to the NRDC Plaintiffs' arguments, NRDC Br. at 37, surveys are required. AR522150. The uncertainty therefore is not whether surveys will proceed, but which survey method accords with the best available science at the relevant point in time. Further, it is of no moment that AIR survey and related specifications are incorporated in a "conservation recommendation" rather than an express condition that might be included as a condition for some future ESA incidental take authorization. Future actions under the Program entailing den detection surveys would have the potential to affect polar bears and, therefore, will require a separate ESA consultation. AR521363. FWS did not err in concluding that the Program, subject to this stipulation requiring future ESA consultations, is not likely to jeopardize polar bears.

D. FWS Properly Accounted for Expected Population Decline and Loss of Female Cubs

NRDC Plaintiffs next argue that FWS ignored projected future declines in polar bear populations and relied instead on "fixed population estimates." NRDC Br. at 38-40. That argument misreads the BiOp and the ESA's requirements. The question under Section 7 is not whether polar bears face serious threats. FWS already recognized that they do. The question is whether the Program, when added to the environmental baseline and cumulative effects and considered in light of the species' status, is reasonably expected to "reduce appreciably the likelihood of both the survival and recovery" of polar

bears by reducing reproduction, numbers, or distribution. 50 C.F.R. § 402.02; AR521361. FWS reasonably concluded that it did not. AR521316-17.

FWS did not ignore polar bears' declining status. It expressly recognized that polar bears depend on sea ice, that loss of sea ice is the species' largest threat worldwide, and that reduced sea ice will result in a decline or continued decline in polar bear abundance and distribution. AR521182. FWS identified the Southern Beaufort and Chukchi Sea subpopulations in the action area, discussed the most recent available population estimates, and specifically acknowledged that the Southern Beaufort subpopulation has experienced declining survival and abundance, reduced body mass and condition, and reduced recruitment. AR521232. FWS also addressed recovery, explaining that polar bears do not currently meet recovery criteria in at least three ecoregions, including the Polar Basin Divergent ecoregion in which the action area lies. AR521365. Indeed, polar bear populations are expected to decline to small fractions of their historical population sizes based on forecasts of atmospheric gases, Arctic air and sea temperature, and sea-ice extent. AR521199-200. Contrary to Plaintiffs' argument, FWS clearly grappled with future decline.

In fact, FWS properly assessed the Program's effects in the context of these population declines. After considering the status of the species, environmental baseline, effects of the action, and cumulative effects, FWS concluded that Program would not impact the population level or the recovery unit level, or the survival of the Southern

Beaufort or Chukchi Sea subpopulations of polar bears, and therefore, would not affect the persistence of the species in the Polar Basin Divergent ecoregion. AR521305. That conclusion rested on several findings: (1) overall, geographic overlap between the Action Area and designated critical habitat is comparatively small; (2) impacts to the physical features of Sea Ice Habitat are expected to be minor and temporary; (3) permanent impacts to the physical features of Terrestrial Denning and Barrier Island Habitats are expected to be small compared to available Terrestrial Denning and Barrier Island Habitat as a whole; (4) operators will maintain adequate oil spill response capability to effectively respond to oil spills such that both the likelihood and impact of spills would be minimized; and (5) Lease Stipulations and ROPs will be implemented under the Proposed Action to avoid and reduce disturbance to both denning and non-denning polar bears in critical habitat. AR521316-17

Nor did FWS's use of a current population estimate (approximately 26,000 individuals), AR521364-65, make its analysis arbitrary. That estimate is the best available data for quantifying the scale of expected effects. Section 7 requires use of the best available scientific and commercial data; it does not require FWS to generate speculative year-by-year population estimates across an 85-year programmatic planning horizon. *See San Luis*, 747 F.3d at 601-02, 610; *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1147 (9th Cir. 2007). "An agency complies with the best available science standard so long as it does not ignore available studies, even if it

disagrees with or discredits them." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014); *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1081 (9th Cir. 2006) ("Without any evidence in the record that FWS ignored relevant information, we hold that FWS satisfied its duty . . . ."). Here, the NRDC Plaintiffs identify ecoregion-level population trends affecting polar bears, *see* NRDC Br. at 39, but that information does not provide a reliable substitute for predicting how many Southern Beaufort bears, or how many maternal dens in the Program area, will be exposed to particular future activities in specific future years. FWS reasonably used the available population information to evaluate the magnitude of the action's expected effects, while also acknowledging the declining population and recovery status. Plaintiffs fail to demonstrate that FWS ignored any science and fail to demonstrate that agency scientific conclusions are "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

Plaintiffs also overstate the role of the BiOp's percentage comparisons. Contrary to the NRDC Plaintiffs' assertions, NRDC Br. at 39, FWS did not treat the "small percentage" calculation as a stand-alone substitute for a jeopardy analysis. Rather, the percentage comparison was one part of a broader biological analysis that considered the nature, magnitude, duration, and demographic significance of the expected effects. AR521361. To be clear, FWS's no-jeopardy conclusion did not rest merely on comparing cub mortality to a static population number. It rested on FWS's expert

judgment that, even under conservative assumptions, the Program would not appreciably reduce polar bear survival or recovery because: (1) there would be no meaningful impacts to bears in the Chukchi Sea subpopulation; (2) no measurable impact on the growth of the Southern Beaufort subpopulation is anticipated because adult female survival, the determining factor for polar bear subpopulation growth, would not be impacted; (3) cub mortality is expected to affect an extremely small percentage of the Southern Beaufort subpopulation (0.07 percent); and (4) females would be available to breed during the next mating season if she loses her entire litter and could produce another litter during the next denning season. AR521365.

FWS's analysis also must be understood in light of the programmatic nature of the consultation. The BiOp explains that lease issuance does not authorize ground-disturbing activity, and BLM will not approve on-the-ground oil and gas activities until a permittee submits site-specific plans, demonstrates compliance with applicable stipulations and ROPs, and BLM completes further NEPA review and ESA consultation as required. AR521166. The BiOp provides that future step-down actions will be informed by annual meetings between BLM and FWS to review project implementation from the past year, project monitoring data, assessment of impacts, including any known take, and pertinent new information of the listed species. AR521375. And reinitiation is required if new information reveals effects to listed species or critical habitat in a manner or to an extent not considered in the BiOp. *Id.* These programmatic safeguards further refute Plaintiffs'

suggestion that FWS unlawfully premised an 85-year analysis on outdated or static assumptions.

The NRDC Plaintiffs' next argument that FWS "arbitrarily minimizes" the loss of female cubs, NRDC Br. at 41-42, fares no better. FWS expressly identified den disturbance and cub mortality as the "effect of most concern," quantified expected cub losses over the 85-year programmatic timeframe, considered reduced cub-survival probabilities, and then evaluated those effects in light of polar bear demography, the status of the species, the environmental baseline, and cumulative effects. AR521361-66.

In sum, FWS considered the current and projected status of polar bears, used the most recent available population estimates, and explained why the Program would not appreciably reduce the polar bear population. Plaintiffs' disagreement with that expert judgment does not establish an ESA violation. *See Marsh*, 490 U.S. at 378; *San Luis*, 747 F.3d at 601-02.

E. The Record Supports FWS's No Adverse Modification Finding for Polar Bear Critical Habitat in the 2025 BiOp

The ESA requires FWS to make findings on how an agency action impacts the relevant ESA-listed "species" and its designated "critical habitat." 16 U.S.C. § 1536(a)(2), (b)(3)(A). FWS thus applies the statutory mandates to the "species," not individual animals, and to the designated "critical habitat," not individual parcels. *See* 50 C.F.R. § 402.02 (2019) (explaining FWS applies the mandate to critical habitat "as a whole"); FWS2025_00421 (applying 2019 regulatory definition of "destruction or

adverse modification"). Here, FWS properly assessed the Program's potential effects on polar bear critical habitat as a whole and reasonably concluded that the Program will not appreciably reduce the value of designated critical habitat for the survival and recovery of polar bears because: (1) overall, geographic overlap between the Action Area and designated critical habitat is comparatively small (*i.e.,* approximately 1.1 percent of available critical habitat occurs within the Program area); (2) impacts to the physical features of sea-ice habitat are expected to be minor and temporary; (3) permanent impacts to the physical features of Terrestrial Denning and Barrier Island Habitat are expected to be small compared to available Terrestrial Denning and Barrier Island Habitat as a whole; (4) operators will maintain adequate oil spill response capability; and (5) and lease stipulations and ROPs will be implemented to avoid and reduce disturbance to both denning and non-denning polar bears in critical habitat. AR521316-17.

The Gwich'in Plaintiffs argue that FWS violated Section 7(a)(2) by assessing the potential for adverse modification to polar bear critical habitat "as a whole" because they contend FWS should make the "destruction or adverse modification" determination as applied to some smaller portion of a critical habitat. Gwich'in Br. at 56-57. The Gwich'in Plaintiffs' argument is not supported by the text of Section 7(a)(2) and ignores settled interpretations that confirm the legality of FWS's definition of "Destruction or adverse modification" at 50 C.F.R. § 402.02.[11]

[11] As noted *supra*, a federal district court recently vacated some provisions of the FWS's ESA Section 7 regulations, including the definition of "destruction or adverse

ESA Section 7(a)(2) provides that: "Each Federal agency shall . . . insure that any action authorized, funded, or carried out by such agency . . . is not likely to . . . result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical." 16 U.S.C. § 1536(a)(2). Congress also addressed application of the adverse modification prohibition in Section 7(b)(3) of the Act. That Section provides that, following completion of the consultation process, FWS "shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." *Id.* § 1536(b)(3)(A). Contrary to the Gwich'in Plaintiffs' arguments, ESA provides that the adverse modification prohibition must be applied to the entirety of a species' critical habitat, not arbitrary subunits. In ESA Section 7, Congress described the "jeopardy" and "adverse modification" prohibitions in the same statutory section, and in the same statutory phrase. *Id*. § 1536(a)(2). The statutory "jeopardy" inquiry provides that Federal agencies shall insure that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species." *Id.* Congress framed the jeopardy inquiry around protecting "species," which includes all individual animals that

---

modification" at 50 C.F.R. § 402.02. *See Ctr. for Biological Diversity*, 2026 WL 898264, at *25. The Gwich'in Plaintiffs do not assert that decision must be given retroactive effect to invalidate FWS's BiOps here, and in any event the record here supports FWS's conclusions regarding adverse modification regardless of which regulatory definition is applied.

are part of the taxonomic "species" or "subspecies," or part of the distinct population segment listed under the Act. *See id.* § 1532(6), (16), (20) (defining "endangered species," "species," and "threatened species"). Congress applied the same structure to the adverse modification prohibition—the mandate applies to a "critical habitat" designation, not individual parcels within the designation.

Specifically, ESA Section 7 speaks in terms of a species' "critical habitat" or, alternatively, the "habitat of such species which is determined . . . to be critical." *Id.* § 1536(a)(2), (b)(3)(A). Congress's use of the statutorily defined term "critical habitat" is vitally important. Congress defined "critical habitat" using inclusive language as:

> (i) the specific areas within the geographical area occupied by the species, at the time it is listed . . ., on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and (ii) specific areas outside the geographical area occupied by the species at the time it is listed . . . upon a determination by the Secretary that such areas are essential for the conservation of the species.

*Id.* § 1532(5)(A)(i), (ii). The "critical habitat" definition thus establishes that all "specific areas" of habitat that FWS designates as critical habitat are collectively a single unit.

Viewing the adverse modification prohibition in context with the definition of critical habitat, FWS must, for each agency action under review, make a single determination of whether that agency action is likely to result in adverse modification as a whole of the "specific areas" collectively designated by FWS as the species' critical habitat. Congress did not, by contrast, instruct FWS to issue separate "destruction or

adverse modification" determinations for each "specific area" of a critical habitat designation that may be affected by the agency action.

FWS has long interpreted and implemented the "destruction or adverse modification" in this same way, as shown by a 2016 amendment to the same regulatory definition of "destruction or adverse modification." FWS explained that its determination of destruction or adverse modification "places an emphasis on the value of the designated critical habitat as a whole for the conservation of a species, in light of the role the action area serves with regard to the function of the overall designation." 81 Fed. Reg. 7214, 7221-22 (Feb. 11, 2016). The ESA Consultation Handbook also makes the same point. Consultation Handbook at 4-36. That is, FWS makes a destruction or adverse modification determination "at the scale of the entire critical habitat designation" after considering how any impacts at the smaller scale of an action area, critical habitat unit, or other more limited scale translate to the whole designated critical habitat and the specific functions it serves. 83 Fed. Reg. at 35180-81.

FWS thus complies with Section 7 by making two comparable findings: (1) a jeopardy determination "at the scale of the entire listed entity," and (2) a determination of destruction or adverse modification "at the scale of the entire critical habitat designation." 81 Fed. Reg. at 7222; *see also* 83 Fed. Reg. 35178, 35181 (July 25, 2018) (same); 84 Fed. Reg. 44976, 44984 (Aug. 27, 2019) (same). In adding the phrase "as a whole" to the regulatory definition in 2019, FWS sought only to express what had always been FWS's

approach. 83 Fed. Reg. at 35181. In other words, the 2019 rule provided an incremental clarification of its 2016 rule and prior practice, but did not make any substantive change. 84 Fed. Reg. at 44982. The 2024 regulations continued this approach. 89 Fed. Reg. 24268, 24290-91 (Apr. 5, 2024). Thus, consistent with FWS's longstanding interpretation of the ESA and its regulations, the FWS's consideration of effects on critical habitat "as a whole" would have been the same regardless of whether some earlier version of the regulations had been in effect.

FWS's approach of analyzing effects on critical habitat "as a whole" has been upheld by the Ninth Circuit, which cited favorably to FWS's Consultation Handbook in holding that a "determination that critical habitat would be destroyed was thus not inconsistent with [a] finding of no 'adverse modification.'" *Butte Env't Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936, 947-48 (9th Cir. 2010). This affirmation of FWS's analysis of impacts to critical habitat at both local and national scales demonstrates that FWS's definition of adverse modification as applied in the 2025 BiOp is consistent with ESA Section 7. *See also Rock Creek All. v. U.S. Fish & Wildlife Serv.*, 663 F.3d 439, 442 (9th Cir. 2011) (the agency "did not err by conducting a large-scale analysis"). This case law also refutes the proposition that any small-scale or localized destruction of critical habitat is necessarily prohibited by the Act. While such localized habitat destruction is an issue to be considered, it can be reasonably considered in the context of its impact on the critical habitat of the species as a whole.

Nevertheless, the Gwich'in Plaintiffs argue that FWS's focus on critical habitat as a whole may overlook localized impacts including the highest-density denning areas of Unit 2. Gwich'in Br. at 58 (citing *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fishers. Serv.,* 265 F.3d 1028, 1035-37 (9th Cir. 2001)). To the extent FWS is obligated to consider localized habitat destruction, the record here confirms that FWS established a procedure to consider such effects to the extent practicable within the confines of a programmatic BiOp. Because BLM and the lessees will implement conservation measures with the intent to avoid and minimize adverse effects to polar bears, FWS reasonably concluded that impacts to denning habitat would be minimized. AR521314 (listing nine reasons). As specific step-down projects are proposed in this multi-stage oil and gas Program, more precise information about the nature and extent of the activities – including the scale and location of the activities and a description of the particular technologies to be employed – will be considered and evaluated in step-down ESA consultations and other analyses (e.g., NEPA) as appropriate. AR521166-67. FWS reasonably concluded that the Program will not result in the destruction or adverse modification of polar bear critical habitat.

Finally, the Gwich'in Plaintiffs are incorrect that FWS's evaluation of critical habitat "as a whole" prevents analysis of the role affected critical habitat may play in polar bear recovery. Gwich'in Br. at 56. Plaintiffs' argument point ignores that the regulatory definition of "destruction or adverse modification" expressly requires

consideration of "the value of critical habitat as a whole for the conservation of a listed species," a concept defined by statute as implicating recovery. 50 C.F.R. § 402.02; 16 U.S.C. § 1532(3) (defining "conservation"); 84 Fed. Reg. at 44982 (discussing how consequences for recovery feature in a "destruction or adverse modification" determination). In both the 2016 and 2019 rules, FWS responded to a comment seeking separate definitions, explaining that the "key distinction is whether the action appreciably diminishes the value of critical habitat for the conservation of the species, not whether the action destroys critical habitat or adversely modifies it." 81 Fed. Reg. at 7221; 84 Fed. Reg. at 44981 (same). Thus, FWS's longstanding interpretation of the term "adverse modification" includes consideration of how destruction of smaller tracts of critical habitat may impair the overall function of critical habitat for a species and its recovery.

The record here confirms that FWS considered how destruction of smaller tracts of critical habitat may impair the overall function of critical habitat for the polar bear and its recovery. With respect to Unit 2 denning habitat in the Program Area, FWS accounted for both physical effects to suitable denning habitat and also disturbance of polar bears. FWS determined that the permanent alteration of Terrestrial Denning Habitat would be limited in geographic scope to 2,000 acres but would likely impact an even smaller subset of suitable denning habitat. AR521310-11. As to disturbance impacts, FWS concluded that the overall impacts of disturbance resulting from the Proposed Action on suitable terrestrial denning habitat in the Program Area would be minimal such that Unit 2 would

still provide sufficient denning opportunities despite disturbance introduced by future Program activities. AR521312. FWS reasonably concluded that Program activities would not appreciably reduce the value of designated critical habitat for the survival and recovery of polar bears. AR521316-17.

In sum, the Gwich'in Plaintiffs' suggested interpretation of the "adverse modification" inquiry as focused on consequences for portions or discrete areas of a larger critical habitat is at odds with Section 7's plain language and the broader statutory scheme. The "best reading" of the ESA confirms that Congress provided that FWS shall make a "destruction or adverse modification" determination as applied to a species' entire critical habitat designation, not individual parcels of habitat within that broader designation.

**VIII. BLM Reasonably Relied on the FWS BiOps**

In addition to challenging the merits of FWS's decision to issue its 2020 and 2025 BiOps for the ANWR oil and gas leasing program, Plaintiffs also allege that BLM unlawfully relied on the BiOps for its various decisions. *See* Gwich'in Br. at 59; NRDC Br. at 35. Again, as an initial matter, all of the BLM decisions supported by the 2020 BiOp have been superseded by decisions that rely on the 2025 BiOp, including the 2025 Program ROD and the subsequent decision to affirm the issuance of AIDEA's leases.

Such claims alleging ESA "violations" by an action agency arise under the citizen-suit provision of the ESA, 16 U.S.C. § 1540(g)(1), which authorizes injunctive actions

against any person "who is alleged to be in violation" of the ESA or its implementing regulations. *Bennett,* 520 U.S. at 171.

In light of the BiOp's determination that the ANWR oil and gas leasing program is not likely to jeopardize polar bears or any other ESA-listed species, *see* FWS2025_606-11, to succeed on their claim Plaintiffs must point to "new information" that the consulting agency did not take into account. *Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990). Yet Plaintiffs do not assert any new information that calls into question the factual conclusions of the 2025 BiOp. Moreover, for the reasons set forth above, the BiOp is fully supported by the record. Therefore, BLM reasonably relied on the 2025 BiOp when it issued its 2025 ROD, and the Court should grant summary judgment to Defendants on Plaintiffs' ESA claims.

## IX. Remedy

While Plaintiffs are not entitled to any relief, they maintain the Court should apply the "presumptive remedy" of vacatur. *See* Gwich'in Br. at 59-61; NRDC Br. at 45-46. But there are numerous reasons why the remedy analysis, if necessary, should not result in vacatur of the 2025 ROD or any other decision.

Of course, vacatur is not automatic, because when "equity demands," courts may leave in place an agency action "while the agency follows the necessary procedures to correct" its error. *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (citation modified). Whether agency action should be vacated depends on several factors,

including "how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Id*. (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).

The equities here weigh heavily against vacating any of the challenged agency actions because the President has declared a national energy emergency. *See* Exec. Order No. 14156 (Jan. 20, 2025), *reprinted in* 90 Fed. Reg. 8433 (Jan. 29, 2025). A reliable, diversified, and affordable supply of energy is crucial to supporting America's economic and national security. *Id.* And the EO specifically directs facilitation of "leasing" domestic energy resources. *Id*. at 8434; *see also* Exec. Order No. 14153 (Jan. 20, 2025), *reprinted in* 90 Fed. Reg. 8347 (Jan. 29, 2025) (declaring the policy of the United States to "expedite the permitting and leasing of energy and natural resource projects in Alaska"). Further, these policies are reinforced by the OBBBA, where Congress has more specifically directed the resumption of Coastal Plain lease sales, and that the agency issue leases with the terms and conditions stated in the 2020 ROD, which are mirrored in the 2025 ROD. *See* OBBBA § 50104. Finally, even if the 2025 ROD were vacated, that would typically result in the prior agency action – here, the 2024 ROD – coming into effect. But implementing the Program under the 2024 ROD is not possible because the Congressional disapproval essentially makes the 2024 ROD a legal nullity. Vacatur would create disruptive consequences by impeding lease sales and exploration activities during a national energy emergency. Given the inherent connection between energy

security and national security, the Court should, at most, remand without vacatur to avoid these disruptive consequences.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' motions, grant Defendants' cross-motions, enter judgment for Defendants, and dismiss these cases with prejudice.

Respectfully submitted.

DATED: July 17, 2026.

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

*/s/ Mark Arthur Brown*
MARK ARTHUR BROWN (Florida Bar No. 0999504)
Senior Trial Attorney
Wildlife & Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3103
mark.brown@usdoj.gov

*/s/ Paul A. Turcke*
PAUL A. TURCKE (Idaho Bar No. 4759)
Trial Attorney
Natural Resources Section
1290 West Myrtle Street, Suite 500
Boise, ID 83702
202-532-5994
paul.turcke@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.4(a)(3), I hereby certify that this memorandum complies with the type-volume limitation of Local Civil Rule 7.4(a)(1) as modified by applicable orders issued by or requested from the Court because this memorandum contains 17,629 words, excluding the parts exempted by Local Civil Rule 7.4(a)(4).

*/s/ Paul A. Turcke*
Paul A. Turcke

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2026, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.

*/s/ Paul A. Turcke*
Paul A. Turcke